UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY,<br><br>*Plaintiff*,<br><br>-against-<br><br>THE DRAMATIC PUBLISHING COMPANY,<br><br>*Defendant,*<br><br>and<br><br>AARON SORKIN,<br><br>*Involuntary Party/Nominal Defendant*. | Case No.:<br><br>**COMPLAINT** |

Plaintiff Atticus Limited Liability Company ("Atticus"), by and through its counsel Loeb & Loeb LLP, as and for its Complaint against Defendant Dramatic Publishing Company ("DPC") and Involuntary Party/Nominal Defendant Aaron Sorkin ("Sorkin"), alleges as follows:

## NATURE OF THE ACTION

1. Atticus and Aaron Sorkin are, respectively, the production company and playwright responsible for the Broadway adaptation of *To Kill a Mockingbird*, one of the highest-grossing plays in Broadway history (the "Sorkin Play"), based on the Harper Lee novel that was recently voted in a *New York Times* survey to be the best book of the past 125 years and has for decades been required reading for virtually every student in the United States. This action arises out of DPC's erroneous claim that the acclaimed Aaron Sorkin adaptation cannot be staged by any regional, local or community theaters, colleges, high schools, churches, clubs or any other amateur groups anywhere in the United States, including performances via a planned non-Equity tour that will bring the Sorkin Play to theaters across the country.

22886021

2. DPC's claim is based upon its copyright ownership to a prior stage adaptation of the novel written by its then-President Christopher Sergel (the "Sergel Play"), and a 1969 grant by Harper Lee that conferred DPC with exclusive rights to stage so-called "stock" and "amateur" productions of the novel. In April 2011, Ms. Lee, through her counsel, served a notice pursuant to the Copyright Act's termination provision (17 U.S.C. § 304(c)), unequivocally terminating DPC's exclusive rights to stage such productions as of April 2016, subject to DPC's continuing *non*exclusive rights to stage and license the Sergel Play. Thereafter, Ms. Lee granted a license to Atticus's predecessor-in-interest to create and present, among other types of performances, stock and amateur productions of a new adaptation of the novel—*i.e.*, the Sorkin Play.

3. Accordingly, amateur organizations in the United States are now able to obtain licenses for and stage productions of *both* the Sorkin Play and the Sergel Play. DPC contends otherwise, based on a reading of the Copyright Act's termination provision that defies all logic (and the English language), but that a single arbitrator in a separate proceeding has held to be reflective of Congress's intent: that *exclusive* grants of copyright interests are *interminable*. That is obviously wrong. *See* 17 U.S.C. § 304(c) ("the **exclusive** or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, … is subject to termination under the following conditions …"). Indeed, in the 40-plus years since authors' termination rights were enshrined in the Copyright Act of 1976, *no* court has ever held—or even implied—that an exclusive license lasts in perpetuity following a valid termination.

4. Whatever the effect of this erroneous ruling as between the actual parties to the arbitration—DPC and the Estate of Harper Lee—it has no relevance to Atticus or Sorkin, neither of whom were parties thereto, and both of whom acquired their rights to write and produce the Sorkin Play years before the erroneous ruling was issued. Pursuant to these rights, and by

operation of U.S. copyright law, regional and community theaters, as well as countless high schools and colleges, have the ability to license and perform the Sorkin Play.  DPC's position—based on a complete misreading of Copyright Act by a single arbitrator in a private arbitration—would deprive *all* of these entities of that opportunity, despite none of them having been parties to the arbitration either, and limit the pool of theatergoers able to enjoy the Sorkin Play to only those fortunate enough to see it on Broadway, the West End or in other so-called "first-class" productions.

5. DPC's position—that it continues to maintain "worldwide *exclusive* rights to all non-first-class theater or stage rights in *To Kill a Mockingbird*"[1] (emphasis added)—has necessitated this action, seeking declaratory judgment that Atticus and Sorkin have the right, along with DPC, to stage and license their respective adaptations of the cherished Harper Lee novel in regional and local theaters in the United States.

## THE PARTIES

6. Plaintiff Atticus Limited Liability Company is a New York limited liability company with its principal place of business in New York, New York.

7. Upon information and belief, Defendant Dramatic Publishing Company is an Illinois corporation with its principal place of business in Woodstock, Illinois.

