**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

ATTICUS LIMITED LIABILITY COMPANY,

        *Plaintiff,*

   and

AARON SORKIN,

        *Involuntary Plaintiff,*

   -against-

THE DRAMATIC PUBLISHING COMPANY,

        *Defendant.*

Case No. 1:22-cv-10147-DLC

**DEFENDANT DRAMATIC PUBLISHING COMPANY'S MEMORANDUM IN**
**<u>SUPPORT OF ITS MOTION TO DISMISS ATTICUS LLC'S COMPLAINT</u>**

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................................iii

LEGAL STANDARD ........................................................................................................4

BACKGROUND ...............................................................................................................5

    A.    Harper Lee makes a series of promises to Dramatic. .............................................5

    B.    Ms. Lee honors her promises for almost 46 years. .............................................6

    C.    Ms. Lee serves a notice of termination on Dramatic. .........................................7

    D.    Ms. Lee's signature appears on the 2015 Letter Agreement. ...............................7

    E.    Egged on by Rudin, Ms. Lee's handlers start breaking her promises....................8

        1.    The bogus "opinion." .................................................................................9

        2.    The pre-arbitration threats .........................................................................10

    F.    The proceedings. .............................................................................................11

ARGUMENT....................................................................................................................12

    A.    The Copyright Act's express terms bar this action. ..........................................12

    B.    The Rudinplay Affiliates are bound by Harper Lee's promises. .........................13

    C.    Plaintiff's claim is barred by the doctrine of res judicata. .................................16

    D.    The Rudinplay Affiliate's allegations concerning Section 304(c) of the Copyright Act have no merit. ....................................................................................................................19

        1.    The plain language of the statue applies to "exclusive" grants. ...................20

        2.    The Rudin Affiliates misread the language and intent of the Act...................21

CONCLUSION..................................................................................................................24

## TABLE OF AUTHORITIES

**Cases**

*Artist Rights Enforcement Corp. v. Estate of Benjamin E. King,*
    224 F. Supp. 3d 231, 236 (S.D.N.Y. 2016) ................................................................13

*Ashcroft v. Iqbal,* 556 U.S. 662, 678 (2009) ...........................................................................4

*Ass'n of Contracting Plumbers of the City of New York v. Local Union 2,*
    841 F.2d 461, 467 (2d Cir.1988) ..............................................................................19

*Bankers Life & Casualty Insurance Co. v. CBRE, Inc.,* 830 F.3d 729, 732 (7th Cir. 2016) ..........................14

*Baxter Int'l, Inc. v. Abbott Labs.,* 315 F.3d 829, 831 (7th Cir. 2003) ..............................................15

*Bell Atl. Corp. v. Twombly,* 550 U.S. 544, 555 (2007) ..............................................................4

*Board of Governors of Federal Reserve System v. Dimension Financial Corp.,*
    474 U.S. 361, 373-74 (1986) ......................................................................................24

*Chase Manhattan Bank, N.A. v. Celotex Corp.,* 56 F.3d 343, 346 (2d Cir. 1995) ...............................17

*Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.,* 467 U.S. 837, 842-44 (1984).......................23

*Chicago Title Land Trust Co. v. Potash Corp.,* 664 F.3d 1075, 1079 ( 7th Cir. 2011) .................17

*Citigroup, Inc. v. Abu Dhabi Inv. Auth.,* 776 F.3d 126, 128 n.1 (2d Cir. 2015).........................16

*Condit v. Dunne,* 317 F.Supp.2d 344, 357 (S.D.N.Y.2004) ..........................................................5

*Cortec Indus. Inc. v. Sum Holding LP,* 949 F.2d 42, 47–48 (2d Cir. 1991). ........................................4

*Davis v. Blige,* 505 F.3d 90 (2d Cir. 2007)..............................................................2, 14, 18

*DC Comics v. Pacific Pictures Corp.,* 2012 WL 4936588, *10 (C.D. Cal. 2012) ...........................13

*Dean Witter Reynolds, Inv. v. Byrd,* 470 U.S. 213, 22-21 (1985) ..................................................16

*Dolan v. U.S. Postal Service,* 546 U.S. 481, 486 (2006) ..............................................................21

*Eastern Associated Coal Corp. v. United Mine Workers,* 531 U.S. 57, 62 (2000) ...........................15

*Ferris v. Cuevas,* 118 F.3d 122, 126 (2d Cir.1997)
    (quoting *Watts v. Swiss Bank Corp.,* 317 N.Y.S.2d 315, 320 (N.Y.1970) ........................17

*Gilliam v. American Broadcasting Companies, Inc.,* 538 F.2d 14, 21 (2d Cir. 1976).....................2

*Giraldo v. Kessler,* 694 F.3d 161, 164 (2d Cir. 2012) ..............................................................4

*Goel v. Bunge, Ltd.,* 820 F.3d 554, 559 (2d Cir. 2016) ..............................................................4

*Gore v. Alltel Commc'ns, LLC,* 666 F.3d 1027, 1033 (7th Cir. 2012)..........................................14

*L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011) ..........................................4

*Lipman v. Rodenbach*, 852 Fed. Appx. 578, 581 (2d Cir. 2021) ...................................................19

*Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*,
    779 F.3d 102, 108 (2d Cir. 2015)........................................................................................17

*Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172- 73 (1985)..........................................21, 22, 24

*Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614 (1985)............................15

*Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 269 (S.D.N.Y. 2005) ...................................4

*Pike v. Freeman*, 266 F.3d 78, 90–91 (2d Cir. 2001).................................................................17

*Range Rd. Music, Inc. v. Music Sales Corp.*, 76 F.Supp.2d 375, 380–81 (S.D.N.Y. 1999) ...........13

*Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) .............................15

*Scherk v. Alberto–Culver Co.,* 417 U.S. 506 ( 1974) .................................................................15

*Schubert v. City of Rye,* 775 F. Supp. 2d 689, 695 (S.D.N.Y. 2011)...........................................5

*Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) ..........................................15

*Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944)................................................................23

*Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984).................................................................16

*Taylor v. Sturgell*, 553 U.S. 880, 893–95 (2008)....................................................................18

*Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002).........................4

*United States v. Mead Corp.*, 533 U.S. 218, 228 (2001)...........................................................23

*Welborn Clinic v. MedQuist, Inc.*, 301 F.3d 634, 639 (7th Cir. 2002) .......................................14

*Woods v. Bourne Co.*, 60 F.3d 978, 987 (2d Cir. 1995)...........................................................22

**Statutes**

17 U.S.C. § 304..................................................................................3, 7, 12, 20, 21, 24

7 U.S.C. § 101 .........................................................................................................18

**Other Authorities**

*Anand v. New York State Dep't of Tax'n & Fin.*, No. 10-CV-5142 SJF WDW,
    2012 WL 2357720, *2, n.2 (E.D.N.Y. June 18, 2012)..............................................4

*Cox v. Perfect Bldg. Maint. Corp.*, 16 Civ. 7474 (VEC),
    2017 WL 3049547, *3 (S.D.N.Y. July 18, 2017) ...............................................4, 5

*Dramatic Publishing Co. v. Carter*, ---F.Supp.3d ---,
  2022 WL 2194586, *5 (N.D. Ill. June 17, 2022).............................................................. 3, 7, 13

*Frere v. Orthofix Inc.*, 2002 WL 1543857, at * 3 (S.D.N.Y. July 15, 2002) .................................................19

*Glob. Leadership Found. v. City of New York*, No. 21CV10942 (DLC),
  2022 WL 3701082, at *2 (S.D.N.Y. Aug. 26, 2022) ........................................................5

*Wendt v. Bond Factor Co.*, 2017 WL 3309733, *5 (S.D.N.Y. Aug. 2, 2017).............................18

Fed. R. Civ. P. 16 ................................................................................................................................19

Fed. R. Civ. P. 24 ................................................................................................................................19

Fed. R. Civ. P. 30 ................................................................................................................................19

Fed. R. Evid. 201 ..................................................................................................................................4

In the 2015 Letter Agreement with Harper Lee upon which the Rudinplay Affiliates[1] base this action, they expressly agreed with Ms. Lee that their rights to produce a stage production of *To Kill a Mockingbird* are subordinate to the rights in Ms. Lee's 1969 Agreement with Dramatic Publishing Company ("Dramatic"). (Tottis Decl., Ex. 4.) This understanding was clear and unequivocal: "The rights granted hereunder shall be subject to the rights granted under [the 1969 Agreement], as limited by such termination." (Tottis Decl., Ex. 3., ¶ 2(b).)

