# EXHIBIT 2

**AMERICAN ARBITRATION ASSOCIATION**
**Commercial Arbitration Tribunal**

In the Matter of the Arbitration between:

Case Number: 01-19-0000-7463

The Dramatic Publishing Company, Claimant

-vs-

The Estate of Nelle Harper Lee, by and through its personal representative Tonja Carter;
Harper Lee, LLC, Respondents/Counterclaimants

## FINAL AWARD OF ARBITRATOR

I, THE UNDERSIGNED ARBITRATOR, having been designated in accordance with the

arbitration agreement entered into between the above-named parties and dated June 25, 1969,

and having been duly sworn, and having duly heard the proofs and allegations of the Parties, and

having previously rendered an Interim Award (Corrected) dated October 21, 2021, attached as

Appendix A, hereby AWARD as follows:

In the Interim Award, I awarded Dramatic its reasonable attorneys' fees in an amount to

be set forth in this Final Award and its reasonable costs incurred.  I ruled that costs would

include all court reporter fees, all fees paid to Arbitration Place (the remote videoconference

facilitator), and other reasonable costs in the Arbitrator's discretion.  I noted that my discretion in

awarding costs would be guided by, but not controlled by, 28 U.S.C. §1920.  I also ruled that the

Estate and the LLC are jointly and severally liable to pay to Dramatic the award of attorneys'

fees and costs.   In addition, I ruled that the administrative fees and expenses of the AAA and the

expenses of the Arbitrator shall be paid by the Respondents.

Dramatic filed its Petition for Fees and Costs on November 3, 2021.  On November 17,

2021, Respondents filed a Response to the Petition.  Their Response contains an "Introductory

Statement and Objection" that objected to being required to submit a response to the Petition for

fees because the Arbitrator failed to provide a reasoned explanation of (a) the basis for the award

of fees and costs, and (b) how the LLC could be jointly and severally liable.  The Response then

proceeded with arguments supported by a declaration and exhibits asserting various deficiencies

with the Petition.

      The following day, November 18, 2021, Dramatic submitted an email acknowledging a

computational error and requesting that the amount of fees it requested in the petition should be

reduced by the amount of the error.  It also submitted revised invoices correcting certain

mistaken redactions in its initial filing.  On November 19, 2021, Respondents submitted an

objection to these corrections.

      On November 24, 2021, I issued an order reopening the hearing as of November 18,

2021, pursuant to Rule 40 of the AAA Commercial Arbitration Rules, to consider the materials

and issues recently raised by the parties and to determine whether clarifications to the Interim

Award would be needed.  In my Order, I granted Claimant's request to reduce the amount of fees

sought and to submit corrected invoice pages removing the erroneous redactions.  I also

requested the parties to submit additional briefs addressing the following issues: (a) Whether the

Arbitrator can assess fees against the Estate and Harper Lee LLC jointly and severally, (b) If the

fee award is not joint and several, how should the fee award be apportioned between the Estate

and Harper Lee LLC? and (c) Why does it matter whether the total fees awarded are joint and

several or not?

      On November 29, 2021, Respondents submitted an objection contending that I had no

authority to reopen the hearing and that due to a lack of jurisdiction for me to make any

substantive changes to the Interim Award, they believed there was no reason for additional

briefs.  On December 2, 2021, I sent an email to counsel for the parties noting Respondents'

objection, and stating that "Under Rule 40, an arbitrator has authority to reopen the hearing on

his own initiative prior to the final Award.  I reopened the hearing only to request information

that might assist me in ruling on the petition for attorney's fees and costs, not to redetermine

substantive issues."  I also clarified that "Neither side is obligated to file a brief."

On December 22, 2021, Claimant filed a brief, in part responding to the questions

previously posed by the Arbitrator, but also (a) requesting additional fees for preparing the brief,

and (b) requesting that the Respondents be required to post a bond.  Respondents objected to the

additional requests, and requested permission to submit a response if I was going to consider

Claimant's new requests.  I granted the Respondents permission to submit a brief, which they did

on January 5, 2022.

On January 6, 2022, the AAA informed the parties that the hearing was closed as of that

date.  The following is my Final Award, addressing attorneys' fees and costs.

## I.      Dramatic Is Entitled to an Award of Attorneys' Fees.

Upon careful review of the submissions of the parties, I find that Dramatic has provided a

sufficient basis for an award of attorneys' fees and costs, as set forth below.

There are three separate sources of authority on which an award of attorneys' fees may be

made to Dramatic.  First is the 1969 Agreement, which provides that the Owner (Ms. Lee) "will

defend, indemnify and hold harmless the Publisher (Dramatic) from and against any monetary

losses or other losses whatsoever, including reasonable attorney's fees, caused by reason of the

breach of any agreement and/or representation herein by the Owner…." ¶1(b).  Also, ¶4(d) of the

Agreement provides that it is "binding upon the parties and "their respective…assigns."  This

provision is broad enough to encompass the LLC, which is the owner, by means of a written assignment, of the copyright in "To Kill a Mockingbird."

A second source is §505 of the Copyright Act, which allows a court in its discretion to award costs, including attorneys' fees, to a prevailing party in a copyright suit.  With respect to the copyright issues in this action, Dramatic is the prevailing party.  Both the Estate and LLC have requested fees and costs in their copyright claims against Dramatic (Resp. Counterclaim, ¶¶58, 62, Prayer for Relief ¶G).

Third is Rule 47(d)(ii) of the AAA Commercial Arbitration Rules.  This provides that an arbitrator may make an "award of attorneys' fees if all parties have requested such an award or it is authorized by law or their arbitration agreement."  Both the Estate and the LLC, as well as Dramatic, have requested attorneys' fees in their respective pleadings.

With respect to fee awards in copyright cases, in *Fogerty v. Fantasy, Inc.*, 510 U.S. 517 (1994) and *Kirtsaeng v. John Wiley & Sons, Inc.*, 136 S. Ct. 1979 (2016), the Supreme Court recognized that §505 gives district courts broad discretion in awarding or denying fee requests and also established various guiding principles to inform that discretion.  Among the principles to consider are that prevailing plaintiffs and prevailing defendants not be treated under different standards, and that defendants should be "encouraged to litigate [meritorious copyright defenses] to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." *Fogerty* at p. 527.  In addition, these cases have mentioned several non-exclusive factors to consider, including frivolousness, motivation, objective unreasonableness, and the need to advance considerations of compensation and deterrence.  *Id*.  In *Kirtsaeng*, the Court clarified that although objective unreasonableness is a substantial factor, it is not the controlling one.  In

other words, even if the non-prevailing party's claims or defenses are reasonable, it may still be required to pay attorneys; fees in the court's discretion.

While I do not find the Respondents' copyright claims to be objectively unreasonable, I have awarded fees and costs to Dramatic because other factors outweigh that factor. Specifically, I consider the factors of encouraging meritorious defenses, motivation, and the need for compensation and deterrence to be compelling in this case. The importance of these factors can be readily discerned from the facts and rulings set forth in the Interim Award.

Similar principles have informed my discretion in awarding fees arising out of the non-copyright issues in the case as well. Dramatic has prevailed in establishing that it did not violate the 1969 Agreement and that the Estate did. It established that the Estate did violate it by hindering the full exercise of Dramatic's rights. Dramatic obtained injunctive and declaratory relief, as well as monetary damages.

A crucial issue in the case was whether Dramatic exceeded its contractual rights by granting stock licenses to regional theaters that used one or more professional actors. Evidence of Mr. O'Donnell's statements and communications provided substantial evidence that the practice did not exceed the scope of the grant, and that the Estate and LLC were aware of this. This was reinforced by decades of acquiescence. Nevertheless, Respondents yielded to pressure from the Rudin interests to the detriment of Dramatic. The Respondents' motivations in this litigation were, as shown in substantial evidence, influenced by these outside interests rather than by the respective rights of the parties under the 1969 Agreement. An award of attorneys' fees to Dramatic will allow it to avoid the brunt of incurring substantial attorneys' fees for vindicating its rights. The award will enable its attorneys to be properly compensated for their work. The

award should also serve as a deterrent to similar conduct by Respondents in the future with respect to violations of Dramatic's rights by the Estate and LLC.

Actions of the Respondents in large measure forced Dramatic into a position of having to defend and protect its contractual and copyright interests.  An award of fees and costs is necessary to ensure that its efforts to protect these interests do not leave it in a large financial hole.

**II.      Calculation of Reasonable Attorneys' Fees and Litigation Costs.**

The Interim Award provides that Dramatic is awarded its "reasonable" fees and costs. The following is my calculation of Dramatic's reasonable fees.

**A.      Reasonable Rates.**

I find that the non-discounted standard hourly rates of Dramatic's attorneys are reasonable.  They are below industry standards reflected in the AIPLA Survey. Petition, Ex. M. The hourly rates charged by Dramatic's counsel are consistently and considerably lower than those charged by Respondents' counsel.  For example, Mr. Tottis' standard rate, as lead counsel, is $575 (discounted to $500) compared to Mr. Hymer, Respondents' lead counsel, whose rate is $590.  Dramatic's second chair, Mr. Stolte, is $475 (discounted to $400) compared to Respondents' second chair, Mr. Black, at $490.  Dramatic's New York counsel are likewise lower than Respondents' New York counsel.  Respondents' expert on reasonable fees, Mr. Rubin, concluded that the hourly rates of Respondents' attorneys are reasonable.  One can reasonably conclude that that, *a fortiori*, the hourly rates of Dramatic's lawyers are reasonable as well.

Respondents do not appear to argue that the standard rates charged by Dramatic's attorneys are unreasonable, as such, but rather assert that lodestar rate cannot exceed the discounted rate that the law firms billed to Dramatic.  Respondents cite Section 1(b) of the 1969 Agreement as limiting attorneys' fees to any "monetary loss."  We need not decide whether that language precludes a higher fee in this case. The other sources of authority to award fees applicable in this case have no such limitation, and I find that the lodestar method of determining a fee award is appropriate here.  The lodestar approach multiplies a reasonable hourly rate by a reasonable number of hours required to litigate the case.  *Perdue v. Kenny A. ex. rel. Winn*, 559 U.S. 542, 551 (2010).

The Seventh Circuit's view appears to be that the billing arrangement between the attorney and client places a ceiling on the amount of the attorney's fee awarded to a prevailing party.  *Assessment Techs. of WI, LLC v. WIREdata, Inc.,* 361 F.3d 434, 438–39 (7th Cir. 2004) ("The best evidence of the value of the lawyer's services is what the client agreed to pay him"); *Bell v. Lantz,* 825 F.3d 849 (7th  Cir. 2016)("the contract between a party and his lawyer places a ceiling on what a court can award the lawyer") (citing *Lieb v. Topstone Industries*, 788 F.2d 151, 156 (3d Cir. 1986).  *Assessment Technologies* alluded to a three-way split among the federal circuit courts. 361 F.3d 434, 438–39.  *Bell* and *Assessment Technologies* represent one extreme in dealing with this issue, applying what appears to be a per se rule that an agreed upon rate operates as a ceiling of reasonableness.  On the other extreme is the Eighth Circuit, which has stated that the fee arrangement between the attorney and client is "immaterial." *Pinkham v. Camex, Inc.*, 84 F.3d 292, 294 (8th Cir. 1996).  Neither of these positions, to the extent that they impose absolute rules, seems appropriate when determining whether fees are "reasonable" in a process delegated to the court's discretion.

We are not bound in this arbitration by the Seventh Circuit's view.  The Supreme Court and several circuits take a more moderate, flexible approach to determining the reasonableness of fees, looking to a variety of factors.  A rigid per se rule that considers only the billing arrangement between the attorney and client is not the optimal approach to determining the lodestar.  For example, in *Crescent Publ'g Group, Inc. v. Playboy Enters.,* 246 F.3d 142, 151 (2d Cir. 2001), the Second Circuit refused "to declare a per se rule that the actual billing arrangement places a ceiling on the amount the prevailing party can recover through a fee award." The Second Circuit concluded that "for prevailing parties with private counsel, the actual billing arrangement is a significant, though not necessarily controlling, factor in determining what fee is 'reasonable.'" *Id.  See also, Getty Petroleum Corp. v. Bartco Petroleum Corp.,* 858 F.2d 103, 114 (2d Cir. 1988)(holding that an award of attorneys' fees may be assessed at a rate greater than the rate in a fee agreement).

The Second Circuit's view stems from *Blanchard v. Bergeron,* 489 U.S. 87, 96 (1989).  It is also the view of the Tenth, Eleventh, and Federal Circuits.  *Cadle Co., II, Inc. v. Chasteen,* 1993 WL 96886, at *1-2 (10th Cir. 1993)( a fee arrangement "does not reflect what is a reasonable attorney fee if the attorney reduces the fee rate because of a client's poor financial condition"); *Tire Kingdom, Inc. v. Morgan Tire & Auto, Inc.,* 253 F.3d 1332, 1337 (11th Cir. 2001)("the agreed-upon fee rate does not necessarily act as a cap or ceiling in determining the reasonable hourly rate. . . . an agreed-upon rate is relevant evidence to determine the fee rate, but it is not necessarily determinative"); *Lumen View Tech. LLC v. Findthebest.com, Inc.,* 811 F.3d 479, 483 (Fed. Cir. 2016)("We have noted that 'although the amount the client paid the attorney is one factor for the court to consider in determining a reasonable fee, it does not establish an absolute ceiling'", citing *Junker v. Eddings,* 396 F.3d 1359, 1365 (Fed. Cir. 2005)).  *See also,*

*Hofer v. Unum Life Ins. Co. of Am.*, 338 F. Supp. 2d 1252, 1256–57 (D. Kan. 2004)("both the Supreme Court and the Tenth Circuit have allowed recovery of attorneys' fees in excess of an agreed-upon amount in certain circumstances"); *Sanguineti v. Boqvist*, 15-CV-3159 (PKC), 2016 WL 1466552, at *3 (S.D.N.Y. Apr. 14, 2016)("Awarding attorney's fees at a higher rate than what was provided for in a fee agreement does not confer a benefit onto a prevailing party, as respondent suggests; rather, the benefit is conferred on the prevailing party's attorney, and holding otherwise 'would result in a windfall to the ... [respondent] as wrongdoer[ ], who would pay less'"), (citing *Getty Petroleum*, 858 F.2d at 114); *Ross v. Congregation B'Nai Abraham Mordechai*, 814 N.Y.S.2d 837, 842–44 (N.Y. Civ. Ct. 2006)("This court finds the Supreme Court's and the Second, Tenth, and Eleventh Circuits' approach most persuasive and holds that a fee agreement is one factor among many that the court will consider in assessing reasonable attorney fees").

I find this middle path more persuasive than the per se rule applied by the Seventh Circuit, and will use the standard, non-discounted rates charged by TottisLaw and McLaughlin & Stern in calculating the amount of reasonable fees, with the exceptions stated in Section E., below.

**B.    Reasonable Hours.**

With some exceptions, addressed in Section E., below, the hours spent by Dramatic's lawyers were reasonable.  This was a complex case with high stakes, not only regarding the respective damage claims but also affecting the continuing rights and obligations of the parties under the contract and copyright law.  As a result, the case was handled with great zeal by both parties, and a great deal of work was required for both parties.

Subject to certain exclusions discussed below, I find that the overall hours billed by Dramatic's attorneys to be reasonable.  One particular indication of this is seen by comparing the respective hours spent by counsel during the litigation.  As seen in Dramatic's Exhibits C and D, the hours billed from the filing of the Demand through the completion of the evidentiary hearing by the TottisLaw firm were far fewer than those billed by the Bradley Arant firm.

| Date Range | TottisLaw | Bradley Arant |
|---|---|---|
| March 2019 – November 2019 | 479 | 1,257 |
| December 2019 – March 2020 | 388 | 700 |
| April 2020 – February 2021 | 800 | 1,675 |
| March 2021 – May 2021 | 1,206 | 1,575 |
| TOTAL HOURS | **2,873** | **5,207** |

*See*, Claimant Ex. C and D.  These numbers speak for themselves.  The TottisLaw firm billed only 55% as many hours as the Bradley Arant firm.  This is persuasive evidence that Dramatic's counsel prepared and presented the case efficiently and reasonably.

The TottisLaw firm not only charged a discounted rate, but also wrote off a substantial amount of time.  Tottis Decl. ¶19.  I have reviewed those entries and find that the time that was credited was not time that would have been excessive, unnecessary, or wasteful if it had been billed.  Rather it was credited because of the financial burden that conducting the arbitration placed on Dramatic.  Accordingly, I find that those hours are reasonable and will allow recovery for that time.  Dramatic has calculated the billing for the credited time would have been $90,682. *Id.*

**C.      Block Billing**

Respondents seek a considerable reduction in the amount of the lodestar due to purported "block billing" by the lawyers.  For example, they would like to eliminate 59% of the hours billed by the TottisLaw firm. (Estate Response, p. 9).

I find that the fees awarded for Dramatic's counsel need not be reduced for block billing. First, as noted in *Farfaras v. Citizens Bank*, 433 F. 3d 558, 569 (7th Cir. 2006), block billing, though not a best practice, is not prohibited.

Moreover, I find that the entries were sufficiently detailed to determine the nature of the work and whether the amount of hours spent was reasonable.  *See Cintas v. Perry*, 517 F. 3d 459, 469 (7th Cir. 2008); *Buffone v. Rosebud Restaurant, Inc.*, 2007 WL 9817882 at *10 (N.D. Ill. 2007); *Pittsburgh & Conneant Dock Co. v. Director*, 473 F. 3d 253, 273 (6th Cir. 2007) (plaintiff's counsel "is not required to record in great detail how each minute of his time was expended," but rather "should identify the general subject matter of his time expenditures," *quoting Hensley v. Eckerhart*, 461 U.S. 424, 437 n. 12 (1983)).

There are some instances in which the potential unreasonableness of some entries was exacerbated due to block billing.  These are discussed in Section E. below.

**D.      Partially Unsuccessful Claims.**

Respondents argue that Dramatic cannot recover fees for claims it did not win, citing the fact that it did not recover damages from three theaters under its contract claim. (Response, p. 6). Respondents failed to mention that Dramatic prevailed on six of the nine theaters involved in the claim.  It also does not mention that I ruled in Section II.D. of the Interim Award that Dramatic did not violate the 25-mile provision of the Agreement even as to the three theaters because those theaters cancelled the planned performances and Respondents suffered no damages.  Similarly,

Respondents cite a lack of success by Dramatic on the tortious interference claim against the LLC, without acknowledging that Dramatic prevailed on the same claim against the Estate. It should also be noted that Dramatic prevailed against all of Respondents' copyright claims.

Respondents' argument lacks merit. A fee award does not require total victory on every claim in the litigation. As the *Hensley* case stated long ago,

> Where a plaintiff has obtained excellent results, his attorney should recover a fully compensatory fee. Normally this will encompass all hours reasonably expended on the litigation, and indeed in some cases of exceptional success an enhanced award may be justified. In these circumstances the fee award should not be reduced simply because the plaintiff failed to prevail on every contention raised in the lawsuit.

*Hensley v. Eckerhart*, 461 U.S. 424, 435 (1983). While *Hensley* also noted that no fee may be awarded for services on unrelated unsuccessful claims, that principle is not applicable where "the plaintiff's claims for relief will involve a common core of facts or will be based on related legal theories." All the claims in this case, whether asserted by the Claimant or the Respondents, whether based on the 1969 Agreement, copyright law, or tortious interference, are closely related – indeed, inextricably intertwined. This much is obvious simply from reading the Interim Award. To quote *Hensley*, because of this common core of facts,

> Much of counsel's time will be devoted generally to the litigation as a whole, making it difficult to divide the hours expended on a claim-by-claim basis. Such a lawsuit cannot be viewed as a series of discrete claims. Instead, the district court should focus on the significance of the overall relief obtained by the plaintiff in relation to the hours reasonably expended on the litigation.

This is all the more true when the lack of success on a claim is not even for the entire claim, but only on three out of the twelve factual components of the claim. *See also*, *Nanetti v. U. of Illinois at Chicago*, 944 F.2d 1416, 1419 (7th Cir. 1991)(" when time is spent jointly preparing two distinct claims, the fact that one claim produces no recovery will not deprive the plaintiff of

every hour spent in joint preparation"); *C.J. v. Dept. of Human Services*, 771 N.E.2d 539, 557–58 (Ill. App. 1st Dist. 2002)(" A prevailing party may be entitled to all his or her attorney fees, even for unsuccessful claims, if those claims arise out of a common core of facts or legally related theories").

Dramatic has obtained substantial, almost complete, relief in this arbitration.  This is not a case in which the unsuccessful claims were distinct in all respects from the successful claims.  Accordingly, reduction of the lodestar is not warranted on the grounds that plaintiff was partially unsuccessful on some relatively minor parts of its claims.

**E.     Exclusions from Requested Fee.**

**1.     McLaughlin & Stern Invoices.**

(**a**)  As previously ordered, the amount of $20,205 will be deducted from McLaughlin & Stern's time entries due to computational error in the initial fee petition.

