**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

ATTICUS LIMITED LIABILITY COMPANY,

      *Plaintiff,*

   and

AARON SORKIN,

      *Involuntary Plaintiff,*

  -against-

THE DRAMATIC PUBLISHING COMPANY,

      *Defendant.*

Case No.: 1:22-cv-10147-DLC

---

## PLAINTIFF'S MEMORANDUM OF LAW (1) IN OPPOSITION TO DEFENDANT'S MOTION TO DISMISS AND (2) IN SUPPORT OF PLAINTIFF'S CROSS-MOTION FOR SUMMARY JUDGMENT

LOEB & LOEB LLP
Jonathan Zavin
Wook Hwang
Frank D.  D'Angelo
345 Park Avenue
New York, New York 10154
Tel: (212) 407-4000
Fax: (212) 407-4990

*Attorneys for Plaintiff*
*Atticus Limited Liability Company*

23518449

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................................... iii

PRELIMINARY STATEMENT ............................................................................................ 1

FACTUAL BACKGROUND ................................................................................................ 4

I.  MS. LEE'S 1969 GRANT OF STAGE RIGHTS IN THE NOVEL TO DPC, AND SUBSEQUENT TERMINATION THEREOF ............................................. 4

II.  ATTICUS AND SORKIN'S ACQUISITION OF STAGE RIGHTS IN THE NOVEL ................................................................................................................ 4

III.  DPC'S 2019 ARBITRATION AGAINST THE LEE ESTATE AND 2022 AWARD THEREIN ............................................................................................... 6

ARGUMENT ......................................................................................................................... 8

I.  THE DERIVATIVE WORKS EXCEPTION DOES NOT CONFER DPC WITH ANY EXCLUSIVE RIGHTS IN THE NOVEL ...................................... 8

   A.  DPC's Position Defies the Plain Language and Purposes of the Copyright Act's Termination Provisions ................................................... 9

   B.  *Mills Music* Does Not Remotely Support DPC's Interpretation ............ 12

II.  THE ARBITRAL AWARD AND CONFIRMATION JUDGMENT AGAINST THE LEE ESTATE HAVE NO PRECLUSIVE EFFECT ON ATTICUS OR SORKIN ..................................................................................... 14

   A.  Choice of Law ........................................................................................ 14

   B.  The Judgment Does Not Satisfy Two Essential Elements Necessary for Preclusion .......................................................................................... 15

      1.  Atticus Was Not a Party to the Arbitration Nor in Privity with the Estate ................................................................................ 15

         a)  Atticus Did Not Agree to Be Bound by the Arbitration ............... 16

         b)  Atticus Is Not Bound by the Judgment Because its Copyright Interest Accrued Prior to DPC's Initiation of the Arbitration ................................................................................ 18

         c)  Atticus Is Not Bound Based on "Adequate Representation" .......................................................................... 20

       2.     The Judgment Is Not Final for the Purpose of Preclusion.........................21

III.    DPC'S ARGUMENT THAT THE NO ICE GRANT IS INVALID HAS NO RELEVANCE TO THIS ACTION, AND IS WRONG IN ANY EVENT ......................22

CONCLUSION.........................................................................................................................24

## TABLE OF AUTHORITIES

**Page(s)**

**Cases**

*A&R Janitorial v. Pepper Constr. Co.*,
  124 N.E.3d 962 (Ill. 2018) ................................................................................................15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ..........................................................................................................8

*Badgerow v. Walters*,
  142 S. Ct. 1310 (2022) .....................................................................................................14

*Baldwin v. EMI Feist Catalog, Inc.*,
  805 F.3d 18 (2d Cir. 2015) ...............................................................................................11

*Baxter Int'l, Inc. v. Abbott Labs.*,
  315 F.3d. 829 (7th Cir. 2003) ...........................................................................................17

*Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
  193 F.3d 415 (6th Cir. 1999) ............................................................................................16

*Boguslavsky v. Kaplan*,
  159 F.3d 715 (2d Cir. 1998) ......................................................................................... 14-15

*Bourne Co. v. MPL Commc'ns, Inc.*,
  675 F. Supp. 859 (S.D.N.Y. 1987), *modified and amended by*,
  678 F. Supp. 70 (S.D.N.Y. 1988) ....................................................................................23

*Brumley v. Albert E. Brumley & Sons, Inc.*,
  822 F.3d 926 (6th Cir. 2016) ............................................................................................11

*Chase Nat'l Bank v. Norwalk*,
  291 U.S. 431 (1934) ..........................................................................................................18

*Classic Media, Inc. v. Mewborn*,
  532 F.3d 978 (9th Cir. 2008) ............................................................................................11

*Clugston v. Moore*,
  655 P.2d 29 (Ariz. Ct. App. 1982) ...................................................................................19

*Cont'l Cas. Co. v. Certain Underwriters at Lloyds of London*,
  10 F.4th 814 (7th Cir. 2021) .............................................................................................7

*Diversified Fin. Sys. v. Boyd*,
  678 N.E.2d 308 (Ill. Ct. App. 1997) ................................................................................19

*Gerrity Bakken, LLC v. Oasis Petro. N. Am., LLC*,
    915 N.W.2d 677 (N.D. 2018) ...............................................................................19

*Guan v. City of New York*,
    37 F.4th 797 (2d Cir. 2022) ...................................................................................8

*Indus. Credit Co. v. Berg*,
    388 F.2d 835 (8th Cir. 1968) ................................................................................19

*John Wiley & Sons, Inc. v. DRK Photo*,
    882 F.3d 394 (2d Cir. 2018)..................................................................................22

*Larry Spier, Inc. v. Bourne Co.*,
    953 F.2d 774 (2d Cir. 1992)..................................................................................10

*Luckett v. Human Rights Comm'n*,
    569 N.E.2d 6 (Ill. Ct. App. 1989) ........................................................................21

*Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*,
    779 F.3d 102 (2d Cir. 2015)..................................................................................15

*Marvel Characters, Inc. v. Simon*,
    310 F.3d 280 (2d Cir. 2002)............................................................................. 9-10

*Mills Music, Inc. v. Snyder*,
    469 U.S. 153 (1985)................................................................................8, 9, 12, 13

*Mitchell v. Austin*,
    94 So. 2d 391 (Ala. 1957).....................................................................................19

*Noriega v. US Bank, Nat'l Ass'n*,
    2017 U.S. Dist. LEXIS 116089 (E.D.N.Y. July 25, 2017)...................................18

*Pelon v. Wall*,
    634 N.E.2d 385 (Ill. Ct. App. 1994) ....................................................................22

*People v. Hopkins*,
    922 N.E.2d 1042 (Ill. 2009) .................................................................................21

*Polk v. Sherwin-Williams Co.*,
    2017 U.S. Dist. LEXIS 46088 (D. Conn. Mar. 29, 2017)......................................8

*Sacerdote v. Cammack Larhette Advisors, LLC*,
    939 F.3d 498 (2d Cir. 2019).................................................................................21

*In re Salas*,
    2018 Bankr. LEXIS 2906 (Bankr. D.D.C. Sept. 24, 2018) ..................................19

*Semtek Int'l Inc. v. Lockheed Martin Corp.*,
   531 U.S. 497 (2001)......................................................................................................14

*Show-World Ctr., Inc. v. Walsh*,
   438 F. Supp. 642 (S.D.N.Y. 1977) ...............................................................................21