8. Involuntary Party/Nominal Defendant Aaron Sorkin is a natural person who, upon information and belief, resides in Los Angeles, California.  By virtue of Sorkin's copyright ownership of the Sorkin Play, Sorkin is a necessary party to this action, and has been joined in this action pursuant to Fed. R. Civ. P. 19(a) following due request that he join this action as a plaintiff.

---

[1] *See* https://www.dramaticpublishing.com/updated-to-kill-a-mockingbird-statement.

**JURISDICTION AND VENUE**

9. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1338(a), as this case arises under the Copyright Act, 17 U.S.C. § 101 *et seq.*, and the declaratory relief sought herein requires an interpretation of the Copyright Act.

10. The Court has personal jurisdiction over DPC and Sorkin because, among other things, each of them may be found in New York, does systematic and continuous business in New York and/or has performed acts directed at New York which give rise to this action, including, without limitation, staging, licensing and/or attempting to stage or license the Sergel Play and the Sorkin Play, respectively, for production in New York.

11. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b) and 1400(a).

**FACTUAL ALLEGATIONS**

**THE TERMINATION OF DPC'S EXCLUSIVE LICENSE
PURSUANT TO THE COPYRIGHT ACT'S PLAIN TERMS**

12. Since its publication in 1960, Harper Lee's *To Kill a Mockingbird* (the "Novel")—the winner of the Pulitzer Prize in 1961—has become one of the most cherished novels in American literature. So widely read and appreciated is the Novel that, in a December 2021 *New York Times* survey of its readers (https://www.nytimes.com/interactive/2021/12/28/books/best-book-winners.html), it was voted the "Best Book of the Past 125 Years" over other acclaimed novels such as J.R.R. Tolkien's *Fellowship of the Ring*, George Orwell's *1984*, and Toni Morrison's *Beloved*.

13. In 1969, Lee entered into an agreement with DPC (the "DPC Grant") granting DPC exclusive "amateur acting rights" in the Novel, defined in relevant part as "all performance rights for little theatres, community theatres and/or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or

4

connected therewith, together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first-class touring production rights" (collectively, "Stock and Amateur Productions").

14. DPC subsequently commissioned the Sergel Play. In the decades since it was written, DPC has licensed the Sergel Play for Stock and Amateur Productions throughout the United States, including in theaters throughout New York.

15. In April 2011, Lee served a notice of termination on DPC pursuant to Section 304(c) of the Copyright Act, 17 U.S.C. § 304(c).

16. This provision of the Copyright Act confers authors and their heirs with the right to terminate any "exclusive or nonexclusive" copyright grant that, like the 1969 DPC Grant, was executed before 1978. An author's right of termination is absolute and inalienable, and "may be effected notwithstanding any agreement to the contrary." 17 U.S.C. § 304(c)(5). In other words, as courts in this and every other Circuit have explained, "the clear Congressional purpose behind § 304(c) was to prevent authors from waiving their termination right by contract." *Marvel Characters v. Simon*, 310 F.3d 280, 290 (2d Cir. 2002).

17. And, in light of its purpose to allow authors to recapture copyright ownership in their works, this termination right of course applies to any "transfer of copyright ownership," including exclusive licenses like the DPC Grant. *See* 17 U.S.C. § 101 ("A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.").

18.     Notwithstanding the termination of the DPC Grant, the Copyright Act permits DPC to continue to exploit the Sergel Play for the purposes set forth in the DPC Grant, pursuant to the so-called "Derivative Works Exception." *See* 17 U.S.C. § 304(c)(6)(A) ("a derivative work prepared under authority of the grant [of a license] before its termination may continue to be utilized under the terms of the grant after its termination").

19.     However, the transfer of copyright ownership effected by the DPC Grant—*i.e.* the *exclusive* right to create and perform Stock and Amateur Productions adapted from the Novel—was unquestionably terminated as a matter of unambiguous federal copyright law. The Copyright Office agrees. *See* https://www.copyright.gov/recordation/termination.html ("A derivative work prepared pursuant to a grant before its termination may continue to be utilized under the terms of the grant after its termination, but the post-termination rights … to prepare new derivative works revert to the authors or their heirs").