The Rudinplay Affiliates, of course, attached neither the 2015 Letter Agreement nor the governing 1969 Agreement to their Complaint.[2] As the Court can see, though, the 1969 Agreement to which the Rudinplay Affiliates conditioned their rights, not only gave Dramatic exclusive stage rights with the exception of Broadway and first-class theaters, it also bound Ms. Lee's "…heirs, executors, administrators, successors and assigns," like the Rudinplay Affiliates, to its terms. (Tottis Decl., Ex. 4, ¶4(d).) That same 1969 Agreement also made clear that in case of a dispute, an arbitrator would have the final say on the scope of Dramatic and Ms. Lee's rights. (*Id.* at ¶4(k).) And, pursuant to the 1969 Agreement, an arbitrator's final say is that Dramatic's worldwide exclusive non-first-class rights survived termination and, accordingly, Ms. Lee never had any of the non-first-class stage rights to transfer to Rudin, any of the Rudinplay Affiliates, or anyone else for that matter. (Tottis Decl., Ex. 2, App. A, pp. 6 & 71-72.)

---

[1] The Complaint, included as Exhibit 1 to the Tottis Declaration for the Court's convenience, identifies Plaintiff Atticus Limited Liability Company ("Atticus") and No Ice, Inc. (f/k/a Rudinplay, Inc.) as entities holding rights relevant to this litigation. (*See, e.g.,* Doc. 1, ¶¶ 6, 20-22, 28.) As the Arbitrator explains in the January 28, 2022 Final Award of Arbitrator (the "Arbitrator's Award"), Rudinplay, Inc. (n/k/a No Ice, Inc.) and Atticus are entities owned, controlled, or operated by Scott Rudin ("Rudin") and formed in connection with the licensing of the Broadway rights to *To Kill a Mockingbird*. (*See, e.g.,* Tottis Decl., Ex. 2, App. A, p. 23.) Accordingly, Defendant Dramatic Publishing Company ("Dramatic") will, like the Arbitrator, refer to them as the "Rudinplay Affiliates."

[2] Both agreements are included in the Tottis Declaration filed with Dramatic's Motion and, as explained below, are integral to the Complaint and properly considered in a motion to dismiss.

If the Rudinplay Affiliates don't like what they bought from Ms. Lee, that is an issue they should take up with her Estate, not Dramatic. At the risk of stating the obvious, a licensor can't transfer rights she doesn't own.[3] Nevertheless, the Rudinplay Affiliates have filed this declaratory judgment action not only pretending that they can lay claim to rights Ms. Lee never could have transferred to them in the first place, but also suggesting that when it comes to Dramatic's rights, Dramatic isn't entitled to rely on a binding arbitration decision about an agreement it made with Ms. Lee over a half-century ago, even after that award was confirmed under the Federal Arbitration Act and reduced to a final judgment in the U.S. District Court for the Northern District of Illinois. That award and the judgment leave no doubt: "…Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird*… ." (Tottis Decl., Ex. 2, App. A, p. 6, ¶10; Ex. 5, p. 3, ¶6(a).) The judgment also enjoins the Lee Estate and, pursuant to Fed.R.Civ.P. 65 (d)(2), anyone in active concert with the Lee Estate, from "… encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing of Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production throughout the world."[4] (*Id.* at ¶ 6(e)(iii).)

The Rudinplay Affiliates' Complaint doesn't just fail to attach the relevant documents or mention the confirmation proceedings in a sister federal court. It also neglects to tell this Court that in June 2022—six months before the Rudinplay Affiliates filed this Complaint—the judge in those confirmation proceedings denied the Lee Estate's motion to vacate the arbitration award based on the very same argument that the Rudinplay Affiliates' declaratory judgment claim now asserts here: enforcing the arbitrator's interpretation of the 1969 Agreement would somehow harm Rudin, the

---

[3] *See, e.g.*, *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007); *Gilliam v. American Broadcasting Companies, Inc.*, 538 F.2d 14, 21 (2d Cir. 1976).

[4] As discussed below, the Arbitrator's findings make clear that Rudin caused the Rudinplay Affiliates to proceed in concert with the Lee Estate. Because this action is meritless on its face and because judgment was only recently entered in the Illinois action, Dramatic has not yet sought to enjoin Rudin from proceeding.

Rudinplay Affiliates and playwright Aaron Sorkin. And, of course, the Complaint also neglects to mention that those arguments were soundly rejected:

> Thus by the terms of the [2015 Letter] Agreement, [Rudin] does not own the non-first-class rights—as they never returned to the Estate following its termination of Dramatic's license. The arbitrator put it this way: "Because Rudin's rights are subject to Dramatic's rights under the terms of 1969 Agreement, and because Dramatic's exclusive rights are preserved by the Derivative Works Exception, it follows that Rudin has no stock and amateur rights for live theatrical productions of [the novel]."

*Dramatic Publishing Co. v. Carter*, ---F.Supp.3d ---, 2022 WL 2194586, *5 (N.D. Ill. June 17, 2022) (Kennelly, J.). Ms. Lee couldn't transfer any non-first-class rights to the Rudinplay Affiliates because she transferred them exclusively to Dramatic over 50 years ago and, as both the Arbitrator and the Illinois district court judge concluded, she never got them back.[5]

It is no wonder Aaron Sorkin refused to join this litigation.

Ultimately, though, there is a far simpler basis for dismissing this action. Even if Ms. Lee could have terminated Dramatic's exclusive rights, she couldn't convey those rights to the Rudinplay Affiliates until *after* the purported termination became effective on April 26, 2016. 17 U.S.C. § 304(c)(6)(D) is crystal clear: "A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination." As the Complaint states, Ms. Lee sent a termination notice in 2011 that was not effective until April 2016. The Rudinplay Affiliates got their rights in June 2015, almost a year before. (Doc. 1, ¶¶ 15, 20-21). So even if the Court were to ignore all of the integral documents the Rudinplay Affiliates failed to attach to their Complaint and even if the Court were to accept every fact pled in the Complaint contradicted by those documents, the Rudinplay Affiliates still wouldn't have a viable

---

[5] As a result, the Court need not reach the Rudinplay Affiliates' mischaracterization of Section 304(c) of the Copyright Act. Should this Court deem it necessary to delve into the depths of copyright termination law, as shown below and as both a three-arbitrator panel of experienced copyright practitioners and then, later, a single experienced arbitrator and copyright expert found, the plain language of the derivative works exception to Section 304(c)'s termination provision bars any claim that Dramatic's rights do not remain exclusive.

claim here because, by operation of law, Ms. Lee was barred from transferring or agreeing to transfer any of Dramatic's rights until after April 26, 2016.

For these reasons and many, many more, the Complaint states no legitimate cause of action and should be dismissed.