(**b**)  In addition, some specific exclusions requested by Respondents are appropriate.  First, regarding McLaughlin & Stern's time entries from January 10, 2019, to January 21, 2019, it seems clear that not all the entries relate to the arbitration as such but rather relate to some of the events preceding and precipitating the arbitration.  The descriptions are not sufficiently precise to determine if the tasks were preparatory for the arbitration.  Accordingly, all entries prior to January 21, 2019, in McLaughlin & Stern's invoices will be excluded.  Those entries total $13,750.  However, the entries in McLaughlin & Stern's invoices from January 22, 2019, and thereafter are sufficiently arbitration-related as to be compensable, unless excluded for other reasons set forth below.  Accordingly, the following items from McLaughlin & Stern's invoices will be excluded:

Per **E.1.(a)** above:
Amount Deducted due to computational error  --  **$20,205**

Per **E.1.(b)** above:
Entries prior to January 22, 2019  --  $13,750

Respondents' Brief, p.12, Item 2  --  $150 (entry unrelated to this case)

Respondents' Brief, p.12, Item 3  --  $250 (entry unrelated to this case)

Respondents' Brief, p.13, Item 4  --  $11,250 (entry for 22.5 hours in one day)

Respondents' Brief, p.13, Item 5  --  $11,000 (entry for 22.0 hours in one day)

Respondents' Brief, p.13, Item 6  --  $400 (inconsistent entries)

Amount Deducted from McLaughlin & Stern per E.1. b) :  $36,800 (less 15% courtesy discount) = **$31,280.**

Total Deductions under E.1. a) and E.1. b):  **$51,485**

Additional exclusions from McLaughlin & Stern's invoices relating to billing for the petition for attorneys' fees are addressed below.

### 2.  Billing on Attorneys' Fees Petitions.

Respondents assert that the fees billed by both TottisLaw firm and the McLaughlin & Stern firm for work on the attorneys' fees petitions were excessive.  They assert that TottisLaw firm billed approximately $42,125 and McLaughlin & Stern billed $16,983, for a total of $59,128 on the first petition for fees.  (Response, p.17).  I agree that this amount is excessive. I understand that much work goes into collecting all the data that goes into a fee petition for a case that was spanned more than two years, and that substantial time goes into preparing the exhibits, declarations, and briefs.  Nevertheless, I find that the number of hours spent on the petition was excessive and that reductions will be required for the number of hours spent on the petition to be reasonable.

In reviewing the invoices to calculate the hours billed to the fee petitions, I arrive at somewhat different numbers than Respondents. Based on my reading of the TottisLaw firm's invoices, Mr. Tottis billed 42 hours, Mr. Stolte billed 43.3 hours, and Cosmin Barbu billed 9 hours. At the firm's standard rates, the lodestar amount would be:

KT      42 x $575 =     $24,150

KMS    43.3 x $475 = $20,567

CB      9 x $175 =     $1575

        Total    =     **$46,292**

I find that a 25% reduction of TottisLaw firm's fees is appropriate and will reflect a reasonable fee for TottisLaw firm's work on the fee petition. Thus, the amount of **$11,573** will be deducted from the lodestar amount for this element of the petition.

A deduction for the attorneys' fees petition entries on McLaughlin & Stern invoice will also be required. Mr. Blasband spent 33.3 hours on the fee petition work. It appears from the invoices of TottisLaw firm that much of the work relating to Mr. Blasband's petition was accomplished by the TottisLaw firm. I find the number of hours billed by Mr. Blasband is excessive. The problem is exacerbated by the lack of any detailed descriptions of the actual work performed.

At Mr. Blasband's standard rate, the lodestar amount would be: 33.3 x $600 = **$19,980**. I find that a 50% reduction of these fees is appropriate and will reflect a reasonable fee for Mr. Blasband's work on the fee petition. Thus, the amount **of $9,990** will be deducted from the lodestar amount for this element of the petition.

I find that Dramatic is entitled to recover the attorneys' fees requested in the Second Declaration of Mr. Tottis filed December 22, 2021, for the work performed after the initial fee

request (herein the "Supplemental Petition").  Dramatic requests **$22,907** for that work.  I find

that the hours worked and rates billed to Dramatic are reasonable and will not be reduced.

F.      **Costs of Arbitration**

Section 1(b) of the 1969 Agreement provides that Ms. Lee "will defend, indemnify and

hold harmless the Publisher from and against any monetary losses or other losses whatsoever,

including reasonable attorney's fees" caused by reason of the breach of the Agreement.  This

provision is very broad.  It is not limited to attorneys' fees, but covers any "monetary losses or

other losses whatsoever. . . "  It is not limited by 28 U.S.C. §1920 either.  While I indicated in

the Interim Award that I would be guided by §1920, I also indicated I was not limited or bound

by that statute.  The breadth of Section 1(b) of the 1969 Agreement encompasses any of the types

of costs billed to Dramatic in this case, whether expert witness fees, travel costs, exemplification,

photocopying, court reporter services, or IT services.  The costs of this arbitration billed to

Dramatic would all be "losses" if not reimbursed.  I find that all of the costs for which

reimbursement is sought are directly related to the arbitration and were necessary to a careful and

thorough preparation and presentation of a case in which a great deal was at stake for both sides.

Accordingly, I award **$189,370** to Dramatic for its costs of arbitration.  *See* Claimant's

Exhibit E and Tottis Decl. ¶23.

G.      **Request for a Bond**

Dramatic has requested that Respondents be required to post a bond to secure payment of

the Final Award.  The request for a bond is denied.  Dramatic has not pointed to any concrete

evidence to indicate that payment of the Award is at risk.  ██████████████████

████████ Response dated January 5, 2022, Ex. B ¶3.  Mr. Hymer has confirmed to Mr. Tottis

in an email dated November 22, 2021, that the Estate has taken no action to dissipate its assets so

as to make the Estate judgment-proof.  Response dated January 5, 2022, Ex. A.  Ms. Carter

provided a sworn affidavit stating that there are sufficient assets to pay the Final Award, and that

she would continue to ensure that sufficient assets would be available. Carter Aff. ¶4.  In light of

these representation by members of the Bar, I find these to be adequate assurances that there are

and will continue to be adequate assets in the Estate to satisfy the Final Award.

## III.    AAA Administrative Fees and Arbitrator's Compensation

The administrative fees and expenses of the American Arbitration Association totaling

$28,500 shall be borne jointly and severally by Respondents, The Estate of Nelle Harper Lee, by

and through its personal representative Tonja Carter, and Harper Lee, LLC. The compensation

and expenses of the arbitrators totaling $245,490 shall be borne jointly and severally, by

Respondents, The Estate of Nelle Harper Lee, by and through its personal representative Tonja

Carter, and Harper Lee, LLC. Therefore, in addition to the other sums awarded herein,

Respondents, The Estate of Nelle Harper Lee, by and through its personal representative Tonja

Carter, and Harper Lee, LLC., jointly and severally shall reimburse Claimant, The Dramatic

Publishing Company, the amount of $135,070, representing that portion of said fees,

compensation, and expenses previously incurred by Claimant, The Dramatic Publishing

Company.

## IV.    Summary of Fees and Costs Awarded.

The following summarizes the total attorneys' fees and total costs awarded in this Final Award.

Attorneys' Fees – Initial and Supplemental Petitions

| | |
|---|---|
| TottisLaw    -- | $1,812,617 (Initial - Claimant's Ex. C) |
| McLaughlin & Stern  -- | $470,083 (Initial - Claimant's Ex. C) |
| TottisLaw    -- | $22,907 (Second Tottis Decl. ¶4) |
| **Total Fees Billed** | **$2,305,607** |

Deductions for Excluded Entries

|  |  |  |
|---|---|---|
| McLaughlin & Stern | -- | $20,205 (per Section E.1.(a)) |
| McLaughlin & Stern | -- | $31,280 (per Section E.1.(b)) |
| McLaughlin & Stern | -- | $9,990 (per Section E.2.) |
| TottisLaw | -- | $11,573 (per Section E.2.) |
| **Total Deductions** | **--** | **-$73,048** |
| **Total Fees Awarded** | **--** | **$2,232,559** |

Arbitration Costs Awarded   --          **$189,370** (no deductions, per Section F)

Amer. Arb. Assoc. Fees and
Arbitrator Compensation Awarded --      **$135,070**

Total Award of Attorneys' Fees and Costs      **$2,556,999**

     All requests for fees or costs not expressly granted herein are denied.  All objections to fees or costs not expressly granted herein are denied.

     This award is in full settlement of all claims and counterclaims submitted to this arbitration. All claims and counterclaims not expressly granted herein are denied.

Dated:  January 28, 2022

Arbitrator Signature: _____
                         William T. McGrath

# APPENDIX A

# AMERICAN ARBITRATION ASSOCIATION
## Commercial Arbitration Tribunal

| | | |
|---|---|---|
| THE DRAMATIC PUBLISHING COMPANY | ) | |
| | ) | |
| Claimant, | ) | |
| | ) | |
| v. | ) | No. 01-19-0000-7463 |
| | ) | |
| THE ESTATE OF NELLE HARPER LEE, | ) | |
| by and through its personal representative | ) | |
| TONJA CARTER; HARPER LEE, LLC, | ) | |
| | ) | |
| Respondents/Counterclaimants | ) | |

## INTERIM AWARD OF ARBITRATOR (CORRECTED)

I, William T. McGrath, the undersigned arbitrator, having been designated in accordance with the arbitration provision in the Agreement entered by the parties on June 25, 1969, and having been duly sworn and having heard the proofs and allegations of the parties, do hereby issue the following Interim Award.

## I.     INTRODUCTION

Claimant, Dramatic Publishing Company ("Dramatic"), filed a demand for arbitration on March 7, 2019, against the Estate of Nelle Harper Lee, by and through its personal representative Tonja Carter ("the Estate"). The Estate filed an Answering Statement on April 8, 2019. On April 24, 2019, the Estate filed a Counterclaim against Dramatic, and Harper Lee LLC ("the LLC") submitted a claim against Dramatic. Dramatic filed an Answer and Reply to the Counterclaim on May 30, 2019. On October 3, 2019, Dramatic filed an Amended Demand. The Respondents collectively filed an Answering Statement to the Amended Demand on October 17, 2019.

1

The contract between the parties (C013,¶4(k))[1] contains the following arbitration clause: "Any controversy arising out of this agreement is to be arbitrated in Chicago  by and under the rules of the American Arbitration Association."

The parties had originally selected a three-arbitrator panel, of which the undersigned was Chair.  On February 19, 2021, on an administrative conference call, the parties notified the American Arbitration Association that they had agreed to have the arbitration heard exclusively by the undersigned. Counsel provided written notice of this to AAA.  AAA then removed the other two arbitrators.

This case revolves mainly around an agreement dated June 25, 1969, between Nelle Harper Lee and Dramatic ("the 1969 Agreement") granting Dramatic certain rights to create a dramatization adapting Miss Lee's famous novel *To Kill a Mockingbird* ("TKAM" or "the Novel") and to license others to perform the play.   Then-president of Dramatic, Christopher Sergel Sr. (now deceased), wrote an adaptation of TKAM.  Dramatic is now operated by the playwright's grandson, Christopher Sergel III.  Miss Lee died in February 2016.

Briefly, Dramatic claims in this arbitration that the Estate and the LLC have breached the 1969 Agreement in various ways, as described more fully below.  It also asserts that the Estate and the LLC have tortiously interfered with contracts Dramatic entered with various licensees.  It seeks actual damages for breach of contract and tortious interference, and punitive damages for tortious interference.  It also seeks various declaratory and injunctive relief against the Estate and the LLC.  The Estate and the LLC deny any liability.

---

[1] Each Exhibit at the Hearing was marked with a letter designation followed by three digits. For example, a Claimant's Exhibit 13 would be marked C013, Respondents' Exhibit 123 would be R123, and a Joint Exhibit 125 would be J125.  A pinpoint cite in an exhibit would be the Exhibit number followed by a three-digit number.  Thus, J125-003 is page three of the exhibit.

The Estate counterclaims that Dramatic has breached the 1969 Agreement in various ways, as described more fully below.  It also claims that it is beneficial owner of the copyright in TKAM and that Dramatic has infringed the copyright in the Novel.  It also claims that Miss Lee terminated the copyright grant effective on April 26, 2016 pursuant to 17 U.S.C. § 304(c).  The LLC alleges that it is the legal owner of the copyright in the Novel by way of assignment from the Estate and that Dramatic has infringed the copyright.  The Estate and LLC seek actual damages and any additional profits and statutory damages for copyright infringement.  They also seek various declaratory relief against Dramatic.  Dramatic denies any liability.

One partially dispositive motion was filed.  On December 17, 2019, the Estate filed a motion for partial summary judgment with regard to Dramatic's request for declaratory relief concerning certain rights granted to it in the 1969 Agreement.  The Estate asserted that the grant of copyright rights to Dramatic was terminated effective April 26, 2016, pursuant to 17 U.S.C. § 304(c). After briefing by the parties, the panel heard oral arguments on the motion.  On February 13, 2020, the panel issued an order denying the Estate's motion.[2]

---

[2] To be clear, the order did not grant summary judgment on the issue to Dramatic.  It simply denied the motion so that the issue could be more fully explored with the benefit of a full hearing.  Nevertheless, Dramatic asserted in its Post-Hearing Brief (p.41) that the Panel found as a matter of law that §304(c)(6)(A) did not eliminate affirmative exclusionary rights that were transferred in the original grant.  After Dramatic made a similar assertion in a colloquy during the hearing, I explained in an email to the parties, dated March 19, 2021, that:

> . . . the Panel's order (which I wrote on behalf of the Panel) was intended only to deny the Respondents' motion for summary judgment, as the Panel deemed it necessary to have a  fuller presentation of the facts as to the terms of the original grant in the hearing.

> Denying a motion for summary judgment filed by one party does not amount to granting  a motion for summary judgment to the opposing party.  To state that 'We do not find that    as      a matter of law §304(c)(6)(A) eliminates any and all affirmative exclusionary rights that were transferred in the original grant' is not the same as saying that 'We find that as     a matter of law §304(c)(6)(A) does not eliminates any and all affirmative exclusionary    rights      that      were transferred in the original grant.'  We made no such finding.

3

After some postponements relating to scheduling difficulties, Covid, and discovery, the evidentiary hearing commenced with opening statements by counsel on March 18, 2021.  There were 25 days of evidentiary hearing via remote video transmission from March 18 through June 16, 2021.  There are over 1,000 exhibits and over 5,000 pages of transcript.[3]

## II. INTERIM AWARD

For the reasons set forth in detail below, I make the following Interim Award:

### A. Monetary Relief

1.        The Estate shall pay to Dramatic actual damages in the amount of $172,500 for the breach of contract resulting in the cancellation of the Jonathan Church Productions licensed performances in the United Kingdom. *See*, Section III.J., *infra*.

2.        The Estate shall pay to Dramatic actual damages in the amount of $12,727 for the breach of contract resulting from the forced cancellations of stock and amateur licensee's performances in the United States. *See*, Section III.J., *infra*.

3.        The Estate is liable to Dramatic for tortious interference with contract.  The monetary damages resulting from the tortious interference are the same as the damages resulting from the Estate's breach of contract.  As a result, the Estate shall pay a single damage award to

---

[3] An almost two-week delay during the course of the hearing occurred when Dramatic's counsel discovered that the Estate has been involved in another arbitration relating to a different grant of rights made by Miss Lee relating to TKAM (the "Peck arbitration").  This arbitration had not been disclosed to Dramatic at any time prior to the hearing.   Dramatic asserted that the Peck arbitration was likely to have documents responsive to its prior document requests.  The Estate disagreed, but agreed to consult with the counsel in the Peck arbitration and conduct a document review.  A complete discussion of the matter is at Tr. 1016-19; 1049-52; 1413-27; 1538-57. A substantial number of documents were eventually produced, which required the hiatus in the hearing to allow Dramatic time to review the documents produced.  Among the documents produced was a highly relevant handwritten note from Miss Lee in which she comments on the scope of her rights and Dramatic's rights.

Dramatic in the amount of $185,227, as damages for breach of contract and tortious interference.  *See*, Section III.J., *infra*.

4.      The LLC is not jointly and severally liable for the breach of contract or for the tortious interference with contract.

5.      No punitive damages are awarded to Dramatic. *See*, Section III.J., *infra*.

6.      Dramatic is awarded its reasonable attorneys' fees in an amount to be determined and set forth in the Final Award.  The Estate and the LLC are jointly and severally liable to pay to Dramatic the award of attorneys' fees.

7.      Dramatic is awarded its reasonable costs incurred, including but not limited to all court reporter fees, all fees paid to Arbitration Place, and such other reasonable costs in the Arbitrator's discretion.  The arbitrator's discretion in awarding costs will be guided by, but not controlled by, 28 U.S.C. §1920.  The Estate and the LLC are jointly and severally liable to pay to Dramatic the award of reasonable costs.

8.      The hearings are reopened to allow Claimant to submit its Petition for attorneys' fees and costs by **November 3, 2021**, and for the Respondents to submit their Response by **November 17, 2021**.  After the petition and response are received, the hearings will be declared closed and the Final Award will be issued within 30 days.

9.      The administrative fees and expenses of the AAA and the compensation and expenses of the Arbitrators shall be paid by the Respondents.  The amount will be set forth in the Final Award.

    **B.  Other Findings and Relief**

    As part of this Award, I also make the following findings and award the following declaratory and injunctive relief:

10.     The terms of the original grant in the 1969 Agreement survive termination. Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ("non-first-class rights") and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights.

11.     Dramatic has not infringed the federal copyright protecting *To Kill a Mockingbird.*

12.     Dramatic may continue to license both versions of *To Kill a Mockingbird.*

13.     The Estate and the LLC shall be enjoined from (i) licensing or granting any third party, including, but not limited to, Scott Rudin ("Rudin") and Rudinplay, Inc., Atticus LLC, any other entity owned, controlled or operated by Scott Rudin, and any entity assigned or licensed rights from Rudinplay (collectively referred to herein as "Rudinplay Affiliates"), any non-first-class stage rights in *To Kill a Mockingbird;* (ii) encouraging, inducing, assisting, approving, or consenting to any wrongful interference with Dramatic's licensees anywhere in the world by Rudin or Rudinplay Affiliates; (iii) encouraging, inducing, assisting, approving or consenting to Rudin's or Rudinplay Affiliates' wrongful licensing of Rudinplay's version of *To Kill a Mockingbird* for any non-first-class production throughout the world; (iv) directly interfering with Dramatic's licensees' licensed non-first-class productions of either version of the Sergel Play; and (v) otherwise interfering with Dramatic's rights to license non-first-class and amateur productions of either version of the Sergel Play.

14.     The Estate and the LLC shall pay to Dramatic any and all future royalties or other payments they receive from Rudinplay Affiliates or any other person or entity from any non-first-class productions of *To Kill a Mockingbird.*

6

15.     The Estate shall:

a.      defend, indemnify and hold harmless Dramatic from and against any and all monetary losses or other losses whatsoever, including attorneys' fees, caused by any legal or administrative action brought against Dramatic by any of the following Dramatic licensees: (i) Jonathan Church Productions, (ii) any other licensee theater that had scheduled a production of the Play on the Church Tour; (iii) Arena Fair Theater at Chappelear Theater, Ohio Wesleyan University; (iv) DeSoto Family Theater performing at Landers Theater Center; (v) Hill Country at Bud El.; (vi) Hart Theater in Hillsboro, Oregon; (vii) Curtain Call; (viii) Azusa Pacific University; and, (ix) any other purely amateur theater that was consented to by Mr. O'Donnell that cancelled a production of TKAM after receiving a cease and desist letter from Rudin or the Estate.

b.      defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by Scott Rudin, Aaron Sorkin, Rudinplay, Rudinplay Affiliates, or Atticus, LLC, or any of their licensees or assignees, or anyone on their behalf connected in any way with Dramatic's exercise of its exclusive worldwide rights to license all non-first-class rights in the Sergel Play;

c.      defend, indemnify and hold harmless Dramatic from or against any and all losses arising from any legal or administrative action brought against Dramatic by any third party as a result of the transfer of any non-first-class rights by the Estate or LLC.

16.     The Estate and the LLC shall account for and shall turn over to Dramatic any payments or royalties received by the Estate or the LLC for any non-first-class rights from Scott Rudin, Rudinplay, any other Rudinplay Affiliate, Aaron Sorkin, or any other secondary theatrical publishing and licensing house.

17.     The parties were allowed to make post-hearing submissions pursuant to Commercial Arbitration Rule 35(c).  The Estate points out that certain additional documents submitted by Dramatic are documents that had not been produced in discovery. (Estate's Supplemental Response, dated August 31, 2019).  The documents identified in footnote 2 of the Estate's Supplemental Response will not be admitted.  Dramatic objected to the Estate's submission of the original and supplemental expert witness reports of Katherine Mendelsohn. Those reports will be admitted.  The fact that Ms. Mendelsohn did not testify at the hearing and could not be cross-examined has been taken into consideration and goes to the weight given to those reports.  All other post-hearing submissions are allowed, unless specifically excluded.

18.     I have considered all of the evidence and arguments raised by the parties.  I set forth below some of the most significant evidence that supports my ruling, but the evidence cited is intended to be illustrative rather than exhaustive.  To the extent not specifically addressed, any additional arguments raised by the parties are either moot or without merit. This Award is in full settlement of all claims and counterclaims submitted to this Arbitration. All claims and counterclaims not expressly granted herein are hereby denied.  This Award shall remain in full force and effect until such time as the Final Award is rendered.

III.    **Reasons for the Award**

A.  **Dramatic Did Not Exceed the Grant of "Amateur Acting Rights" in the 1969 Agreement.**

1.  **The Meaning of "Amateur Acting Rights."**

A key issue in this case is whether Dramatic exceeded the grant to it of "amateur acting rights" in *To Kill a Mockingbird*.  Paragraph 2(a) of the 1969 Agreement grants Dramatic the exclusive right to write a dramatization (the "Play") based on the Novel and to license the "amateur acting rights" in the Play.  The issue whether Dramatic exceeded the rights granted to it requires interpretation of the definition of "amateur acting rights" in ¶4(e) of the 1969 Agreement, in particular of the phrase "together with all stock and repertoire performances whether any or all of the above-mentioned performances are given by paid and/or unpaid actors…."  The answer also requires a determination of the meaning of the immediately following limitation in the definition:  "…but shall not include Broadway production rights nor first-class professional road or first-class touring production rights."  Section 2(a) also provides that Miss Lee "reserves all rights not expressly granted to [Dramatic], including but not limited to professional acting  . . . rights."