*Siegel v. Warner Bros. Entm't*,
   690 F. Supp. 2d 1048 (C.D. Cal. 2009) ........................................................................10

*Siegel v. Warner Bros. Entm't, Inc.*,
   542 F. Supp. 2d 1098 (C.D. Cal. 2008) ........................................................................11

*Smith v. Estate of Womack*,
   149 N.E.2d 778 (Ill. 1958)............................................................................................19

*Spoleto Corp. v. Ethiopian Airlines Grp.*,
   2022 U.S. App. LEXIS 34070 (2d Cir. Dec. 12, 2022) ................................................18

*State Bldg. Venture v. O'Donnell*,
   940 N.E.2d 1122 (Ill. 2010)..........................................................................................21

*State Farm Fire & Cas. Co. v. John J. Rickhoff Sheet Metal Co.*,
   914 N.E.2d 577 (Ill. App. Ct. 2009) .............................................................................16

*Stewart v. Abend*,
   495 U.S. 207 (1990)........................................................................................................9

*Sweeting v. Campbell*,
   119 N.E.2d 237 (Ill. 1954)..............................................................................19, 20, 21

*Taylor v. Sturgell*,
   553 U.S. 880 (2008)............................................................................................. *passim*

*In re Tyson*,
   433 B.R. 68 (S.D.N.Y. 2010).......................................................................................16

*United States v. Int'l Bhd. of Teamsters*,
   905 F.2d 610 (2d Cir. 1990)..........................................................................................21

*W. P. Carey, Inc. v. Bigler*,
   2019 U.S. Dist. LEXIS 51975 (S.D.N.Y. Mar. 27, 2019) .............................................8

*W. Union Tel. Co. v. Foster*,
   247 U.S. 105 (1918)......................................................................................................21

*Waite v. UMG Recordings, Inc.*,
   450 F. Supp. 3d 430 (S.D.N.Y. 2020)...........................................................................10

*Wendt v. The BondFactor Co.*,
   2017 U.S. Dist. LEXIS 121706 (S.D.N.Y. Aug. 2, 2017) (Cote, J.) .................................14, 21

*Wight v. Chandler*,
   264 F.2d 249 (10th Cir. 1959) ...............................................................................................19


**Statutes and Rules**

Copyright Act of 1976 .......................................................................................... *passim*

17 U.S.C. § 101 ...................................................................................................10, 13

17 U.S.C. § 304(c) ................................................................................................ *passim*

17 U.S.C. § 505..........................................................................................................4, 24

Federal Arbitration Act ...............................................................................................14

Fed. R. App. P. 4(1)(A).................................................................................................22

Fed. R. Civ. P. 12(b)(6)................................................................................................1, 8

Fed. R. Civ. P. 56 .......................................................................................................1, 8


**Other Authorities**

47 Am Jur 2d Judgments § 566 (2022) ............................................................... 19-20

47 Am. Jur. 2d Judgments § 569 (2022) ...................................................................20

3 Nimmer on Copyright § 10.03[A][7] (2022) .......................................................23

Restatement (Second) of Judgments, § 40 (1982) .......................................................16

Restatement (Second) of Judgments, § 44 (1982) .......................................................18

Plaintiff Atticus Limited Liability Company ("Atticus") respectfully submits this memorandum of law (1) in opposition to the motion to dismiss, pursuant to Fed. R. Civ. P. 12(b)(6), of Defendant The Dramatic Publishing Company ("DPC"); and (2) in support of Atticus's cross-motion, pursuant to Fed. R. Civ. P. 56, for summary judgment granting the declaratory relief sought by this action.

## PRELIMINARY STATEMENT

This action centers on whether the Copyright Act permits DPC to preclude others, including Atticus and Aaron Sorkin ("Sorkin"), from staging so-called "stock" and "amateur" stage productions of Harper Lee's *To Kill a Mockingbird* (the "Novel"), widely regarded as one of the most cherished works of American literature. Atticus and Sorkin are, respectively, the production company and playwright responsible for the critically-acclaimed Broadway adaptation of the Novel (the "Sorkin Play"). DPC is the owner of a prior stage adaptation of the Novel written by its former President Christopher Sergel (the "Sergel Play"). DPC claims to have the perpetual right to prevent stock and amateur productions of any other stage version of the Novel, pursuant to a now-terminated 1969 grant by Harper Lee (the "1969 Grant") that conferred DPC with the then-exclusive right to stage stock and amateur adaptations of the Novel. In other words, DPC claims that, despite the *uncontested* termination of its 1969 Grant, the Sergel Play is the *only* stage version of the Novel that may ever be produced and performed by regional theaters, schools, community theaters and other amateur groups. That is wrong.

The legal issues are two-fold, and straightforward: (1) whether, pursuant to U.S. copyright law, DPC can continue to claim *exclusive* stock and amateur stage rights to the Novel, notwithstanding Ms. Lee's uncontested termination of the 1969 Grant; and (2) whether the decision of a single arbitrator (a private attorney serving as sole arbitrator in a private arbitration

between DPC and the Estate of Harper Lee)—and incorrectly concluding that, as a matter of federal copyright law, exclusive licenses are *interminable*—binds Atticus, Sorkin or anyone else who was not a party (or in privity with a party) to the arbitration.  As the pending motions reflect, the parties agree that these pure issues of law can be resolved as a matter of law, but disagree as to the governing law.  DPC is wrong on both issues.

First, there is no question that exclusive licenses are terminable pursuant to the Copyright Act's termination provisions.  As DPC itself acknowledges, as it must, the plain language of the Copyright Act's applicable termination provision is unambiguous that both "the **exclusive** or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978, . . . **is subject to termination**[.]"  17 U.S.C. § 304(c) (emphasis added). DPC's position would render this provision entirely meaningless, by eliminating exclusive grants from the purview of copyright termination altogether—an overreach that plainly has no basis in the statute or the case law.  Indeed, in the 40-plus years since authors' termination rights were enshrined in the Copyright Act of 1976, no court has ever held or even implied that an exclusive license cannot be terminated.  *All* law is to the contrary.  DPC's reliance on the so-called "derivative works exception," 17 U.S.C. § 304(c)(6)(A), is a red herring, as this provision merely permits DPC to continue to exploit the Sergel Play (*i.e.*, the derivative work) following termination—*not* to preclude the performance of any and every other stage adaptation of the Novel.

Second, the arbitrator's decision purporting to rewrite the Copyright Act's termination provision is not only shockingly wrong, but entirely irrelevant to this action.  DPC would have a private attorney's obviously incorrect decision regarding a matter of U.S. copyright law, issued in a private arbitration, determine the rights under copyright law for everyone in the country. Whatever preclusive effect that decision may have as between DPC and the Lee Estate, it has no

preclusive effect on Atticus, which was not a party to, nor in privity with, any of the parties to the arbitration.  Nor does it have any preclusive effect on Sorkin, or the untold number of regional, local and community theaters, colleges, high schools, churches, clubs and other amateur acting group in the United States seeking to stage or perform stage adaptations of the Novel who were not parties to, nor in privity with, any of the parties to the arbitration.  DPC is wrong that Atticus and Sorkin are in privity with the Lee Estate merely because they acquired rights to the Novel from Ms. Lee.  Critically, Atticus's predecessor acquired those rights from Ms. Lee *before* DPC commenced its arbitration against the Lee Estate.  The law is clear that, for preclusion purposes, grantee-grantor privity exists only where the grant is made *after* the commencement of the prior proceeding, such that the grantee had actual or constructive notice thereof.  DPC's preclusion argument fails for this reason alone.  It fails for the additional and independent reason that neither the arbitral award nor the ensuing confirmation judgment are "final" under applicable preclusion principles, as they remain subject to appeal.