## ATTICUS'S AND SORKIN'S RIGHTS TO THE SORKIN PLAY

20.     By agreement dated June 29, 2015 (the "No Ice Grant"), Harper Lee granted to No Ice, Inc. (f/k/a Rudinplay, Inc.) the exclusive stage rights to the Novel for purposes of creating a new derivative stage adaptation.

21.     In light of DPC's continuing post-termination right to exploit the Sergel Play in Stock and Amateur Productions, however, the No Ice Grant provided that the rights to Stock and Amateur Productions conferred thereby would be nonexclusive:

> Producer acknowledges that pursuant to an agreement (the "Prior Agreement") dated June 26, 1969 between Author and The Dramatic Publishing Company ("DPC"), Author granted DPC the right to create a play (the "Prior Adaptation") based on the Novel, and to exploit the amateur acting rights (as defined in the Prior Agreement) in the Prior Adaptation. Author represents that it has terminated the Prior Agreement effective April 26, 2016. Producer acknowledges that, notwithstanding such termination, the amateur acting rights to the Prior Adaptation can continue to be exploited following such termination under the terms of the Prior

6

  Agreement on a non-exclusive basis in the United States, and on an exclusive basis elsewhere. The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination.

  22. The consideration paid by No Ice was thus expressly given in exchange for the right to exploit, on a nonexclusive basis, the stage rights to Stock and Amateur Productions that had been the subject of the DPC Grant, together with the other exclusive stage rights set forth in the No Ice Grant.

  23. No Ice thereafter engaged Sorkin, one of the leading theater, film and television writers in America, as the playwright for this new derivative stage adaptation of the Novel. Sorkin is well-known and widely acclaimed for his work, having won multiple Academy Awards, Golden Globe Awards, Emmy Awards and other recognitions for critically and commercially successful works like *The Social Network*, *Molly's Game*, *Steve Jobs*, *Moneyball*, *The American President*, *A Few Good Men* and *The West Wing*.

  24. Accordingly, No Ice and Sorkin entered into an agreement dated January 19, 2017, consisting of the Approved Production Contract for Plays (a form agreement promulgated by the Dramatists Guild of America) and a rider amending and supplementing its standard terms (collectively, the "Sorkin Agreement").

  25. As set forth in the Sorkin Agreement, Sorkin is the "sole and exclusive Author, owner and the copyright proprietor of the [Sorkin] Play and of all rights of every kind or nature therein."

  26. Pursuant to the Sorkin Agreement, certain copyright interests with respect to the Sorkin Play were granted to No Ice, including the exclusive right to produce and present the following categories of productions:

- "First Class Performances," defined to include "live stage productions of the [Sorkin] Play on the speaking stage, … under Producer's own management, in a

    regular evening bill in a first class theatre in a first class manner, with a first class cast and a first class director," as well as "first class 'bus and truck' tours of the Play";

- "Off-Broadway Performances," defined as "performances of the [Sorkin] Play in theatres which are classified as Off-Broadway pursuant to the Actors Equity Association Agreement Governing Employment Off-Broadway, as that agreement may be amended from time to time";[2] and

- "Second Class Performances," defined as "all performances of the Play other than Stock, Amateur and Ancillary Performances . . . , Off-Broadway Performances . . . , and First Class Performances and Developmental (i.e., 'workshop') Productions," as well as "second class 'bus and truck' tours of the [Sorkin] Play, **including without limitation non-Equity tours**" (emphasis added).

27. No Ice, in its capacity as producer, is further entitled to financial participations from the exploitation of "Subsidiary Rights," defined to include "Stock Performances," "Amateur Performances," and "Ancillary Performances." In that regard, Sorkin is obligated to "use best efforts to exploit the [Sorkin] Play for [such] Subsidiary Rights purposes."

28. By agreement dated December 12, 2018, No Ice assigned all of the foregoing rights to Atticus, including all relevant rights previously held by No Ice pursuant to the No Ice Grant and the Sorkin Agreement. Accordingly, Atticus holds the exclusive rights to produce, *inter alia*, Equity and non-Equity tours, as well as financial participations in Stock, Amateur and Ancillary Performances that Sorkin is obligated to use best efforts to exploit.