## LEGAL STANDARD

Although a court defers to a plaintiff's well-pleaded facts on a motion to dismiss, a court should disregard labels and legal conclusions. *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009); *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 555 (2007). Importantly, even if a plaintiff failed to attach documents to the complaint, a court can consider them "[w]here plaintiff has actual notice of all the information in the movant's papers and has relied upon these documents in framing the complaint." *Cortec Indus. Inc. v. Sum Holding LP*, 949 F.2d 42, 47–48 (2d Cir. 1991). Typically, such documents include " 'a contract or other legal document containing obligations upon which the plaintiff's complaint stands or falls, but which for some reason—usually because the document, read in its entirety, would undermine the legitimacy of the plaintiff's claim—is not attached to the complaint.' " *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted). Courts also have included and considered integral to a complaint arbitration awards, securities prospectuses and SEC filings, offering memoranda, stock warrants, disciplinary charges and hearing transcripts. *See, e.g.*, *Cortec Indus.*, 949 F.2d. at 47; *L-7 Designs, Inc. v. Old Navy, LLC*, 647 F.3d 419, 422 (2d Cir. 2011); *Anand v. New York State Dep't of Tax'n & Fin.*, No. 10-CV-5142 SJF WDW, 2012 WL 2357720, *2, n.2 (E.D.N.Y. June 18, 2012); *Munno v. Town of Orangetown*, 391 F. Supp. 2d 263, 269 (S.D.N.Y. 2005); *Thomas v. Westchester Cnty. Health Care Corp.*, 232 F. Supp. 2d 273, 276 (S.D.N.Y. 2002).[6]

---

[6] Courts also take judicial notice of relevant documents and matters of public record "provided that the fact 'can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned.'" *Cox v. Perfect Bldg. Maint. Corp.*, 16 Civ. 7474 (VEC), 2017 WL 3049547, *3 (S.D.N.Y. July 18, 2017) (quoting Fed. R. Evid. 201(b)); *see also Giraldo v. Kessler*, 694 F.3d 161, 164 (2d Cir. 2012). Under these standards,

Here, the Rudinplay Affiliates made the conscious decision to avoid attaching a number of documents integral to the Complaint, although, when it suits their whim, they quote from or reference those documents. Accordingly, Dramatic cites to documents on which the Rudinplay Affiliates relied in framing their Complaint, where necessary, in its discussion below.[7]

## BACKGROUND

### A.    Harper Lee makes a series of promises to Dramatic.

In 1969, about eight years after she published *To Kill a Mockingbird*, Harper Lee agreed to grant Dramatic the exclusive non-first-class stage rights in her novel, stating that it would be the "…only one the amateur acting rights of which [Ms. Lee] will permit to be leased and/or licensed." (Tottis Decl., Ex. 4, ¶ 2(a).) "Amateur acting rights" was defined to include "stock, repertoire, lyceum and Chautauqua performances", but specifically excepted "…Broadway production rights … first-class professional road and/or first class touring productions rights." (*Id.*, ¶ 4(e).) As the Arbitrator would later conclude, these stock and amateur rights amounted to "non-first-class rights."[8] (Tottis Decl., Ex. 2, App. A, pp. 9-17.)

But that's not all Ms. Lee promised Dramatic. She also pledged she would never do anything to interfere with Dramatic's rights, agreeing to "…do nothing, either by omission or commission, to prevent or hinder [Dramatic] from the full exercise of all rights granted and /or purported to be granted" in the 1969 Agreement. (Tottis Decl., Ex. 4, ¶ 1(a).) She also promised that

---

"courts have regularly taken judicial notice of arbitration awards," *Cox* 2017 WL 3049547 at *3, as well as court filings, *Glob. Leadership Found. v. City of New York*, No. 21CV10942 (DLC), 2022 WL 3701082, at *2 (S.D.N.Y. Aug. 26, 2022) (Cote, J.), local government meeting minutes, *Schubert v. City of Rye*, 775 F. Supp. 2d 689, 695 (S.D.N.Y. 2011), and news articles and recordings and transcripts of radio and television broadcasts, *Condit v. Dunne*, 317 F.Supp.2d 344, 357 (S.D.N.Y.2004), without converting to a summary judgment motion.

[7] This includes: the 1969 Agreement between Ms. Lee and Dramatic, (*see, e.g.* Dkt. 1, ¶¶ 2, 13, 32-33); the April 2011 notice of termination of the 1969 Agreement (*id.*, ¶ 15); the 2015 Letter Agreement between Ms. Lee and Rudinplay (*id.*, ¶ 20-22, 36); and the January 28, 2022 Final Award including the substantive Interim Award (Appendix A) and key exhibits explicitly referenced in the Awards (*id.*, ¶ 32-35, 37).

[8] The non-first-class rights are delineated in exacting detail in the Judgment. (Tottis Decl., Ex. 5, ¶ 6(f).)

anybody she transferred any rights to would be bound by her word, stating that the Agreement would "be binding upon..." her "heirs, executors, successors and assigns." (*Id.* at ¶ 4(d).) Finally, she agreed that an arbitrator, and not a court, would decide any disputes about what the Agreement meant: "Any controversy arising out of this agreement is to be arbitrated in Chicago by and under the rules of the American Arbitration Association." (*Id.* at ¶4(k).)

**B.   Ms. Lee honors her promises for almost 46 years.**

For close to the next half-century, Dramatic licensed its play, authored by Christopher Sergel, Sr., Dramatic's then-president, to non-first-class theaters across the country, including many leading regional theaters like the Guthrie, Steppenwolf and Huntington Theaters. (Tottis Decl., Ex. 2, App. A, pp. 2, 16.) Dramatic paid Ms. Lee royalties and she accepted them. (*Id.*) Even when she wasn't happy about her commitments, she honored them. For example, "some 30 years" after executing the 1969 Agreement, Ms. Lee expressed "seller's remorse," saying she regretted ever giving Dramatic "stock" (*i.e.*, non-first-class) rights because she felt the play was "over-produced" in "for profit" regional productions. (*Id.*, pp. 22-23.)

As the Arbitrator noted, Ms. Lee made it clear in a letter she wrote to her friend, Veronique Peck, wife of actor Gregory Peck, that "she controlled Broadway and first-class rights, but not stock productions, which include regional productions." (*Id.* at 21.) In the letter discussed by the Arbitrator, Ms. Lee referred to the scope of her theatrical rights, stating, "All I know is that my agent has been saying, 'No remakes, no Broadway play, no musical (!), no nothing,' for 35 years to all and sundry. As far as I'm concerned, he will keep on saying it for the rest of my life." (Tottis Decl., Ex. 6.)[9] She also made clear that she understood the difference between Broadway rights and non-first-

---

[9] For the purposes of this motion, Dramatic does not challenge whether Ms. Lee knowingly transferred Broadway rights or was otherwise aware that she was executing a document assigning any theatrical rights to the Rudinplay Affiliates when she executed the June 2015 Letter Agreement less than a year before she died.

class rights, even though she was unhappy about having transferred any theatrical rights to anyone, stating, "the Class A (Broadway) play rights are in me. (Dramatic Publishing Co. has amateur and stock co. rights, much to my disgust.)" (*Id.*)

Nevertheless, Ms. Lee continued to honor her commitments to Dramatic.

### C.   Ms. Lee serves a notice of termination on Dramatic.

Dramatic received a notice of termination pursuant to 17 U.S.C. 304(c) dated April 28, 2011 bearing Ms. Lee's signature. (Doc. 1, ¶ 15.) As set forth in the notice, the effective date of termination is April 26, 2016. (Tottis Decl., Ex. 7.)

### D.   Ms. Lee's signature appears on the 2015 Letter Agreement.

Enter Scott Rudin.