Paragraph 2 reads in its entirety as follows:

The Owner [Miss Lee] hereby grants to the Publisher [Dramatic] the complete rights throughout the world:
(a) To write or caused to be written a dramatization based upon and/or adapted from the Property [the Novel], but agrees that said dramatization (herein called the "Play") is to be the only one the amateur acting rights of which the Owner will permit to be leased and/or licensed; and the Owner reserves all rights not expressly granted to the Publisher, including but not limited to the professional acting, radio broadcasting, television and motion picture rights;
(b) To lease the amateur acting rights in and to the Property and/or the Plat and/or parts thereof;
(c) To publish the Play and/or parts thereof in such form and style as the Publisher may determine;

9

(d) To publish portions of the Play up to 1,500 words in collections of readings.

Paragraph 4(e) reads in its entirety as follows:

The phrase 'amateur acting rights' as used herein shall mean performances by living actors in the immediate presence of an audience and shall include all performance rights for little theatres, community theatres and/or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or connected therewith, together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first-class touring production rights.

I find that a preponderance of the evidence demonstrates that Dramatic did not exceed the scope of the grant of "amateur acting rights," as defined in ¶4(e).

Looking at the words and phrases in these paragraphs by themselves does little to help understand the scope of the grant because, among other uncertain terms, the Agreement does not explain what the expressly granted "stock" or "repertoire" performances are. One thing that can be unambiguously ascertained from the words and structure of the grant is that amateur rights are different than stock rights. There is a clear dichotomy between those two groups.[4]

The first group identified in the definition of "amateur acting rights" includes performance rights for "little theatres, community theatres, and/or drama associations, colleges, universities, high school and other school groups, churches, clubs, and other amateur organizations or groups…"[5] These are clearly identified as amateur groups. The stock rights are not included in this grouping of rights. Instead, stock rights are set apart by the phrase "together with" to create a separate grouping within the definition of "amateur acting rights." This

---

[4] For convenience, I will use the terms "stock" or "stock rights" as a shorthand term meant to include the contractual language "stock, repertoire, lyceum, and Chautauqua" rights when referring to the 1969 Agreement.

[5] For convenience, I will refer to this group of rights collectively as "amateur rights" or "purely amateur rights."

dichotomy indicates that stock performances are of a different nature or character than amateur performances.  Stock performances are not the same thing as amateur performances.  Both types of performances, however, are included in the grant of rights.

For this reason, the Estate's claim that Dramatic's rights are limited to strictly amateur performances, such as high schools, colleges, churches, or community theaters, is not supported by the language of ¶4(e).

The question remains – what do "stock," "repertoire," "Broadway production rights," "first-class professional road" rights, and "first-class touring production" rights mean?  These terms all appear in the 1969 Agreement.  The evidence at the hearing showed that these are terms of art in the theater industry, and they do not have a single consistent, uniform meaning.  The same is true for certain related terms used by witnesses and in documents, such as "regional," "commercial," and "West End." These terms do not appear in the 1969 Agreement but were frequently used in the evidence in describing or elaborating on the Agreement terms.  In short, the terms "stock," "repertoire," "Broadway production rights," "first-class professional road" rights, and "first-class touring production" rights are ambiguous, so it is necessary to look to extrinsic evidence to properly interpret the 1969 Agreement.

In determining what are stock rights in the 1969 Agreement, I will first address three types of evidence in the hearing that I found to be most instructive in determining the meaning of stock rights:  the testimony of the expert witnesses, and other knowledgeable sources; industry and trade usage of relevant terms; and the practices of the parties under the 1969 Agreement.  Testimony of the parties and documentary evidence will also be discussed.  Following that, I will discuss various other evidence relevant to my finding on the meaning of stock rights.

### 2.   Experts and other knowledgeable sources.

Alan Brodie, Dramatic's agent in the U.K. and elsewhere overseas, was not called as an expert witness, but he has long experience in theatrical licensing in the U.K., and I considered him to be a knowledgeable source of information as to the meaning of stock and other relevant licensing terms.

Brodie testified about first-class rights, secondary rights, and West End rights.  ("West End" refers to first-class theaters in the West End area of London; West End productions are equivalent to Broadway productions).  He noted that first-class contracts are different than stock and amateur contracts, that stock performances use professional actors, and that stock rights are not first-class rights.  He equated West End rights with first-class rights.

Andrew Nurnberg is the Estate's literary agent.  He succeeded McIntosh & Otis in that role.  He is a renowned and experienced literary agent.  However, he frankly admitted that he has limited experience with theatrical licensing, and I do not consider him a knowledgeable source as to the meaning of stock rights and other relevant theatrical terms.  He testified that he would contact Timothy O'Donnell when issues regarding the meaning of such terms arose.

The Estate's expert witness, Robert Marx, testified that there are three "broad classes" of theaters: 1) Broadway/first-class, 2) regional/resident/repertory theaters (sometimes referred to in the hearing as "the three Rs"), and 3) community theaters.  Stock rights fall into the second category.  Other witnesses echoed this testimony, including Dramatic's experts, Douglas Rand and Alan Salzenstein.  Rand testified that stock is not amateur and not Broadway, but stock is professional. He also testified that stock is not limited to mean summer stock. He opined that stock includes all professional productions except Broadway and first-class. (Tr. 4749-4764).

12

The Estate argued that "stock" in the 1969 Agreement should be interpreted as summer stock.  Marx tried to equate stock with summer stock, but his testimony on that point was not convincing.  Substantial evidence in the record shows use of the term stock when not referring to summer stock.

Marx admitted on cross-examination that stock can include professional actors, which significantly undermines the Estate's contention that no professional theaters can be considered stock.  He also acknowledged a theater can be a LORT theater and also be a stock theater.  This is significant because the Estate contended throughout the hearing that LORT theaters, which use union professional actors, could not be considered stock theaters. LORT is an abbreviation for "League of Resident Theaters."  LORT has a working relationship with Actors' Equity.

There was evidence that even Timothy O'Donnell, a lawyer for the Estate who is experienced in theater matters and copyright, took the view, at least initially, that Dramatic's stock right include "everything but first-class productions."  (C104).  This will be discussed in greater detail below.

### 3.  Trade Usage

There is substantial evidence in the record of trade usage that supports Dramatic's position that stock rights as used in the 1969 Agreement include any professional theatrical rights that are not Broadway or first-class rights.  This evidence undermines the Estate's contention that stock rights are limited to purely amateur performances and must be completely non-professional.

This is convincingly demonstrated in the trade press.  Exhibit R001 is an example of how the industry used the term "stock" in the years shortly before the 1969 Agreement was signed.  This exhibit consists of two pages from the March 9, 1966 issue of *Variety*, which Marx

acknowledged as "the longstanding, century-old trade magazine for the theater and film and television in America." (Tr. 4310).  The headline article begins "for the first time since the heyday of stock, there are more professional actors working in regional theaters than in Broadway and in touring productions."  It goes on to remark that "the theatrical unions are well aware of the trend."  Marx testified that in 1963, the Guthrie, a well-known regional theater in Minneapolis, had 42 actors on full salary with benefits.  At R001-02, under the heading "Resident Companies," the 1966 *Variety* article includes a list of upcoming performances of stock and repertory groups around the country.  It identifies a host of significant regional theaters as stock or repertory.  Marx admitted these theaters were not summer stock. (Tr. 4382-4389).  He also conceded that the theaters mentioned in this *Variety* article, regional theaters using professional actors, fell into the "middle bucket" – they were not community theater and not Broadway theaters. (Tr. 4389-90).  *See* also, Tr. 4443-52, 4454, in which the Arena Stage in Washington, which had entered a LORT union contract, was characterized as a stock theater. Other regional professional theaters were also characterized as stock. (*Id.*)

This evidence alone demonstrates that, prior to and at the time of the 1969 Agreement, regional, repertory, and resident theaters were referred to in the industry as stock, that stock theaters had professional actors, and that stock was not used to mean exclusively summer stock.

Evidence from the trade press also undercut Marx's opinion that "repertoire" as used in the 1969 Agreement was something different than "repertory" theater.  While "repertoire" can mean a list or supply of works for performance, substantial evidence from the trade press shows that it is also commonly used as a synonym for "repertory."

Many additional instances of trade press usage of stock and repertoire support the conclusion that stock rights include the use of professional actors.  For example, C488 included

14

many such references, e.g. p. 10 ("professional theater, including stock, repertoire, and semi-professional groups").  (Tr. 4388-4409; 4425- 4432). The articles also showed instances of "repertoire" being used as equivalent to "repertory."  Marx acknowledged this.  (Tr. 4426-27). Another article referred to "stock and repertoire theaters from the large, such as the Guthrie in Minneapolis…." (Tr. 4431; 4425-4432).  The usage of the terms stock and repertoire in the articles covering many decades from 1910 to the 1980s undermines certain conclusions in Marx's expert report, prompting him to admit that "In an absolute way in reflection of these examples, I probably should have been less absolute."  (Tr. 4432).  The Dramatist Guild Minimum Basic Agreement, a model contract adopted by the Guild in 1926 for use in the industry and which was still operative in 1969 and up until 1985, uses the term repertoire instead of repertory.  (C486-011-016; Tr. 4714).

Similar trade usage of stock and repertoire appeared in Exhibit C489 (Tr. 4620-4634). Many of these examples pre-dated the 1969 Agreement.  *See* also, C493 (Tr. 4507-4515), C498 (Tr. 4441-4452).

Other trade usage of the term "stock" is seen in numerous trade editions of dramatic works.  Consistent with other evidence in the case, these trade editions tend to categorize dramatic rights into three groups -- amateur, stock, and first-class rights, as seen in C-274. Brodie, reviewing this exhibit, testified that these notices are quite standard in trade editions, and that "everything really falls into amateur, stock or first-class.  There is only those pockets."  (Tr. 2613).

### 4.  Course of Performance

For many years, the parties operated in a way that would reasonably indicate that stock and repertoire was not limited to strictly amateur productions.  Since at least 1975, Dramatic

15

licensed performances at well-known regional theaters that used professional actors, such as PAF Playhouse, Indiana Repertory Theater, the Huntington Theater, Steppenwolf, the Guthrie Theater, and many others.  None of this was hidden from Miss Lee or her agents.  The royalty statements clearly identify the name of each theater to which Dramatic licensed TKAM.  The names of prominent regional theaters, together with instances of significant revenues generated from many performance venues, would alone indicate that these were not community or high school theaters.  The statements were directed to Miss Lee's professional representatives -- sophisticated theatrical agents such as Annie Laurie Williams and McIntosh & Otis.  Miss Lee's representatives, if not Miss Lee herself, knew or should have known that these venues hired professional actors and generated revenues far greater than high school, college, and community theaters, and were not summer stock theaters.  Miss Lee and her agents accepted these royalties for many years without straightforwardly demanding compliance with or terminating the license for noncompliance with what they now contend is the meaning of the grant language.  This is a strong indication that stock rights include non-first-class professional performances.  Dramatic has identified many instances since as early as 1975 where TKAM was performed at professional theaters that were not first-class Broadway theaters, without any objection expressed by Miss Lee or her agents.  *See, e.g.* Claimants Demonstrative Ex. 2; C028; and J182.

A notable example would be the Alabama Shakespeare Festival (ASF), in Montgomery, Alabama, approximately 85 miles from Monroeville where Miss Lee lived.   It is one of the largest Shakespeare festivals in the world.  Miss Lee was a "fan" and sometimes funded productions there. (Tr. 1251).  Ms. Carter spent several years on the Board of ASF.  The evidence at the hearing showed that over the years there were three performances of TKAM at ASF.  Ms. Carter on cross-examination testified that she was told the performances of TKAM

did not include Equity actors.  (Tr. 1243-48).  Further cross-examination established that ASF's website indicates that "ASF actors are professionals belonging to Actors' Equity, the actors' union."  (Tr. 1250; C270).  Ms. Carter also seemed to acknowledge that one of the notable actors in an ASF production of TKAM was a professional actor (Tr. 1312), and she later in her testimony agreed that the production of TKAM at ASF was a professional production using Equity Actors. (Tr. 1892).  Other evidence identified the male lead in the 2013 production, Kurt Rhoads, as a "Broadway and regional theater veteran."  (C407-002).  There was also evidence that Dramatic issued a stock rather than an amateur license to ASF based on ASF's application, which indicated the use of professional actors under a union (LORT C) contract. (C445; Tr. 1899-1902).  Regardless of what Carter might have been told about the performances of TKAM at the ASF being amateur, Carter and Miss Lee were or should have been, aware that ASF is a highly professional theater, and that Dramatic licensed the Play to other similar regional professional theaters around the country.  A preponderance of the evidence indicates that Ms. Lee and the Estate knew, or should have known, that ASF was a professional theater and used professional actors.

The Estate argues that before 1975 Dramatic never licensed a professional production and that its early catalogs focused on amateur productions.  (Post-Hrg. Br. 27).  This is not surprising since, as Mr. Sergel testified, amateur was always the focus of Dramatic and still is.  This does not lead to the conclusion that Dramatic had only amateur rights under the 1969 Agreement.  It overlooks that Dramatic obtained stock and repertoire rights as well, and, as discussed above, stock and repertoire rights are not limited to high schools and community theaters.  As for the catalogs, Mr. Sergel's testimony highlighted instances from catalogs over many years that also emphasize Dramatic's stock productions.

17

### 5.   Miss Lee's Objections, Inaction, and Acceptance of Benefits

The longstanding course of performance by the parties is also seen in the lack of any significant action by Miss Lee to gain compliance by Dramatic with the Estate's position that Dramatic could not license stock productions with professional actors, and her and the Estate's acceptance of benefits from performances that used professionals.

Occasionally, beginning in 1989, Miss Lee's agents would raise a concern that some performance was first-class, but Dramatic or its lawyers would explain that the production was not in fact first-class and there was no serious follow up by Lee's agents.  The earliest example cited in Respondents' Post-Hearing Brief (p. 27) of Miss Lee complaining about professional actors in Dramatic's licensed productions is in 1989 (J018), twenty years after the 1969 Agreement, despite Dramatic having licensed stock venues with professional actors' since at least 1975.  This first instance of an objection is reflected in a letter from Christopher Sergel Sr. in August, 1989, to Evva Pryor, Miss Lee's agent.  The letter is in response to Pryor's phone calls.  From context it is clear that Pryor had complained about a Dramatic-licensed production at the Mermaid theater in London on the grounds that the Mermaid was a first-class or West End theater.  Sergel's letter presents a convincing explanation why the Mermaid is not a first-class or West End theater, but rather a "fringe theater," and thus the production was a stock production. A week later, Miss Lee's lawyer, Eugene Winick, responded to Sergel reiterating that the Mermaid was first-class. (C021-003).  Sergel's lawyer, Alvin Deutsch, promptly responded to Winick with a thorough explanation of why this production was not first-class or West End, and not, as Winick asserted, a serious breach of the 1969 Agreement.  (C021-005-009).

A similar exchange between the parties occurred eighteen months later in February, 1991, when Miss Lee's agent complained about a production at the Paper Mill Playhouse.  Dramatic's

law firm responded, explaining in detail why the Paper Mill production was a stock performance, not a first-class professional production. (J031).  Among other things, the letter to Miss Lee's agent at McIntosh & Otis points out that on two recent occasions, Dramatic declined to license productions at professional theaters.

In March, 1993, Miss Lee's lawyers sent one more letter to Dramatic's lawyer mentioning the Mermaid theater and proposing that any issues about professional status should be resolved by joint approval.  (J034).  No further action was taken on that.  There is no record of any renegotiation of the 1969 Agreement. (Tr. 2900-2901).  Other evidence shows that when Dramatic received a request for rights outside of its grant, such as a request for Broadway musical rights, it referred the inquiry to McIntosh & Otis.  (C034; Tr. 2901-2902).

After 1993, twenty-plus more years went by without any complaints or objections, until 2015-16.  *See*, J078, a 2016 email from Julia Ede, of Nurnberg's office suggesting that Miss Lee and her agents apparently did nothing further to stop Dramatic from its course of conduct for "nearly 30 years."  The Estate's Demonstrative Exhibit (Slide 55) presented in Opening Statements, as well as its Post-Hearing Brief (p.27), confirm that there were no objections after March 1993 until December 1994.  During all that time, Dramatic continued its prior course of licensing stock productions that included professional paid actors, and Miss Lee and her agents continued to collect royalties on those productions.  This inaction constituted conduct from which Dramatic could draw the justifiable and reasonable inference that Miss Lee and her agents did not intend to assert the claims against Dramatic that it is now pursuing.  *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 620 (D. Conn. 2019).  When a party objects to conduct and fails to follow up for years, it is a basis for estoppel. *Id*., at 620-21.  *See also*, *Byron v. Chevrolet Motor Div. of Gen. Motors Corp.*, 1995 WL 465130, at *10 n.11 (S.D.N.Y. Aug. 7,

1995) (copyright claimant who sent two cease and desist letters and then did not file suit for six years was barred by estoppel); *Naxon Telesign Corp. v. Bunker Ramo Corp.*, 686 F.2d 1258, 1266 (7th Cir. 1982) (patentee who sent letter threatening suit and then delayed filing for 58 months was barred by estoppel).

It was not until 2015-16 that the Estate, ignoring the course of performance since 1975, reverted to its position from the early 1990s. After 1993, the next group of objections cited by the Estate (Post-Hrg. Br. 27) were from 2015, 2016, and 2019. There is also some evidence from late 2014 that Nurnberg was "perturbed" because he felt the Barbican theater in London was "a little more than" stock. (J061). In any event, the twenty plus years of licensing by Dramatic that preceded those 2015-19 objections (J063, J078, R147, R151, R152) are significant evidence of a course of performance by the parties showing that stock rights under the 1969 Agreement include productions with professional actors, and that the presence of professional actors in a regional production does not make it a first-class/professional/Broadway production of the type reserved to Miss Lee. The 2015-19 objections also coincide with the period in which three notable developments occurred: i) Carter and Nurnberg had taken over as Miss Lee's licensing agents, ii) Carter became the administrator of the Estate, and iii) the negotiations and eventual contractual relationship with Rudin had begun.

In sum, the Estate's and Miss Lee's objections to Dramatic's licensing of productions with professional actors do not compel the conclusion that stock and repertoire productions had to be strictly amateur, with no professionals.

### 6. Miss Lee's Comments on What Rights She Held.

There are several indications in the record that Miss Lee herself (as well as her agents) understood that the rights reserved to her and proscribed to Dramatic were first-

class/Broadway/West End rights, not stock rights for production in regional theaters.  For example, in 1987, Dramatic inquired whether Miss Lee would agree to allow it to license the Sergel version for a Broadway play.  McIntosh & Otis declined that request, but in so doing Ms. Fallowfield of McIntosh & Otis in a letter to Sergel quoted Miss Lee's response explaining why she did not want a Broadway production of the Play.  Miss Lee stated:

> As to my feelings about the play itself, Chris is correct that both Maurice Crain and I were enthusiastic about it at this time. I still am in this way. I think it admirably fulfills the purpose for which it was written, for amateur, high school and little theater groups, and stock productions. I have never thought of the play as a West End or Broadway production, and it has never been my desire to see it as such.

(Tr. 2833).

Miss Lee's comment delineates between amateur and stock, on the one hand, and West End or Broadway on the other.  This is consistent with the characterizations by the experts of the three "buckets" of rights dramatic rights.   Miss Lee acknowledges that Dramatic had admirably fulfilled the purpose of licensing both amateur and stock performances.  Ms. Fallowfield elaborates that Miss Lee is delighted for the play to be performed "by amateurs or as stock performance", but that Miss Lee "absolutely does not wish a first-class production of any kind." (J10).

Other examples of similar comments by Miss Lee are also an indication that she understood that she controlled Broadway and first-class rights, but not stock productions, which include regional productions.  Exhibit C410 is a 2003 handwritten letter from Miss Lee to her friend, Veronique Peck, the wife of Gregory Peck.  This letter is from records in the Peck Arbitration.  It was produced in the course of the hearing in the present case.  In this letter, Miss Lee writes "The class A (Broadway) play rights are in me."  She adds, "Dramatic Publishing Co. has amateur and stock co. rights, much to my disgust."

Exhibit C418 is a declaration of Cecilia Peck, a friend of Miss Lee's and the daughter of Veronique Peck.  Cecilia Peck's declaration is from also from the Peck Arbitration, which involves a dispute over motion picture rights of TKAM, a share of which had been owed by her father.  The apparent purpose of Cecilia's declaration is to make the point that Miss Lee did not want remakes of the movie.  The declaration points out that Miss Lee did not want new works made from TKAM.  According to Cecilia, Miss Lee made only one exception, namely, for Dramatic's version of TKAM, which Miss Lee regretted.  The declaration states "She had given one Christopher Sergel permission to write an amateur play of TKAM to be performed in middle and high school, but by the early 1990s regretted her decision because she thought the play was being over-produced in non-school regional theater settings for profit, rather than school settings to educate young people.  This strengthened her resolve to prohibit further exploitation of TKAM in new works."  C418-005.