The resolution of these two issues ends the inquiry and mandates the conclusion that DPC has *no* right to prohibit Atticus, Sorkin or anyone else from performing the Sorkin Play—or *any* stage adaptations of the Novel other than the Sergel Play.  DPC attempts to distract from this case-dispositive conclusion by arguing that the 2015 grant from Ms. Lee to Atticus's predecessor was invalid.  That is not only wrong, but an entirely irrelevant sideshow.  This case does not turn on what rights Atticus has vis-à-vis the Lee Estate, but whether *DPC* retains exclusive stage rights to the Novel and thus can seek to preclude Atticus—or anyone else—from performing all dramatic adaptations of the Novel.  Copyright law is unambiguous that it does not.

Atticus therefore respectfully requests that the Court (1) deny DPC's motion to dismiss, (2) declare that Atticus and Sorkin have the right, in relation to DPC, to present stock and amateur

performances of the Sorkin Play in the United States; (3) declare that any such productions of the Sorkin Play have not infringed and could not infringe any purported copyright interest DPC claims to hold to the Novel; and (4) award Atticus its costs and reasonable attorneys' fees incurred in connection with this lawsuit pursuant to 17 U.S.C. § 505.

## FACTUAL BACKGROUND

### I.   MS. LEE'S 1969 GRANT OF STAGE RIGHTS IN THE NOVEL TO DPC, AND SUBSEQUENT TERMINATION THEREOF

Ms. Lee authored and, in 1960, published the Novel.  (Doc. 1 ¶ 12; Zavin Decl., Ex. 1 at 1.)  In 1969, Ms. Lee entered into the DPC Grant.  (Zavin Decl., Ex. 1)  Pursuant thereto, Ms. Lee granted to DPC the right to "write or cause to be written a dramatization based upon and/or adapted from the [Novel][.]"  (*Id.* § 2(a).)  Ms. Lee agreed that DPC's dramatization "is to be the only one the amateur acting rights of which [Ms. Lee] will permit to be leased and/or licensed[.]"  (*Id.*)  In sum, Ms. Lee granted DPC the exclusive right to stage Stock and Amateur Productions (as defined in § 4(e) of the 1969 Grant) of the Novel.  DPC's then-President, Christopher Sergel, subsequently wrote the Sergel Play, which DPC has since licensed to third parties.

In April 2011, Ms. Lee served a notice terminating the DPC Grant pursuant 17 U.S.C. § 304(c).  (Zavin Decl., Ex. 2.)  That termination became effective on April 26, 2016.  (*Id.*)[1]

### II.   ATTICUS AND SORKIN'S ACQUISITION OF STAGE RIGHTS IN THE NOVEL

Following service of her notice of termination, Ms. Lee entered into an agreement with No Ice, Inc. (f/k/a Rudinplay, Inc.)  ("No Ice") dated June 29, 2015 (the "No Ice Grant").  (Zavin

---

[1] DPC claims Ms. Lee "br[oke] her promises" and launches into a series of salacious allegations against her purported "handlers."  (Doc. 29 at 8-11.)  One might alternatively describe Ms. Lee's conduct as the proper exercise of her congressionally authorized statutory right of termination.  In any event, none of DPC's caustic allegations are relevant to the legal issues on which the parties' motions turn.

Decl., Ex. 3.)  Ms. Lee designated No Ice as her exclusive agent to select a playwright.  (*Id.* § 1.)

Upon Ms. Lee's written approval of the selected playwright, Ms. Lee granted No Ice an option to

acquire the right to "create develop, produce and present a live stage play" based on the Novel.

(*Id.* §§ 2(a) & 3(a).)  That option would "be deemed exercised" upon the "initial commercial first

class production" of the play on Broadway or London's West End.  (*Id.* § 4.)

Recognizing the import of the Copyright Act's derivative works exception, the No Ice

Grant acknowledged that DPC was free to continue exploiting the Serkel Play in Stock and

Amateur Productions on a "non-exclusive basis":

> [No Ice] acknowledges that pursuant to an agreement (the "Prior Agreement")
> dated June 26, 1969 between [Ms. Lee] and [DPC], [Ms. Lee] granted DPC the
> right to create a play (the "Prior Adaptation") based on the Novel, and to exploit
> the amateur acting rights (as defined in the Prior Agreement) in the Prior
> Adaptation.  Author represents that it has terminated the Prior Agreement effective
> April 26, 2016.  Producer acknowledges that, notwithstanding such termination, the
> amateur acting rights to the Prior Adaptation can continue to be exploited following
> such termination under the terms of the Prior Agreement **on a non-exclusive basis
> in the United States**, and on an exclusive basis elsewhere.  The rights granted
> hereunder shall be subject to the rights granted under the Prior Agreement, as
> limited by such termination.

(*Id.* § 2(b) (emphasis added).)

No Ice and Aaron Sorkin—one of the leading theater, film, and television writers in

America—thereafter entered an agreement dated January 19, 2017 (the "Sorkin Agreement")

(Zavin Decl., Ex. 4), by which No Ice engaged Sorkin to create a new stage adaptation of the Novel

(the "Sorkin Play").  As a result of the Sorkin Agreement, Sorkin is the "sole and exclusive Author,

owner and the copyright proprietor of the [Sorkin] Play and of all rights of every kind or nature

therein."  (Doc. 1 ¶ 25.)  No Ice, in its capacity as producer, retained the exclusive right to produce

certain categories of productions and to financially participate in other categories of productions.

(*Id.* ¶¶ 26-27.)  By agreement dated December 12, 2018, No Ice assigned the foregoing rights to

Atticus, including all relevant rights previously held by No Ice pursuant to the No Ice Grant and the Sorkin Agreement.  (Zavin Decl., Ex. 5 § 1.)

The Sorkin Play premiered at the Shubert Theatre on Broadway on December 13, 2018, to great acclaim.  (Zavin Decl. ¶ 11; Doc. 1 ¶¶ 29-31.)  Pursuant to the terms of the No Ice Grant, the December 2018 Broadway premiere exercised the option and thus effectuated the grant of the stage rights to Atticus.  (Zavin Decl., Ex. 3 § 4.)

## III.   DPC'S 2019 ARBITRATION AGAINST THE LEE ESTATE AND 2022 AWARD THEREIN

On March 7, 2019, DPC initiated arbitration against the Estate of Harper Lee and Harper Lee, LLC (together, the "Estate").  (Zavin Decl., Ex. 6, App. A thereto at 1.)  DPC and the Estate were the only parties to the Arbitration.  (*Id.*)  On October 21, 2021, a private attorney serving as sole arbitrator in the proceeding entered an Interim Award of Arbitration (the "Award").[2]  In the Award, the arbitrator ruled, *inter alia*, that "[t]he terms of the original grant in the 1969 Agreement [*i.e.*, the DPC Grant] survive termination.  Under the 1969 Agreement, Dramatic has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird* ('non-first-class rights') and has all rights under the Agreement that provide for Dramatic to enjoy the full exercise of all non-first-class theater or stage rights."  (*Id.* at 6 ¶ 10).