---

[2] Actors' Equity Association is the labor union representing American actors and stage managers in the theater industry. See https://www.actorsequity.org/.

29. The production of the Sorkin Play premiered at the Shubert Theatre on Broadway in December 2018. In addition to lending Sorkin's unique voice throughout his adaptation of the Novel, the Sorkin Play incorporates various structural and narrative changes, including, for example, introducing the climactic trial of Tom Robinson at the outset of the story and returning to it at intervals throughout the play; offering narration through three disparate characters rather than through Scout alone; and giving Tom and Calpurnia, the Novel's two primary Black characters, more prominent roles and greater agency. In short, other than elements derived from the underlying Novel, the Sorkin Play is markedly different from the Sergel Play, which hews far more closely to the structure of the Novel.

30. The Sorkin Play received near-universal acclaim following its premiere. The *New York Times*, for example, called Sorkin's changes "effective, exhilarating even," and the *Los Angeles Times* lauded the Sorkin Play as "provocatively fresh."[3] The production was so successful that it garnered nine Tony Award nominations (and one win), and, after mere months, became one of the highest-grossing plays in Broadway history.

31. The success of the Broadway production has spawned numerous opportunities to exploit the Sorkin Play, including, for example, a West End production currently running at London's famed Gielgud Theatre, as well as tours and sit-down productions throughout the United States. Among these are a planned non-Equity tour that will visit a multitude of theaters throughout the country and, separately, an offer by Samuel French, a Concord Theatricals Company, to license the stock and amateur rights so as to allow an untold number of other local

---

[3] *See* https://www.nytimes.com/2018/12/13/theater/to-kill-a-mockingbird-review-jeff-daniels.html; https://www.latimes.com/entertainment/arts/theater/reviews/la-et-cm-to-kill-mockingbird-broadway-review-20181213-story.html.

and community theaters, colleges, high schools, churches and drama clubs to stage their own performances of the acclaimed Aaron Sorkin adaptation.

### DPC'S RELIANCE ON AN ARBITRAL AWARD TO WRONGLY CLAIM *EXCLUSIVE* RIGHTS TO PRESENT NON-FIRST CLASS STAGE PRODUCTIONS OF THE NOVEL

32. On or about February 3, 2022, DPC issued a press release claiming that, pursuant to an award issued in a single-person arbitration against the Estate of Harper Lee, DPC "has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird*." (*See* https://www.dramaticpublishing.com/updated-to-kill-a-mockingbird-statement). This pronouncement is accompanied by a link to a "Final Award of Arbitrator," dated January 28, 2022, and attaching an "Interim Award of Arbitrator (Corrected)," dated October 21, 2021.

33. According to this "Interim Award," notwithstanding Harper Lee's termination of the DPC Grant, the Arbitrator ruled:

- "**The terms of the original grant in the 1969 Agreement [*i.e.*, the DPC Grant] survive termination. Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ('non-first-class rights')** and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights." (Interim Award at 6, ¶ 10) (emphasis added).

- "The [Harper Lee] Estate … shall be enjoined from (i) licensing or granting any third party, including, but not limited to, Scott Rudin ('Rudin') and Rudinplay, Inc., Atticus LLC, any other entity owned, controlled or operated by Scott Rudin, and any entity assigned or licensed rights from

10

Rudinplay (collectively referred to herein as 'Rudinplay Affiliates'), any non-first-class stage rights in *To Kill a Mockingbird*; [and] (iii) encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing of Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production throughout the world …."

(*Id.* at 6, ¶ 13).

34. In sum, the Interim Award purported to rule that authors such as Harper Lee have *no* right to terminate grants of exclusive rights under the Copyright Act, and went so far as to actively enjoin Harper Lee's heirs from exploiting the rights she had recaptured by her April 2011 termination notice. This of course is contrary to the plain and unambiguous language of the Copyright Act's termination provisions, its fundamental purpose in permitting authors to terminate exclusive grants, and uniform decisional authority across all federal jurisdictions giving effect to its purpose and language.

35. The Interim Award further purported to adjudicate the rights of Atticus, its predecessor-in-interest No Ice, and No Ice's President Scott Rudin (collectively referred to as "Rudin")—**none of whom were parties to the arbitration**—concluding that "Rudin has no stock and amateur rights for live theatrical productions of [*To Kill a Mockingbird*]."