In 2015, after negotiation with Ms. Lee's literary agent, Andrew Nurnberg, the current representative of her Estate, Tonja Carter and a lawyer named Tim O'Donnell, Rudin and his lawyers produced a letter agreement for Ms. Lee to sign regarding a new Broadway stage production of *To Kill a Mockingbird*. (Tottis Decl., Ex. 3.) The 2015 Letter Agreement specifically identifies the 1969 Agreement as the "Prior Agreement" which is "dated June 26, 1969 between" Ms. Lee and Dramatic. (*Id.*) It explains that the 1969 Agreement granted Dramatic a right to create an adaptation of *To Kill a Mockingbird* and to exploit the amateur acting rights "as defined in the 1969 Agreement." (*Id.*, ¶ 2(b).) Those rights, as determined by the Arbitrator and as confirmed by the Northern District of Illinois, constitute all non-first-class stage rights. (Tottis Decl., Ex. 2, App. A, p. 6, ¶10; Ex. 5, p. 3, ¶6(a); *Dramatic Publishing Co. v. Carter*, ---F.Supp.3d ---, 2022 WL 2194586, *5 (N.D. Ill. June 17, 2022).)

The Letter Agreement says that Ms. Lee "represents that it (sic) has terminated the [1969] Agreement effective April 26, 2016." (Tottis Decl., Ex. 3, ¶ 2(b)). Rudinplay, Inc., the signatory to the 2015 Letter Agreement, then acknowledges that "notwithstanding the termination, the [non-

first-class rights] to [Dramatic's version of *To Kill a Mockingbird* ] can continue to be exploited following such termination under the terms of the [1969 Agreement] on a non-exclusive basis in the United States, and on an exclusive basis elsewhere."[10] (*Id.*) Finally, the 2015 Letter Agreement provides that, "[t]he rights granted hereunder shall be subject to the rights granted under the [1969 Agreement], as limited by such termination."[11] (*Id.*)

Dramatic was not a party to the 2015 Letter Agreement, nor does the Complaint suggest that Dramatic was aware of it prior to the Arbitration, participated in its preparation or agreed to any of its terms.

### E.   Egged on by Rudin, Ms. Lee's handlers start breaking her promises.

Within months of executing the 2015 Letter Agreement, Rudin began pressuring Ms. Lee's handlers to breach the 1969 Agreement. From that point on, Rudin and the Lee handlers worked in tandem to violate Dramatic's exclusive rights. For example, even though, as the Arbitrator found and the Rudinplay Affiliates do not challenge, the 1969Agreement provided for Dramatic's exclusive non-first-class rights and even though Dramatic had licensed and Ms. Lee had accepted royalties from regional theater productions for the previous 46 years, "Rudin complained to Nurnberg about a 'professional production' at the Queens Theater in Corona, New York." (Tottis Decl., Ex. 2, App., p. 73.) Nurnberg (Ms. Lee's literary agent) dutifully responded to Rudin, telling him that O'Donnell (Ms. Lee's lawyer) would look into it. Rudin replied, "'I am—as you know—very eager that **we** start to enforce your agreement with Sergel." (*Id.* (emphasis added).)

From that point forward, "we" meant the Rudin team and the Lee team.

As detailed in the Arbitrator's Award, Rudin and his lawyer (the late Loeb and Loeb partner, Seth Gelblum) demanded that Lee's agents stop the Queens Theater production stating, "'We

---

[10]Termination rights under the Copyright Act do not apply outside the United States.

[11]The 2015 Letter Agreement also says that the parties planned to "enter into a long-form agreement" (Tottis Decl., Ex. 3, ¶15), but nothing in the Rudinplay Affiliates' Complaint suggests a subsequent agreement exists.

MUST deal with this.'" (Tottis Decl., Ex. 2, App., pp.73-76.) Even though the notice of termination wasn't effective and even though the 1969 Agreement gave Dramatic rights in non-first-class theater irrespective of the notice, Rudin's Loeb and Loeb lawyer claimed the professional productions violated "'Scott's exclusive rights,'" and demanded that the production be stopped. And although O'Donnell previously told Rudin that Dramatic had "everything but first class" theater rights (*id.*, p. 23), in what the Arbitrator labelled an "appeasement process" (*id.*, p. 74), O'Donnell and Nurnberg, on behalf of Ms. Lee, agreed to do Rudin's bidding. Initially, as the Arbitrator put it, in response to "Rudin's desires to prevent Dramatic from licensing any performances with one or more professional actors," Nurnberg sent Dramatic an email a few weeks later "to remind Sergel of the newly minted prohibition on professional actors…". (*Id.*) O'Donnell forwarded the email to Gelblum, Rudin's lawyer, with the statement, "'To allay Scott's unease.'" (*Id.*)

### 1. The bogus "opinion."

The appeasement did not stop there. Even though O'Donnell knew (and told Rudin) that Dramatic had everything but first-class rights and even though he represented the Lee Estate, he proposed writing "a formal opinion letter on **my** letterhead" opining that Dramatic could not license any professional theater. (*Id.*, p. 75 (emphasis added).) O'Donnell also told Nurnberg that before the Estate publicly announced its deal with Rudin regarding the Broadway production "'you can give that to [Dramatic] first and tell him [Dramatic] that you had sought **independent legal advice**…'" even though O'Donnell was anything but independent. (*Id.* (emphasis added).)

As the Arbitrator found, the so-called "opinion" "'…marks a complete reversal of O'Donnell's position prior to Rudin's influencing campaign'" that Dramatic owned everything but first-class rights. (*Id.*) Indeed, O'Donnell would later acknowledge the illegitimacy of that opinion. (*Id.*, p. 79.) Importantly, both Rudin and his Loeb and Loeb lawyer were intimately involved in the crafting of the "opinion" and continued working as a team with Ms. Lee's agents:

The evidence shows **that Rudin had significant influence** over the O'Donnell opinion letter, **including providing approval to send it.** For example, on January 27, 2016, Nurnberg sent an email to Scott Rudin saying that while Rudin prepares a press release….Nurnberg would send O'Donnell's opinion letter to [Dramatic's president]. Nurnberg enclosed a copy of the opinion letter **for Rudin. Rudin responds** that he wants to send it to Seth Gelblum for review first. Nurnberg responds that he is happy to have Gelblum look at it… The next day **Rudin responds:** "SETH THINKS TIM'S LETTER IS EXCELLENT" SEND AWAY!" Nurmberg forwards the ringing endorsement to O'Donnell, with the comment "Well, that's a relief. It means you won't have to take up snow-shoveling for a living."

(*Id.*, p. 75 (capitalization in original, bold added).) As the Arbitrator concluded, this exchange

reflected "…a clear indication that O'Donnell and Nurnberg were under pressure to do Rudin's

bidding to prevent or hinder Dramatic" from executing its rights under the 1969 Agreement. (*Id.*)[12]

### 2.     The pre-arbitration threats.

Many of the joint actions of the Rudinplay Affiliates and the Lee Estate which precipitated

Dramatic's decision to file its arbitration are detailed by the Arbitrator. (*Id.*, pp. 76-85.) As the

Arbitrator noted, in early 2019, the Rudin Affiliates' new Loeb and Loeb lawyer, Jonathan Zavin,

began to push the Lee Estate and its new lawyer, Matt Lembke, to improperly threaten Dramatic's

licenses both in the United Kingdom and the United States. At one point, Mr. Zavin asks for Mr.

Lembke's assistance to threaten a planned tour in the U.K. by Jonathan Church. In particular, Mr.