Cecilia Peck's declaration is of only tangential significance.  There are two points to note, however.  First is that it provides no guidance in helping define the rights Miss Lee granted to Dramatic since it does not acknowledge that Ms. Harper granted stock rights in addition to amateur rights, and any implication by Cecilia Peck that Miss Lee only granted rights to middle and high schools is wrong and contrary to the language of the 1969 Agreement.  I only mention this declaration for its reference to Miss Lee's "regret," which echoes the "disgust" that Miss Lee expressed in her 2003 letter to Cecilia Peck's mother in C410.

Where this takes on some relevance is that whatever regret or disgust Miss Lee may have expressed at Dramatic's exploitation of its contractual rights for regional productions, her comments tend to show that Miss Lee was aware that stock rights included such "over-produced" and "for profit" regional productions.  The comments do not lead to the conclusion that regional

22

theater productions for profit were not granted to Dramatic; on the contrary, they show that Miss Lee understood that she had granted such rights (stock and repertoire) and later regretted doing so.  It is more like "seller's remorse" being expressed thirty years after the transaction had closed.

### 7.  Timothy O'Donnell's Comments

Certain statements of Timothy O'Donnell, an attorney representing Miss Lee and the Estate, lend support to Dramatic's views as to what rights Dramatic held under the 1969 Agreement.

In June 2015, Miss Lee had granted Rudinplay, Inc., the rights to present a version of TKAM on Broadway (in a contract that O'Donnell had negotiated on behalf of Miss Lee) (Tr. 1134).  Rudinplay is a company operated by Scott Rudin, a film, television, and theater producer. In October, 2015, Rudin contacted Lee's agent, Andrew Nurnberg, to complain that Sergel's version of TKAM was to be performed at the Queens Theater in Corona, New York.  (C104). Rudin asserted that it was a "professional" production and "has to be terminated asap," even though he noted that it was "not for profit."  (C104-004).  Nurnberg responded that he would have O'Donnell look into it.  O'Donnell's response to Rudin and Nurnberg was "We cannot prohibit the Dramatic Play Company from exercising their right to license the Sergel adaptation in non-first-class productions."  This is a key piece of evidence and it launched a campaign by Rudin and his lawyers leading to a reversal of O'Donnell's initially stated position and overturning the practice of the parties for the past four decades.

When Rudin received O'Donnell's message that Dramatic owned all the dramatic rights except first-class rights, Rudin responded, "I thought they had rights to amateur productions only."  To which O'Donnell responded, "Nope, they have everything but first-class production

rights.  I went through this with Seth Gelblum [Rudin's lawyer] and gave him a copy of the agreement during the negotiation."  This was significant because Miss Lee's grant of dramatic stage rights to Rudinplay was expressly subject to the exclusive rights granted to Dramatic.  In essence, Rudinplay was granted any stage rights not already owned by Dramatic.  Any rights Dramatic had were rights Rudin did not have.

Rudin continued to press the issue, adding attorney Gelblum to the email thread. Gelblum argued that there was no right in the 1969 Agreement to use professional actors, but O'Donnell appeared unconvinced.  (C104-001).

O'Donnell's original view that Miss Lee had retained first-class rights and that Dramatic held all the adaptation rights beyond first-class is further evidenced in Exhibit J050, an email thread between O'Donnell and David Rogers, Rudin's Director of Development, in October and November 2013, prior to Miss Lee's deal with Rudinplay.  Rogers was exploring Rudin's possible acquisition of dramatic rights for TKAM.  O'Donnell informed him that Dramatic held the exclusive rights for stock and amateur productions of TKAM.  Rogers responded that "without the possibility of licensing a new adaptation out regionally beyond first-class productions, we are less inclined to do it."  Of interest here is that Rogers, Director of Development in Rudin's organization, equates stock rights with regional rights.  O'Donnell appears to agree with this.  In his response to Rogers, O'Donnell does not dispute Rogers' understanding that regional productions, even by a sophisticated commercial operation such as Rudin, would violate Dramatic's stock rights.  (C042).

The Estate's efforts to minimize O'Donnell's "Nope" email are unconvincing.  In Matthew Lembke's direct examination, the Estate showed that there were additional emails with Gelblum in the C104 thread, which led Lembke to the conclusion that Gelblum had pointed out

to O'Donnell that he (O'Donnell) had "misremembered" the "paid and/or unpaid" language in the 1969 Agreement, because O'Donnell had paraphrased it as "regardless of whether the actors are professional" in a preceding email.  To support this conclusion, Lembke testified that "the language doesn't say professional.  It says paid or unpaid."  (Tr. 2444-46).

That much is correct.  But the "paid and/or unpaid" language in the contract does not exclude professionals either.  Professionals are paid.  Also, in the continuing emails, after O'Donnell says he will "take a second look," O'Donnell does not appear to concede that Gelblum was correct in his interpretation.  Rather, the email shows O'Donnell retorting with a series of rhetorical questions back to Gelblum.  Then the thread in C104 ends, without any response from Gelblum.  In Lembke's further testimony, he contends that his reading of this is correct because four months later, O'Donnell issued his January 2016 opinion letter, in which he reverses his prior position that Dramatic has everything but first-class production rights. Lembke's conclusion does not follow inexorably from this email thread.  It is equally believable if not more believable, that O'Donnell felt pressured by the Rudin group and/or his own client to generate a tool that the Estate and Rudin could use to expand Rudin's rights at the expense of Dramatic's.  *See*, Section III.F. and III.G, below.

We cannot know with confidence whether O'Donnell misremembered the contract language.  The reason for this is that he refused to testify, despite receiving a subpoena from Dramatic.  We do, however, have O'Donnell's own words in C104 and J50, and his conclusions there are consistent with substantial expert testimony, and evidence of from the trade press and the past course of performance of the parties.

### 8. Stock Rights Can Be Professional.

The Estate contends that the 1969 Agreement did not grant "professional acting rights" to Dramatic and that Dramatic breached the grant by licensing productions that used professional actors. The issue arises because ¶2(a) provides that "all rights not expressly granted to Dramatic, including . . . professional acting rights," are reserved to Miss Lee. Stock rights are expressly granted to Dramatic, "whether performed by paid and/or unpaid actors . . . .", so the question becomes whether stock rights include the right to use professional actors.

The preponderance of the evidence leads me to conclude that stock rights encompass productions that include professional actors. The plain language of the 1969 Agreement does not compel a finding that a production with one or more paid professionals cannot be considered stock or repertoire. Paragraph 2(a) grants "amateur acting rights" exclusively to Dramatic. These are defined in ¶4(e) to include "all stock [and] repertoire" performances, whether by "paid and/or unpaid actors…" Professional actors typically are paid, so they cannot categorically be excluded from the class of "paid actors."

The mere fact that one or more professional actors appear in a production does not cause it to be "professional" in the sense of the "professional acting" rights reserved to Miss Lee in the 1969 Agreement. The presence of professional actors in the cast, even if they are members of Actors' Equity, does not take a production out of the category of stock production and transform it into a Broadway or first-class production. Rather, the professional acting rights reserved to Miss Lee are for non-stock productions such as Broadway, first-class professional road, and first-class touring rights. See ¶4(e). *See also*, C131-002, an internal email dated October 5, 2015, from Julia Ede to Nurnberg, stating, "I'll check with Tim, but I do know that stock does include professional rights, just not first class professional rights (e.g. Broadway and West End)."

Beyond these specific examples of reserved rights, other non-stock professional acting rights are reserved to Miss Lee.  An example would be rights to off-Broadway productions. (C028-002, ¶6; C003; C030-004-05, ¶19; Tr. 2492-2506; 3235-36).  In addition, because Dramatic's stock rights are limited to "performances by living actors in the immediate presence of an audience" (¶4(e)), there would appear to be a wide range of other professional acting rights that are not held by Dramatic and are reserved to Miss Lee.  The reservation of professional acting rights to Miss Lee could encompass many modes of presenting dramatic performances with professional actors other than live in-person stage plays, such as performances involving new media, digital media, social media, mobile, streaming, pay per view, DVDs, or any other method or media now known or later developed.

This reading is also supported, for example, by the fact that just a few months before the 1969 Agreement, Miss Lee's agent, Annie Laurie Williams, negotiated with Dramatic a dramatic rights contract on behalf of a different author (the "Bel Kaufman Agreement").  The reservation of professional acting rights to Bel Kauffin in that agreement (C012) is identical to the 1969 Agreement, except that the Rider in the Bel Kaufman Agreement adds to the reservation of first-class professional rights an additional reservation, namely:  "and/or any other production subject to the jurisdiction of Actors' Equity Association."  Thus, in a Rider to the same Dramatic-printed form contract, Annie Laurie Williams included an express reservation of rights to the author for Actors' Equity productions in Bel Kaufman Agreement, but did not include that same reservation in the Rider to the 1969 Harper Lee Agreement.  (Tr. 2564-2572).  Paragraph 4(e) of the Bel Kauffman Agreement, as amended by the Rider negotiated by Annie Laurie Williams, says:

. . . together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first-class touring production rights *and/or any other production subject to the jurisdiction of Actors' Equity Association*.  (Emphasis added).

Miss Lee's agreement is identical except for the italicized language.  This suggests that productions using Actors' Equity actors were not reserved to Miss Lee.  This is supported by the fact that the other "Page Four" hand-typed additions and the "Rider" page in both contracts, all clearly inserted by Ms. Williams, are virtually identical, excepting only some minor variations not relevant here.  (Compare C012-004-5 with C013-003-4).

No one is alive to testify about why the Actors' Equity performances were reserved to Mr. Kaufman, but not to Miss Lee.  But the documents themselves and the propinquity in time of the two transactions leads to a reasonable inference that Dramatic rejected any request to bind Dramatic to such a clause with respect to TKAM.

Further similar evidence is seen in an email exchange between Brodie's and Nurnberg's offices, in which Ms. Ede from Nurnberg's office, writes "we accept that stock means professional," after Ms. McNair from Brodie's office had explained, by way of example, that Dramatic would license "the Goodman or Arena Stage, all highly professional, but not first-class."  (J063)

Another acknowledgment from internal correspondence in Nurnberg's office is seen in Ex. C150.   Julia Ede is reporting on a conversation she had with Edward Snape, who had signed a contract with Dramatic for a regional 2018 U.K. tour.  Ede reports that Snape "said he does have professional rights under Sergel's contract, just not first-class rights.  We know this already, because Sergel's stock rights does include professional actors."

The Estate's arguments (Post-Hearing Br. 24-29) fall short of demonstrating by a preponderance of the evidence that stock rights under the 1969 Agreement cannot include any productions with professional actors.

### 9.   The Parties' Negotiations

The Estate argues (Post-Hrg. Br. 26) that prior to the execution of the 1969 Agreement only amateur rights were under discussion.  It relies on early letters from Dramatic to Annie Laurie Williams seeking to obtain amateur acting rights for TKAM, and Ms. Williams' response declining the request, as evidence of prior negotiations.  (J003-J006).   This correspondence is not convincing support for the conclusions it draws.  Three of the documents are from 1961, eight years before the 1969 Agreement.  The other is from 1965.  This is a tenuous connection to any actual negotiations that took place in connection with the 1969 Agreement.  Also, J003 mentions professional stage rights and J004 and J005 mention Broadway in the same vein, which suggests that the professional rights referred to in the correspondence are Broadway and first-class rights.  This is consistent with the conclusion that the reservation of professional acting rights is limited to Broadway and first-class rights and does not affect stock rights.  In short, nothing in these documents demonstrates that the negotiation of the 1969 Agreement was limited to amateur rights only.

### 10. The U.K. Productions Did Not Exceed the Grant of Stock Rights.

The Estate claims that Dramatic breached the grant of rights by licensing three U.K. tours or productions of TKAM, specifically: 1) the 2013 production at Regent's Park Open Air Theater; 2) the 2014-15 Regent's Park tour productions; and 3) the Jonathan Church tour that was licensed to take place in 2019 but was ultimately cancelled.  (Post-Hrg. Br. 13-17).  It argues that each of these fell into one or more of the following categories:  commercial, first-class, or second-class tour productions.

a)  **Commercial Rights.**

The Estate does not explain exactly what it means by "commercial" rights.  It is not a term used in the 1969 Agreement.  Rather, the Estate points to statements made by Christopher Sergel in his deposition to the effect that Miss Lee reserved "commercial and first-class" and "professional commercial" rights. (Post-Hrg. Br. 13).  It also points to Sergel's testimony in the hearing that stock rights are "non-commercial professional rights" and are "professional productions that are not Broadway, commercial, first-class, West End, et cetera."  ((Post-Hrg. Br. 15).  Despite the Estate's characterization of this testimony, it is not "unequivocal" (*Id.*) because Sergel, in the cited testimony, used the term but never explained exactly what he meant by the term.  The term is inherently vague.  As Brodie testified, "everything is commercial because you are trying to make money."  (Tr .332).  It is therefore important to determine what the term means in the theater industry.

As the Estate points out, Sergel attempted to clarify what he meant in the previous statements.  In his hearing testimony, he stated that "commercial" is a leading, but not the only, indicator of a first-class production.  (Tr. 3246-47).  The Estate also points to comments by Brodie in R044 indicating that the absence of investors and production by a charitable, not for profit organization would be factors in determining whether a production is non-commercial. (Post-Hrg. Br. 14).

A preponderance of the evidence presented at trial leads me to conclude that whether a production is commercial (whether in the U.K. or the U.S.) is only of significance under the 1969 Agreement when the term is used as a synonym for "first-class."  The Agreement itself does not use the word commercial in either ¶2 or ¶4(e).  But the evidence showed that it is sometimes used synonymously with first-class.  The evidence also showed that the term is sometimes used

to identify one of several non-dispositive and non-exclusive factors that may be useful in

determining whether a production is first-class.  It sometimes, but not always, is used to refer to

the presence of investors, but it is not necessarily dispositive -- that is, the fact that a production

has one or more investors does not automatically make a production first-class where other

indicia show that it is not a first-class production.  Commercial is also sometimes used to refer to

highly-financed, expensive productions, such as on Broadway, involving multiple rounds of

investments and SEC filings.  (Tr. 3417).

To sum up, there is substantial evidence that the mere fact that a production might be

referred to as commercial or has some characteristics of a commercial production is not

sufficient to demonstrate that it is in violation of the grant to Dramatic.  If a commercial

production licensed by Dramatic were a first-class, Broadway, or West End production, it would

exceed the grant, but merely having commercial aspects is insufficient in to take a production out

of the stock category.

### b.       First-class Productions.

The Estate claims that Dramatic breached the 1969 Agreement because the Regents Park

Open Air Theater and the Barbican are first-class theaters.  (Post-Hrg. Br. 15-16).  It also asserts

that the Jonathan Church tour which was cancelled, was a first-class tour.

Brodie's testimony was most informative on the question of whether the various U.K.

productions exceeded the scope of the grant to Dramatic.  He was in a unique position to address

that issue because of his many years of experience as an agent in the field of theatrical licensing

in the U.K.  He worked with and followed in the footsteps of Michael Imison, who was also

involved with U.K. theatrical licensing and represented Dramatic in the 1970s and 1980s with

31

respect to TKAM.  In contrast, Mr. Nurnberg, while well-known and experienced as a literary agent, did not have much experience in theatrical licensing, and he admitted as much.

Brodie testified that the term "stock" is not generally used in the U.K., but it equates to repertory and second-class productions, which he calls, in a broader sense, "non-first-class" productions.  These productions use professional actors.  (Tr. 149).  The term "first-class" means productions "connected to the West End in a commercial sense."  "First-class" equates to Broadway in the U.S. (Tr. 150).

Brodie explained that "West End" refers to the commercial theaters that run in the West End area of London.  Generally, the theaters are geographically located in the West End, but some West End theaters may be outside the strict boundaries, such as Victoria Palace, which is about 10 minutes away.  West End theaters are run by commercial theater owners and generally belong to the Society of London Theatre (SOLT), although not every member of SOLT is a West End theater.  They also run on "West End equity contracts." (Tr. 152-155).

Brodie explained that there is not always a bright line between first-class productions and secondary rights productions, and there are sometimes grey areas.  There are factors that are useful in making that determination. (Tr. 274-278).  A production heading to or coming away from the West End would be regarded as a secondary rights production.  (Tr. 180-181).  There are other factors as well that help to determine whether a production is first-class.  (Tr. 181-187; 274-278).  SOLT membership is a factor, but is not dispositive, as some SOLT members are not West End or first-class theaters.

The preponderance of the evidence demonstrates that the Regents Park and Barbican productions of TKAM were not West End or first-class productions.  Nor was the scheduled

Jonathan Church tour a West End/first-class production.  Accordingly, these licenses by

Dramatic did not exceed the grant in the 1969 Agreement.

Regent's Park is an open-air theater.  Though it is a member of SOLT, membership in

SOLT is not enough to categorize an open-air theater as West End.  Brodie's testimony was clear

on this.  (Tr. 155-55; 189-190; 274).  The second Regent's Park production of TKAM was a

touring production, as a follow-on to the success of the 2013 production.  Though the license

required the production to be done "in a first-class manner," that was simply to ensure that the

tour would be of the same high quality as the prior open-air production.  (Tr. 194-96).

Exhibit C345-004-005 is a list of the venues on the 2014-15 tour of TKAM.  Brodie was

familiar with these theaters and testified that none of them was a West End or first-class touring

production.  He testified it was not a commercial tour; it was a second-class tour.  (Tr. 198-200;

334).

The final destination on this tour was at the Barbican.  (Tr. 198).  This production was co-

produced by Fiery Angel, a commercial producer.  But Fiery Angel was not exclusively a

producer of first-class productions.  Brodie testified that they handled "everything from

secondary rights to first-class…. They also have a very strong educational wing…." (Tr. 201-

202; 332).  The fact that Fiery Angel was involved in the production of one venue at the end of a

long secondary rights tour does not make it a first-class production.  (Tr. 200-203).

In Exhibit R054, a February 2015 email from Nurnberg to Sarah McNair at Brodie's

office, Nurnberg relates that Miss Lee and her lawyer are "appalled" by the "proposed Barbican

production," referring to it as "blatantly professional."  But, as discussed above, professional is

not a breach if the production is not first-class.  Ms. McNair explained this in her reply email,

stating "I wonder if the author [Ms. Lee] and her lawyer do understand that stock means

professional."  And, as Brodie explained in his testimony, it was not a Barbican production, it was a Regent's Park production that was "sitting down at the Barbican."  (Tr. 209-210).  He also explained that the presence of an arguable A-list actor (from the U.S.) did not cause this to be a first-class production.  (Tr. 213-216).

The Estate points to the video trailer advertisement for the 2015 Regent's Park tour saying the tour is "Direct from the West End" as evidence that it was a first-class tour.  (R322).  Whether that was misleading advertising or overzealous hyperbole, it does not outweigh the substantial evidence that the tour was a second-class reprise of the 2013 Regent's Park open-air production which was also a second-class production.  An inaccurate marketing piece is not enough to elevate the tour to a first-class West End production.

Brodie did admit that the Barbican production was in the grey area and that staging a production of TKAM there was, in McNair's words "sail[ing] pretty close to the wind" (R037), but he concluded that they did not go over it.  (Tr. 291).

There was other evidence that the Barbican production of TKAM was not first-class. *See, e.g.*, Tr. 213-215 (lead actor was not well-known in U.K. and reprised the role he played at the open-air production); Tr. 216 (no top limit on what an actor in a second-class performance can be paid); Tr. 294 (*Les Mis* began at the Barbican but transferred out to a West End theater); Tr. 296 (Barbican performed art center plays as well as first-class runs); Tr. 296 (Brodie represented a play at the Barbican that Nurnberg "vetted," and "nobody in their right mind would have called that a first-class production").

In short, the Barbican theater was in the "grey area."  Whether any given production at the Barbican was first-class depended on the production. (Tr. 278).  Regent's Park was not in the grey area -- it was not first-class. (*Id.*).  Fiery Angel may have been a commercial organization,

34

but Regent's Park was not.  Though all first-class/West End productions are commercial, not all commercial productions are first-class.  (Tr. 389).  In this case, having the Barbican as a venue for the last stop on a Regent's Park tour, all of which were second-class venues, puts the Barbican production into the second-class category.  While it might have been close to the line, it was not over it. (Tr. 291).

In looking at Brodie's testimony as a whole, I find it persuasive and authoritative and is strong evidence that the Regent's Park 2013 production and 2014-15 tour, including the performances staged at the Barbican were not first-class West End productions.

c.   **Second-class Productions**

The Estate also argues that the Regent's Park productions (as well as the licensed Jonathan Church tour) breached the grant because they were unauthorized second-class productions.  (Post-Hrg. Br. 17).  However, as Brodie testified, second-class rights in the U.K. are equivalent to stock rights in U.S. terminology.  This is supported by the descriptions of the venues and the nature of the productions, which were being performed in regional theaters around the U.K.  Since stock rights are expressly granted to Dramatic, the secondary touring rights in the U.K. an equivalent to stock rights and are not reserved to Miss Lee.

d.   **Jonathan Church Tour**

Similarly, the Jonathan Church tour was not first-class or West End, and did not exceed the grant to Dramatic.  It was a second-class tour at regional theaters around the U.K.  This was within the stock and repertoire rights granted in the 1969 Agreement.

The Estate claims that the Church tour license violated the grant because it was commercial and used professional actors, and included Regent's Park open air theater.  (Tr. 105). All of those assertions have been addressed above and apply as well to the Church tour.  The

planned Church tour, which was eventually cancelled, was also intended to reprise the 2013

Regent's Park tours.  (Tr. 228; J087).  It included no London venues other than Regent's Park.