In so ruling, the arbitrator astonishingly relied on "the absence of any clear statement in the [copyright] statute divesting derivative authors of the exclusive rights granted in the original contract."  (*Id.* at 68-69).  Thus ignoring the unambiguous language of the Copyright Act that both "the **exclusive** or nonexclusive grant of a transfer or license of the renewal copyright or any right

---

[2] On February 16, 2022, the Arbitrator further entered a "Disposition for Application of Modification of Award" that resolved all of the issues, including fee issues, at issue in the arbitration.  (Zavin Decl., Ex. 6.)

under it, executed before January 1, 1978, . . . **is subject to termination**," 17 U.S.C. § 304(c) (emphasis added), the arbitrator concluded that authors like Ms. Lee have *no* right to terminate grants of exclusive rights under the Copyright Act.

The Arbitrator also purported to adjudicate the rights of Atticus—*which was not a party of the arbitration*—concluding that Atticus "has no stock and amateur rights for live theatrical productions of [*To Kill a Mockingbird*]." (Zavin Decl., Ex. 6, App. A thereto at 72.) This is directly at odds with the No Ice Grant, in which Ms. Lee, years before the issuance of this arbitral award, represented that DPC's rights to exploit the Sergel Play for Stock and Amateur Productions was on a "non-exclusive basis" only, and expressly granted No Ice all other stage rights to exploit a dramatic adaptation of the Novel (*i.e.*, the Sorkin Play)—including for Stock and Amateur Productions. (Zavin Decl., Ex. 3.)

On October 19, 2021, DPC moved to confirm the Award in the United States District Court for the Northern District of Illinois ("Northern District of Illinois"). (Zavin Decl., Ex. 7.) DPC and the Estate were the only parties to that confirmation proceeding as well. (*Id.*) On January 13, 2023, the Northern District of Illinois entered a Final Judgment Order (the "Judgment") confirming the Award (Zavin Decl., Ex. 8), constrained by the principle that, on motions to confirm or vacate, "arbitration awards are largely immune from . . . scrutiny in court." *Cont'l Cas. Co. v. Certain Underwriters at Lloyds of London*, 10 F.4th 814, 816 (7th Cir. 2021). The district court thus could not analyze whether the arbitrator erred in determining that exclusive licenses are interminable. No such constraint applies here.

## **ARGUMENT**[3]

As a result of Ms. Lee's termination of the DPC Grant, DPC does not hold any exclusive rights in the Novel in relation Atticus or Sorkin.   DPC's distortion of the Copyright Act's termination provision is as meritless as it is unprecedented. DPC's effort to immunize the weakness of its position from judicial review, based on a private arbitration to which neither Atticus nor Sorkin were party, is equally unfounded.

## I.  THE DERIVATIVE WORKS EXCEPTION DOES NOT CONFER DPC WITH ANY EXCLUSIVE RIGHTS IN THE NOVEL

17 U.S.C.  § 304(c) confers upon authors and their statutorily designated heirs the right to terminate "the exclusive or nonexclusive grant of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978[.]" 17 U.S.C. § 304(c).  The "principal purpose of the amendments in § 304 was to provide added benefits to authors." *Mills Music, Inc. v. Snyder*, 469 U.S. 153, 172 (1985).  The "termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product."  *Id.*  Section 304(c), in other words, affords the author a second bite at the apple to receive the financial benefits of her work.

---

[3] The applicable procedural standards are straightforward in this dispute.  To survive a Rule 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotation marks and citation omitted).  Entry of summary judgment is appropriate when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(a); *see Guan v. City of New York*, 37 F.4th 797, 804 (2d Cir. 2022).  Pursuant to Fed. R. Civ. P. 56, summary judgment motions may be filed at the pleading stage.  *See, e.g., W. P. Carey, Inc. v. Bigler*, 2019 U.S. Dist. LEXIS 51975, at *31 (S.D.N.Y. Mar. 27, 2019) (explaining that "[c]ourts in this Circuit have granted pre-answer motions for summary judgment in certain circumstances," and collecting cases); *Polk v. Sherwin-Williams Co.*, 2017 U.S. Dist. LEXIS 46088, at *3 (D. Conn. Mar. 29, 2017) ("Under Federal Rule of Civil Procedure 56(b), a party may file a motion for summary judgment at any time until 30 days after the close of all discovery, including before filing an answer.") (internal quotations and citation omitted)).

The termination right is subject to certain "limitations."  17 U.S.C. § 304(c)(6).  Among those limitations is the so-called "derivative works exception," which provides as follows:

> A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

*See id.* § 304(c)(6)(A).  The effect of the exception is "to enable derivative works to continue to be accessible to the public after the exercise of an author's termination rights."  *Mills Music,* 469 U.S. 153 at 176; *Stewart v. Abend*, 495 U.S. 207, 226 (1990).

Simply put, an author who terminates a license cannot state a claim for copyright infringement against the licensee over the continued exploitation of a derivative work prepared during the term of the license.  *See Mills*, 469 U.S. 153 at 178.  According to DPC, however, Section 304(c)(6)(A) not only *permits* the continued utilization of a derivative work created by the licensee, but affords an exclusive licensee the post-termination right to *prevent* others from exploiting any new derivatives based on the underlying work.  In other words, DPC contends that exclusive licenses remain exclusive following a valid termination, and thus cannot be terminated. The unprecedented and dramatic extension of the derivative works exception that DPC proposes has no merit or basis in the law.

### A.     DPC's Position Defies the Plain Language and Purposes of the Copyright Act's Termination Provisions

The absurd interpretation advanced by DPC is contradicted by the plain language of the Copyright Act's termination provision, which provides that *both* "the **exclusive** or nonexclusive grant of a transfer or license of the renewal copyright or any right under it . . . **is subject to termination**[.]"  17 U.S.C. § 304(c). (emphasis added).  This provision—applicable by its plain terms to exclusive licenses—"grants authors (or if deceased, their statutory heirs) an inalienable right to terminate a grant in a copyright fifty-six years after the original grant '**notwithstanding**

9

**any agreement to the contrary**.'"  *Marvel Characters, Inc. v. Simon*, 310 F.3d 280, 282 (2d Cir. 2002) (emphasis added; quoting 17 U.S.C. § 304(c)(5)).

The "unequivocal purpose" of termination is to "provide a mechanism by which artists can reclaim their copyright after the work has had time to become more valuable."  *Waite v. UMG Recordings, Inc.*, 450 F. Supp. 3d 430, 438 (S.D.N.Y. 2020); *see also, e.g.*, *Larry Spier, Inc. v. Bourne Co.*, 953 F.2d 774, 778 (2d Cir. 1992) ("[T]he purpose of the statute is to protect . . . . the rights of these persons to terminate assignments of copyrights made by the spouse and parent, and to recapture the copyrights for themselves"); *Siegel v. Warner Bros. Entm't*, 690 F. Supp. 2d 1048, 1055 (C.D. Cal. 2009) (purpose of termination right "is to provide authors or their heirs a meaningful opportunity to recapture the right to the extension in the copyright term afforded . . . by the 1976 Act[.]").