36. This is directly at odds with the No Ice Grant, in which Harper Lee, years before the issuance of this arbitral award, represented that DPC's rights to exploit the Sergel Play for Stock and Amateur Productions was on a "non-exclusive basis" only, and expressly granted No Ice *all* other stage rights to exploit a dramatic adaptation of the Novel (*i.e.,* the Sorkin Play)— including for Stock and Amateur Productions.

11

37. DPC's reliance on this arbitral award, and its publicly stated intent to exploit and enforce these purportedly "exclusive" rights, has threatened and jeopardized Atticus's ability to exploit its production rights to the Sorkin Play, including for Second-Class Performances (as defined in the Sorkin Agreement) like the non-Equity tour that will bring the Sorkin Play to theaters around the country.

38. It has also precluded the consummation of the agreement with Samuel French to present the Sorkin Play to a much larger swath of local, community, university and high school theatergoers to whom DPC wrongly claims to have the *sole* right to present a dramatic adaption of one of the most cherished works of American literature.

## FIRST CLAIM
### (Declaratory Judgment)

39. Atticus incorporates by reference each of the allegations set forth in the preceding paragraphs of this Complaint as though set forth fully herein.

40. Pursuant to the Sorkin Agreement, Atticus and/or Sorkin hold the exclusive right to present Second-Class, Stock, Amateur and Ancillary Performances (as those terms are defined in the Sorkin Agreement) of the Sorkin Play derived from the Novel.

41. DPC claims that it holds the "exclusive" rights to present all "non-first-class" productions derived from the Novel, pursuant to the arbitral award issued in a proceeding to which neither Atticus nor Sorkin were party.

42. An actual and justiciable controversy has arisen and now exists between Atticus and Sorkin, on the one hand, and DPC, on the other hand, regarding whether DPC owns *exclusive* rights to present "non-first class" productions of *any* derivative work based on the Novel or, as Atticus contends, that Atticus and Sorkin have sufficient rights to present such productions of the Sorkin Play, for which Atticus has no adequate remedy at law.

43. As a result of the foregoing, a declaration is necessary and appropriate because a substantial controversy exists between the parties having adverse legal interests as to their respective rights to derivative stage adaptations of the Novel—namely, the Sergel Play and the Sorkin Play. The dispute is of sufficient immediacy and reality to warrant the issuance of a declaratory judgment.

44. Declaratory judgment in this action would serve a useful purpose in clarifying and settling the respective rights and obligations of the parties and would finalize the controversy by according Atticus relief from uncertainty and insecurity with respect to non-first class productions of the Sorkin Play.

45. Atticus thus requests declaratory judgment that: (1) Atticus and Sorkin have the right, in relation to DPC, to present any and all Second-Class, Stock, Amateur and Ancillary Performances (as those terms are defined in the Sorkin Agreement) of the Sorkin Play in the United States; and (2) any such productions of the Sorkin Play have not infringed and could not infringe any purported copyright interest DPC claims to hold to the Novel.

## **DEMAND FOR A JURY TRIAL**

Plaintiff hereby requests a jury trial upon the claims and matters so triable.

## **PRAYER FOR RELIEF**

**WHEREFORE**, Atticus respectfully requests judgment as follows:

a) Adjudging and declaring that: (1) Atticus and Sorkin have the right, in relation to DPC, to present any and all Second-Class, Stock, Amateur and Ancillary Performances (as those terms are defined in the Sorkin Agreement) of the Sorkin Play in the United States; and (2) any such productions of the Sorkin Play have not

infringed and could not infringe any purported copyright interest DPC claims to hold to the Novel.

b) Awarding Atticus its costs and reasonable attorneys' fees; and

c) Awarding such other and further relief as this Court deems just and proper.

Dated: November 30, 2022
New York, New York

                LOEB & LOEB LLP

                By: */s/ Jonathan Zavin*
                     Jonathan Zavin
                     Wook Hwang
                     Frank D. D'Angelo
                     345 Park Avenue
                     New York, New York 10154
                     Tel: (212) 407-4000
                     Fax: (212) 407-4990

                *Attorneys for Atticus Limited Liability Company*