Zavin points out to Mr. Lembke, that the Rudinplay Affiliates and the Lee Estate are "'on the same

side,'" and explains that "Rudin's play 'is an extremely valuable property for both parties,'" that will

"'earn millions of dollars in the U.K.'" He concludes, "We can't let Dramatic or their licensees screw

this up.'" (*Id.*, p. 77.) Rudin's U.K. firm, in turn, sent a cease-and-desist letter to the Jonathan

Church lawyers falsely claiming that "'Rudin is 'the **exclusive** worldwide licensee' for live stage

rights of TKAM." (*Id.* (emphasis added).)

---

[12] Ms. Lee died, shortly afterwards, in February 2016. (Tottis Decl., Ex. 2, p. 2.)

The Arbitrator details multiple additional acts taken jointly by the Rudinplay Affiliates' lawyers and the Lee Estate's lawyers not only to hinder and prevent Dramatic from the full exercise of its rights under the 1969 Agreement, but also to tortiously interfere with Dramatic's agreements with multiple licensees. (*Id.*, pp. 80-85.) In fact, the Arbitrator actually concludes that the two groups acted "in concert" regarding "…the Church tour [a U.S. tour of Dramatic's TKAM] or any of the many other instances of interfering with Dramatic's full exercise of its rights." (*Id.*, p. 80.) The Arbitrator further found that because the Rudinplay Affiliates were granted all stage rights "not already granted exclusively to Dramatic," this "…undoubtedly fueled Rudin's eagerness to engage in actions to narrow Dramatic's rights and thereby expand his own rights. (*Id.*, p. 81.) Finally, the Arbitrator made clear that Rudin "…has been kept aware of the arbitration by Lembke, who has sent pleadings and orders from the arbitration to Rudin." (*Id.*, p. 87.)

### F.     The proceedings.

Ultimately, Dramatic had no choice but to file a claim in arbitration against the Lee Estate. As the Arbitrator found, the Rudinplay Affiliates were a driving force behind the Lee Estate's actions during the arbitration. The Arbitrator found "substantial evidence" that the Estate was well aware that Dramatic had not exceeded the scope of its grant, but that the Lee Estate "…yielded to pressure from the Rudin interests to the determent of Dramatic." (*Id.*, p. 5.) Moreover, the Lee Estate's motivations, "as shown in substantial evidence" were influenced by the Rudin interests "…rather than by the respective rights of the parties under the 1969 Agreement." (*Id.*)

The Lee Estate's joint actions with the Rudinplay Affiliates resulted in an award by the Arbitrator of extensive injunctive and declaratory relief, including an express finding that Dramatic's exclusive rights survived Ms. Lee's termination notice and orders barring the Lee Estate from

continuing to engage in wrongful conduct with the Rudinplay Affiliates.[13] (*See generally id.*, App., p. 5-8.) In addition to awarding just under $200,000 in damages, the Arbitrator awarded over $2.5 million in attorneys' fees and costs.

Dramatic immediately moved to confirm its awards and the Lee Estate moved to vacate a portion of the Award, including the determination that Dramatic's non-first class rights remained exclusive following termination. The motion to vacate was denied in June 2022, although the issue of the definition of "non-first-class rights" was remanded to the Arbitrator for clarification. In September 2022, the Arbitrator issued a detailed definition of "non-first-class rights." On January 13, 2023 the district court in Chicago entered a final judgment confirming the entire award, awarding post-award interest under applicable Illinois law and awarding Dramatic its additional attorneys' fees in the district court proceeding. (Tottis Decl., Ex. 5.)

## ARGUMENT

### A.   The Copyright Act's express terms bar this action.

Under the Copyright Act, whatever effect Ms. Lee's termination of the 1969 Agreement had on Dramatic's exclusive rights, there is no question that the Act barred her from transferring any rights held by Dramatic until after the effective date of termination, April 26, 2016. The plain language of 17 U.S.C. § 304(c)(6)(D) is incontrovertible: "A further grant, or agreement to make a further grant, of any right covered by a terminated grant **is valid only if it is made after the effective date of the termination**." (emphasis added).

Grantors can't transfer rights they don't have. Courts facing this issue repeatedly have read the plain language of the statute and applied it as written. *Artist Rights Enforcement Corp. v. Estate of*

---

[13] To the extent it matters, even the Rudinplay Affiliates' statement that simply "one" arbitrator decided the issue of the effect of Section 304(c) of the Copyright Act is objectively false. As the Arbitrator noted a panel of three arbitrators denied the Lee Estate's attempt at a partial summary judgment issue on the effect of Section 304 during the Arbitration proceedings. It was, however, allowed a mulligan before the single arbitrator during the full hearing and lost there as well. (Tottis Decl., Ex. 2, App., p. 3, n. 2.)

*Benjamin E. King*, 224 F. Supp. 3d 231, 236 (S.D.N.Y. 2016) (promise of future rights contained in sale agreement invalid when agreement predated termination notice); *Range Rd. Music, Inc. v. Music Sales Corp.*, 76 F.Supp.2d 375, 380–81 (S.D.N.Y. 1999) (transfer of interest "conveyed nothing" because it was executed before the effective date of termination); *DC Comics v. Pacific Pictures Corp.*, 2012 WL 4936588, *10 (C.D. Cal. 2012) (same). Despite this, the Rudinplay Affiliates' Complaint claims Ms. Lee granted "stage rights in Stock and Amateur Productions that had been the subject of" the 1969 Agreement to them in the June 2015 Letter Agreement. (Doc. 1. ¶¶ 21-22.) Under the plain language of the Copyright Act, those rights were not available for transfer until April 26, 2016, at the earliest, so, as far as non-first-class rights go, Ms. Lee had nothing to transfer to the Rudinplay Affiliates (or anyone else) in 2015.

At this point, the Court need go no further. The very rights upon which the Rudinplay Affiliates have based their suit do not exist as a matter of law. This matter should be dismissed with prejudice.

**B.      The Rudinplay Affiliates are bound by Harper Lee's promises.**

Under the express terms of the 2015 Letter Agreement they sent Harper Lee, the Rudinplay Affiliates promised to subordinate their rights to those of Dramatic: "The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination." (Tottis Decl., Ex. 3, ¶ 2(b).) As the Illinois district court found, under that language:  "…[I]f Dramatic is properly found to have retained the right to produce the play in non-first-class theatres, then Rudinplay did not acquire that right …. **This is exactly what transpired."** *Dramatic Publishing*, ---F.Supp.3d ---, 2022 WL 2194586 at *5 (emphasis added). The Illinois court explained that when the Arbitrator decided under the Derivative Works Exception to Section 304(c ) of the Copyright Act that Dramatic continued to "exclusively hold all non-first-class rights" that same finding applied to the 2015 Letter Agreement: "…[B]y the terms of the Rudinplay Agreement, Rudinplay does not

own the non-first-class rights—as they never returned to the Estate following its termination of Dramatic's license." *Id.* That analysis is unassailable.

Even without the Rudinplay Affiliates' explicit consent to be bound by the 1969 Agreement, Ms. Lee couldn't sell them anything she did not already own. *Davis*, 505 F.3d at 99. And under the express terms of the 1969 Agreement, she had no right to transfer Dramatic's non-first-class rights. Ever. When Ms. Lee agreed to license all non-first-class theatrical rights in *To Kill a Mockingbird* to Dramatic 50 years ago, she made another deal: she promised that any disputes with Dramatic related to the 1969 Agreement would be decided by an arbitrator rather than a court: "Any controversy arising out of this agreement is to be arbitrated in Chicago by and under the rules of the American Arbitration Association." (Tottis Decl., Ex. 4, ¶ 4(k).)[14] Dramatic's and Ms. Lee's decision to adopt such broad arbitration language meant that as a matter of applicable law,[15] an arbitrator would decide "…all manner of claims tangentially related to the agreement, including claims of fraud, misrepresentation, and other torts involving both contract and performance." *Welborn Clinic v. MedQuist, Inc.,* 301 F.3d 634, 639 (7th Cir. 2002).[16] It also meant that Ms. Lee and Dramatic agreed to "opt out of the court system" and accept whatever an arbitrator concluded. *Bankers Life & Casualty Insurance Co. v. CBRE, Inc.*, 830 F.3d 729, 732 (7th Cir. 2016).