The license agreement for the tour (J087) specifically excludes West End theaters.  The license

was for secondary rights, equivalent to stock.  As Brodie, the licensing agent, testified, the

Church tour that had no intention to run in the West End, or as an unlimited run.  Part of the tour

had an educational base.  The director and scenic designer were the same as the 2013 Regent's

Park tour.  (Tr. 230-231).  Though Church was a commercial production company, it did both

first and second-class production.  This was not first-class.  (Tr. 389).  Nine of the theaters on the

proposed Church tour were identical to the 2015 Regent's Park tour and the others were similar.

None were West End theaters.  (Tr. 233-237).

In summary, it was a regional tour of repertory theaters.  It involved secondary rights, not

first-class rights. (Tr. 355).

For the foregoing reasons, I find that Dramatic did not exceed the grant of "amateur

acting rights" in the 1969 Agreement.

### B.  Ratification/Modification by Acquiescence

I have concluded above that Dramatic did not exceed the grant of stock and repertoire

rights in the 1969 Agreement.  But even if we assume, arguendo, that Dramatic exceeded the

grant of these rights, I also find upon a preponderance of the evidence that Miss Lee ratified by

acquiescence any licenses that the Estate contends exceeded the grant of stock rights, and

modified the 1969 Agreement by decades of acquiescence to allow Dramatic to issue non-first-

class/Broadway/West End licenses on an exclusive basis under its grant of stock and repertoire

rights from Miss Lee.

1.   **Legal Principles of Ratification and Modification by Acquiescence**

A modification of a contract is a change in one or more respects which introduces new elements into the details of the contract and cancels others but leaves the general purpose and effect undisturbed.  A valid modification must satisfy all the criteria essential for a valid contract: offer, acceptance, and consideration.  A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance.  *Intl. Bus. Lists, Inc. v. Am. Tel. & Tel. Co.*, 147 F.3d 636, 641 (7th Cir. 1998).  *See also*, *Corrugated Metals, Inc. v. Indus. Commn.*, 540 N.E.2d 479, 484 (Ill. App. 1st Dist. 1989)("A modification of a contract may be ratified by acquiescence in a course of conduct consistent with the existence of that modification"); *Castellano v. Wal-Mart Stores, Inc.,* 373 F.3d 817, 821 (7th Cir. 2004)("By knowingly accepting the benefits of the third amended lease for such a substantial period of years, the mortgagee acquiesced to the terms of that lease"); *Maher & Assocs. v. Quality Cabinets,* 267 Ill.App.3d 69, (1994)("A contract is validly modified if the party which did not propose the changes is shown to acquiesce in the modification through a course of conduct consistent with acceptance").

Ratification is similar.  Ratification occurs when the principal learns of an unauthorized transaction, then retains the benefits of the transaction or takes a position inconsistent with nonaffirmation.  For ratification to occur, the principal must, with full knowledge of the act, manifest an intent to abide and be bound by the transaction.  Ratification may be inferred from surrounding circumstances, including long-term acquiescence, after notice, to the benefits of an allegedly unauthorized transaction.  *Stathis v. Geldermann, Inc.,* 692 N.E.2d 798, 807–08 (Ill. App. 1st Dist. 1998).  *See also*, *Progress Printing Corp. v. Jane Byrne Political Comm.,* 601 N.E.2d 1055, 1067–68 (Ill. App. 1st Dist. 1992)(same); *Fed. Trade Commn. v. Credit Bureau*

*Ctr., LLC*, 235 F. Supp. 3d 1054, 1061-62 (N.D. Ill. 2017)("A party may show ratification

through circumstantial evidence, 'including long-term acquiescence, after notice, to the benefits

of an allegedly unauthorized transaction,'" quoting *Sphere Drake Ins. v. American Gen. Life Ins.*,

376 F.3d 664, 677 (7th Cir. 2004)).

 While actual knowledge of the principal is normally required, one cannot avoid

ratification though a head in the sand approach. *Progress Printing*, 601 N.E.2d at 1068

("although normally a principal's actual knowledge of the transaction is essential, 'one whose

ignorance or mistake was the result of gross or culpable negligence in failing to learn the facts

will be estopped as if he had full knowledge of the facts,'" quoting 18 Ill.Law & Prac. *Estoppel* §

23 at 84 (1956)).  As noted in *Fed. Trade Comm'n. v. Credit Bureau Ctr., LLC*, 235 F. Supp. 3d

1054, 1061-22 (N.D. Ill. 2017), where the court found that a company ratified the acts of its

independent contractors, the company "hid its head in the sand and deliberately

avoided knowledge of complaints [about the contractors' actions] so that it could keep raking in

the benefits of [the contractors'] activities."

 It is important to note the longstanding principle of agency law that the knowledge of an

agent acting in the scope of the agency is imputed to the principal.  *Zurich Capital Markets Inc.

v. Coglianese*, 03 C 7960, 2005 WL 1950653, at *3 (N.D. Ill. Aug. 12, 2005)("A court

may impute an agent's knowledge to the principal when that knowledge relates to a matter as to

which the agent acts within his or her power to bind the principal or upon which it is his or her

duty to give the principal information," citing Restatement of Agency 2d, § 272).  *See also*, *U.S.

v. One Parcel of Land*, 965 F.2d 311, 316 (7th Cir. 1992)("Where a corporate agent obtains

knowledge while acting in the scope of his agency, he presumably reports that knowledge to his

corporate principal so the court imputes such knowledge to a corporation").  This principle of

agency law was recognized by the Illinois long ago in *Germania Life Ins. Co. v. Koehler*, 48 N.E. 297, 299-300 (Ill. 1897), where an insurance agent accepted premiums on a life insurance policy and delivered the premiums to the insurance company, knowing the insured had moved to a geographic territory not covered by the policy.  That knowledge of the agent was imputed to the company because it was within the scope of the agency.  The court stated "It is true that the rule which imputes to the principal the knowledge possessed by the agent applies only to cases where the knowledge is possessed by an agent within the scope of whose authority the subject-matter lies. In other words, notice to an agent which is held to be notice to the principal must be notice of such facts as are connected with the business in which the agent is employed."  The court also recognized that the insured has a right to presume that the agent would communicate the relevant information to the company. The presumption is that the agent in such case does his duty as required by law. *Id*. at 303.  On the strength of this long-established principle of agency law, any knowledge of McIntosh & Otis and its individual agents, as well as any knowledge of Carter, Nurnberg, O'Donnell, Lembke, within the scope of their agency is imputed to Miss Lee.

## 2.  The Estate Ratified and Modified the Contract by Acquiescence.

The evidence shows that at least as early as 1975, Dramatic was licensing productions that were other than strictly amateur.  For some forty years after that, Dramatic was licensing productions in well-known regional venues using professional actors in addition to its licensing of strictly amateur productions.  (J041).  Many of those professional stock and repertoire productions generated significant ticket sales, resulting in substantial revenues for Dramatic and substantial royalties for Miss Lee. (R021; Tr 1267-83.  None of those regional productions with professional actors was a Broadway or first-class production, as discussed above.

Assuming that PAF Playhouse production in 1975 was the first production with professional actors (Tr. 2726-30; 3162), the earliest objection directed to Dramatic that the Estate cites in its post-hearing brief complaining about a professional or first-class production was approximately fourteen years later. In the meantime, there were many productions with professionals, and Miss Lee collected royalties for all of them.

As discussed in III.A. 5., above, from 1989 to 1993, some objections were made, but Dramatic thoroughly explained its position and Miss Lee took no action.  She did not terminate or repudiate the agreement.  She did not file an arbitration.

Decades passed during which Dramatic continued to license stock and amateur rights to non-first-class regional venues in the U.S. and U.K. with no objection from Miss Lee, no cease and desist letter, no termination of the license agreement.  It was not until late 2014/early 2015 that there was a sea change.  Miss Lee's agents – no longer McIntosh & Otis, but rather Nurnberg and Carter – began complaining that the very conduct Dramatic had been engaging in since at least the mid-70s violated Miss Lee's reservation of "professional acting" rights.  In 2015, the Estate's long-dormant concerns came far too late to overcome acquiescence over three or four decades.  During that long period of inaction, the rights of Dramatic to license productions with professional actors in high quality regional theaters became entrenched.  To allow the Estate to disrupt the longstanding licensing practices of Dramatic after the Estate had collected royalties from a vast number of stock productions would be manifestly unfair. (*See*, J041).

The Estate contends that there can be no acquiescence, modification, or ratification because Miss Lee (and presumable her agents) lacked sufficient knowledge for these theories to be applied.  For several reasons, those arguments are not persuasive.

40

The preponderance of the evidence shows that Miss Lee and her agents had the requisite knowledge to support Dramatic's claim of acquiescence.  First, Miss Lee's own words indicate she knew that Dramatic was licensing professional regional theaters.  She stated in a 2003 letter that Dramatic "has amateur and stock rights, much to my disgust" and knows that what she controls are the "Broadway rights." (C410)("The class A (Broadway) play rights are in me").  Cecilia Peck indicated that Miss Lee "regretted" granting the stock and amateur rights to Dramatic because of the "overproductions," which I interpret as regional stock productions using professionals and generating significant revenues.  As noted above, this shows not only that she was aware of the type of productions Dramatic was licensing but also that she was aware that these productions were properly licensed as stock performances and that she could not prevent Dramatic from licensing them.

Second, Miss Lee was represented by sophisticated theatrical agents, such as Annie Laurie Williams and McIntosh & Otis for most of the relevant period.  They were located in New York, the hub of the theater world.  They received all the royalty statements identifying the theaters at which TKAM was performed and the revenues produced.  It is implausible that they were unaware that regional performances with Equity actors were being performed around the country, sometimes at LORT or COST theaters and generating substantial box office receipts.  It is implausible that these sophisticated theater agents all the royalties and commissions were coming from high schools, colleges, and community theaters.  Their knowledge is imputed to their principal, Miss Lee.  There is no evidence that their receipt of Dramatic's royalty statements and payments was outside the scope of their authority or that they ever acted in any way outside the scope.  The evidence showed that at least one of the McIntosh & Otis agents,

Evva Pryor, actually attended one of the performances in a professional regional theater. (J033). There is no evidence that any complaint to Dramatic followed.

Third, all the royalty statements went to McIntosh & Otis. These statements did not hide the fact that performances were taking place at prominent regional theaters. These were identified as "stock" performances. They were listed separately in the statements from "amateur" performances. It was obvious that some of the stock venues had significant revenues that were unlikely to emanate from community theaters or school performances. (Tr. 173-175). From these revenues came Miss Lee's royalties and McIntosh & Otis' commissions. There was substantial evidence of how sharp and engaged Miss Lee was over all the years and was interested in what was going on with her work (as confirmed by her comments in correspondence). In addition, her agents undoubtedly had full knowledge of what kind of productions Dramatic was licensing, especially in the wake of the 1989-1993 correspondence. There was no evidence presented to the contrary. The knowledge of these agents is imputed to Miss Lee.

Fourth, there was nothing hidden or sinister about Dramatic's licensing of performances that used professional actors performed at notable regional venues. Dramatic provided tickets to Evva Pryor to attend the Paper Mill Playhouse production. Reviews of performances of TKAM with professional actors appeared in the New York Times, which Miss Lee was known to read, and other prominent newspapers.

In summary, there was substantial evidence introduced at the hearing from which it can be seen that Miss Lee and her agents knew the kind of productions of TKAM Dramatic was licensing for several decades. They continued to accept the royalties from those performances for the entire time. The Estate's complaints during the 2015-2019 period that Dramatic was

42

violating the 1969 Agreement by licensing "professional" and "first-class" productions came far too late to override the decades of acquiescence of Dramatic's licensing of over-produced but non-first-class productions.  The Estate collected royalties for those performances as well.

### C. Dramatic Did Not Violate the 1969 Agreement or Miss Lee's Copyright by Making a Revised Script or Licensing Both Versions Simultaneously

The Estate claims that Dramatic violated the 1969 Agreement by creating and licensing an unauthorized version of TKAM that changes the narrator in the original version of the Sergel dramatization (J001) from Jean Louise Finch, the adult Scout, to Miss Maudie.  (J002, "the Miss Maudie version").  The Estate also contends that even if the Miss Maudie version were authorized, Dramatic violated the 1969 Agreement by licensing both versions simultaneously.

The Estate has suggested there were other revisions as well, though there is no evidence as to what those changes are.  Based on the evidence in the record, there is nothing to indicate those changes, if anything other than references to the Miss Maudie version in some stage of development, were other than insignificant changes or changes involved with the staging or production.  There is no convincing evidence that there was some published version other than the Miss Maudie version.

### 1. Relevant Provisions in the 1969 Agreement

We begin by looking at the relevant terms in the Agreement.  The grant of rights in ¶2(a) gives Dramatic the right to write "a dramatization" based on TKAM, but that "said dramatization (herein called the 'Play') is to be the only one" that Miss Lee will permit to be licensed. Throughout the Agreement there are numerous references to "the Play."  All these references are in the singular.  All references to "the dramatization" in ¶7 in the Rider are also in the singular.

Paragraph 2 also grants Dramatic certain additional rights to "the Play and/or parts thereof."  Specifically, Dramatic has the right "to lease the amateur acting rights," and "to

43

publish the Play "and/or parts thereof."  *See* ¶2(b) and ¶2(c).  In addition, Dramatic has the right

"to publish portions of the Play up to 1,500 words in collections of readings."  ¶2(d).  *See also*,

¶3(e), obligating Dramatic to pay Lee royalties on the licensing of "the Play and/or parts

thereof."

Paragraph 4(a) states in its entirety:

(a)  Without in any way limiting any of the other provisions of this agreement, the Publisher
shall have the absolute and unlimited right, for the purpose of the dramatization to be
produced, to make such changes, alterations, adaptations, additions to or eliminations
from the Property as in its sole judgment and discretion the Publisher shall deem
advisable.

Also relevant to this issue is ¶7 in the "Page Four" addendum in the Agreement. (C013-

004).  This paragraph sets up a protocol for Miss Lee to have an approval right over the Play

before publication and licensing.  It states in pertinent part: "Before publication of the

dramatization and before the leasing and/or licensing of the amateur acting rights to the

dramatization, the Publisher [Dramatic] agrees to submit a copy of the dramatization to the

Owner [Lee]."  Though ¶7 uses the term "dramatization" rather than "the Play," the Preamble

and ¶2 equate those terms, and it is clear that ¶7 is referring to the Play.  The paragraph goes on

to set up a procedure for Miss Lee to review Sergel's dramatization within thirty days of receipt

and approve or suggest revisions that are not material alterations.  If approval or objections are

not provided within this period, the dramatization is deemed approved. C013, ¶7 ("If within such

thirty (30) day period the owner has not given her written approval or submitted her written

objections to the Publisher, the dramatization shall be deemed to have been approved by the

Owner . . . .").

Several things are clear from the foregoing excerpts of language of the 1969 Agreement.

First, the contract envisions one version of the Play.  Dramatic has rights to do certain things

44

with parts or portions of the Play.  Nothing in the contract language authorizes Dramatic to publish or license multiple versions of the Play.

Second, ¶4(a) does not give Dramatic the right to make multiple versions of the Play.  It gives Dramatic the right to make changes to "the Property," i.e., the Novel, for the dramatization, i.e., the Play, to be produced.  In adapting the Novel into a dramatization, the Publisher has broad discretion.  This broad discretion is tempered somewhat by the provisions added in ¶7of the Rider.

Third, the approval process in ¶7 is only for the initial Play, before the first licensing or publication.  The whole process is to occur "Before publication of the dramatization and/or licensing of the amateur rights to the dramatization."  The apparent intention is to enable the author to review the Play before it goes public and to make objections and suggest reasonable revisions that the parties will use reasonable best efforts to agree on.  This paragraph does not give Miss Lee unconditional approval rights.  She was authorized to make "line changes and/or revisions" as she deems "necessary and proper," but she cannot require the publisher "to materially alter the basic structure and/or nature of the dramatization or make extensive revisions therein."  This suggests an intent to constrain Miss Lee's degree of control over the adaptation, presumably because of the time, effort, and creativity required to create the adaptation.

In sum, the terms of the 1969 Agreement do not grant Dramatic the right to make multiple dramatizations based upon the Property.  The provisions of ¶4(a) and ¶7 do not come into play, as they relate to the creation and approval of the Play before publication, all of which occurred in or around 1969.

**2. Miss Lee and Her Agents Acquiesced in the Creation and Licensing of the Miss Maudie Version.**

Although I conclude that Dramatic does not have the right to publish a second version of TKAM, I find that Miss Lee and the Estate acquiesced in Dramatic's creation and licensing of the Miss Maudie version.

Again, the key to acquiescence is whether Miss Lee or her agents had adequate knowledge of the complained of conduct. There is evidence that the Miss Maudie version has been licensed by Dramatic since at least 1991 when it appeared at the Paper Mill Playhouse and continued being performed ever since then, so there has been longstanding use of the Miss Maudie version. (J032; C277; Claimant's Demonstrative Exhibit 2; Tr. 3825).

There is also substantial evidence that Miss Lee and her agents were aware. There is plausible evidence that the revised version sent to Pryor was the Miss Maudie narration. The evidence shows that in 1989, Sergel submitted a revised version of the Play to Evva Pryor of McIntosh & Otis, seeking Miss Lee's blessings. Though the exact script Sergel submitted is not known for certain, it is likely that it was the Miss Maudie version, which was performed not long after the submission to Pryor. In light of the procedures used for the approval of the original script, it was reasonable for Sergel to take Pryor's non-response as approval. Ms. Pryor's knowledge of that version is imputed to Miss Lee. There is no evidence that Sergel was aware of any disapproval by Miss Lee or Pryor or that Miss Lee or Pryor ever communicated disapproval to Sergel or anyone Dramatic at that time. The revised version was performed at the Paper Mill Playhouse in 1991. Ms. Pryor attended a performance of the Miss Maudie version at the Paper Mill.

Ms. Carter testified that if Pryor was aware of some changes being proposed by Sergel she would have reported that to Miss Lee. Other evidence of Miss Lee's knowledge followed.

The New York Times reviewed the production and noted that it was narrated by Miss Maudie. (J032). The Estate admits in an Interrogatory answer that Miss Lee said "that she did not like Miss Maudie as the narrator of the play." (R304-005-006; Tr. 1180, 1186, 1755-56).

There is also credible evidence from Gayle Sergel Brown that she saw Miss Lee at a performance of the Miss Maudie version at the Paper Mill Playhouse in 1991. This evidence is corroborated by testimony of Marjorie Murray, who was with Ms. Brown at that performance. This evidence is contested by the Estate, which presented testimony from an actress in the performance at the Paper Mill Playhouse, Marjorie Johnson. Ms. Johnson testified that it was inconceivable that Miss Lee could have been in the audience and the cast not know about it. (Tr. 4570-72). Ms. Johnson admitted on cross-examination that when she is acting, she does not look at the audience because she is paying attention to who she is talking to on stage. "I never look in the audience...I never know who is out in the audience." (Tr. 4590). Instead, her testimony is to the effect that if the director or anyone in the cast knew Miss Lee was at a production, "there is no way we could not have found out about that...absolutely, we would have known." (Tr. 4572). There is an element of speculation in her testimony. A preponderance of the evidence indicates that Miss Lee was at the performance.

There is also evidence suggesting that Miss Lee knew about the Miss Maudie version in 2006. A friend of Miss Lee named Wayne Flynt gave a talk in 2006 at the Birmingham Pledge Foundation on the occasion of the Foundation bestowing its Lifetime Service Award on Miss Lee. In that talk, Flynt mentions Miss Maudie as the narrator. Ms. Carter admitted that Miss Lee probably heard or read that presentation by Flynt. (C006, p. 205; Tr. 1193-96; 1221). Miss Lee wanted Flynt to do the eulogy at her funeral, and he presented the 2006 talk as the eulogy. (C006, p. 201; Tr. 1837).

There was nothing hidden about the Miss Maudie version.  It was apparent on Dramatic's website as early as 2007 that there was a revised version.  In June, 2015, Dramatic sent Carter a license for Mockingbird LLC to produce TKAM.  Mockingbird is a company created by Miss Lee to produce amateur productions of TKAM each year in Monroeville, The license clearly indicates it is for a "revised version." (C089-002; Tr.1187, 2638).    More recently, Ms. Carter acknowledged seeing the Miss Maudie version when it was staged by Mockingbird LLC (Tr. 1187).  This is bolstered by Exhibit C161-004-007, in which Carter signed the license documents for the Spring 2017 Monroeville production.  These documents show that the license was for the "revised" version of TKAM (C161-007).  *See also*, Tr. 1758-59, where Ms. Carter acknowledged that "we used to put on the revised version thinking it was the only version."

In summary, there is convincing evidence going back to at least 2006 that Miss Lee and her agents at McIntosh & Otis were aware of the Miss Maudie version.  Yet Miss Lee and her agents did not take any decisive steps to stop Dramatic from licensing the Miss Maudie version.  *See* Tr. 1756-57, where Ms. Carter admits that she cannot point to any steps Miss Lee took with respect to the Miss Maudie version.  Yet Miss Lee and the Estate have retained all the royalties that have been earned from licensing the Miss Maudie version.  (Tr. 1199-1201).  This persisted from 1991 through the most recent license of the revised version.  It is not enough that Miss Lee may have expressed her dislike of the revised version.  There is no evidence that Miss Lee told that to Dramatic or took any steps to stop performance of the revised version.  As a result, Miss Lee approved the Miss Maudie version by acquiescence.  Because of this acquiescence, I find that Dramatic did not violate the 1969 Agreement by creating and licensing the Miss Maudie version of TKAM.

The acquiescence operates as consent to the creation and licensing of the Miss Maudie version.  Accordingly, Dramatic has not infringed the copyright in TKAM.