Nothing in the derivative works exception prevents an author from exercising this "inalienable" termination right, contrary to DPC's contention otherwise.  *See, e.g.*, https://www.copyright.gov/recordation/termination.html ("A derivative work prepared pursuant to a grant before its termination may continue to be utilized under the terms of the grant after its termination, but the post-termination rights . . . to prepare new derivative works revert to the authors or their heirs.").  Dramatic's absurd insistence that, pursuant to the derivative works exception, *all* "terms" of any copyright grant remain in full force following termination would mean that a wholesale copyright assignment would, like an exclusive license,[4] be *in*terminable for purposes of recapturing the originally granted rights.  Not surprisingly, courts have squarely and

---

[4] Pursuant to the Copyright Act, both assignments and exclusive licenses are deemed to constitute a "transfer of copyright ownership" with respect to the rights conveyed.  17 U.S.C. § 101.  Under DPC's reading, any such transfer of ownership by assignment or exclusive license could *never* be recaptured based on its proposition that all "terms" of the grant survive termination.

repeatedly rejected DPC's core premise, and held that both exclusive licenses and wholesale assignments are, as the statute provides, subject to termination.  *See, e.g., Siegel v. Warner Bros. Entm't, Inc.*, 542 F. Supp. 2d 1098, 1107, 1113-14 (C.D. Cal. 2008) (heirs recaptured rights following termination of 1938 grant that had conveyed to comic book publisher "all . . . exclusive right[s]' to *Superman* 'to have and hold forever';" explaining that "the 1976 Act gave artists and their heirs the ability to *terminate* any prior grants . . . regardless of the terms contained in [the grant], *e.g.*, a contractual provision that all the rights (the initial and renewal) belonged exclusively to the [grantee]"); *Baldwin v. EMI Feist Catalog, Inc*., 805 F.3d 18, 22 (2d Cir. 2015) (Copyright Act permitted author's heirs to terminate unfettered grant by which "Grantor hereby sells, assigns, grants, transfers and sets over to Grantee . . . all rights and interests whatsoever now or hereafter known or existing, heretofore or at any time or times hereafter acquired or possessed by Grantor in and to [the Song and various derivative works]"); *Classic Media, Inc. v. Mewborn*, 532 F.3d 978, 980 (9th Cir. 2008) (same, with respect to grant of "[a]ll motion picture (including musical motion picture), television and radio rights in and to the said literary work[s] . . . throughout the world for the full period of the renewal copyrights in the work[s] and any further renewals or extensions thereof"); *Brumley v. Albert E. Brumley & Sons, Inc.*, 822 F.3d 926, 929 (6th Cir. 2016) (same, with respect to grants "assign[ing] and transfer[ring] . . . all of [the couple's] right title and interest" and "all rights to obtain renewals or copyrights in the future upon Works written or composed by [the author]").

Ignoring this authority, DPC insists that exclusive grants persist following termination because "[n]othing in the language [of the derivative rights exception] even hints that it is not applicable to exclusive grants."  (Doc. 29 at 20-21.)  DPC misses the point entirely, as there is no dispute that the derivative works exception applies to any manner of grant.  But, per its plain

11

language, the exception merely permits a grantee to continue to "**utilize**" derivative works created during the term of the license. *See* 17 U.S.C. § 304(c)(6)(A) ("A derivative work prepared under authority of the grant before its **termination** may continue to be **utilized** under the terms of the grant after its **termination**, but this privilege does not extend to the preparation after the **termination** of other derivative works based upon the copyrighted work covered by the **terminated** grant.") (emphasis added).  Nothing in the derivative works exception, however, confers the licensee or assignee with the right to **prevent** any other exploitation of the underlying work, or other derivative works based on the same underlying work.  Nor can the repeated references to "termination" be read out from this provision.  Under DPC's interpretation, however, "termination" of an exclusive license is impossible—thus rendering these references meaningless, contrary to the most basic canons of statutory interpretation.  And, as DPC would have it, despite termination of the grant, DPC would continue not only to have the right to *utilize* its derivative work, but would continue to have rights in the Novel itself (*i.e.*, the right to create derivative works)—further rendering the very concept of termination meaningless.

Notably, DPC is unable to cite to a *single* judicial decision, treatise or Copyright Office opinion stating, or remotely suggesting, that exclusive licenses are interminable as it claims.  No such authority exists.

> **B.**     *Mills Music* **Does Not Remotely Support DPC's Interpretation**

DPC relies nearly exclusively on the Supreme Court's decision in *Mills Music* to contend that, pursuant to the derivative works exception, exclusive licenses remain exclusive following termination.  This reliance is misplaced, as that decision does not remotely support DPC's position.

In *Mills Music*, the Supreme Court considered the narrow and, here, irrelevant question of "whether an author's termination of a publisher's interest in a copyright also terminates the publishers' contractual right to share in the royalties on such derivative works."  469 U.S. at 156.

The Court held that the "contractual obligation to pay royalties survives the termination," reasoning that the word "utilized" is "expressly confined by the 'terms of the grant." *Id.* at 169. Because the right to share in royalties was a contractual term that governed the music publisher's *utilization* of the derivative works, that contract provision survived termination. *Mills Music* did *not* hold, or even suggest, that Section 304(c)(6)(A) grants an exclusive licensee interminable exclusivity and a corresponding right to *prevent others* from utilizing the underlying work after termination.

*Mills Music* instead exposes the fallacy of the DPC's reasoning. As the Court observed, the termination at issue in that case "caused the ownership of the copyright to revert to the [authors' heirs[.]" *Id.* at 163. Copyright ownership is defined in the Copyright Act to encompass any exclusive rights. *See* 17 U.S.C. § 101 ("'Copyright owner,' with respect to any of one of the **exclusive** rights comprised in a copyright, refers to the owner of that particular right") (emphasis added); *id.* ("A 'transfer of copyright ownership' is an assignment, mortgage, **exclusive** license, or any other conveyance, alienation, or hypothecation of a copyright or of any of the **exclusive** rights comprised in a copyright, whether or not it is limited in time or place of effect, but not including a nonexclusive license.") (emphasis added). DPC's insistence that exclusivity cannot be terminated is directly at odds with the *Mills Music* Court's holding that termination caused "ownership" to "revert."

*Mills Music* further recognized that the "principal purpose" of the Copyright Act's termination provisions were "to provide added benefits to authors" and that "the concept of a termination right itself [was] obviously intended to make the rewards for the creativity of authors more substantial"—purposes that are "plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself," but that DPC claims do not exist. *Id.* at 172-73.

13

## II.   THE ARBITRAL AWARD AND CONFIRMATION JUDGMENT AGAINST THE LEE ESTATE HAVE NO PRECLUSIVE EFFECT ON ATTICUS OR SORKIN

Even though Atticus and Sorkin were not parties to the arbitration, DPC argues that the Award against the Estate precludes Atticus's claim for a declaratory judgment.  (Doc. 29 at 13-19.)  DPC claims Atticus (1) "consent[ed] to be bound" by the arbitration clause in the 1969 Grant (*id.* at 13-16) and (2) is in "privity" with the Estate (*id.* at 16-19).  DPC is wrong on both counts.