The fact that the Arbitrator applied the Copyright Act doesn't change the analysis. Arbitrators regularly handle claims under federal statutes. *See, e.g., Baxter Int'l, Inc. v. Abbott*

---

[14] Ms. Lee also agreed that that the promises she made to Dramatic in the 1969 Agreement would be binding on anybody else she transferred rights to, like the Rudinplay Affiliates, when she agreed that the terms of the 1969 Agreement "shall be binding upon…[her] heirs, executors, administrators, successor and assigns." (Tottis Decl., Ex. 4, ¶4(d).)

[15] Ms. Lee and Dramatic further agreed that the 1969 Agreement would be interpreted under Illinois law (Tottis Decl., Ex. 4, ¶ 4(d)) and any arbitration relating to the agreement would be conducted in Chicago. (*Id.*, ¶ 4(k).)

[16] *See also Gore v. Alltel Commc'ns, LLC*, 666 F.3d 1027, 1033 (7th Cir. 2012). ("Any controversy arising out of this agreement" language in arbitration agreement meant "all disputes having their origin or genesis in the contract, whether or not they implicate interpretation or performance of the contract per se" were the province of the arbitrator and not the court.)

*Labs.*, 315 F.3d 829, 831 (7th Cir. 2003), citing *Rodriguez de Quijas v. Shearson/American Express, Inc.*, 490 U.S. 477 (1989) (claims under the Securities Act of 1933); *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) (claims under federal securities laws and RICO); *Scherk v. Alberto–Culver Co.,* 417 U.S. 506 ( 1974) (same); and *Mitsubishi Motors Corp. v. Soler Chrysler–Plymouth, Inc.,* 473 U.S. 614 (1985) (federal antitrust laws).

      Arbitrators' vast remedial powers derive from the fact that they act as the parties' agent and, therefore, are empowered to grant *any* relief the parties themselves have the power to agree upon. *Eastern Associated Coal Corp. v. United Mine Workers,* 531 U.S. 57, 62 (2000). Nothing happened in Dramatic's relationship with Ms. Lee (or her Estate) over the past 50 years that would allow Ms. Lee (or her heirs, successors or assigns) to welch on her binding deal to accept an arbitrator's analysis and decision. She remained bound by that promise in 2011 when she served a notice of termination on Dramatic. Likewise, she was bound in 2015 when, seven months before her death, her agents gave her the 2015 Letter Agreement to sign with the Rudinplay Affiliates. The fact that Ms. Lee, or her handlers, decided to cut a separate deal with Rudin, as a matter of law, didn't and couldn't modify her decades-long contractual commitment to Dramatic to "opt out of the court system" and accept an arbitrator's decision with respect to the meaning of the 1969 Agreement.

      The Rudinplay Affiliates and their lawyers went into the deal with Ms. Lee with their eyes open. They knew they were bound by Dramatic's earlier rights. They also knew that Ms. Lee had opted out of the court system and agreed that an arbitrator would have the final word on those respective rights. The Rudinplay Affiliates' conclusion in their Complaint that because they may have tried to get Ms. Lee to transfer some of Dramatic's exclusive rights to them in the 2015 Letter Agreement before the Arbitrator confirmed she had no basis for doing so is nonsense. (Doc. 1, ¶ 36.) Under that logic, all any party to a contract need do to avoid its obligations and terms is agree to grant a third-party contradictory rights after entering into the original contract. That's not the way

contracts work. The Rudinplay Affiliates bought rights from Ms. Lee subject to an earlier agreement. That agreement said an arbitrator would determine the contract's meaning. And he did. On top of that, his decision was confirmed by a federal court. If the Rudinplay Affiliates believe they were duped by Ms. Lee, their recourse is with Ms. Lee's Estate, but they have no basis for dragging Dramatic into their drama. Their Complaint should be dismissed.

### C.   Plaintiff's claim is barred by the doctrine of res judicata.

The foregoing discussion is premised on the undisputed pleadings before this Court. The 1969 Agreement said that in the event of a dispute between Dramatic and Ms. Lee, an arbitrator would resolve it. And an arbitrator did resolve it. This is no different than if the contract provided that disputes would be settled by a coin flip or by random lot.[17] The contract's terms dictated a method by which disputed terms would be decided and, as a factual matter, the dispute mechanism resolved that Ms. Lee could only transfer Broadway and first-class theater rights to third parties.

There's another, obvious legal principle that dooms the Rudinplay Affiliate's claims: res judicata. Given Rudin and his Affiliates' undisputed privity with the Estate of Harper Lee, they are bound by the arbitration award and the final judgment in the Northern District of Illinois. (Tottis Decl., Ex. 5.) And because the Rudinplay Affiliates are in privity with the Lee Estate, that decision is binding on them.

Res judicata "bars the subsequent litigation of any claims that were or could have been raised in a prior action." *Citigroup, Inc. v. Abu Dhabi Inv. Auth.*, 776 F.3d 126, 128 n.1 (2d Cir. 2015)). It applies to a subsequent litigation when "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the same adverse parties or those in privity with them; and

---

[17] Actually, there is a difference between arbitration and random lot or coin flip. As a matter of policy, coin flips and lots are not likely to be viewed as a favored form of dispute resolution over judicial fora. As the Federal Arbitration Act and countless cases make clear, arbitration is.  *See Dean Witter Reynolds, Inv. v. Byrd*, 470 U.S. 213, 22-21 (1985); *Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984).

(3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102, 108 (2d Cir. 2015) (citation omitted)); *Pike v. Freeman*, 266 F.3d 78, 90–91 (2d Cir. 2001); *Chicago Title Land Trust Co. v. Potash Corp.*, 664 F.3d 1075, 1079 ( 7th Cir. 2011) (same, applying Illinois law).[18]

Here, it can't be disputed that the judgment in Illinois federal court was a judgment on the merits and that is true whether it's a district court decision or an arbitration award. *See, e.g.*, *Pike*, 266 F.3d at 90–91 ("It is well settled that this doctrine [res judicata] serves to bar certain claims in federal court based on the binding effect of past determinations in arbitral proceedings."). Likewise, as the published *Dramatic Publishing* decision makes clear, the question of Dramatic's exclusive rights was central to the arbitration and Illinois decision. Indeed, the Lee Estate not only lost on the issue twice in the arbitration (on partial summary judgment and following a full hearing on the merits), it was one of the few issues on which it based its motion to vacate.  Despite these losses, Paragraphs 33 through 36 of the Rudinplay Affiliates' Complaint sets forth an identical claim.

The only remaining issue is one of privity. Res judicata applies not only to the parties involved in the prior litigation, it also applies to those in "privity" with those parties. For the purposes of res judicata, privity includes "successors to a property interest, those who control an action although not formal parties to it, those whose interests are represented by a party to the action, and possibly co-parties to a prior action." *Ferris v. Cuevas*, 118 F.3d 122, 126 (2d Cir.1997) (quoting *Watts v. Swiss Bank Corp.*, 317 N.Y.S.2d 315, 320 (N.Y.1970)); *see also Taylor v. Sturgell*, 553

---

[18] To the extent Illinois law, as the law of the state where the Arbitration decisions were rendered or federal common law may apply, each of these laws are substantially similar. Compare standard in *Marcel Fashions* (above) with *Chicago Title Land Trust Co. v. Potash Corp.*, 664 F.3d 1075, 1079 (7th Cir. 2011) (res judicata applies where the following elements are present: (1) a final judgment on the merits in an earlier action, (2) a common identity of the cause of action in both the earlier and later suit, and (3) a common identity of parties or their privies in the two suits, applying Illinois law) *see, also e.g.*, *Chase Manhattan Bank, N.A. v. Celotex Corp.*, 56 F.3d 343, 346 (2d Cir. 1995) ("the federal doctrine uses privity in a way similar to its use under New York law").