### 3. Miss Lee and the Estate Acquiesced to the Simultaneous Licensing of the Two Versions.

An entirely separate question is whether Dramatic had any right to publish and license both versions simultaneously.  The Estate argues that even if Dramatic had the right to create, publish, and license the Miss Maudie version, it did not have the right to continue licensing both versions simultaneously without consent or authorization.

The question then becomes whether Miss Lee and her agents acquiesced to the licensing of both versions of the Play at the same time.  I find that they did.

Similar to modification or ratification by acquiescence, in the context of intellectual property rights, the concept is often referred to as estoppel by acquiescence or equitable estoppel.  The equitable defense of estoppel by acquiescence occurs when the rightsholder through affirmative word or deed expressly or impliedly consents to the infringement.  The elements are 1) plaintiff's (or in his case counterplaintiff's) knowledge of the infringing activity, 2) plaintiff's implied or express consent to the activity, and 3) defendant's change of position in reliance on plaintiff's conduct.  *Sturgis Motorcycle Rally, Inc. v. Rushmore Photo*, 2021 WL 1176242, at *24 (D.S.D. March 29, 2021).  The plaintiff's (counterplaintiff's) misleading conduct may include specific statements, action, inaction, or silence where there is a clear duty to speak.  *R2 Medical Sys., Inc. v. Katecho*, 931 F. Supp. 1397, 1416 (N.D. Ill. 1996).

A preponderance of the evidence at the hearing establishes that Miss Lee and her agents acquiesced in Dramatic's licensing of both versions of the Play at the same time.  The factors have been met and the equitable principles underlying application of the doctrine are present.

49

There is substantial evidence that Miss Lee and her agents knew that Dramatic had created and was licensing the Miss Maudie version for some thirty years.

Miss Lee's and her agents' awareness of the Miss Maudie version has been discussed above.  It was equally apparent that even after the revised version began being licensed, the original version was also being licensed.  Reference to both versions were present on Dramatic's website since at least 2009, to which the Estate stipulated.  (Tr. 2417-21; 2883-87; C302).  Mockingbird LLC itself licensed the Miss Maudie version for performance in Monroeville.  It is implausible that Miss Lee and Ms. Pryor over the course of thirty years were not aware that both versions of the Play were being licensed and performed.  There was nothing hidden about the years of performance of both versions.  The agents at McIntosh & Otis were sophisticated in the theater world and Miss Lee was also quite aware of matters relating to TKAM.

Exhibit J041, which is a compilation identifying all licenses issued by Dramatic from 2002-2019, shows that during that period Dramatic issued approximately 950 licenses for the original version while in the same time period it issued approximately 1,450 licenses of the Miss Maudie version. Any claim that McIntosh & Otis and Miss Lee were unaware of the licensing of both version strains credulity.  In any event, any claim of incomplete knowledge would be an exercise of willful blindness or lack of diligence.

Ms. Carter, who took over from McIntosh & Otis as Miss Lee's agent, has testified that she thought the Miss Maudie version was the original version.  Ms. Carter knew as early as January, 2015, that there was a revised version. (C246).  Also, in June, 2015, she received from Dramatic a license for a performance of the Miss Maudie version at Monroeville that is clearly labeled "revised version."  (C089).  While her belief that the Miss Maudie version was the original suggests a lack of diligence and familiarity with the past forty or more of the theatrical

50

licensing of TKAM, the more important thing is that her lack of awareness is not relevant. The more relevant knowledge was the decades of information that Miss Lee and McIntosh & Otis had acquired. It is this knowledge and lack of any action that leads to the acquiescence of Dramatic's licensing of two versions over the course of many years.

The Estate's that Miss Lee and McIntosh & Otis were unaware of the simultaneous licensing is reminiscent of the conduct in *Sturgis Motorcycle v. Rushmore*, *supra*, 2021 WL 1176242, at 24. In that case, where the plaintiff's predecessor in interest had actually purchased from defendant products bearing the allegedly infringing trademarks for resale at its own stores, the court found that plaintiff acquiesced, stating, "It is incomprehensible that for over 10 years no one at [plaintiff] would have knowledge of these rally products being purchased from [defendant] and then being sold at retail its own retail store." By this conduct, the plaintiff "expressly or impliedly represented that it would not assert a right or exclusive claims to those [trademarks]."

There is no clear evidence that during the many years of the existence and simultaneous licensing of two versions prior to 2015, Miss Lee or the Estate complained to Dramatic of the creation or licensing of Sergel's two versions of the Play, or took steps to stop it.

The evidence showed that on several occasions in the past, Sergel suggested the possibility of Dramatic obtaining Broadway rights for TKAM. On those occasions, Pryor forcefully refused. In those instances, Sergel Sr. accepted the refusal and proceeded no further. But when he sought approval for marketing a revised version, he got no response. He could reasonably assume Pryor fulfilled her duties as agent and passed the request to Miss Lee (Ms. Carter assumed as much). So, it is reasonable to conclude that Sergel Sr. felt he had the right to license either version of the Play, and Dramatic proceeded to do so for many years without any

51

objection from Miss Lee or her agents.  There is no evidence that prior to 2015 Dramatic had any awareness that Miss Lee or her agents considered that its licensing both versions to be a violation of the contract or her copyright.  The conduct of Miss Lee and her agents lulled Dramatic into a sense of security in going ahead.  *LEGO A/S v. Best-Lock Constr. Toys, Inc.*, 404 F. Supp. 3d 583, 618 (D. Conn. 2019).

On these reasonable assumptions, Dramatic continued for years licensing the two versions.  From 2007 to the time of the arbitration, both versions were listed on Dramatic's website.  It reasonably relied on the lack of objection from Lee and her agents to proceed with licensing the two versions hundreds of times for years.  The inaction of Lee and the Estate was consent to continue.

The Estate has suffered no harm from the simultaneous licensing of the versions, and has accepted substantial monetary benefits.  To allow the Estate to now assert breach of contract and copyright infringement would be inequitable.  As Judge Learned Hand recognized long ago in a case of acquiescence, "when for eight years one plans one's business on the assumption that one may use a mark, it is a grave dislocation to stop its use…."  *Landers Frary & Clark v. Universal Cooler Corp.*, 85 F. 2d 46, 49 (2d Cir. 1936).  The same would be true after decades of simultaneously licensing both versions of the Play.

Because of this acquiescence, I find that Dramatic did not violate the 1969 Agreement by simultaneously licensing the Miss Maudie version and the original version of TKAM.

The acquiescence operates as consent to the simultaneous licensing of the Miss Maudie version and the original version of TKAM.  Accordingly, Dramatic has not infringed the copyright in TKAM.

**D.  Dramatic Did Not Violate the 25-Mile Provision.**

As seen above, the 1969 Agreement contains a Rider.  Paragraph 2 of the Rider states:

> In the event the Owner shall lease professional acting rights to a third party for the purpose of producing a first class dramatic play or dramatico-musical play based on the [Novel], during the run of the said play in New York or during a first class touring engagement thereof, the Publisher shall not permit amateur performances, as provided herein, within a distance of twenty-five (25) miles of the city limits of any city which had a 1960 U.S. census population in excess of 150,000. After the close of the final first class road company, the Publisher may release amateur rights without restriction.

The Estate claims that Dramatic issued several licenses that violated this provision and that this constituted a material breach of the 1969 Agreement.  The Estate pointed to nine licenses granted by Dramatic to various theaters around the country.

In June, 2018, Carrie Blomquist, professional Leasing Director of Dramatic, inquired of Tonja Carter whether the Estate wanted Dramatic to restrict licensing around New York City or other cities in light of the announcement of dates for Rudin's Broadway production.  Carter turned the matter over to Nurnberg, and on the same day O'Donnell responded by sending Blomquist a list of cities restricted under the 25-mile provision.  (C164; C165; R296).

Blomquist then pointed out to O'Donnell that several amateur theaters had already been licensed before the announcement of the Broadway dates.  She told O'Donnell that the terms of the 25-mile restriction were not clear on this issue, and inquired how the Estate would like to proceed.  O'Donnell replied that the Estate did not desire to unreasonably impede Dramatic's licensing "of amateur performances by nonprofessional actors."  R296-010.  He indicated that if she would provide the details of the previously licensed performances, the Estate would take the request to proceed with those licenses under advisement.

53

Blomquist provided O'Donnell with a list of nine theaters that were licensed prior to the announcement of the Broadway dates.  O'Donnell responded that of the nine, only one was "of concern," because it was located in Staten Island.  Blomquist contacted that theater the let it know that the show was not available at that time.

In July and August, 2018, Blomquist notified O'Donnell of a new request for a license by a community theater near Boston, and another for an amateur theater outside Philadelphia. O'Donnell replied that "going forward, we see no need to restrict school performance in any manner regardless of location.  The same is true of purely amateur performances."  He added, however, that "our position with respect to performances anywhere using equity member actors remain unchanged."  (R296-017-19).  Similar correspondence continued into early January 2019, with some venues being approved and others not.  (R296-021-40).

On January 9, 2019, a day after granting permission for several new amateur venues, O'Donnell wrote to Blomquist stating "Given the email from Rudin's lawyers yesterday, we're going to have to rescind this permission as well as any others not already licensed and insist on the 25-mile rule going forward."  (R296-042).

Blomquist understood this to mean O'Donnell on behalf of the Estate was rescinding the permissions she had recently requested and would not give any permissions for waiver of the 25-mile rule going forward.  She also understood that O'Donnell was not requesting that the licenses issued previously be cancelled.  (Tr. 701-02).

On January 31, 2019, Lembke sent a letter to Deutsch stating that Dramatic had granted several licenses in violation of the 25-mile restriction.  Lembke stated "Any prior consent by any purported representative of the Estate is hereby revoked."  As grounds for the revocation, Lembke stated that "the Estate believes that any purported consent that Dramatic

obtained…..was the result of misrepresentation or omissions of material facts."  Specifically, he asserted that three of the theaters were professional theaters or intended to use professional actors in the performance.   These three theaters were the Kavinoky, the Grand, and the Dayton Playhouse.  (J129).  Shortly thereafter, on February 6, 2019, Carter sent another revocation letter to Blomquist, stating: "To the extent that any purported representative of Ms. Lee or the Estate consented to issuance of any licenses in contravention of the terms of the DPC Agreement, such consent is hereby revoked." (R152-003).

### 1.  The Revocation Was Overbroad.

The Estate claims that those three professional performances exceeded the grant of rights and also were in violation of the 25-mile rule.  Because it learned that some of these performances would include professional actors, it revoked the permission it had already given on the basis that Dramatic had misrepresented the amateur status of these theaters.  Each of these theaters had, before the announcement of the dates of the Broadway run, scheduled the performances to run on dates after the Broadway opening of TKAM.

The issue here is to determine the impact of the waivers granted by O'Donnell and the subsequent revocation of the waivers by the Estate.

I conclude that the waivers by O'Donnell were only applicable if no professional actors were to appear in the scheduled performances.  (R296-010; Tr. 756-57; 776-77).  The waiver covered "purely amateur" performances (Tr. 777) and "amateur performances by non-professional actors."  O'Donnell had inserted these conditions (which were not required by the 19069 Agreement) into the waivers.  Sergel admitted as much.  (Tr. 3121-22).

The evidence shows that Blomquist, after hearing from O'Donnell that the waivers were only for "amateur performances by non-professional actors," did not disclose to O'Donnell that the Kavinoky, Grand, and Dayton theaters intended to use at least one professional actor in their productions. While these performances were otherwise permissible as stock performances under the 1969 Agreement, a waiver was required because they were within the proscription of the 25-mile rule. The intended performances at the Kavinoky, Grand, and Dayton Playhouse theaters therefore exceeded the scope of the waiver. The other performances, however, were purely amateur and did not exceed the scope of the waiver.

This raises the question of the effect of the Estate's revocation. I find that the Estate's revocation of the waiver with respect to the Kavinoky, Grand, and Dayton theaters was valid. However, the blanket revocation is overbroad, and the Estate has shown no basis for the revocation of the waivers to the purely amateur theaters.

Carter's February 6, 2019, revocation letter revokes all the consents granted by O'Donnell, not just the consents related to the three performances intending to use professional actors. Lembke's letter of January 31, 2019, addressing only the theaters in the letter intending to use professional actors, revoked consent only as to those specific licenses. (J129-003). This letter asserts as a basis for revocation Dramatic's "misrepresentation or omissions of material facts." As to the three professional theaters, there was an omission to inform O'Donnell of that fact. But Carter's letter states no basis whatsoever for the revocation of the waiver received by the purely amateur theaters.

While the revocation of consent for the Kavinoky, Grand, and Dayton Playhouse theaters may have been justified for omission of a material fact, that does not provide a valid basis for the revocation or rescission of the consent O'Donnell gave Dramatic for each the other purely

amateur venues.  There was no misrepresentation or omission of a material fact as to those theaters.  The Estate has not argued or provided any evidence that the other venues were not purely amateur.

The Estate's intimations the O'Donnell was not authorized to issue those consents by calling him a "purported" representative of the Estates issuing "purported consent" (R152, J129) are baseless.  O'Donnell specifically represented he was acting on behalf of the Estate, and all the consent emails between O'Donnell and Blomquist included Carter and Nurnberg.  (R296).

### 2.  The Rider Language Does Not Authorize the Licenses.

Dramatic contends that in any event no waiver or consent was needed because the 25-mile rule did not apply to the contested licenses here because they were granted before the Broadway run of TKAM opened.  This issue depends on the interpretation of the language in the clause as it appears in the Rider.

As a preliminary matter, I find that the Rider is part of the 1969 Agreement.  Both parties had copies of the Rider in their files.  Dramatic, when initiating contact with the Estate about how this issue should be handled, referred to its contractual obligation. (C164; C165; Tr. 3103 (Sergel himself looked at the contract on this issue)).

The question is whether the 1969 Agreement, apart from any waivers, allows Dramatic to issue licenses made *before* the opening of TKAM on Broadway, even though the performances would take place *after* the opening.  Dramatic reads ¶2 of the Rider as saying that Dramatic cannot "permit" (i.e., enter a license for) a restricted Play "during the run,"  but it can enter a license for such a Play before the opening, regardless of whether the eventual performance in the restricted area takes place during the run.  The rationale for this reading is that one does not

know at the time of licensing the Play in a restricted area whether the Broadway performance will ever open or how long it will run.

The Estate reads the provision as saying Dramatic cannot enter a license at any time if that license would "permit" (i.e., grant authority to) the licensee to perform the Play in a restricted area during the run, regardless of when the license was entered.  The rationale for this reading is that the purpose of the clause is to prohibit performances in the restricted area during the run because it would give rise to competing performances running simultaneously, which might dampen enthusiasm or demand for the Broadway or first-class play.  The inclusion of such a clause in the licensing agreement might enhance the owner's ability to license the Play to a Broadway or first-class producer.  To use a theatrical term, the Estate contends that Dramatic's reading would enable Dramatic to "steal the thunder" from the Broadway production.

I find that the Estate's reading is the more reasonable and intended meaning of the provision.  Sergel acknowledged that under Dramatic's reading, even though he was aware of the opening he would be able to license a restricted Play until the day before the Broadway opening. (Tr. 3101-2).  His use of the phrase "strictly speaking" (Tr. 3102:3) suggests an implicit recognition of the unreasonableness of that interpretation.

Dramatic's reading of "permit" to mean "to execute a license" is strained, and does not coordinate with other terminology used in the contract to express the concept of executing or issuing a license for the Play.  For example, the first sentence in the 25-mile provision uses the phrase "lease professional acting rights to a third-party."  The words "lease," "license," and "lease and/or license" are used throughout the 1969 Agreement when referring to the granting of rights.  (See, e.g., ¶2(a), (b), ¶2(b); ¶7).  In light of these uses, it seems unlikely that the parties intended "permit" in ¶2 of the Rider to mean "to execute a license."

### 3.  Effect of the Revocation

The result of all this is that Dramatic granted several licenses to purely amateur venues that O'Donnell consented to.  The Estate purported to revoke that consent but the evidence shows no basis that would justify revocation.

Rudin sent cease and desist letters to the theaters that had been previously approved by O'Donnell. (Tr. 708-709).  Three venues, the Kavinoky, Grand, and Dayton Playhouse, had been granted a license with O'Donnell's consent, which was later revoked by the Estate based on a material omission.  None of those three productions took place.  Each was cancelled after receiving the cease and desist letter.  Most of the amateur productions were cancelled as well.  The few amateur productions that proceeded had been consented to.

As a result, none of these licenses granted by Dramatic ever resulted in a Play being performed without authorization.  The three professional theaters all cancelled their productions.  In the end, no breach of the 1969 Agreement occurred.

A further reason there is no breach is because Miss Lee and the Estate suffered no damages from Dramatic's grant of licenses within the 25-mile restricted area.  Damages are an essential element of a breach of contract action.  *In re Illinois Bell Telephone Link-Up II*, 2013 IL App (1st) 113349, ¶19 ("Damages are an essential element of a breach of contract action and a Claimant's failure to prove damages entitles the defendant to judgment as a matter of law").  To recover damages for breach of contract, a plaintiff must establish actual loss resulting from the breach.  *Morse v. Donati*, 136 N.E. 3d 1043, 1049-50 (Ill. App. 2019).  Contract damages are measured by the amount of money needed to place the plaintiff in the same position as if the contract had been performed *Westlake Fin. Group, Inc. v. CDH-Delnor Health Sys.*, 25 N.E. 3d 1166, 1174 (Ill. App. 2015).  The measure of actual loss is the damages that are compensatory

and make the plaintiff whole again, but do not put plaintiff "in a better position than if there had

been performance." *Wanderer v. Plainfield Carton Corp*., 351 N.E. 2d 630, 635 (Ill. App.

1976).  *See also*, *Mayster v. Santacruz*, 163 N.E. 3d 246, 253 (Ill. App. 2020).  ("The purpose of

damages is to put the nonbreaching party into the same position, but not a better position, as if

the contract had been performed").

The Estate suffered no damages from Dramatic's grant of rights for performances that

never took place.  The Estate's pre-and post-hearing briefs do not identify any such damages.

Section II. E. of its post-hearing brief, in which it discusses the damages it seeks, does not even

mention breach of the 25-mile restriction.

Since there is no breach and there were no unauthorized performances of the Play

in any restricted areas, there is no copyright infringement.

### E.  Dramatic's Exclusive Rights under the Original Grant were not Terminated under 17 U.S.C. §304(c).

In its prayer for relief, Dramatic seeks a declaration that it continues to have all the rights

granted to it under ¶4(e) of the 1969 Agreement, despite the Estate's notice of termination to

Dramatic under 17 U.S.C. §304(c).  Dramatic claims that those rights include the sole and

exclusive right to license dramatizations of TKAM to be performed in stock and amateur

theaters.  The Estate claims that any such rights were terminated in the U.S. effective April 26,

2016, as a result of Miss Lee's issuance of the notice.  The Estate acknowledges that, under the

statute, the termination notice does not affect Dramatic's rights outside the U.S. (Counterclaim

¶9).  It also acknowledges that even after the termination, Dramatic retains a privilege to license

the Play under the original grant, but asserts that those are not exclusive rights.  (*Id*. ¶10).

Dramatic responds that it continues to hold exclusive rights under the terms of the original grant by virtue of the Derivative Works Exception (the "Exception") under §304(c)(6)(A).  Dramatic also claims that Miss Lee's grant of rights to Rudin was invalid because it was prior to the effective date of the termination.

The Derivative Work Exception states:

> (**6**) In the case of a grant executed by a person or persons other than the author, all rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to all of those entitled to terminate the grant under clause (1) of this subsection. In the case of a grant executed by one or more of the authors of the work, all of a particular author's rights under this title that were covered by the terminated grant revert, upon the effective date of termination, to that author or, if that author is dead, to the persons owning his or her termination interest under clause (2) of this subsection, including those owners who did not join in signing the notice of termination under clause (4) of this subsection. In all cases the reversion of rights is subject to the following limitations:
>
> > (**A**) A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

I must determine whether, under the Exception, Dramatic continues to hold exclusive rights or merely holds non-exclusive rights under ¶4(e) of the 1969 Agreement.

For the reasons stated below, I have determined that, by virtue of the Exception, Dramatic continues to hold after termination of the original grant all the exclusive rights granted to it in the 1969 Agreement.

The 1969 Agreement provides in ¶2 that Miss Lee grants to Dramatic the "complete rights throughout the world" to create a dramatization ("the Play") of TKAM.  The rights granted to Dramatic are exclusive.  The Play created by Dramatic "is to be the only one the amateur acting rights of which the Owner [Miss Lee] will permit to be leased and/or licensed…" (¶2(a)).  The Estate has also acknowledged that the rights granted to Dramatic under the 1969 Agreement were exclusive rights.  (Estate Partial S.J. Mot., p. 3).

Section 304(c) of the Copyright Act allows a copyright owner to terminate transfers and licenses covering the extended renewal term of a work.  This section states that "the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978…is subject to termination…"  Paragraph 4(f) of the 1969 Agreement states that the term of the agreement is "for the term of the original copyright of the Property and the renewals and/or extensions thereof".  Section 304(c)(3) provides that termination may be effected at the end of fifty-six years from the date copyright was secured.

In April 2011, Miss Lee, as the author of TKAM, served a notice of termination on Dramatic to take effect on April 26, 2016.  An author's right to terminate a transfer is subject to certain conditions.  One of those conditions is the Derivative Works Exception.

The basic provision of §304(c)(6) is that for a grant of rights executed by the author of a work (here Miss Lee), "all of that particular author's rights under this title that were covered by the terminated grant revert…to that author or, if that author is dead, to the persons owning his or her termination interest…"  This broad reversion right of the author, however, is subject to an important "limitation" in the case where the terminated grant covers derivative works.  This "limitation" is the Exception, set forth in §304(c)(6)(A).