### A.   Choice of Law

"[I]t is an open question whether federal or state law governs a federal court's determination of the preclusive effect of an arbitral award[.]"  *Wendt v. The BondFactor Co.*, 2017 U.S. Dist. LEXIS 121706, at *10 (S.D.N.Y. Aug. 2, 2017) (Cote, J.) (citation omitted).  On the one hand, Supreme Court precedent holds that the preclusive effect of a judgment issued by a federal court sitting in diversity should be determined according to the laws of the state in which the court sits—in this case, Illinois, the state in which the Northern District of Illinois entered the Judgment.[5]  On the other, Second Circuit precedent suggests federal common law may govern the preclusive effect of the Judgment because the Arbitrator decided a federal question arising under the Copyright Act.[6]  The Court need not resolve this choice-of-law issue.  As explained below, Atticus prevails whether one applies federal or Illinois preclusion principles.

---

[5] The Supreme Court has held that a federal court must apply "the law that would be applied by state courts in the State in which the federal diversity court sits."  *Semtek Int'l Inc. v. Lockheed Martin Corp.*, 531 U.S. 497, 508 (2001).  Here, the Northern District of Illinois exercised only diversity jurisdiction when entering the Judgment.  Because the Federal Arbitration Act "does not itself create jurisdiction," an application to confirm an arbitration award typically does not raise a federal issue because the relief sought is "no more than a contractual resolution of the parties' dispute" that "involve[s] only state law[.]"  *Badgerow v. Walters*, 142 S. Ct. 1310, 1314, 1316-17 (2022).  Here, DPC's motion before the Northern District of Illinois sought to enforce the arbitration award pursuant to the arbitration clause contained in the 1969 Grant.  (Zavin Decl., Ex. 7.)  Enforcing a parties' contractual arbitration provision, under *Badgerow*, "involve[s] only state law."  *Badgerow*, 142 S. Ct. at 1317.

[6] *See Boguslavsky v. Kaplan*, 159 F.3d 715, 720 n.4 (2d Cir. 1998) (applying federal

**B.**     **The Judgment Does Not Satisfy Two Essential Elements Necessary for Preclusion**

Res judicata, or claim preclusion, bars later litigation when "(1) the previous action involved an adjudication on the merits; (2) the previous action involved the [same adverse parties] or those in privity with them; and (3) the claims asserted in the subsequent action were, or could have been, raised in the prior action." *Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc.*, 779 F.3d 102, 108 (2d Cir. 2015) (citation omitted)); *see also, e.g., A&R Janitorial v. Pepper Constr. Co.*, 124 N.E.3d 962, 966 (Ill. 2018) (requiring "(1) a final judgment on the merits rendered by a court of competent jurisdiction, (2) an identity of cause of action, and (3) an identity of parties or their privies").

DPC's attempt to bind Atticus and Sorkin to decisions rendered in its dispute with the Estate fails on two grounds.  First, Atticus and Sorkin were not parties to the arbitration nor in privity with the Estate.  Second, under Illinois law, the Judgment is a not a final adjudication on the merits.

**1.     Atticus Was Not a Party to the Arbitration Nor in Privity with the Estate**

The Supreme Court's decision in *Taylor v. Sturgell*, 553 U.S. 880 (2008) establishes the framework for considering whether a party is bound by a judgment in another proceeding.  "A person who was not a party to a suit generally has not had a 'full and fair opportunity to litigate' the claims and issues settled in that suit." *Taylor v. Sturgell*, 553 U.S. 880, 892 (2008) (quotation marks and citation omitted).  The "rule against nonparty preclusion" is subject only to the "enumerated six exceptions" set forth in the Restatement (Second) of Judgments ("Restatement").

---

preclusion principles to an unconfirmed arbitration award because "Federal law governs the preclusive effect of a prior federal question judgment" and the arbitration "concerned a federal question").

*In re Tyson*, 433 B.R. 68, 99-100 (S.D.N.Y.  2010) (quoting *Taylor*, 553 U.S. at 893) (Cote, J.).[7]

Though its briefing is not a model of clarity, DPC appears to claim three exceptions apply.  (Doc.

29 at 13-19.)  None do.

### a)  Atticus Did Not Agree to Be Bound by the Arbitration

First, DPC argues that Atticus gave its "explicit consent to be bound" by the Arbitration

because § 2(b) of the No Ice Grant states that the "rights granted hereunder shall be subject to the

rights granted under the [1969 Grant], as limited by such termination."  (Doc. 29 at 13-16.)  DPC

reasons that because the 1969 Grant contained an arbitration provision, Atticus agreed to be bound

by arbitration between DPC and the Estate.  (*Id.*)  DPC's argument is nonsense.

To be sure, "[a] person who agrees to be bound by the determination of issues in an action

between others is bound in accordance with the terms of his agreement."  *Taylor*, 553 U.S. at 893

(quoting RESTATEMENT § 40).  However, "no such agreement should be inferred except upon the

plainest circumstances."  RESTATEMENT § 40 cmt. b; *Becherer v. Merrill Lynch, Pierce, Fenner &*

*Smith, Inc.*, 193 F.3d 415, 423 (6th Cir. 1999) (same).

Here, Atticus did not agree, let alone expressly, to be bound by the 1969 Grant's arbitration

clause.   Section 2(b) of the No Ice Grant was, by its plain terms, just a disclaimer—an

acknowledgement that DPC could continue utilizing the Serkel Play nonexclusively after

termination.  (*See* Zavin Decl. ¶ 4, Ex. 3 § 2(b) (stating play "can continue to be exploited following

such termination under the terms of the Prior Agreement on a ***non-exclusive basis***" (emphasis

added)).   Section 2(b) does *not* say that Atticus' rights are "limited by such termination *as*

*determined by the arbitration provision in the 1969 Grant*."  It does not mention arbitration at all.

---

[7] *See also State Farm Fire & Cas. Co. v. John J.  Rickhoff Sheet Metal Co.*, 914 N.E.2d
577, 589 (Ill. App. Ct. 2009) (listing enumerated exceptions in Restatement).

Section 2(b) bears no resemblance to type of "agreement to be bound" contemplated by the Restatement. As explained in *Taylor*, the exception applies where the parties to separate actions against the same defendant "agree that the question of the defendant's liability will be definitively determined, one way or the other, in a 'test case,'" or via a court-filed "stipulation" to be bound by a separate actions. 553 U.S. at 893-94 (quotations omitted). Atticus never agreed to have the scope of the Copyright Act's termination provision, a question of U.S. copyright law, decided by a single private attorney in a private arbitration to which it was not a party.

Contrary to DPC's argument (Doc. 29 at 13-14), the Northern District of Illinois did *not* hold, or even analyze, whether Atticus is bound by the Judgment. (Nor could it, given that Atticus was not a party to the confirmation proceeding.) The Northern District of Illinois also did *not* agree with, or even analyze, the validity of DPC's absurd interpretation of the derivative work exception. (It could not, given the severe limitations imposed when reviewing whether to confirm an arbitration award.) As DPC itself explained in its briefing to the court, when conducting that narrow inquiry, the "arbitrator's decision is binding and unreviewable as to the parties to the arbitration." (Zavin Decl., Ex. 9 at 2-3, 11-12 (citing *Baxter Int'l, Inc. v. Abbott Labs.*, 315 F.3d. 829, 832 (7th Cir. 2003).) Thus, in adjudicating the rights between DPC and the Estate, the court did not review the merits of the arbitrator's (plainly erroneous) interpretation of § 304(c)(6)(A).

That determination—a matter solely between DPC and the Estate—has no preclusive effect as to Atticus or Sorkin. *See Baxter*, 315 F.3d at 832 (noting that, despite enforceability of award, any non-party affected by the Award "is free to sue and obtain relief" and "[n]one of them would be bound the award").