U.S. 880, 893–95 (2008) (setting forth exceptions to the rule against nonparty preclusion, including certain qualifying "privity" relationships, such as "preceding and succeeding owners of property, bailee and bailor, and assignee and assignor").

The Rudinplay Affiliates check a number of these privity boxes. First, as their own allegations make clear, they are successors in interest, claiming they obtained *exclusive* rights from Ms. Lee and her Estate.[19] (Dkt. 1, ¶¶ 20-28.) While all licenses may not result in privity, an exclusive license creates a successor in interest, a hallmark of privity. "An exclusive license . . . conveys an ownership interest" in a copyright. *Davis v. Blige*, 505 F.3d 90, 101 (2d Cir. 2007); see also 17 U.S.C. § 101 ("A 'transfer of copyright ownership' is an assignment, mortgage, exclusive license, or any other conveyance ... of a copyright or any of the exclusive rights comprised in a copyright, whether or not it is limited in time or place of effect. . .") As pleaded by the Rudinplay Affiliates, they are successors-in-interest and, thus, are in privity with the Lee Estate, thus bound by the Arbitration Award entered against the Estate and prohibited from relitigating the issue of Dramatic's exclusive rights under the doctrine of res judicata.

Separately, where, as here, a third party's rights are adequately represented by a party to the proceeding, courts find privity for the purposes of res judicata. *See, e.g.*, *Wendt v. Bond Factor Co.*, 2017 WL 3309733, *5 (S.D.N.Y. Aug. 2, 2017) (Cote, J.) (privity arises when the interests involved in the prior litigation are virtually identical to those in the later litigation and those interests are vigorously defended). As discussed above, the Lee Estate and its lawyers and the Rudinplay Affiliates and their lawyers had a years-long relationship, not just working "in concert" as the Arbitrator found, but also repeatedly seeking to disrupt the full exercise of Dramatic's exclusive rights. (Tottis Decl., Ex. 2,

---

[19] Obviously, Dramatic disputes the Rudinplay Affiliates' claim that they have any right in non-first-class rights, but do not dispute they have the exclusive right to produce the Sorkin version of *To Kill a Mockingbird* in Broadway and other first-class venues.

App. A, pp. 79, 80; *supra*, pp. 7-11) and to, in tandem, thwart Dramatic's legitimate licensing opportunities to their mutual advantage. (*Id.*, pp. 73-83.)

Perhaps most importantly, though, the Arbitrator specifically found the Rudinplay Affiliates were kept fully up to speed on the arbitration "…by Lembke, who has sent pleadings and orders from the arbitration." [20] (Tottis Decl., Ex. 2, App. A, p. 87.) The Rudinplay Affiliates' regular and consistent involvement and participation with the Lee Estate reflects exactly the sort of relationship and control underlying the doctrine of res judicata. Dramatic is entitled to rely on the finality of the arbitration without fear that its rights, conclusively adjudicated in that proceeding, will not now be destroyed. *See, e.g.*, *Lipman v. Rodenbach*, 852 Fed. Appx. 578, 581 (2d Cir. 2021) (summary order) (allowing plaintiff to relitigate matters previously settled would undermine defendant's ability to rely on the finality of the results of the previous litigation).[21]

> **D.** **The Rudinplay Affiliate's allegations concerning Section 304(c) of the Copyright Act have no merit.**

Should the Court decide to address the merits of the Rudinplay Affiliates' claims regarding Section 304(c) of the Copyright Act, those claims fail as well.

---

[20] Had the Rudinplay Affiliates believed that the Estate did not adequately represent their rights in the Arbitration they could have sought to join, as the Arbitrator noted. (Tottis Decl., Ex. 2, App. A, p. 87.) Likewise, they could have moved to intervene in the Illinois federal action under Fed. R. Civ. P. 24(a)(2).  See *Ass'n of Contracting Plumbers of the City of New York v. Local Union 2*, 841 F.2d 461, 467 (2d Cir.1988) (third party permitted to intervene on a motion to vacate an arbitration award where the party had "a substantial interest in the arbitration . . ."); *Frere v. Orthofix Inc.*, 2002 WL 1543857, at * 3 (S.D.N.Y. July 15, 2002) (permitting intervention pursuant to Fed. R. Civ. P. 24(a)(2)). The Rudinplay Affiliates' decision not to intervene in either proceeding reflects their satisfaction with the Estate's representation of its interests in both fora.

[21] To the extent the Court does not believe the incorporation of "integral" documents here is sufficient to support a finding of res judicata, Dramatic requests that, pursuant to Fed. R. Civ. P. 16, it be permitted limited discovery to address this dispositive issue promptly. Dramatic is confident that production of communications between the Lee Estate (and its respective counsel) and the Rudin Affiliates (and their respective counsel) with, perhaps, one Fed. R. Civ. P. 30(b)(6) deposition would resolve this matter to the Court's satisfaction.

1.       **The plain language of the statue applies to "exclusive" grants.**

Congress was clear that subsection (c) of Section 304 of the Copyright Act applies to both exclusive and nonexclusive licenses. It states right up front: "…[T]he ***exclusive*** or nonexclusive grant of a transfer or license of the renewal copyright or any right under it . . . is subject to termination under the following conditions…". 17 U.S.C. § 304(c) (emphasis added). Further down in subsection 304(c)(6)(A), Congress sets forth a list of exceptions or limitations, but never once distinguishes between "exclusive" or "nonexclusive" grants. Subsection 6 provides in relevant part, "In all cases the reversion of rights is subject to the following ***limitations***" (emphasis added) and the very first exception, for derivative works, is the one at issue before this Court:

> (A) A derivative work prepared under authority of the grant before its termination may continue to be ***utilized under the terms of the grant after its termination***, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 304(c)(6)(A) (emphasis added).

In sum, then, the plain language of the statute provides for: 1) termination of an exclusive grant, but 2) if that exclusive grant is for a derivative work, then that exclusive grant "may continue to be utilized" under the terms of the original exclusive grant without any limitation. To the extent the text was not already clear, plugging the word "exclusive" into the text resolves any doubt:

> A derivative work prepared under the authority of the **[exclusive] grant** before its termination may continue to be **utilized under the terms of the [exclusive]grant** after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated **[exclusive] grant**.

17 U.S.C. § 304(c)(6)(A) (emphasis added).

Nothing in the language even hints that it is not applicable to exclusive grants. Congress didn't say "some of the terms of the grant," nor did it say, "This doesn't apply to exclusive grants." And it certainly didn't limit the language to "nonexclusive" grants after making clear just a few lines up that Section 304(c) applies to "exclusive and nonexclusive grants." It is error to read words in a

statute in isolation. *Dolan v. U.S. Postal Service*, 546 U.S. 481, 486 (2006). This is exactly why the Arbitrator concluded that Dramatic's right to exclusivity "is required by the plain language of the §304(c) of the Act." (Tottis Decl., Ex. 2, App. A, p. 63.) Section304(c)(6)(A) is the "limitation" to the termination section; it is the exception. And the words in the exception say that all of the terms of an exclusive grant survive termination.