The issue here is to determine what is the effect of this limitation on what rights of Dramatic under the original grant are terminated, if any.  The Estate acknowledges that Dramatic has the right to continue to issue post-termination licenses of the "amateur acting rights" for the Play under the Exception, but asserts that Dramatic no longer has exclusive "amateur acting rights" as under the original grant, but only non-exclusive rights to license amateur acting rights.  The Estate maintains that the word "privilege" in the Exception connotes that the author of a derivatives work covered by the original grant cannot continue to exercise any exclusive

derivative rights transferred in the original grant. *See*, Estate's Partial Motion for Summary Judgment.

There are several reasons why I have determined that Dramatic continues to have the right to exclude the Estate from granting any third party the "amateur acting rights" for an adaptation of TKAM.

### 1. The Language of the Act

First, this conclusion is required by the plain language of §304(c) of the Act.  The section (of which the Exception is a part) begins by saying that the termination right applies to both "exclusive or non-exclusive grant[s] or license[s]…."  The reversion language of §304(c)(6) then provides that all of the authors rights covered by the terminated grant revert to the author upon termination, but adds an exception of broad applicability stating that "*in all cases* the reversion of rights is subject to" the "limitation" set forth in the immediately following subsection (6)(A).  (Emphasis added).  The very word "limitation" informs us that the reversion of rights is not absolute -- not all rights conveyed in the original grant revert to the author.  Specifically, a derivative work prepared under the original grant (as Sergel's play was) "may continue to be utilized *under the terms of the grant* after its termination…."  (Emphasis added).  The Exception does not eliminate exclusive licenses from its scope or state that exclusive licenses become non-exclusive.  Nothing in §304 expressly carves out exclusive rights from protections of the Derivative Work Exception.  On the contrary, the Exception expressly states that the derivative work can continue to be utilized under the terms of the original grant, which in this case granted Dramatic the exclusive right to license a play based on TKAM to amateur and stock theaters. Nothing in the language of §304(c)(6)(A) can reasonably be construed to mean that all grants of exclusive rights to create or license derivative works are somehow converted to nonexclusive

licenses after the termination of the original grant.  The Exception simply does not allow such a reading.

### 2.  Mills Music

Neither party offers any cases that directly answer the question of whether a termination under §304(c) terminates exclusive rights to a derivative work granted in the terms of the original agreement.  However, *Mills Music, Inc. v. Snyder*, 489 U.S. 153 (1985) provides significant guidance as to the meaning and application of the Derivative Works Exception.

*Mills* involves a controversy between a music publisher (Mills) and the heirs of the author of a copyrighted song (Snyder) over the division of royalty income from licenses (known as "mechanical licenses") granting numerous record companies the right to make sound recordings (which are derivative works) of Snyder's song.

In 1940, Snyder assigned his entire interest in all renewals of the copyright to Mills in exchange for a 50 percent share of the royalties that Mills received from mechanical licenses.  In 1951, Mills registered a renewal copyright. Thereafter, Mills, directly or through its agent, the Harry Fox Agency, issued over 400 licenses to record companies authorizing the use of the song, and obligating the companies to pay royalties to Mills, who in turn was obligated to pay 50 percent of those royalties to the Snyder.  After the Snyder's death, his heirs terminated Snyder's grant to Mills of rights in the renewal copyright.  Snyder's heirs demanded of Mills' agent that the all the royalties on the recordings be remitted to them and none to Mills as a result of the §304(c) termination.  The agent placed the disputed funds in escrow and brought an interpleader action, and the district court entered judgment for Mills.

The district court held that the statute made no distinction between grantees who themselves make or own derivative works and those who license others to do so, and that

therefore the terms of the original grant that had been in effect prior to the termination governed the record companies' obligation to pay royalties. Under those agreements Mills and the heirs were each entitled to a 50 percent share in the net royalty.

The Court of Appeals reversed, holding that the §304(c)(6)(A) exception preserved only the grants from Mills to the record companies and that the reversion of the copyright to respondents carried with it Mills' right to collect the royalties payable under those grants. *Harry Fox Agency, Inc. v. Mills Music, Inc.,* 720 F.2d 733 (1983).

The Supreme Court reversed and followed the reasoning of the "exhaustive opinion" of the district court. The Supreme Court held that pursuant to §304(c)(6)(A), Mills was entitled to a share of the royalty income in dispute under the terms of the Snyder's original grant to Mills in 1940. It found that nothing in the legislative history or the language of the statute indicates that Congress intended to draw a distinction between authorizations to prepare derivative works that are based on a single direct grant and those that are based on successive grants. Rather, the consequences of a §304 termination do not apply to derivative works that are protected by the §304(c)(6)(A) exception. The Court explained that the "boundaries of that Exception are defined by reference to the scope of the privilege that had been authorized under the terminated grant and by reference to the time the derivative works were prepared." 469 U.S. at 164.

While the issue here is somewhat different than *Mills*, much of the Court's language and reasoning provides guidance to the proper interpretation of the Exception. The Court reinforces that the Exception means what it clearly says: "we believe the consequences of a termination that §304 authorizes simply do not apply to derivative works that are protected by the Exception defined in §304(c)(6)(A)." *Id*.

In its opinion, the Court repeatedly emphasizes the importance of the terms of the

original grant of rights to the derivative author (in this case, Dramatic) in determining the scope of what is within the Exception and what reverts to the original author.  In ruling for Mills, the Court read the statute "to preserve the total contractual relationship. . . ."  *Id*. at 169.  The original grant from Miss Lee to Dramatic provides that Dramatic shall be the only one who has the right to create and license a play for performance in amateur and stock theaters.  These contractual rights are preserved by the Exception.

In explaining that Snyder's original grant to Mills and Mills' subsequent grant to the record companies must be read together, the Court in *Mills* states that "although the termination has caused the ownership of the copyright to revert to the Snyders, nothing in the statute gives them any right to acquire any contractual rights that the Exception preserves." It goes on to say "the statutory transfer of ownership of the copyright cannot fairly be regarded as a statutory assignment of contractual rights." *Id*. at 167-68.

The exclusive rights granted to Dramatic in 1969 that the Estate claims have now reverted to it are the very contractual rights that the Exception preserves to Dramatic.  The Estate can license the creation of new dramatic works for use outside stock and amateur theaters, but it cannot contravene the exclusive rights it transferred to Dramatic for the stock and amateur markets under the terms of the original grant.

In the Court's analysis, there are two key facts that determine whether a derivative author is protected by the Exception.  "The scope of the duly authorized grant and the time the derivative work was prepared are what the statute makes relevant because these are the factors that determine which of the statute's two countervailing purposes should control." *Id*. at 174. Dramatic meets both of these statutory tests.  It was granted an exclusive license to create a play for the amateur and stock markets and this derivative work was created before the termination.

The Court summed up its reading of the §304(c)(6)(A) Exception with these words: "The 'terms of the grant' as existing at the time of termination govern the author's right to receive royalties; those terms are therefore excluded from the bundle of rights that the author may seek to resell unimpeded by any ill-advised prior commitment." *Id*.

### 3. Countervailing Purposes of the Termination Right.

The Estate notes that the purpose of §304(c) termination rights was to award the original author with the benefit of the extended term.  (Est. Partial S.J. Mot. p. 3).  The Estate presented the decision facing Congress as a binary one -- whether to award the "windfall" to the author or the grantee.  (*Id*.).  But as *Mills* points out, Congress did not view it as an 'either/or" situation. Rather, Congress crafted, with guidance from the Copyright Office and interested industries, a carefully balanced compromise that provided with some benefits to original authors and some benefits to derivative authors.  The compromise is embodied in the Exception, which is to "preserve the right of the owner of a derivative work to exploit it, notwithstanding the reversion."  469 U.S. at 173 and fn. 41.  In the Exception, the right to exploit an already prepared derivative work "was to be excluded from the bundle of rights that would revert to the author upon termination."  *Id*.  Part of the balancing of interests was that the derivative author was not allowed to create new derivatives after termination, even if this right was granted under the original contract.  In other words, a right to make additional derivative works after termination is expressly excluded from the Exception, but no such express exclusion is made for exclusive rights granted for derivative works created before termination.

The non-binary approach of the Exception was also recognized by the District Court in *Mills*:  "It may readily be acknowledged that the extension period is intended to benefit the author…. However, this does not mean that authors were intended to be the exclusive

beneficiaries of the extension.  On the contrary, the statute and its legislative history clearly

evidence that where the author has assigned his copyright, Congress intended that in specified

situations the benefits of the extension be shared.  This intent is manifested by the very

Exception, an express limitation on the reversion of rights to authors upon termination." *Harry*

*Fox Agency v. Mills Music*, 543 F. Supp. at 857-58 (S.D.N.Y. 1982).  The court added that the

Exception "is as much a part of the statute as the right of reversion." (*Id.*).  The Exception is the

compromise by which the interests of derivative authors are recognized and effectuated.

The Estate is wrong in asserting that if DPC's exclusive right remained in effect, the

termination provision would be meaningless.  (Est. Post-Hearing Br. 35)).  That argument

ignores the very purpose of the Exception -- to apportion the right to provide some benefits of

the extended period to the derivative author.  The benefits extended are those provided to the

licensee under the original terms of the grant.  The implication of the Estate's claim is that

Dramatic's reading would leave Miss Lee/the Estate empty-handed.  That is not the case.  This is

not a situation in which the copyright owner transferred all right, title, and interest in the entire

copyright or to all derivative rights to the grantee.   Here the grant to Dramatic is only a limited

license of live stage dramatization rights for amateur acting (as defined to include stock rights).

This will not inhibit the Estate from exercising all the myriad rights and derivative rights it still

controls, such as television, radio, new media, digital media, social media, mobile, streaming,

pay per view, DVDs, musicals, opera, or any other method or media now known or later

developed, other than the stock and amateur live stage rights Dramatic owns.

The purpose of the Exception in this situation is best met by preserving the exclusive

rights as granted to Dramatic under the original grant, especially in the absence of any clear

statement in the statute divesting derivative authors of the exclusive rights granted in the original contract.

In sum, the *Mills* case provides authoritative guidance of how a court should analyze the scope of the §304(c)(6)(A) Exception in light of the statutory language and the purpose of the provision. Following the principles laid out by the Court leads to the conclusion that if the terms of the original grant include exclusivity, that right may continue to be exploited for pre-termination.

**4. The Estate's Distinction between Rights and Privileges.**

Although the Estate admits in its Motion Partial Summary Judgment that "the Original Agreement also granted to Dramatic the exclusive right to license amateur productions in stock and repertoire theatres" (p. 3), it argues that the Exception does not provide Dramatic any exclusive rights in the U.S. after termination. To avoid the impact of the statutory language that the derivative work "may continue to be utilized under the terms of the grant after its termination," it contends that this is a "privilege" under the statutory language and that privileges, distinct from rights, are not exclusionary. (Partial S.J. Mot., p. 7). It cites the second sentence of the *Black's Law Dictionary* definition of "privilege," namely "the legal freedom to do or not do a given act. It immunizes conduct that, under ordinary circumstances, would subject the actor to liability." These two sentences are not mutually exclusive. A privilege may immunize. It can also endow someone with the legal freedom to do a given act. When read in conjunction with the immediately preceding phrase that the derivative work may continue to be used "under the terms of the grant," the statute is fairly interpreted to provide that Dramatic has the legal freedom to exercise the exclusive right concededly granted to Dramatic in the original grant. In *Mills*, the Court emphasized the importance of the terms of the original grant in

defining the scope of the Exception.  The Estate's very narrow reading of the word "privilege" as nothing more than an immunity does not provide a sufficient basis to deprive every grant of exclusive rights to derivative works of the full benefits of the Exception.  This would exclude a substantial and important category of derivative works from the benefits of the Exception.

The inappropriate narrowness of the Estate's definition of "privilege" can be seen if one reads the *entire* definition from Black's Law Dictionary.  The first sentence of the definition reads:  "A special *right*, exemption, *or* immunity granted to a person or class of persons; an exception to a duty." (Emphasis added).  Thus, "rights" are encompassed within the various different meanings of "privilege."  Nothing in the *Black's* definition compels a reading of "privilege" that necessarily excludes "rights", especially when to do so would deprive an exclusive derivative rights holder from exercising the very right granted to it.

The breadth of the word "privilege" can be further seen in *Black's* definition of the word "rights" as "A power, privilege, or immunity secured to a person by law" (definition 3).  Thus, according to *Black's*, privileges are encompassed in the term "right," and rights are encompassed in the term "privilege."  If Congress had intended that the ambiguous term "privilege" to exclude all exclusive rights from the "terms of the grant," it could have done so, but did not.  The multi-definition word "privilege" does not warrant imputing such an intent to Congress.

The Estate's reading of the term "privilege" is belied by the way the Supreme Court uses the term "right" when discussing §304(c)(6)(A).  For example (with emphasis added):

- "Moreover, although the termination has caused the ownership of the copyright to revert to the Snyders, nothing in the statute gives them any right to acquire any contractual *rights* that the Exception preserves." (p. 167).

- "The purpose of the Exception was to 'preserve the *right* of the owner of a derivative work to exploit it, notwithstanding the reversion.'" (p. 173, quoting former Register of Copyrights, Barbara Ringer).

70

■ "Therefore, even if a person acquired the right to exploit an already prepared derivative work by means of an unfavorable bargain with an author, that *right* was to be excluded from the bundle of rights that would revert to the author when he exercised his termination right." (p. 173).

These references suggest that the Court in *Mills* did not read any distinction between "privilege" and "right." The Court used "right" when referring to the grantee's continued use of the derivative work "under the terms of the grants after termination."

### 5. The Estate's Grant of Rights to Rudin.

Dramatic also argues that any grant of stock and amateur rights by Miss Lee to Rudin is invalid because the grant of rights was prior to the effective date of termination and thus contravenes §304(c)(6)(D). (Cl. Post-Hrg. Br. 39-40). That section states: "A further grant, or agreement to make a further grant, of any right covered by a terminated grant is valid only if it is made after the effective date of the termination."

My ruling on the continuation of Dramatic's exclusive rights under the original grant pursuant the Derivative Works Exception in §304(c)(6)(A) makes it unnecessary to rule on this issue. It should be noted, however, that the rights that Ms. Lee granted to Rudin in the letter agreement between Ms. Lee and Rudinplay, dated June 29, 2015, are broad, but are expressly made subject to the rights Ms. Lee granted to Dramatic in the 1969 Agreement. (R058). In pertinent part, the Rudin Agreement states: "The rights granted hereunder shall be subject to the rights granted under the [1969] Agreement, as limited by such termination," referring to Ms. Lee's purported termination of Dramatic's rights. In effect, the agreement granted Rudin all live stage rights in TKAM other than those owned by Dramatic.

In addressing this issue in its Post-Hearing Brief, the Estate acknowledges that the rights conveyed to Rudin in the June 29, 2015 letter agreement "are not 'covered by' the terminated grant from Ms. Lee to Dramatic." (p. 39). Because Rudin's rights are subject to Dramatic's

71

rights under the terms of 1969 Agreement, and because Dramatic's exclusive rights are preserved by the Derivative Works Exception, it follows that Rudin has no stock and amateur rights for live theatrical productions of TKAM.

### F. The Estate Prevented or Hindered Dramatic from the Full Exercise of Its Rights.

Paragraph 1(a) of the 1969 Agreement provides that Miss Lee ". . . will do nothing, either by omission or commission, to prevent or hinder [Dramatic] from the full exercise of all rights granted and/or purported to be granted herein."  The essence of the provision (the "Prevent-Hinder Provision") is twofold.  First, Miss Lee (and after her death, the Estate) warrants that Lee/the Estate will not grant any rights or enter any agreements with a third-party relating to TKAM that would "prevent or hinder" Dramatic from "the full exercise of all rights granted" in the 1969 Agreement.  Second, Lee/the Estate warrant that they "will do nothing, either by omission or commission, to prevent or hinder" Dramatic from "the full exercise" of the rights granted in the Agreement.  The provision thus addresses both conduct of the Estate that prevents or hinders Dramatic from fully exercising its rights and conduct of the Estate that enables a third-party to prevent or hinder Dramatic from fully exercising its rights.

For the reasons stated below, I find that the Estate has violated the Prevent-Hinder Provision.

Most, but not all, violations resulted from the Estate's interactions with Rudin.  These caused considerable havoc and certainly prevented or hindered Dramatic's full exercise of its stock and amateur rights.

Much of the hindrance stemmed from the 2015-2019 efforts of the Estate to prohibit Dramatic from issuing "professional" licenses after decades of accepting royalties for such performances and taking no serious steps to stop Dramatic's licensing of such performances.

72

There was recognition by Miss Lee and her representatives that professional performances were allowed so long as they were not first-class productions, including Broadway and West End.

But things changed in 2015.  Coincidentally or not, this was the year Miss Lee entered the agreement with Rudin, in June 2015 to allow a Broadway dramatization of TKAM, as well as all other dramatization rights, subject to Dramatic's rights.  (R058).

On October 7, 2015, Rudin complained to Nurnberg about a "professional production" at the Queens Theater in Corona, New York.  Nurnberg told Rudin that O'Donnell would look into it, and Rudin responded to Nurnberg and O'Donnell "I am – as you know – very eager that we start to enforce your agreement with Sergel."  Rudin also asked O'Donnell for his opinion. (J066-002).

O'Donnell, a copyright lawyer with experience in theatrical practice, responded to Rudin that "we cannot prohibit Dramatic Play Company from exercising their right to license the Sergel adaptation in non-first-class productions."  (C104).  Rudin responded "I thought they had rights to amateur productions only," to which O'Donnell responded "Nope, they have everything but first-class production rights."  He directed Rudin's lawyer, Seth Gelblum to look at the definition of "amateur acting rights" in 1969 Agreement, which allows stock and repertoire and is not limited to purely amateur performances.

This was not unknown territory for O'Donnell.  He had known for at least a year that the 1969 Agreement allowed non-first-class professional productions.  *See*, C066 (October, 2014, correspondence from O'Donnell indicating that he treated "first-class" status as determinative in deciding whether a performance exceeded Dramatic's grant under the 1969 Agreement).

Exhibit C104 shows Gelblum continuing to try to convince O'Donnell to change his position.  Exhibit C066 shows that Rudin himself also continued to challenge O'Donnell's

interpretation.  Two weeks later Gelblum wrote to O'Donnell: "By the way, Scott has informed me that Andrew Nurnberg and you are actively engaged in stopping the unauthorized Queens production.  Thank you."  (J068).

In the following weeks, the pressure from Rudin and his lawyer on O'Donnell continued.  On November 1, 2015, Rudin told Gelblum "We MUST deal with this," (referring to the Queens Theater production).  Gelblum forwarded this O'Donnell, adding "This is a very big problem.  I cannot believe your licensing agent has not stopped this immediately … Do you need me to intercede directly, on the grounds that this is a violation of Scott's exclusive rights?"  (C114).  Gelblum continued to pressure O'Donnell to take steps against Dramatic regarding Queens and another production.  (J069).

Eventually, the continuing pressure achieved Rudin's goal, at least in significant part.  On November 4, 2015, O'Donnell told Gelblum that while he would not attempt to enjoin the Queens Theater, "we will, in good time, remind Mr. Sergel that his agreement with the author does not allow him to license a production with professional actors."  (*Id.*).

Nurnberg was copied on much of the correspondence and was aware of Rudin's desires to prevent Dramatic from licensing any performances with one or more professional actors.  A few weeks later, following up on O'Donnell's promise to remind Sergel of the newly minted prohibition on professional actors, Nurnberg sent an email to that effect to Sergel.  (C117).  Nurnberg immediately forwarded the message to O'Donnell, who promptly forwarded it to Gelblum with the statement:  "To allay Scott's unease."

In January, 2016, O'Donnell continued the appeasement process and coordination with Rudin in ways directly affecting Dramatic. (C120).  As a means of dealing with Dramatic's decades long assertion of its rights to license non-first-class professional productions, O'Donnell

proposes to write a "formal opinion letter on my letterhead," and tells Nurnberg that "you can give that to him first and tell him that you had sought independent legal advice . . . ." (*Id*.). O'Donnell then promptly prepared the opinion letter dated January 20, 2016. A week later, Nurnberg sends a copy to Rudin, telling him that he (Nurnberg) will send it to Sergel. (C121).

The legal opinion letter states that Dramatic cannot license the Play to theaters that use professional actors, even if the theaters are stock or repertoire theaters. The opinion marks a complete reversal of O'Donnell's position prior to Rudin's influencing campaign. O'Donnell refused to testify in these proceedings, despite receiving a subpoena from Dramatic.

The Estate used the O'Donnell opinion letter to support Rudin's view that Dramatic had no right to license stock or repertoire productions with any professional actors. The evidence shows that Rudin had significant influence over the O'Donnell opinion letter, including providing approval to send it. For example, on January 27, 2016, Nurnberg sent an email to Scott Rudin saying that while Rudin prepares a press release (presumably announcing his plans for a Broadway production of TKAM), Nurnberg would send O'Donnell's opinion letter to Sergel. Nurnberg enclosed a copy of the opinion letter for Rudin. Rudin responds that he wants to send it to Seth Gelblum for review first. Nurnberg responds that he is happy to have Gelblum look at it. (C122). The next day Rudin reports: "SETH THINKS TIM'S LETTER IS EXCELLENT. SEND AWAY!" Nurnberg forwards this ringing endorsement to O'Donnell, with the comment "Well, that's a relief. It means you won't have to take up snow-shoveling for a living." (C123). This is a clear indication that O'Donnell and Nurnberg were under pressure to do Rudin's bidding to prevent or hinder Dramatic from licensing stock and repertoire productions with professional actors, as they had been doing under the 1969 Agreement for decades. From that point on, the Estate persisted in its assertions to Dramatic that it did not have

the right to grant licenses for productions with professional actors.  Having received the approval from Rudin, Nurnberg sent the opinion letter to Sergel.  (C125).