      **b)**      **Atticus Is Not Bound by the Judgment Because its Copyright Interest Accrued Prior to DPC's Initiation of the Arbitration**

Second, DPC argues Atticus is a successor in interest to the Estate's property interest in the Novel and is therefore in "privity" with the Estate.  (Doc. 29 at 18.)  DPC's argument fails because Atticus acquired its copyright interest in the Novel (Zavin Decl., Ex. 3) *before* DPC's initiation of the arbitration on March 7, 2019 (Zavin Decl., Ex. 6, Ex. A thereto at 1).  Atticus therefore is not in "privity" with the Estate for preclusion purposes.

As explained in the Restatement, the successor-in-interest privity exception "has *no* application to a successor who acquires his interest *before* the action was commenced concerning the property."  RESTATEMENT § 44 cmt. f (emphasis added).  Federal courts across the country, including in this Circuit, have repeatedly and overwhelmingly adhered to this fundamental rule. *See, e.g.*, *Spoleto Corp. v. Ethiopian Airlines Grp.*, 2022 U.S. App. LEXIS 34070, at *4 (2d Cir. Dec. 12, 2022) ("For purposes of res judicata, an assignee is deemed to be in privity with the assignor where the prior action is commenced *before* there has been an assignment.") (emphasis added; internal quotation, citation and alterations omitted); *Noriega v. US Bank, Nat'l Ass'n*, 2017 U.S. Dist. LEXIS 116089, at *14 n.7 (E.D.N.Y. July 25, 2017) ("As the Mortgage was assigned by ASC to USBNA on November 7, 2011, (see Third Assignment)—*prior* to the commencement of the Foreclosure Action on December 5, 2011 (see Foreclosure J.)—ASC was a predecessor in interest to USBNA and is not in privity with USBNA for res judicata purposes.") (emphasis added).[8]

---

[8] *See, also, e.g., Chase Nat'l Bank v. Norwalk*, 291 U.S. 431, 438 (1934) ("[A] decree against a mortgagor with respect to property does not bind a mortgagee whose interest was acquired *before* the commencement of the suit, unless he was made a party to the proceedings.  For in every case where a mortgage was given before the litigation against the mortgagor was instituted, the mortgagee is entitled to have a decision determining his rights rendered on the basis of the facts and considerations adduced by him.") (internal citation omitted; emphasis added);

Illinois courts likewise adhere to this rule. *See, e.g., Diversified Fin. Sys. v. Boyd*, 678 N.E.2d 308, 311 (Ill. Ct. App. 1997) ("[O]nce the transfer is made, the actions of the transferor no longer bind the transferee.  Where the transferor becomes a party to an action concerning property, after it has been transferred, his becoming a party "does not make him in any sense a representative of his successor in estate.") (quoting RESTATEMENT (SECOND) OF JUDGMENTS § 44, cmt. f (1982)); *Smith v. Estate of Womack*, 149 N.E.2d 778, 781 (Ill. 1958) ("A privy to a judgment or decree is one whose succession to the rights of property thereby affected occurred *after* the institution of the particular suit, and from a party thereto.") (emphasis added); *Sweeting v. Campbell*, 119 N.E.2d 237, 240 (Ill. 1954) ("Since she acquired her interest in the property prior to the commencement of the action in McLean County, appellant was not in privity with any of the parties to that action.").  Other state courts and leading commentators agree.[9]

---

*Indus. Credit Co. v. Berg*, 388 F.2d 835, 841-42 (8th Cir. 1968) ("[A] person in privity with a party to a lawsuit, in the sense that he will be bound by a judgment for or against that party under principles of res judicata or collateral estoppel, must acquire his interest in the transaction *after* commencement of the action or rendition of the judgment." (emphasis added)); *Wight v. Chandler*, 264 F.2d 249, 253 (10th Cir. 1959) (holding that because the plaintiff "acquired the interest now in controversy *prior* to the institution of the action and having owned it ever since, he was not in privity with the defendant Drew," the "default judgment against the defendant Drew did not operate either as res judicata or estoppel by judgment" (emphasis added)); *In re Salas*, 2018 Bankr. LEXIS 2906, at *35 (Bankr. D.D.C. Sept. 24, 2018) ("[T]he facts do not show that collateral estoppel applies on the basis that Max is 'a successor to a party's property interest.' That latter exception applies to successors who acquired their interest in property *after* the commencement of the litigation leading to the judgment declaring ownership of property.") (emphasis added)).

[9] *See, e.g., Gerrity Bakken, LLC v. Oasis Petro. N. Am., LLC*, 915 N.W.2d 677, 684 (N.D. 2018) ("[T]he privity doctrine cannot be applied if the rights to property were acquired by the person sought to be bound before the adjudication."); *Clugston v. Moore*, 655 P.2d 29, 31 (Ariz. Ct. App. 1982) ("The Restatement (Second) of Judgments, §§ 43, 44 (1980), makes it clear that whereas a judgment determining interests in real or personal property has preclusive effect upon a person who succeeds to the interest of a party to the action, the rule has no application to a successor who acquired her interest before the action was commenced concerning the property."); *Mitchell v. Austin*, 94 So. 2d 391, 392-93 (Ala. 1957) (collecting authorities and holding "no one is in privy to a judgment whose succession to the rights of property thereby affected, occurred previously to the institution of the suit"); *see also* 47 AM JUR 2D JUDGMENTS § 566 (2022) ("[A] privy is one who, *after the commencement of the action*, has acquired an interest in the subject

The reason for this timing rule makes good sense.  One who, like Atticus, acquires a property interest in good faith—without any possibility of knowing that a legal proceeding has been instituted affecting the property—is entitled to have a full and fair opportunity to defend its rights.  Simply put, good-faith purchasers deserve legal protection.  As the Supreme Court of Illinois aptly explained, "there is of course the possibility" that the second tribunal "may reach a result inconsistent with, or contrary to, the result which was reached" in the first tribunal. *Sweeting*, 119 N.E.2d at 241.  But potential inconsistency yields to "the importance which our legal system attaches to the overriding principe that every litigant shall have his day in court." *Id.*

### c)   Atticus Is Not Bound Based on "Adequate Representation"

Third, DPC argues Atticus is bound based on purportedly having been "adequately represented" by the Estate in the prior (and ongoing) litigation.  (Doc. 29 at 18.)  But adequate representation applies only "in certain limited circumstances." *Taylor*, 553 U.S. 880 at 894 (quoting *Richards v. Jefferson Cty.*, 517 U.S. 793, 894 (1996).  In *Taylor*, the court disclaimed the amorphous concept of "virtual representation" alleged by DPC. *Id.* at 896.  Instead, the concept of adequate representation is confined only to certain formally defined legal relationships, including "properly conducted class actions and suits brought by trustees, guardians, and other fiduciaries." *Id.* at 894 (internal citation omitted).  DPC identifies no such formal legal

---

matter affected by the judgment through or under one of the parties, as by inheritance, succession, purchase, or assignment." (emphasis added)); 47 Am. Jur. 2d Judgments § 569 (2022) ("[A] person to whom a party to an action has made an assignment or has granted property or an interest therein *before* the commencement of the action is not regarded as in privity with the assignor or grantor so as to be affected by a judgment rendered against the assignor or grantor in the action, unless that person is made a party to the action." (emphasis added)).