**2.      The Rudin Affiliates misread the language and intent of the Act.**

Despite the clear language of the exception, at paragraph 34 of their Complaint, the Rudinplay Affiliates assert an erroneous legal conclusion, telling this Court that both of the Arbitrators' decisions finding that the statute means what it says are "…contrary to the plain and unambiguous language of the Copyright Act's termination provisions, its fundamental purpose in permitting authors to terminate exclusive grants, and uniform decisional authority across all federal jurisdictions giving effect to its purpose and language." (Doc. 1, ¶ 34.) All three statements are inaccurate and, frankly, misleading.

According to the Supreme Court, Congress adopted the derivative works "exception" to specifically carve out grants directed to derivative works from the consequences of Section 304(c), which focuses on the rights of authors to terminate grants and "relieve [them] of the consequence of ill-advised and unremunerative grants" made before the author knew the value of her work. *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172-73 (1985). While much of the Copyright Act and Section 304(c) protect the rights of authors, Congress added Section 304(c)(6)(A) as an **"Exception,"** not to protect the rights of authors, but to "preserve" the rights of the owner of a derivative work:

> The **Exception** in § 304(c)(6)(A) was designed, however, to exclude a specific category of grants—**even if they were manifestly unfair to the author**—from that broad objective. The purpose of the **Exception** was to "**preserve the right of the owner of a derivative work to exploit it, notwithstanding the reversion.**" Therefore, even if a person acquired the right to exploit **an already prepared derivative work by means of an unfavorable bargain with an author**, that right was to be excluded from the bundle of rights that would revert to the author when he exercised his termination right.

*Mills Music*, 469 U.S. at 173. (emphasis added).

The Court reinforced that the exception means what it clearly says: "we believe the consequences of a termination that § 304 authorizes simply do not apply to derivative works that are protected by the Exception defined in § 304(c)(6)(A)." *Mills Music*, 469 U.S. at 164. *See also Woods v. Bourne Co.*, 60 F.3d 978, 987 (2d Cir. 1995) ("The effect of *Mills Music*, then, is to preserve during the post-termination period the panoply of contractual obligations that governed pre-termination uses of derivative works . . . ").

Indeed, the Supreme Court was clear that the words of the exception permitting the derivative works owner to continue under "the terms of the grant" meant all the terms of the grant:

> It should be noted that Justice WHITE's dissent does not adopt the Court of Appeals' reading of the Exception. He reads the "terms of the grant" to include only those terms defining the amount of the royalty payments and to exclude the terms identifying the parties to whom the royalty is payable. The statute itself, however, refers to "the terms of the grant"—not to some of the terms of the grant.

*Mills Music*, 469 U.S. at 167, fn. 35. In light of this straightforward explication of the statutory language in *Mills Music*, it is clear that the Rudinplay Affiliates' claims regarding "uniform decisional authority across all federal jurisdictions" is, at best, misleading, especially since no authority suggests otherwise.

Indeed, to create the appearance of "decisional authority," the Rudinplay Affiliates selectively quote a statement (which, of course, has no precedential value) from the Copyright Office website at paragraph 19 of their Complaint. (Doc. 1, ¶ 19.) The actual quote from the Copyright Office website is:

> A derivative work prepared pursuant to a grant before its termination may continue to be utilized under the terms of the grant after its termination, but the post-termination rights **to authorize new uses of the derivative work that are not covered by the grant** and to prepare new derivative works revert to the authors or their heirs.

https://www.copyright.gov/recordation/termination.html (last visited 1/22/23) (emphasis added). The Complaint's quote from the website omits the bolded language, which of course, makes clear that only new derivative works "that are not covered by the grant" may be created. The fact that the Rudinplay Affiliates omit this salient language should tell the Court all it needs to know about their argument.

Moreover, by referencing the website language in their Complaint, the Rudinplay Affiliates seem to request *Chevron* deference[22] for an anonymous Copyright Office post, even though an post like this is not even entitled to *Skidmore* deference.[23] They provide no basis for why the statement on the Copyright Office website (for which the author's credentials are unknown) has any persuasive power to make it worthy of something closer to "great respect" as opposed to "near indifference." *United States v. Mead Corp.*, 533 U.S. 218, 228 (2001). [24]

Finally, the Rudinplay Affiliates' unsupported reference to the "fundamental purpose" of the statute commits the cardinal statutory construction sin of making sweeping pronouncements about Congressional meaning at the expense of the statute's plain language:

> Application of "broad purposes" of legislation at the expense of specific provisions ignores the complexity of the problems Congress is called upon to address and the dynamics of legislative action. Congress may be unanimous in its intent to stamp out some vague social or economic evil; however, because its Members may differ sharply on the means for effectuating that intent, **the final language of the legislation may reflect hard-fought compromises**. Invocation of the "plain purpose" of legislation at the expense of the terms of the statute itself takes no account of the processes of compromise and, in the end, prevents the effectuation of congressional intent.

---

[22] *Chevron U.S.A. Inc. v. Nat. Res. Def. Council, Inc.*, 467 U.S. 837, 842-44 (1984)(when Congress has "explicitly left a gap for an agency to fill, there is an express delegation of authority to the agency to elucidate a specific provision of the statute by regulation" and any ensuing regulation is binding in the courts unless procedurally defective, arbitrary or capricious in substance, or manifestly contrary to the statute).

[23] *Skidmore v. Swift & Co.*, 323 U.S. 134, 140 (1944) (agency interpretations are entitled to persuasive deference, though the weight of such deference in any particular case will depend on the circumstances).

[24] The Copyright Office Compendium, a more authoritative reference guide created by the Office, does not contain the statement referenced by the Estate/LLC.

*Board of Governors of Federal Reserve System v. Dimension Financial Corp.*, 474 U.S. 361, 373-74 (1986).

(emphasis added). In fact, as the Supreme Court makes clear in *Mills Music*, the derivative works

exception in Section 304(c) reflects exactly the same sort of "hard-fought compromises"[25] it would

later identify in *Dimension Financial*. Nobody disputes that, generally, Section 304(c) was adopted to

give authors a shot at recapturing some of the original rights they'd granted soon after creation of

their works, but in so doing, Congress sought to balance the interests of authors with the interests of

creators of derivative works,[26] even if it meant the original author got stung in the transaction.

## CONCLUSION

For the reasons set forth above, this Court should dismiss the Rudinplay Affiliates'

Complaint with prejudice, award costs, attorneys' fees and any other relief the Court deems

appropriate.

Dated:  January 23, 2023                      Respectfully submitted,

                                              TottisLaw

                                              By:      /s/ Kevin Tottis

                                                       Kevin Tottis
                                                       Keith Stolte
                                                       Max A. Stein
                                                       401 N. Michigan Avenue
                                                       Suite 530
                                                       Chicago, IL 60611
                                                       Tel: (312) 527-1400
                                                       ktottis@tottislaw.com
                                                       kstolte@tottislaw.com
                                                       mstein@tottislaw.com

---

[25] "[T]he termination provisions reflect[s] a practical compromise that will further the objectives of the copyright law while recognizing the problems and needs of all interests involved." *Mills Music*, 469 U.S. at 173 quoting H.R. Rep. No. 94-1476, at 124.

[26] According to the Supreme Court, "Congress intended the termination provisions to produce an accommodation and a balancing among various interests." *Mills Music,* 469 U.S. at 173, n. 40.

McLaughlin & Stern, LLP

Steven J. Hyman
David Blasband
Oliver R. Chernin
260 Madison Avenue
New York, New York  10016
Tel: (212) 447-1100
shyman@mclaughlinstern.com
dblasband@mclaughlinstern.com
ochernin@mclaughlinstern.com

*Attorneys for The Dramatic Publishing Company*