And to the extent there was any doubt that Rudin and his lawyers played a significant role in the development and issuance of the O'Donnell opinion letter or whether it expressed an independent opinion, O'Donnell's correspondence to Lembke in January 2019 eliminates any such doubt.  In sending the opinion to Lembke, O'Donnell explains the provenance of the letter: "Rudin has a copy, and the Actor's Equity argument expressed in the opinion came from a distinction posited by his original lawyer at Loeb & Loeb, Seth Gelblum."  (C183-001).

Another method by which the Estate and its agents prevented and hindered Dramatic's full exercise of its rights was by stating or implying to or its licensees that Miss Lee had "all professional acting rights." (e.g., J103; J080).  This is an overstatement, and omits informing the recipient of other important language in the contract as well as the complete context of past practice.  It does not explain that Dramatic's grant of "amateur acting rights" is not as limited as it sounds, and that it includes stock and repertoire rights, which commonly use professional actors.  It does not explain that Dramatic had been licensing stock performances with professional actors for many years.  To simply say that Miss Lee reserved professional acting rights is misleading in that it does not tell the whole story.  It does not include mention of stock rights or how stock right encompass the use of professional actors.  Instead, it tells the story according to Rudin's wishes, not according to the parties' practices under the contract for many decades.

Prevention and hinderance is also seen in the Estate's actions leading up to and during the Jonathan Church affair.  On January 9, 2019, Jonathan Zavin, an attorney for the Rudin interests, sent a cease and desist letter to Dramatic concerning the imminent commencement of the

76

Jonathan Church tour of TKAM in the U.K. and Ireland.  (R113).  This tour had been in the works since at least January, 2018.  (R115-002).  Zavin sent a copy of the letter to Lembke, "looking forward to discussing it" with Lembke and suggesting that the Estate "send a similar letter to Dramatic Publishing, saying the tour violates the agreement with Lee."  (J099; R112).  A few days later, on January 15, Lembke sent a letter to Dramatic asserting "it appears Dramatic Publishing has exceeded its rights" under the Agreement, and asking, inter alia, whether any of the actors "are members of trade unions," (i.e., are professional actors).  (R115).  Lembke's letter does not outright demand Dramatic to cease and desist, but the letter is clearly aligned with Zavin's and in no way expresses disagreement with Zavin's letter, which Lembke had received from Zavin.  While Lembke's letter asks for information about the production, the Estate was well aware of Dramatic's position, based on the longstanding practices of the parties, that Dramatic's stock and repertoire rights included the use of professional actors in non-first-class productions.

At this time, Rudin's U.K. lawyers had already sent cease and desist letters to Jonathan Church and to some or all the venues on the tour.  (R117; C186).  Rudin's lawyer continued to pressure Lembke and the Estate, exhorting them, to cooperate on the issue, because they are "on the same side."  Zavin explains in the January 15 email that Rudin's play "is an extremely valuable property for both parties" and that "the play will likely "earn millions of dollars in the U.K.," concluding "We can't let Dramatic or their licensees screw this up."  (J102).

On January 11 and again on January 17 Rudin's U.K. law firm had sent letters to Jonathan Church's attorneys asserting that Rudin is "the exclusive worldwide licensee" for the live stage rights of TKAM.  The letter states that these rights are subject only to the "limited rights" granted by Miss Lee to Dramatic "for amateur performance only."  (J106).  The

correspondence attaches a redacted copy of the 1969 Agreement displaying only the grant of rights (¶2) and the definition of "amateur acting rights (¶4(e)), but does not provide any further explanation of or limitation on its misleading statement that Dramatic had rights for "amateur performances only." Rudin's U.K. lawyers also sent a similar letter to the fifteen theaters on the Church tour, stating that Dramatic's rights were "for amateur performances only." (J107).

While the lawyers for Church and Rudin exchanged lawyerly letters back and forth, Jonathan Church himself appealed to Scott Rudin in an attempt to come up with a better solution than a complete shutdown of the tour just weeks before its scheduled commencement. Zavin provided Lembke copies of all of this correspondence. (R106, R107, R118, J102).

Church's letter points out several things that were, or should have been obvious to the Estate. Church writes, "There have been many touring productions of the Christopher Sergel adaptation in recent years," and that the Estate's agents were involved, even after licensing Rudin's production. (R118-003). He adds that "at the very least there is a grey area in terms of the definition of amateur acting rights (which certainly seem to go further than you or I would ordinarily expect to be encompassed within the meaning of amateur rights)." Church also perceives that Rudin's aggressive stance of demanding a shutdown of the entire tour was meant "to send a clear message to Dramatic…." (*Id.*). Zavin provided a copy of this to Lembke.

In addition, Church's lawyer had previously pointed out to the Rudin team (who shared the letter with Lembke) that the Church tour was the same production as first staged at Regent's Park Open Air Theatre and the agreement excluded the West End. None of the locations of the Church tour came within the definition of West End. The letter, dated January 15, 2019, states:

> We do not accept that a small marginally profitable regional tour will affect the exclusivity of a production in London's West End [i.e. Rudin's proposed production]….The productions are plainly different in nature. Our client's production is nothing more than a revival and includes no star names….It is not licenses for

78

production in the West End.  As noted above, there have been numerous previous professional productions of To Kill a Mockingbird and as such the title is not a new one to the U.K. theatre marketplace.

J102-003-004.

With that background, Church proposed some reasonable alternatives to a complete shutdown that would help mitigate the losses.  (R118-003-004).  A few hours later, Zavin informs Lembke that "Scott has no interest in setting."  (R118).  All of this was shared with Lembke.

Nowhere in this intensive campaign by Rudin to shut down the Church tour does the Estate, which was fully apprised at each step, take any measure to stop or deter Rudin from his impetuous activity.  In fact, it lent credence to Rudin's campaign by sending a letter to Dramatic asking whether the Church production was using any professional actors.  The Estate persisted in its position that Dramatic could only license purely amateur productions with no professional actors, and it failed to tell Rudin that Dramatic had the right to license non-first-class performances with professional actors.  These actions and failures to take actions by the Estate and its agents prevented and hindered Dramatic, by commission and omission, from fully exercising its rights under the 1969 Agreement.

O'Donnell, still an attorney for the Estate at this time, contributed to this scenario as well. On January 9, Zavin asked Lembke to send a "similar" cease and desist letter to Dramatic, Lembke forwarded the email and attachment to O'Donnell.  O'Donnell's response was to send a copy of his 2016 opinion letter to Lembke saying "this letter opinion from 2016 may be useful." C183-001.  This is the same opinion letter about which O'Donnell had previously written "Sergel's lawyer Alvin Deutsch is a very cantankerous guy who knows that this [opinion letter] is not at all clear, so I am not going to fool him either."  (C304-001).  Nurnberg characterized

this comment as a recognition by O'Donnell that this wouldn't pull the wool over [Deutsch's] eyes."

In light of the foregoing incidents and correspondence, the Estate's arguments that it did not "act in concert" with Rudin is unconvincing, with respect to the Church tour or any of the many other instances of interfering with Dramatic's full exercise of its rights.  (Post-Hrg. Br. 45). From 2015 on whether by omission or commission, repeatedly cooperated with each other to narrow Dramatic's rights to purely amateur rights only.  The Estate did little or nothing to dissuade Rudin and his lawyers from seeking to cancel productions of Dramatic licensees.  The Estate's reluctance to go all in to publicly embrace Rudin's campaign (e.g. not issuing statements in support of Rudin; not suing Dramatic) fall far short of excusing the actions or omissions it did take to prevent and hinder Dramatic's rights.

Nor does the lack of responsiveness of Dramatic or Deutsch regarding the Church tour exculpate the Estate.  The Estate's expressed desire to find out Dramatic's views on the matter seems a bit of a charade.  Dramatic had made its views known many times in the past, namely, that it had the right to license non-first-class productions with professional actors.  The Estate was fully apprised by Rudin of the actions it was taking.  The second-class regional nature of the tour was made known to Lembke when Rudin's lawyer sent him the Harbottle letter and Jonathan Church's plea for leniency.  In light of the Estate's steadfast previously expressed position that Dramatic had nothing more than purely amateur rights, any prompt response from Deutsch or Dramatic would have been unlikely to cause the Estate to step in and stop Rudin course of action.  Sergel had already made Dramatic's view clear in 2016 when Nurnberg sent him the O'Donnell opinion letter: "We will not cooperate with bully tactics or threats." (C125).

### G.  The Estate and its Agents Tortiously Interfered with Dramatic's Contracts

Dramatic asserts that the Estate and the LLC have tortiously interfered with Dramatic's contractual relations by engaging in various unjustified acts that have caused substantial monetary and reputational damage to Dramatic.  (Br. 34-38).

To establish tortious interference with contract under Illinois law, a plaintiff must show: (1) the existence of a valid and enforceable contract between the plaintiff and another; (2) the defendant's awareness of the contract; (3) the defendant's intentional and unjustified inducement of a breach of the contract; (4) a subsequent breach by the other, caused by the defendant's conduct; and (5) damages." *MG Design Assocs., Corp. v. CoStar Realty Info., Inc.*, 267 F. Supp. 3d 1000, 1022 (N.D. Ill. 2017).

I find that the Estate has tortiously interfered with contracts between Dramatic and several of its licensees.  Dramatic has presented documents and testimony establishing each of the elements by a preponderance of the evidence.  The existence of contracts between Dramatic and certain licensees identified below is uncontroverted.  The Estate was aware of these contracts and engaged in conduct that induced breaches by the licensees.  As a result of the Estate's conduct, Dramatic suffered damages.

As has been detailed above, from the time the Estate granted certain live stage adaptation rights to Rudin, he made it clear to the Estate that he was eager to enforce his rights against Dramatic and its licensees.  The Estate worked together to help him engage in a campaign against Dramatic's licensees.  The rights granted to Rudin consisted of all live stage rights in TKAM that were not already granted exclusively to Dramatic.  This undoubtedly fueled Rudin's eagerness to engage in actions to narrow Dramatic's rights and thereby expand his own rights.

On numerous occasions, as seen above, the Estate through its agents, helped Rudin in his efforts. An important part of the interference was to re-interpret the grant of rights in the 1969 Agreement to characterize Dramatic's rights as being purely amateur rights. This required throwing over the language of the agreement and decades of the past practice of the parties under the agreement. Though the phrase "amateur acting rights" was used as a label for the defined term, both parties knew that it was not limited to purely amateur rights, but included stock and repertoire rights which were regularly performed by professional actors.

O'Donnell knew this, and told Rudin as well as Carter and Nurnberg that Dramatic had the rights to "everything but first-class productions." Nevertheless, to further the plan of expanding Rudin's rights to the detriment of Dramatic's rights, the Estate decided to create an "opinion letter" from O'Donnell to Nurnberg, not setting forth O'Donnell's original opinion that Dramatic had everything but first-class rights, but now stating that Dramatic cannot license any productions with professional actors. Far from being his own independent opinion, it is based on a theory fed to him by Rudin's lawyer, Gelblum. O'Donnell, on behalf of the Estate, sent the letter to various licensees of Dramatic to perpetuate the false notion that Dramatic had nothing more than purely amateur rights.

O'Donnell sent a copy of the opinion letter to Rudin, which undoubtedly made it clear to Rudin that he had the Estate's support for the theory that Dramatic had no right to license productions with professional actors. If nothing else, this communicated to Rudin that the Estate would not object to Rudin asserting to Dramatic's licensees that Dramatic had amateur rights only. Needless to say, since the Estate's lawyer, O'Donnell, signed the opinion letter directed to the Estate's agent, Nurnberg, the Estate was in no position to tell Rudin that Dramatic had rights beyond purely amateur rights. The Estate took no steps to contradict Rudin's campaign to

narrow Dramatic's rights after Rudin issued a flurry of cease and desist letters to the Church tour and to amateur licensees who had been given permission by O'Donnell.  These letters stated that Dramatic was not authorized and that the theaters would face dire consequence if they did not cancel the productions. (*See, e.g.,* R168-175; R117).  And cancel they did, to the detriment not only of Dramatic, but to the detriment of Jonathan Church, all the venues on the tour, the actors (some of whom were children), and other employees – not to mention the theater-going public in a variety of locations throughout the U.K. and Ireland, far from London's West End.

While Rudin took the lead by sending out the letters to shut down the Church tour in 2019, the Estate facilitated and enabled that action by conveying to Rudin the information (or, more appropriately, misinformation) Rudin needed to convince the venues they faced legitimate legal risks.  The Estate's failure to object to Rudin's letter writing campaigns legitimized Rudin's activities in the eyes of the licensees.

The actions of the Estate in 2016 relating to the 25-mile rule present another example of interference by the Estate resulting in the cancellations of performances by theaters.  After agreeing with Dramatic that it could issue licenses to purely amateur performances within the restricted area as long as there were no professional actors in the performances, it nevertheless revoked those waivers.  Upon learning that three theaters for which it had granted permission were using professionals, it revoked the agreed permission not only for those three theaters but also revoked without justification the permission it had granted to nine other amateur theaters that were not using any professional actors, thus forcing them to cancel.  *See*, J130 (Lemke letter to Deutsch asserting violation of the 25-mile rule).  There was no justification for revoking the permission to the nine theaters that did not plan to use professionals.

Another instance of the Estate cooperating with Rudin to interfere with Dramatic's licensing can be seen in a series of documents from November, 2016, showing that Rudin asked the Estate to collect and provide to Rudin information about licenses Dramatic had issued in prior years, including details of performances and income received from Dramatic.  (C147-149).

The Estate immediately collected the licensing information and O'Donnell sent it to Rudin's lawyers for review.  While the Estate declined Rudin's offer to fund a lawsuit against Dramatic, at no point in these documents or any other documents after 2015 does the Estate ever disabuse Rudin of the belief that Dramatic owned only purely amateur rights.  (J080-083).

The Estate argues that its conduct was justified as a means to protect its legitimate intellectual property interests.  (Est. Pretrial Br. 10-11).  It cites *Am. Broad. Co. v. Maljack Prods., Inc.*, 34 F. Supp. 2d 665 (N.D. Ill. 1998) for the principle that a copyright owner is justified in sending cease and desist letters even if the claim is disputed.

Certainly, the holder of a protected copyright interest has the privilege to put others on notice of its claim.  But as *Maljack* and other cases recognize, even if the communication is otherwise privileged, reliance on the defense requires that the defendant has a good faith belief in its copyright interest.  The privilege/justification defense is not applicable if the defendant does not exercise its privilege in good faith.  *Am. Broad. Co. v. Maljack Productions, Inc.*, 34 F. Supp. 2d 665, 675 (N.D. Ill. 1998).  *See*, *Stonestreet Mktg. Services, Inc. v. Chicago Custom Engraving, Inc.*, 994 WL 162824, at *6 (N.D. Ill. Apr. 28, 1994)(holder of a valid privilege must exercise the privilege in good faith); *Art Line, Inc. v. Universal Design Collections, Inc.*, 966 F. Supp. 737, 744 (N.D. Ill. 1997)("a copyright owner may not send infringement letters which (a) contain false statements or (b) are issued in bad faith"); *Spangler Candy Co. v. Crystal Pure Candy Co.*, 235 F. Supp. 18, 32 (N.D. Ill. 1964), aff'd, 353 F.2d 641 (7th Cir. 1965)(same).

As seen in the discussion above, the preponderance of the evidence shows that the conduct of the Estate purportedly done to protect its copyright interests was not in good faith. Its reversal of position after decades of accepting royalties from stock productions and its cooperation with Rudin and his lawyers to come up with a contravening position that Dramatic had only purely amateur performances were not done in good faith, especially in light of the fact that all the relevant persons (Carter, Nurnberg, O'Donnell, Rudin and his lawyers) were all aware that Dramatic had the right to license "everything but first-class productions," as O'Donnell had informed them.

### H.      Harper Lee LLC is Not Jointly Liable for Tortious Interference.

Dramatic contends that Harper Lee LLC, the company that claims to hold the copyright in TKAM, is jointly liable with the Estate for tortious interference. (Cl. Post-Hrg Br. 35). Respondents contend that the LLC did not commit any acts of interference, and that the tortious conduct was performed on behalf of the Estate. (Est. Post-Hrg Br. 43).

The issue is complicated by the fact that the personnel and the interests of the two entities are interconnected. Nevertheless, the most relevant activities giving rise to liability were by or on behalf of the Estate, such as the cooperation and assistance rendered to Rudin. Early in the chronology of interference, the copyright was held by Miss Lee or the Estate. After the transfer of copyright to the LLC on April 25, 2016, the Estate remained the beneficial owner of the copyright interest. The evidence shows that the Rudin interests felt they were dealing with the Estate. Dramatic has not made any significant showing to the contrary. The involvement of the LLC seems to be limited to being the holder of the copyright and the collector of payments, some of which are passed on to the Estate or paid out as commissions.

In *Svanaco, Inc. v. Brand*, 417 F. Supp. 3d 1042, 1058 (N.D. Ill. 2019), the court recites a two-pronged test to establish joint liability; namely:  "(1) there must be such unity of interest and ownership that the separate personalities of [the entities] no longer exist; and (2) circumstances must be such that adherence to the fiction of separate ... existence would sanction a fraud or promote injustice." *Wachovia Secs., LLC v. Banco Panamericano, Inc.*, 674 F.3d 743, 751–52 (7th Cir. 2012).  While there is to a significant degree a unity of interest and ownership, I do not find that it is present here in a way that the separate personalities of the Estate and the LLC would no longer exist.  Nor do I find that adhering to corporate separateness would sanction a fraud or promote injustice.

Accordingly, I find that the LLC is not jointly liable for tortious interference with contract.

## I.     The Rudin Interests Are Not Necessary Parties to the Arbitration.

The Estate argues that judgment should be entered for the Estate and LLC because Dramatic failed to join any of the Rudin interests, in particular Atticus LLC, which is the entity that holds the stage rights other than those held by Dramatic, as a necessary party.  (Br. 42).  This argument fails for the reasons set forth in *Lindland v. U.S. of Am. Wrestling Ass'n, Inc.*, 230 F.3d 1036, 1039 (7th Cir. 2000), which I find persuasive.

In *Lindland,* a wrestler who did not make the Olympic team prevailed in an arbitration proceeding that ordered a rematch in which the wrestler won.  The USOC and USA Wrestling argued that the arbitration award was not valid because another wrestler, who would lose his spot on the Olympic team, was not included in the arbitration.  The court rejected this argument, holding that "The notion, advanced by both USA Wrestling and the USOC, that an arbitration must include all persons who could be affected by the outcome is novel and would work a

revolution in arbitral proceedings." *Id.* at 1039.   The Estate cites Illinois procedural cases

dealing with general principles of joinder in court litigation, but does not cite any arbitral

principles on the issue.  As the court noted, "A party to arbitration cannot refuse to implement an

existing award just because it dreads the prospect of a later incompatible award."

It should also be noted that the Estate never sought to join the Rudin interests in the

arbitration.  Nor has Rudin requested to join, even though is has been kept aware of the

arbitration by Lembke, who has sent pleadings and orders from the arbitration to Rudin.  The

Estate has cited no authority that indicates that an arbitrator can force a third-party who is not a

party to the arbitration agreement to participate in the arbitration against its will.

### J.    Calculation of Damages.

Dramatic has suffered actual damages both as a result of the breach of contract by the

Estate and as a result of the tortious interference by the Estate.   The damages resulted from the

cancellation of the Jonathan Church tour in 2019 and the cancellation of the amateur

performances in 2016, as discussed above.

The evidence showed that Dramatic lost royalties from the cancellation of the Jonathan

Church tour in the amount of $172,500.  This number is based on reasonable estimates taking

consideration of the number of venues and the similarities to the prior Regent's Park tour.

(Claimant's Demonstrative Ex. 5; Tr. 3825-30).  Respondents have not presented any specific

alternative calculations of a more accurate measure of damages.

Dramatic also lost royalties from the cancellation of several amateur performances in

2016.  It calculated its damages based on cancellation of TKAM at thirteen theaters.  It estimated

its total lost revenues as $25,625, as shown in the spreadsheet which is C295.  Four theaters on

the spreadsheet show no lost revenues.  I have ruled that Dramatic cannot recover for the three

professional theaters on the spreadsheet because the Estate was entitled to revoke it waiver for those three theaters.  Dramatic provided reasonable estimates for the lost revenues from the remaining six theaters.  The total lost revenues for those six theaters is $12,727.  Respondents have not presented any specific alternative calculations of a more accurate measure of damages for those six theaters.

Accordingly, Dramatic is awarded actual damages in the total amount of $185,227.

While the conduct of the Estate recounted above is troubling, I decline to award punitive damages to Dramatic.  Punitive damages are not favored in the law.  They are available only in cases where the wrongful act complained of is characterized by wantonness, malice, oppression, willfulness, or other circumstances of aggravation.  *Franz v. Calaco Dev. Corp.*, 818 N.E.2d 357, 366 (Ill. App. 2d Dist. 2004).  I find that the Estate's interference conduct, though close to the line, does not exceed the high standards of wantonness, malice, oppression, willfulness, or other circumstances of aggravation to warrant an award of punitive damages in this case.

For all the foregoing reasons, I enter the Interim Award set forth above.

Dated:  October 21, 2021

William T. McGrath,
Arbitrator