relationship, because none exists.  *See Sacerdote v. Cammack Larhette Advisors, LLC*, 939 F.3d 498, 510 (2d Cir. 2019) (rejecting similar "adequate representation" argument).[10]

DPC also complains that Atticus "could have sought to join" the arbitration or "moved to intervene in the Illinois federal action[.]" (Doc. 29 at 19 n.20.) Even if true, DPC's argument is legally irrelevant. "The right to intervene in an action does not, in the absence of its exercise, subject one possessing it to the risk of being bound by the result of the litigation, under the doctrine of res judicata." *Sweeting*, 119 N.E.2d at 240 (quoting 30 AM. JUR. JUDGMENTS § 220); *Show-World Ctr., Inc. v. Walsh*, 438 F. Supp. 642, 648 (S.D.N.Y. 1977) ("The fact that a party has a right to intervene, which it chooses not to exercise, is not enough to make it bound by a judgment in the proceeding in which it possessed such a right." (citing *Brown v. Wright*, 137 F.2d 484, 487 (4th Cir. 1943)); *W. Union Tel. Co. v. Foster*, 247 U.S. 105, 115 (1918)).  Atticus was under no obligation to intervene in a private arbitration in Chicago before a private arbitrator, and does not lose any rights under U.S. copyright law because it chose not to do so.

### 2.    The Judgment Is Not Final for the Purpose of Preclusion

Under Illinois law,[11] preclusion does not apply for an additional reason: the Judgment is not final because the Estate's avenues for appellate review have not been exhausted.[12] The

---

[10] DPC's citation (Doc. 29 at 18) to this Court's decision in *Wendt*, 2017 U.S. Dist. LEXIS 121706, is inapt.  In that case, the Court applied New York law—which does not apply here—and the virtual representation theory that the Supreme Court expressly disclaimed in *Taylor*. *Id.* at *13.

[11] Under federal law, the pendency of an appeal does not deprive a judgment of its preclusive effect.  *See United States v. Int'l Bhd. of Teamsters*, 905 F.2d 610, 621 (2d Cir. 1990).

[12] *See State Bldg. Venture v. O'Donnell*, 940 N.E.2d 1122, 1127 (Ill. 2010) ("[F]inality requires that the potential for appellate review must have been exhausted." (citation omitted)); *People v. Hopkins*, 922 N.E.2d 1042, 1050 (Ill. 2009) ("This court has repeatedly held that for purposes of applying the doctrine of collateral estoppel, finality requires that the potential for appellate review must have been exhausted." (internal alterations, quotation marks, and citation omitted)); *Luckett v. Human Rights Comm'n*, 569 N.E.2d 6, 10 (Ill. Ct. App. 1989) (applying rule);

Northern District of Illinois entered the Judgment on January 13, 2023 (Zavin Decl., Ex. 8), so the Estate has the right to appeal to the Seventh Circuit within 30 days, *see* Fed. R. App. P. 4(1)(A). Giving preclusive effect would therefore be premature given the possibility of reversal on appeal.

### III. DPC'S ARGUMENT THAT THE NO ICE GRANT IS INVALID HAS NO RELEVANCE TO THIS ACTION, AND IS WRONG IN ANY EVENT

Apparently recognizing the utter lack of merit to its own claim of perpetual exclusive rights, DPC takes aim at the validity of Atticus's stage rights to the Novel, arguing that "the Copyright Act's express terms bar this action" because Ms. Lee allegedly transferred her rights in the Novel to Atticus before "the effective date of termination, April 26, 2016." (Doc. 29 at 12.) DPC's argument again misses the point.

Atticus is *not* suing DPC for copyright infringement, a scenario in which the hypothetical existence and scope of Atticus's rights would be relevant. *See, e.g.*, *John Wiley & Sons, Inc. v. DRK Photo*, 882 F.3d 394, 410 (2d Cir. 2018) (holding only owners of exclusive rights may bring claim for copyright infringement). Rather, Atticus seeks only a declaration that DPC cannot sue Atticus for copyright infringement. The *only* issue that matters for purposes of this action, therefore, is whether *DPC* can maintain a claim of holding exclusive rights in the Novel so as to confer it with standing to sue Atticus, Sorkin or anyone else for copyright infringement. For the reasons explained herein, that claim cannot be maintained against anyone other than the Estate. For purposes of *this* action, whether Atticus has exclusive, nonexclusive, or no rights in the Novel is irrelevant.

Moreover, DPC's claim that Atticus has no rights in the Novel is flat wrong, for at least three reasons.

---

*Pelon v. Wall*, 634 N.E.2d 385, 388 (Ill. Ct. App. 1994) (applying rule).

First, as explained above, pursuant to the No Ice Grant, no grant of rights was made until the option was deemed exercised in December 2018, when the Sorkin Play premiered at the Shubert Theatre.  (*See* Zavin Decl., ¶¶ 4, 11; Ex. 3 § 4; Doc. 1 ¶¶ 29-31.)  This, of course, was *after* the effective date of termination.  *See* 17 U.S.C. § 304(c)(6)(D) (emphasis added).

Second, even if the No Ice Grant were invalid, Atticus, at minimum, has a nonexclusive license to the stock and amateur rights at issue.  Unlike an exclusive license, a nonexclusive license need not be in writing.  3 NIMMER ON COPYRIGHT § 10.03[A][7] (2022) ("[N]onexclusive licenses may therefore be granted orally, or may even be implied from conduct.").  Thus, when "the totality of the parties' conduct indicates an intent to grant such permission, the result is a nonexclusive license." *Id.*  Here, following the effective date of termination, Atticus has indisputably exploited the Sorkin Play for years with the permission of the Estate, in exchange for the valuable consideration paid to Ms. Lee and, thereafter, her Estate.  (Doc. 1 ¶¶ 29-31; Doc. 29 at 8-11) (describing efforts by the Estate to exploit the Sorkin Play).)

Third, DPC has no standing to challenge the validity of the No Ice Grant.  As courts have made clear, the derivative rights exception on which DPC exclusively relies "confers no right upon the current grantee [here, DPC,] to have the property offered to him first or upon any given terms as a contractual right of first refusal" *Bourne Co. v. MPL Commc'ns, Inc.*, 675 F. Supp. 859, 866 (S.D.N.Y. 1987), *modified and amended by,* 678 F. Supp. 70 (S.D.N.Y. 1988).  In other words, while an *author* may contest the validity of an agreement subject to § 304(c)(6)(D), the statute confers no such right on the original grantee.[13]

---

[13] Tellingly, DPC does not even suggest that it ever even tried to negotiate a new license with Ms. Lee prior to the effective date of termination.

## <u>CONCLUSION</u>

For the foregoing reasons, Atticus respectfully requests that the Court (1) deny DPC's motion to dismiss, (2) grant summary judgment in Atticus' favor granting the declaratory relief sought in this action, and (3) award Atticus its costs and reasonable attorneys' fees incurred in connection with this lawsuit pursuant to 17 U.S.C. § 505.

Dated: February 6, 2023
New York, New York

LOEB & LOEB LLP

By: ___/s/ Jonathan Zavin_____
Jonathan Zavin
Wook Hwang
Frank D. D'Angelo
345 Park Avenue
New York, New York 10154
Tel: (212) 407-4000
Fax: (212) 407-4990

*Attorneys for Plaintiff Atticus Limited Liability Company*