**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY, | |
| *Plaintiff,* | |
| and | Case No. 1:22-cv-10147-DLC |
| AARON SORKIN, | |
| *Involuntary Plaintiff,* | |
| -against- | |
| THE DRAMATIC PUBLISHING COMPANY, | |
| *Defendant.* | |

**DRAMATIC PUBLISHING COMPANY'S**
**RESPONSE TO MOTION FOR SUMMARY JUDGMENT**

## Table of Contents

Table of Authorities............................................................................................................iii

Examples Of Dramatic's Necessary Discovery.....................................................................2

BACKGROUND FACTS ........................................................................................................5

ARGUMENT............................................................................................................................5

    A.    The Rudinplay Affiliates cannot avoid 17 U.S.C. § 304(c)(6)(D)..................................7

    B.    The Rudinplay Affiliates are bound by all terms of the 1969 Agreement. ................7

    C.    This entire action is barred by the doctrine of res judicata. .......................................12

        1.    The Rudinplay Affiliates are in privity with the Lee Estate. ...........................12

            a)    The Rudinplay Affiliates agreed to be bound by the arbitrator's decision............14

            b)    The Lee Estate adequately represented the Rudinplay Affiliates' legal interests..15

            c)    The Rudinplay Affiliates have controlled the Lee Estate from the Outset...........17

        2.    The Court should not ignore the Illinois decision. .........................................18

    D.    Dramatic's exclusivity survives termination. .............................................................20

CONCLUSION.......................................................................................................................23

## Table of Authorities

**Cases**

*Agolf, LLC v. Village of Arlington Heights*, 946 N.E.2d 1123, 1132-33 (Ill. App. 2011)...........................17

*Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009) ..............................................................................1

*Association of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 81 (2d Cir. 2018) ..................... 1, 2

*Ballweg v. City of Springfield*, 499 N.E.2d 1373, 1375 (Ill. 1986) ......................................................18

*Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*,
    193 F.3d 415, 423 (6th Cir. 1999) ............................................................................................14

*Chevron Corp. v. Donziger*, 886 F. Supp.2d 235, 270 (S.D.N.Y. 2012)..........................................12

*City of Chicago v. St. John's United Church of Christ*,
    935 N.E.2d 1158, 1167 (Ill. Appl. Ct. 2010)........................................................................13

*Davis v. Blige*, 505 F.3d 90, 100, n.10 (2007) ............................................................................23

*Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007) ...........................................................................6

*Duane Reade, Inc. v. St. Paul Fire & Marine Uns. Co.*,
    600 F.3d 190, 195 (2d Cir. 2010)...........................................................................................12

*Dwyer v. Evoy*, 12 F.Supp.2d 832, 834-35 (N.D. Ill. 1998) .......................................................19

*First Financial Marketing Services Group, Inc. v. Field Promotions, Inc.*,
    286 F.Supp. 295, 298 (1968) ................................................................................................23

*Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124 (2d Cir. 2022)........................................................11

*Gilliam v. Am. B'casting Cos.,Inc.*, 538 F.2d 14, 21 (2d Cir. 1976) .............................................6

*Hellstrom v. U.S. Dept. of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000) .................................1

*Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 437 (1999)........................................................23

*Illinois Founders Ins. Co. v. Guidish*, 618 N.E.2d 436, 440 (Ill. Ct. App. 1993) ..........................19

*In Holzer v. Motorola Lighting, Inc.*, 693 N.E.2d 446, 455 (Ill. Appl. Ct. 1998)............................14

*Lai Ling Cheng v. Modansky Leasing Co.*,
    73 N.Y.2d 454, 460, 539 N.E.2d 570, 573 (1989).................................................................10

*Lawrence v. Board of Election Com'rs of City of Chicago*,
    524 F.Supp.2d 1011, 1019 (N.D. Ill. 2007)..........................................................................19

*Luckett v. Human Rights Comm'n*, 569 N.E.2d 6, 10-11 (Ill. App. Ct. 1989) ............................18

*Lutkauskas v. Ricker*, 28 N.E.3d 727, 738 (2015) ................................................................ 12, 15

*Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995) .................................................. 3

*Miller v. Wolpoff & Abramson, L.L.P.,* 321 F.3d 292, 303 (2d Cir. 2003) ................................... 5

*Mills Music, Inc. v. Snyder*, 469 U.S. 153,164 (1985) ....................................... 20, 21, 22, 23

*Pelon v. Wall*, 634 N.E.2d 385, 388 (Ill. App. Ct. 1994) ........................................................ 18

*People ex rel. Burris v. Progressive Land Developers, Inc,*
     602 N.E.2d 820, 825 (Ill. App. 1992) .......................................................... 16, 17

*People v. Baldwin*, 175 N.E.3d 1090, 1098-99 (Ill. Ct. App. 2020) .................................. 19

*People Who Care v. Rockford Bd. Of Educ.*, 68 F.3d 172, 177 (7th Cir 1995) ............................. 13

*Rogers v. Desiderio,* 58 F.3d 299, 302 (7th Cir. 1995) ........................................................... 19

*Ronan Associates, Inc. v. Local 94-94A-94B, Intern. Union of Operating Engineers,*
     24 F.3d 447, 449 (2d Cir. 1994) .............................................................................. 9

*Shaw v. Citizens State Bank of Shipman*, 540 N.E.2d 1132, 1134 (Ill. Ct. App. 1989) ............................ 19

*Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) ................................... 8

*St. John's United Church of Christ*, 935 N.E.2d at 1168 ....................................... 16, 17

*Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019) .............................................. 11

*State Life Insurance Co. v. Board of Education*, 81 N.E.2d 877, 880 (Ill. 1948) ............................ 18

*Taylor v. Sturgell*, 553 U.S. 880 (2008) .......................................................................... 16

*U.S. v. BDO Seidman, LLP*, 492 F.3d. 806, 815-16 (7th Cir. 2007) ................................. 3, 15

*Wilder v. World of Boxing LLC,*
     310 F. Supp.3d 426, 441 (S.D.N.Y 2018), *aff'd* 777 Fed.Appx. 531 (2d Cir. 2019) ................ 9, 10, 11

*Wilson v. City of Chicago*, 900 F.Supp. 1015, 1026 (N.D. Ill. 1995) .................................... 19

*Zachman v. Hudson Valley Federal Credit Union*, 49 F.4th 95, 104 (2d Cir. 2022) ................................. 9, 11

**Statutes**

17 U.S.C. § 304 .......................................................... 1, 2, 4, 7, 13, 22, 23, 25

**Other Authorities**

Fed. R. Civ. P. 56 ........................................................................................ 2, 5

Restatement (Second) of Judgments § 40 .................................................................. 14

*Clark & Leland Condominium, L.L.C v. Northside Comm. Bank,* 14-cv-3928, 2016 WL 302102, * 3 (N.D.
     Ill Jan. 25, 2016) .......................................................................................... 19

*Hicks v. Midwest Transit, Inc.*, 02-cv-4028, 2006 WL 8455841, *6 (S.D. Ill. May 8, 2006)......................19

*Mandelstein v. Rukin*, Case No. 17-cv-9216,  2018 WL 4384383, *4-5 (N.D. Ill. Sept. 14, 2018)..........19

*Walden*, 2015 WL 1433353 at *5 ...............................................................................................................5

Motions to dismiss and motions for summary judgment are not two sides of the same coin. Motions to dismiss test the sufficiency of the pleadings and decide whether a plaintiff has stated a plausible claim. *Ashcroft v. Iqbal*, 556 U.S. 662, 678-679 (2009). Summary judgment considers whether the parties can establish the essential elements of their cases and should only be granted if the non-moving party cannot make a "sufficient showing" on one of those essential elements. *Hellstrom v. U.S. Dept. of Veterans Affairs*, 201 F.3d 94, 97 (2d Cir. 2000). Just because a party claims one issue constitutes a "pure issue of law" is not a sufficient basis for a court to jettison an entire case in that party's favor without discovery. Summary judgment motions are a "'drastic device'" and should not be granted in the face of major factual contentions, especially where, as here, the nonmoving party has not had an opportunity to take discovery. *Association of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 81 (2d Cir. 2018) (citation omitted).

As the now completed briefing on its motion to dismiss demonstrates, Dramatic has provided the Court with multiple bases for dismissing the Rudinplay Affiliates' Complaint. Should the Court, however, find that the pleadings are not facially deficient and—despite the plain language of Section 304(c)'s derivative work exception expressly providing that a derivative work's ' owner's right to "utilize" the work "under the terms of the grant" and the express directive of the Supreme Court that the phrase "terms of the grant" means "all the terms of the grant"—that the Rudinplay Affiliates may pick and choose the terms of the grant under which Dramatic may operate, the Rudinplay Affiliates still must overcome several obstacles before the Court can even consider entering judgment in their favor. These obstacles include:

- Proving that Ms. Lee actually owned the non-first-class rights in the first instance when she purportedly transferred them to the Rudinplay Affiliates;

- Proving that the Rudinplay Affiliates' express agreement that any rights they claim in the 2015 Letter Agreement are "subject to the rights granted under the 1969 Agreement" coupled with their decision to exclude those rights from the express warranties they

drafted for Ms. Lee to grant them in that agreement allows them to ignore the terms of the 1969 Agreement;

- Proving that any rights were properly transferred to them under Section 304(c)(6)(D) of the Copyright Act;

- Proving that they were not in privity with the Lee Estate or otherwise bound by the Arbitration decision and Northern District of Illinois judgment under claim and issue preclusion doctrines; and

- Ultimately, under the derivative works exception in Section 304(c)(6)(A), identifying which "terms of the grant" survived Ms. Lee's termination and the basis for their picks.

On these bases alone, the Court should deny the summary judgment motion.

## Examples Of Dramatic's Necessary Discovery

These numerous issues require discovery and certainly make entertaining summary judgment inappropriate until that discovery can be completed, let alone before Dramatic has even answered.[1] Accordingly, pursuant to Fed. R. Civ. P. 56(d), Dramatic requests discovery on a variety of topics.

To ensure that parties like Dramatic have the opportunity to discover that information, Rule 56(d) "authorizes district courts to defer ruling on a motion for summary judgment—or to deny the motion altogether—'[i]f a nonmovant shows by affidavit or declaration that, for specified reasons, it cannot present facts essential to justify its opposition.'" *Association of Car Wash Owners*, 911 F.3d at 83-84. The Second Circuit assesses requests for discovery made pursuant to Rule 56(d) to determine if the requesting party has provided an affidavit or declaration describing: (1) what facts are sought

---

[1] Not only has there been no opportunity for discovery, Dramatic has not had an opportunity to raise affirmative defenses or assert any counterclaims, be they voluntary or compulsory counterclaims. This last point could mean that entry of summary judgment at this early juncture would give the Rudinplay Affiliates the opportunity to claim Dramatic is bound by a judgment far beyond the limited issue before this Court regarding exclusivity. This is especially problematic given that the Lee Estate and Rudinplay Affiliates have previously advanced the materially false claim that Dramatic had **no** professional acting rights, despite the express grant of "stock and repertoire" rights in the 1969 Agreement that led to the underlying arbitration in the first place. If this Court were to accept the Rudinplay Affiliates' claim that, essentially, the Arbitrator was not the boss of them, it could lead them to subsequently claim that nothing in the arbitration relating to the parties' rights has any effect on them. Also, whether the Lee Estate is a necessary party to this action should be resolved.

and how they are to be obtained, (2) how such facts are reasonably expected to raise a genuine issue

of material fact, (3) what efforts the affiant has made to obtain them, and (4) why the affiant's efforts

were unsuccessful. *See, e.g.*, *Meloff v. New York Life Ins. Co.*, 51 F.3d 372, 375 (2d Cir. 1995) (vacating

judgment where plaintiff was not given adequate opportunity for discovery).

To comply, with Rule 56(d), Dramatic provides the Declaration of Kevin Tottis.[2] The Tottis

Declaration explains that while, to date, no discovery has occurred in this case, Dramatic has

provided the Rudinplay Affiliates with a list of initial topics about which it seeks discovery and the

Rudinplay Affiliates have failed to even respond. (Tottis Decl., ¶15, Ex. 8.) The Tottis Declaration

also identifies the following topics of discovery, most of which were included in the request sent to

the Rudinplay Affiliates counsel on February 16, 2023. This material raises both factual issues and

potential factual issues central to Dramatic's defense:

1. **The communications among the Lee Estate (including its lawyers), Sorkin (and his lawyers) and the Rudinplay Affiliates (and their lawyers) regarding the Arbitration.** This material is directly related to issues of res judicata, including the ability of the Rudinplay Affiliates to influence the Lee Estate's actions in the arbitration, including any recommendations of legal theories and strategies they may have offered and the Lee Estate's efforts to keep them apprised of the progress of the Arbitration, the confirmation proceedings and the appeal. (Tottis Decl., ¶ 17(b).) In the Arbitration, the Lee Estate actually asserted a "common interest privilege" as to many of these documents, citing authority which describes that relationship as one "where the parties undertake a joint effort with respect to a common legal interest…" *U.S. v. BDO Seidman, LLP*, 492 F.3d. 806, 815-16 (7th Cir. 2007). If the Rudinplay Affiliates share this view, Dramatic is entitled to a privilege log. If they don't, Dramatic is entitled to the material.

2. **Communications and other material relating to the Rudinplay Affiliates' understanding of the 1969 Agreement.** Dramatic is entitled to determine the Rudinplay Affiliates' knowledge and understanding of the exclusivity provisions, the meaning and effect of the 1969 Agreement on the rights they were acquiring, including the need for representations and warranties from Ms. Lee that the Rudinplay Affiliates drafted for her and the effect it might have on her successors and assigns as well as the arbitration provision. Dramatic is also entitled to discovery that might show any changes in those understandings over time. This material relates directly to understanding the

---

[2] Mr. Tottis also provided a Declaration in connection with Dramatic's Motion to Dismiss. (Doc. 30.) Hoping to limit any potential confusion, the Declaration being submitted with this Opposition starts with Paragraph 11 and the Exhibits are numbered starting with Exhibit 8, each picking up where the first Declaration ended.

rights to which the Rudinplay Affiliates believed the 2015 Letter Agreement it prepared were "subject to." (Tottis Decl., ¶17(c).)

3. **Complete copies of any agreements modifying the 2015 Letter Agreement or transferring any of the rights as well as all drafts relating to the negotiation of the agreement.** In support of their Motion, the Rudinplay Affiliates have provided copies of some, but not all of the agreements impacting whatever rights were granted in the 2015 Letter Agreement. Some of the documents are heavily redacted. (*See, e.g.*, Doc. 37-4.) In addition, Doc. 37-4 says that the 2015 Letter Agreement was modified in 2018 by a settlement between the Lee Estate and the Rudinplay Affiliates arising out of litigation. (*See, e.g.*, Doc. 37-4, § 22.27(b).) Dramatic is entitled to all documents relating to the Rudinplay Affiliates' and Sorkin's alleged rights which they claim form the basis for this lawsuit. (Tottis Decl., ¶17(d).)

4. **The basis, nature and extent of the alleged implied contract between Ms. Lee and/or the Estate and the Rudinplay Affiliates.** In their Memorandum, the Rudinplay Affiliates argued without any factual basis that even if their 2015 Letter Agreement was invalid under Section 304(c)(6)(D), they had an implied license. (Doc. 36, p. 23.) To allow it to defend against this assertion, Dramatic is entitled to know how the alleged implied license was formed and the details of any such license. (Tottis Decl., ¶17(a).)

5. **All information reflecting Ms. Lee's understanding that she was licensing rights for a new play.** The evidence shows that, for years, Ms. Lee was adamant she never would agree to license another version of *TKAM*, whether it was for Broadway or the stock and amateur market. (Tottis Decl., ¶17(e), Doc. 30-6(evidencing Ms. Lee's position and uncovered in the Arbitration only after multiple attempts by the Lee Estate to suppress disclosure).) (Dramatic is not claiming rights to first-class theater. Nevertheless, the document upon which the Rudinplay Affiliates base their claim for non-exclusive non-first-class rights is the 2015 Letter Agreement.) In sworn testimony, Mr. Rudin has said that neither he nor anyone on the Rudinplay Affiliates' behalf had any direct contact with Ms. Lee. Ms. Lee survived a stroke in 2007, but suffered from both macular degeneration and profound hearing loss. (Tottis Decl., ¶17(e).) A serious question exists as to whether she understood what rights she owned or knowingly executed the 2015 Letter Agreement. As her sister wrote in 2011, "Poor Nelle can't see and can't hear and will sign anything put before her by anyone in whom she has confidence." (Tottis Decl, ¶17(e); Ex.14.)

6. **Contention interrogatories and other discovery regarding the 1969 Agreement.** Dramatic is entitled to have a clear understanding of those terms of the 1969 Agreement the Rudinplay Affiliates believe do or do not survive the termination, the overall effect of the termination and the basis for those beliefs. (Tottis Decl., ¶17(f).)

7. **Authentication of a number of documents**. Either the Rudinplay Affiliates need to stipulate to the authenticity of a number of documents or Dramatic should be given the opportunity to authenticate them through third parties. (Tottis Decl., ¶17(g).)

8.  **Unredacted documents**. If the Estate plans to rely on any document, Dramatic is entitled to review the entire document, under the terms of a protective order. (Tottis Decl., ¶17(h).)

As this non-exhaustive list makes clear, there is much Dramatic needs to discover before the issues in this case can properly resolved on summary judgment.[3] Accordingly, pursuant to Rule 56(d), the Court should now either defer considering the Rudinplay Affiliates' motion or simply deny it.

## BACKGROUND FACTS

Relevant facts are summarized in the motion to dismiss memoranda as well as the Statement of Additional Facts.

## ARGUMENT

The basis for the Rudinplay Affiliates' argument is truly extraordinary. They have sued Dramatic claiming that Dramatic may not exercise the rights it got from Harper Lee under the terms of their 1969 Agreement, even though under the terms of the 1969 Agreement, Dramatic and Ms. Lee agreed an arbitrator would determine those rights. In particular, the Rudinplay Affiliates claim Dramatic may not exercise its exclusive rights which the contractually required arbitrator undeniably decided remained exclusive to Dramatic. Throughout their complaint and supporting memorandum, they have steadfastly refused to even address as a matter of basic contract law just how they could have an interest in rights Ms. Lee had no right to transfer to them in the first place. The Rudinplay Affiliates didn't just find these rights lying on the sidewalk or otherwise generate them themselves; their only claim to these rights derives from Ms. Lee's rights and Ms. Lee's rights were expressly

---

[3] In assessing similar submissions, courts have noted that where no discovery has occurred, a declaration will suffice even if it does not specify the facts that counsel anticipates learning through discovery, since a submission made before discovery has even begun allows for the inference that "such facts will be further developed through discovery." *Walden*, 2015 WL 1433353 at *5 (citing *Miller v. Wolpoff & Abramson, L.L.P.*, 321 F.3d 292, 303 (2d Cir. 2003)).

limited by her obligations to Dramatic, a fact the Rudinplay Affiliates expressly acknowledged in the 2015 Letter Agreement.

Dramatic incorporates the arguments made in its motion to dismiss papers into this brief (Docs. 28-30, 47), so it will not repeat all of them here. Notably, however, the Rudinplay Affiliates never once explain how Ms. Lee could transfer rights she didn't own or address the cases cited by Dramatic stating this elementary principle. *Davis v. Blige*, 505 F.3d 90, 99 (2d Cir. 2007); *Gilliam v. Am. B'casting Cos.,Inc.*, 538 F.2d 14, 21 (2d Cir. 1976). Perhaps more fundamentally, as a matter of basic contract law, they provide no reason for the Court to ignore clear obligations from the 1969 Agreement which the Rudinplay Affiliates expressly incorporated into their 2015 Letter Agreement. Likewise, in light of these obligations, they fail to explain to the Court how those contractual obligations change simply because they have Ms. Lee's signature on a document that predates the arbitration.

Finally, even if the Court were to find that Ms. Lee's lack of ownership somehow did not constrain her ability to transfer rights she didn't own and even if the Court could find that eight years later, the Rudinplay Affiliates may pick and choose the rights under the 1969 Agreement they now want to incorporate into their 2015 Letter Agreement, the Rudinplay Affiliates still have provided no legitimate basis for the Court to permit them to ignore the plain language of Section 304 of the Copyright Act. This is true whether it applies to the timing of the transfer under 17 U.S.C. § 304(c)(6)(D) or, as they seek in the fundamental question they pose to this Court, the derivative works exception that unambiguously provides (without further exception) that, post-termination, a derivative work owner may continue to utilize its work "under the terms of the grant." Nor, under the appropriate principles of res judicata, do they explain how the Arbitration Award and judgment in the Northern District of Illinois addressing the identical issue before this

Court do not bind them as privies. Given these fundamental failings, as well as the multiple discovery topics identified above, the Court should now reject the Rudinplay Affiliates' motion.

### A. The Rudinplay Affiliates cannot avoid 17 U.S.C. § 304(c)(6)(D).

Dramatic will not repeat the arguments it made in its initial memorandum and reply in its motion to dismiss. (Doc. 29, pp. 12-13; Doc. 47, pp. 3-5.) As explained, as a matter of law, under 17 U.S.C. § 304(c)(6)(D), the Rudinplay Affiliates simply do not have any non-first-class rights and their motion (and entire case) should fail. Should the court, however, consider the Rudinplay Affiliates' argument claiming an unidentified implied license compelling, Dramatic is entitled to full discovery on the matter.

### B. The Rudinplay Affiliates are bound by all terms of the 1969 Agreement.

In the 1969 Agreement, Ms. Lee granted Dramatic the exclusive right to non-first class productions and Ms. Lee had the right to receive an exclusive license royalty of 25 percent for the right to stage those productions worldwide. (Dramatic's Statement of Additional Facts ("SOAF") ¶1; Doc. 30-4, ¶¶ 2-3.) Ms. Lee and Dramatic also agreed that in resolving their disputes, the parties had the right to alternative dispute resolution through arbitration in Chicago under the rules of the American Arbitration Association. SOAF, ¶5, Doc. 30-4, ¶ 4(k) for "any controversy arising out of [the 1969 Agreement]." (The parties also agreed that each had the right to enforce the terms of the 1969 Agreement against the other's "heirs, executors, administrators, successors and assigns." (SOAF, ¶4; Doc. 30-4, ¶ 4(d).[4] All of these agreements are included in the parties' "rights" under the 1969 Agreement.

---

[4] "This agreement …shall be binding upon and inure to the benefit of the parties hereto and their respective heirs, executors, administrators, successors and assigns."

In the 2015 Letter Agreement, sent to Ms. Lee's handlers on Rudinplay's letterhead and drafted by the Rudinplay Affiliates,[5] the Rudinplay Affiliates first demonstrated full knowledge of the 1969 Agreement and all of the rights and obligations contained in it, specifically identifying the 1969 Agreement and defining it as the "Prior Agreement." (SOAF, ¶19); Doc. 37-3, ¶ 2(b).) Then, to leave no doubt as to the impact of that Prior Agreement, the Rudinplay Affiliates expressly promised in the very words they drafted that the rights they obtained in the 2015 Letter Agreement were limited by the rights in the Prior Agreement: "The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination." (SOAF, ¶24; Doc. 37-3, ¶ 2(b).) So, based on the "rights" as described by the Rudinplay Affiliates' own letter, they acknowledged Dramatic's existing production rights, they accepted that they were on the hook for anything Ms. Lee agreed to with Dramatic back in 1969 (binding on "successors and assigns") and they also agreed that any disputes about the meaning or legal effect of the term providing that Dramatic's play "…is to be the only one the amateur [non-first-class] rights of which [Ms. Lee] will permit to be leased and/or licensed" would be resolved by an arbitrator. (SOAF, ¶¶1-5; Doc. 37-3.)[6]

Other than claiming res judicata does not apply to this language (apparently because the 2015 Letter Agreement referenced but didn't repeat every word from the 1969 Agreement), the

---

[5] Because, to date, Dramatic has not had the chance to conduct discovery, it cannot state with absolute certainty that words included in a letter on Rudinplay letterhead that simply ask Ms. Lee to "agree and accept" were drafted by the Rudinplay Affiliates. If, though, that is contested, then Dramatic is entitled to discover the basis for that assertion, including reviewing all drafts and correspondence relating to it.

Further, Dramatic cannot be certain that the terms set forth in the 2015 Letter Agreement remain the terms of the agreement between Ms. Lee and her Estate and the Rudinplay Affiliates. This is because, as noted above, the 2015 Letter Agreement was modified by the terms of a settlement between the Estate and the Rudinplay Affiliates dated as of May 9, 2018. (SOAF, ¶17(d); Doc. 37-4, § 22.27(b).) The Rudinplay Affiliates haven't provided a copy of the agreement and the copy provided to Dramatic in the Arbitration redacted almost everything.

[6] *See, e.g.,* Doc. 29, pp. 14-16 (discussing an arbitrator's powers, including to apply federal law and citing, among others *Shearson/American Express, Inc. v. McMahon*, 482 U.S. 220 (1987) (upholding arbitrator's determination of claims under federal securities laws and RICO)).

Rudinplay Affiliates don't address this central point. As Dramatic has made clear, this is an issue of contract law. Ignoring this language does not mean, as the Rudinplay Affiliates' now apparently contend, they were free to contract with Ms. Lee as though the 1969 Agreement did not exist. "Under New York law, it is well established that contract terms and other agreements may be incorporated by cross-reference," just as the Rudinplay Affiliates did here. *Zachman v. Hudson Valley Federal Credit Union*, 49 F.4th 95, 104 (2d Cir. 2022); *see also, Ronan Associates, Inc. v. Local 94-94A-94B, Intern. Union of Operating Engineers*, 24 F.3d 447, 449 (2d Cir. 1994). In *Ronan Associates*, for example, an employee accepted a job subject to the benefits contained in a collective bargaining agreement. Finding that agreement bound the employer to arbitrate, even though the employer hadn't entered into the actual collective barging agreement, the Second Circuit explained: "Parties to a contract are plainly free to incorporate by reference, and bind themselves *inter sese* to, terms that may be found in other agreements to which they are not party." 24 F.3d at 449.

This basic principle applies with equal force to parties binding themselves not just to arbitrate, meaning the ***method*** for resolving disputes, but also to the actual ***resolution*** of issues that might impact their own contracts. This is because where a contract references extraneous dispute regulation rules, "…the content of those rules or regulations is incorporated into the contract's terms." *Wilder v. World of Boxing LLC,* 310 F. Supp.3d 426, 441 (S.D.N.Y 2018), *aff'd* 777 Fed.Appx. 531 (2d Cir. 2019) (summary order). There, a boxer and promoter claimed another boxer breached their contract when he tested positive for performance enhancing drugs. Despite an earlier jury verdict to the contrary, the court found that because the parties' agreement referenced the WBC's anti-doping testing program the WBC had full discretion to determine whether the boxer's doping violated the agreement as a result of the parties' binding agreement to abide by the WBC's anti-doping testing program. *Id.* at 441-442.

9

Here, the 2015 Letter Agreement not only states expressly that the Rudinplay Affiliates' rights are subject to the rights in the 1969 Agreement, the Rudinplay Affiliates drafted it. Thus, to the extent the Rudinplay Affiliates chose not to include qualifications in their references to the 1969 Agreement when they drafted the 2015 Letter Agreement, any ambiguities they may now claim as a result of that decision should be construed against the Rudinplay Affiliates. *See, e.g.*, *Lai Ling Cheng v. Modansky Leasing Co.*, 73 N.Y.2d 454, 460, 539 N.E.2d 570, 573 (1989). There is no dispute that the referenced agreement is the 1969 Agreement; in fact, the Rudinplay Affiliates attached it to their motion and admitted that fact. (Doc. 36, p. 5; Doc. 37-1; Doc. 1, ¶ 21 (quoting Doc. 37-1).) Nor for the purposes of contract construction does the timing of the Arbitrator's decision have any bearing on the Rudinplay Affiliates' rights. Just as the parties' reference to the WBC's anti-doping program meant the WBC's post-jury verdict decision that there was not a violation of the WBC's rules was binding on the parties in *Wilder*, the Rudinplay Affiliates agreed to be bound to ***all*** of the terms of the 1969 Agreement, including the Arbitrator's interpretation and determination of those terms.[7]

What's more, the Rudinplay Affiliates included a second reference in the 2015 Letter Agreement to their obligation to subject their rights to the rights in the 1969 Agreement. In Paragraph 11(e), the Rudinplay Affiliates themselves specifically carved out the rights contained in the 1969 Agreement from Ms. Lee's warranty, stating that she represents and warrants she "has not assigned or licensed to any person and/or entity, and has not entered into any agreements" that would "derogate from or conflict with" the rights in the Novel granted to the Rudinplay Affiliates ***except for the rights contained in the 1969 Agreement*** by noting that Ms. Lee's representation

---

[7] In the 2015 Letter Agreement, the Rudinplay Affiliates offer up their opinion that "…notwithstanding such termination, the amateur acting rights to the [1969 Agreement] can continue to be exploited following such termination under the terms of the Prior Agreement on a non-exclusive basis in the United States, and on an exclusive basis elsewhere." (Doc. 37-3, ¶ 2(b).) But the "rights granted" under the 1969 Agreement are not subject to the ruminations of the Rudinplay Affiliates; they are subject to the rights set forth in the agreement, and those rights have now been determined by the Arbitrator and confirmed by the Northern District of Illinois.

and warranty is "subject to the provision of Paragraph 2(b) above." (Doc. 37-3, ¶ 11(e).) As with the original reference to the 1969 Agreement, this provision contains no other limitation on the rights being represented or warranted.

The 2015 Letter Agreement is clear on its face that the Rudinplay Affiliates were aware of and agreed that their rights would, at a minimum, be limited by the rights of Lee and Dramatic as set forth in the 1969 Agreement. *See, e.g.,* *Wilder*, 310 F. Supp. at 442 (because the parties agreed in their contract to the WBC's anti-doping program, "they are thus now bound by it"). Even if this were not the case, there can be no doubt but that the Rudinplay Affiliates were aware of the 1969 Agreement, and thus were on inquiry notice regarding the terms of that agreement, and their potential impact on their own agreement with Ms. Lee. *See, e.g.,* *Zachman*, 49 F.4th at 102; *Fisher v. Aetna Life Ins. Co.*, 32 F.4th 124 (2d Cir. 2022). As the Second Circuit explained in *Fisher*, "'[w]here an offeree does not have *actual* notice of certain contract terms, he is nevertheless bound by such terms if he is on *inquiry* notice of them and assents to them through conduct that a reasonable person would understand to constitute assent.'" *Id.* (quoting *Starke v. SquareTrade, Inc.*, 913 F.3d 279, 288 (2d Cir. 2019)) (emphasis in original). Here, the Rudinplay Affiliates clearly were aware of the 1969 Agreement, its terms were obvious to them and it was called to their attention since they referenced it themselves in drafting the 2015 Letter Agreement. Moreover, the Rudinplay Affiliates then indicated their assent to its terms by, among other things, explicitly making their agreement with Ms. Lee subject to it at multiple points in the 2015 Letter Agreement. To the extent that the Rudinplay Affiliates now attempt to walk away from their own acknowledgement of the 1969 Agreement in their drafting of the 2015 Letter Agreement, that attempt in and of itself creates fact issues about which Dramatic is entitled to seek discovery pursuant to Rule 56(d).

**C.  This entire action is barred by the doctrine of res judicata.**

Whether this action is precluded under the doctrine of res judicata is a question of Illinois law. *Duane Reade, Inc. v. St. Paul Fire & Marine Ins. Co.*, 600 F.3d 190, 195 (2d Cir. 2010) ("The law governing the doctrine of res judicata in a diversity action is 'the law that would be applied by state courts in the state in which the federal diversity court sits.'") (citations omitted). Here, the Arbitration Award was rendered in Illinois and the final judgment was rendered by an Illinois district court in a diversity action. (Doc. 30-2; Doc. 30-5.) Thus, where Illinois and federal law differ, Illinois controls.

A prior action bars a subsequent action under the doctrine of res judicata when three elements exist: 1) a final judgment on the merits rendered by a court of competent jurisdiction; 2) an identity of cause of action; and 3) an identity of parties **or their privies**. *Lutkauskas v. Ricker*, 28 N.E.3d 727, 738 (2015).[8] In their Response, the Rudinplay Affiliates claim no difference between Illinois and federal common law, but that is only partially right. Although the primary elements are the same, as discussed below, under federal law a judgment is "final" even if it is on appeal, *Chevron Corp. v. Donziger*, 886 F. Supp.2d 235, 270 (S.D.N.Y. 2012). Illinois law is inconsistent on the matter, leading many courts to stay the action before them during the pendency of the appeal. Of particular importance, though, Illinois law differs significantly from federal common law on the issue of "privity" and whether the Lee Estate could adequately represent the Rudinplay Affiliates' interests.

**1.  The Rudinplay Affiliates are in privity with the Lee Estate.**

Obviously, the Lee Estate and Rudinplay Affiliates are not identical parties. But identity is not required in the presence of "privity." As courts have noted, for the purposes of res judicata,

---

[8] Because the Rudinplay Affiliates don't appear to dispute the identity of the issues—central to the Arbitration and the present case is whether, following termination under 17 U.S.C. § 304(c)(6)(A), Dramatic continues to own exclusive rights to stage non-first-class productions of *To Kill a Mockingbird*—there is no need to address it further.

privity is an elusive concept, but any analysis depends primarily on the mutuality of interests and the relationship of the parties. *City of Chicago v. St. John's United Church of Christ*, 935 N.E.2d 1158, 1167 (Ill. Appl. Ct. 2010); *People Who Care v. Rockford Bd. Of Educ.*, 68 F.3d 172, 177 (7th Cir 1995). Even with the few facts now before it, the Court can see the close relationship between the Rudinplay Affiliates and the Lee Estate. Their mutuality of interests bar this action under the doctrine of res judicata. At a minimum, it creates significant fact issues and requires additional discovery. Moreover, the Rudinplay Affiliates failure to respond to an email request in this regard or even start a dialogue on the issue strongly suggests the evidence would not help their cause.

Dramatic has previously identified a number of bases for res judicata to apply, but will focus here on at least three grounds upon which privity exists between the Rudinplay Affiliates and the Lee Estate. First, by agreeing their stage rights as granted in the 2015 Letter Agreement were subject to the 1969 Agreement, the Rudinplay Affiliates effectively agreed to be bound by the arbitrator's decision relating to the Dramatic's and Ms. Lee's respective rights under the 1969 Agreement. Second, privity arises because the Rudinplay Affiliates' and the Lee Estates' legal interests are closely aligned—indeed they are identical—and the Lee Estate adequately represented those interests in the Arbitration and district court action. Third, the Rudinplay Affiliates' control over the Lee Estate and its conduct of the arbitration and Illinois district court action is sufficient to demonstrate privity.[9]

---

[9] In addition, the Rudinplay Affiliates appear to have ratified the terms of the 2015 Letter Agreement in December 2020 (Doc. 37-4, pp. 3 of 96 and 29 of 96) nearly two years after Dramatic filed its Arbitration and nine months *after* a three-arbitrator panel denied the Lee Estate's motion for partial summary judgment on the issue of exclusivity. (Doc. 30-2, Appendix, p. 3) As Dramatic has explained (Doc. 47, p. 8), where original rights ownership is concerned, a subsequent decision does not bar application of privity as successor-in-interest. The fact that the Rudinplay Affiliates contracted *after* knowing of the decision pretty much eliminates their whole first-in-time argument. It also underscores the extraordinary prejudice Dramatic will suffer if it is barred further discover about the transfer of rights between the Rudinplay Affiliates.

a)   **The Rudinplay Affiliates agreed to be bound by the arbitrator's decision.**

In their memorandum, the Rudinplay Affiliates rely almost exclusively on Section 40 of the Restatement (Second) of Judgments for their argument that they can't be bound by the 1969 Agreement. (Doc. 36, pp. 16-17.) (The case they cite is *Becherer v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 193 F.3d 415, 423 (6th Cir. 1999), which found no express agreement to be bound but did not analyze whether an implied agreement to be bound existed.) In so doing, they focus exclusively on privity based on an "express" agreement to be bound and ignore the test for privity based on an implied agreement. Dramatic, however, prevails in either case. As detailed above, the Rudinplay Affiliates expressly agreed to be bound.[10] If, however, the Court believes this was anything but clear, Dramatic is entitled to conduct discovery on the Rudinplay Affiliates' understanding of the 1969 Agreement.

Moreover, as the Restatement makes clear, privity can arise where an implied agreement to be bound exists. The factors to consider whether an implied agreement exists include:

> the closeness of the interests of the persons involved, whether they were represented by the same or collaborating counsel, whether opportunity existed for the person to participate as a party in the first action, whether the person asserted to have made the agreement could invoke benefits of the judgment in the other action should its outcome favor his position, and what representations were made to the court concerning the relation between the actions.

Restatement (Second) of Judgments § 40, comment b.

As the Arbitrator expressly found, the Lee Estate and the Rudinplay Affiliates and their respective counsel worked in concert to shut down the productions of Dramatic's licensees, giving rise to the arbitration. (SOAF, ¶¶30-50; Doc. 30-2, Appendix A, pp. 73-80, 84-85.) The Lee Estate's

---

[10] *In Holzer v. Motorola Lighting, Inc.*, 693 N.E.2d 446, 455 (Ill. Appl. Ct. 1998), the court found a patent licensor's agreement to accept reduced royalties in the event that the licensee ever had to pay damages to a third party was in a sense an agreement to be bound by a later ruling, and thus privity between the licensor and licensee existed, even though the agreement did not explicitly include the language.

14

lawyers kept the Rudinplay Affiliates' lawyers fully apprised of the progress of the arbitration, furnishing them with pleadings, orders and other information. (SOAF ¶¶65-73; Doc 30-2n App, A, p. 87) These communications reflect only what was turned over to Dramatic during the Arbitration. Other oral and written communications were withheld on the basis of the Lee Estate's assertion of common interest agreement with the Rudinplay Affiliates. (SOAF, ¶17(b); Tottis Decl, Ex. 33.)

Furthermore, the Rudinplay Affiliates don't deny they could have intervened in the Arbitration and it is obvious they would have invoked the benefits of the rulings of the arbitrator and district court had either ruled in favor of the Lee Estate. Finally, as already noted, during the Arbitration, the Lee Estate represented that they and the Rudinplay Affiliates were subject to a common interest agreement, which means they must be part of a "joint effort with respect to a common legal interest." *BDO Seidman*, 492 F.3d. at 815-16.

In sum, the conduct of the Lee Estate and the Rudinplay Affiliates identified above is sufficient to warrant a finding that the latter implicitly (if not expressly) agreed to be bound by the arbitrator's decision. To the extent this evidence is not sufficiently compelling to the Court, Dramatic should be provided the opportunity to discover the full extent of the "collaboration" between counsel on the Arbitration and district court action and the bases the Rudinplay Affiliates had for not joining either.

### b) The Lee Estate adequately represented the Rudinplay Affiliates' legal interests.

As Dramatic explained in its motion to dismiss, under Illinois law privity also arises "between parties who adequately represent the same legal interests." *Lutkauskas v. Ricker*, 28 N.E.3d 727, 739 (Ill. App. 2015), quoting *People ex rel. Burris v. Progressive Land Developers, Inc*, 602 N.E.2d 820,

825 (Ill. App. 1992).[11] "It is the identity of interest that controls in determining privity, not the nominal identity of the parties." *Lutkauskas,* 28 N.E.3d at 739. Ultimately, a nonparty to a prior suit may be bound pursuant to privity if its interests "are so closely aligned to those of a party" in that prior suit that the party was, essentially, a virtual representative of the nonparty. *St. John's United Church of Christ*, 935 N.E.2d at 1168 (citations omitted).

Citing *Taylor v. Sturgell*, 553 U.S. 880 (2008), the Rudinplay Affiliates claim that the U.S. Supreme Court disclaimed the concept of "virtual representation." They ignore the fact that *Taylor* was discussing federal common law of res judicata. Illinois law is much broader and, when it comes to the issue of "virtual representation," Illinois courts have found "…*Taylor* in no way addressed, let alone overruled, this state's common law regarding privity." *St. John's United Church of Christ*, 935 N.E.2d at 1168.

In *St. John's United Church of Christ*, among the factors the court found compelled finding privity between a church and one of its parishioners in a prior suit and intervenor parishioners in a subsequent suit was their shared religious beliefs and their mutual interest in property rights in the graves of ancestors buried in a cemetery. Specifically, the court found:

> All of the living relatives in this case shared the same core religious beliefs and property interests that they sought to protect by intervening or seeking injunctive relief. They also shared those same core religious beliefs with St. John's. The living relatives' interests are not only closely aligned to those of Runge [the parishioner party in the first action], they are, in the words of the living relatives' own filings, exactly the same as Runge's."

---

[11] When considering the adequacy of the representation in a prior action, the Illinois Supreme Court has focused on whether the same legal position was "vigorously urge[d]" in the prior action, such as through extensive briefing and argument by competent counsel. *Burris,* 151 Ill. 2d at 297 (finding privity between the Illinois Attorney General and members of the Nation of Islam because their interests were identical and the Attorney General extensively briefed and argued the matter). Whether Dramatic's non-first-class rights remained exclusive following the termination was a central issue in the arbitration (and the district court) and subject to extensive briefing and oral argument on summary judgment, oral argument during the hearing, briefing in post-hearing submissions and briefing on the Lee Estate's motion to vacate in the district court. (SOAF, ¶¶53-55; Tottis Decl. ¶39).

*Id.* at 1169.

In *Agolf, LLC v. Village of Arlington Heights*, 946 N.E.2d 1123, 1132-33 (Ill. App. 2011), a fitness club tenant of a shopping plaza sued the city of Arlington Heights over the implementation of a TIF district as part of a redevelopment project. The fitness club lost, appealed and lost again. The owner of the shopping center filed suit against the city urging the same arguments. The court granted summary judgment holding that the claim was precluded based on the prior action filed by the owner's fitness club tenant. In affirming, the court of appeals found privity between the owner and its fitness club tenant:

> First, Capital Fitness and plaintiff shared the same legal interest in their respective lawsuits against defendant. Capital Fitness sought injunctive relief and a declaratory judgment to prevent defendant from incorporating the Plaza in its TIF district and redevelopment plan. This was the exact same relief plaintiff sought in its suit against defendant. Next, it is clear to us that Capital Fitness adequately represented this shared legal interest.

*Id.* at 1132.

Here, the relationship between the Rudinplay Affiliates and the Lee Estate is much closer than they relationship between the parishioners in *St. Johns*, the landlord and tenant in *Agolf* and the Attorney General and members of the Nation of Islam in *Burris*. And like those cases, their legal interests are identical and were extensively briefed and argued by competent counsel in the prior actions. That is more than enough for privity to exist. To the extent the Court is not convinced that the relationship between the Rudinplay Affiliates and the Lee Estate (who, recall, asserted the common interest privilege when it came to communications with the Rudinplay Affiliates) and their mutuality of interests warrant a finding of privity, Dramatic is entitled to full discovery in this regard.

### c) The Rudinplay Affiliates have controlled the Lee Estate from the Outset.

It was not lost on the Arbitrator that prior to the Arbitration the Lee Estate and its agents were doing the Rudinplay Affiliates' bidding to hinder Dramatic's licensing rights. (*See, e.g.*, Doc. 30-2, Appendix, p. 75.) As noted above, from what little Dramatic knows, it is clear the Lee Estate

supplied the Rudinplay Affiliates with salient materials in the arbitration (SOAF, ¶¶65-73) The Lee Estate refused to produce other communications based on a common interest agreement with the Rudinplay Affiliates (nor did it produce a privilege log in this regard), so there is no telling how extensive the control or influence that latter had over the arbitration or the district court litigation. Given the level of control the Rudinplay Affiliates and their counsel had over the Lee Estate and its legal team prior to the Arbitration, it is highly likely their control continued after the Arbitration was filed. Dramatic is entitled to discover the extent the Rudinplay Affiliates influenced the Lee Estate's conduct in the arbitration and district court action.

### 2. The Court should not ignore the Illinois decision.

The Rudinplay Affiliates argue that res judicata cannot apply because the Illinois district court's judgment is not final since it is subject to a notice of appeal. As Dramatic explained in its Reply, Illinois law is not a model of clarity in this area. The confusion arises from two conflicting Illinois Supreme Court decisions. In *State Life Insurance Co. v. Board of Education*, 81 N.E.2d 877, 880 (Ill. 1948), the court held that the decision of the court of first instance retains its preclusive effect, regardless of whether or not the losing party appeals the decision. Decades later, the court held that, for the purposes of collateral estoppel, "finality required that the potential for appellate review must have been exhausted." *Ballweg v. City of Springfield*, 499 N.E.2d 1373, 1375 (Ill. 1986).[12] *Ballweg*, however, did not mention, let alone, overrule *State Life*. While *Ballweg* (and two cases cited by the Rudinplay Affiliates, *State Bldg. Venture v. O'Donnell* and *People v. Harris*) are limited to collateral estoppel, some Illinois appellate courts have, without any analysis, extended *Ballweg* to claim preclusion.[13] Other Illinois appellate courts and federal district courts, however, continue to follow

---

[12] This case, of course, includes both res judicata (claim preclusion) and collateral estoppel (issue preclusion).

[13] *See, e.g.*, *Luckett v. Human Rights Comm'n*, 569 N.E.2d 6, 10-11 (Ill. App. Ct. 1989); *Pelon v. Wall*, 634 N.E.2d 385, 388 (Ill. App. Ct. 1994).

the rule in *State Life*,[14] which, as a result, has created an "intra-court conflict." *See Rogers v. Desiderio*, 58 F.3d 299, 302 (7th Cir. 1995).

This confused state of affairs has led the Seventh Circuit and several district courts to conclude they have "no idea what the law of Illinois is on the question of whether a pending appeal destroys the claim preclusive effect of a judgment." *Id.; Wilson v. City of Chicago*, 900 F.Supp. 1015, 1026 (N.D. Ill. 1995) (stating "since *Ballweg* was decided, the state's intermediate appellate courts have been all over the board, some following *State Life Insurance Co.*, and others following *Ballweg*," and agreeing with the Seventh Circuit that the law in Illinois is unsettled.); *see also Mandelstein v. Rukin*, Case No. 17-cv-9216,  2018 WL 4384383, *4-5 (N.D. Ill. Sept. 14, 2018); *Clark & Leland Condominium, L.L.C v. Northside Comm. Bank,* 14-cv-3928, 2016 WL 302102, * 3 (N.D. Ill Jan. 25, 2016); *Dwyer v. Evoy*, 12 F.Supp.2d 832, 834-35 (N.D. Ill. 1998).

Because the Illinois Supreme Court has never explicitly or implicitly overruled its decision in *State Life*, the decision in that case remains good law for purposes determining finality in cases involving res judicata. *Rogers*, 58 F.3d at 301-02 (treating *State Life* as current law) At the least, the Court should stay this case pending disposition of the Lee Estate's appeal in the Illinois action consistent with the express admonition of the Seventh Circuit, and several federal district and Illinois appellate courts. *Rogers*, 58 F.3d at 302; *Dwyer*, 12 F.Supp.2d at 835; *Wilson*, 900 F. Supp. at 1026 & 1029; *Shaw v. Citizens State Bank of Shipman*, 540 N.E.2d 1132, 1134 (Ill. Ct. App. 1989).[15]

---

[14] *See e.g.,  People v. Baldwin*, 175 N.E.3d 1090, 1098-99 (Ill. Ct. App. 2020); *Illinois Founders Ins. Co. v. Guidish*, 618 N.E.2d 436, 440 (Ill. Ct. App. 1993); *Shaw v. Citizens State Bank of Shipman*, 540 N.E.2d 1132, 1134 (Ill. Ct. App. 1989);  *Lawrence v. Board of Election Com'rs of City of Chicago*, 524 F.Supp.2d 1011, 1019 (N.D. Ill. 2007); *Hicks v. Midwest Transit, Inc.*, 02-cv-4028, 2006 WL 8455841, *6 (S.D. Ill. May 8, 2006).

[15] The Lee Estate's appellate brief is due March 29, 2023. (SOAF, ¶80; Tottis Decl.  Ex. 46.) Under the Seventh Circuit's rules, Dramatic's response brief is due April 28, 2023 and the Lee Estate's reply brief is due May 9, 2023.

**D.  Dramatic's exclusivity survives termination.**

As Dramatic discussed extensively in its motion to dismiss submissions (which it incorporates by reference), Section 304 of the Copyright Act provides an author the right to terminate a license or "grant" after a certain period of time. Generally speaking, it allows authors the opportunity to recapture certain rights they previously transferred. That right, however, is subject to an express exception which allows another group of authors—creators of derivative works—to continue to exploit their previously-prepared creations "under the terms of the original grant":

> A derivative work prepared under authority of the grant **before its termination** may continue to be *utilized under the terms of the grant after its termination*, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

17 U.S.C. § 304(c)(6)(A) (emphasis added). As the Supreme Court has explained, "[w]e believe the consequences of a termination that § 304 authorizes simply do not apply to derivative works that are protected by the Exception defined in § 304(c)(6)(A)." *Mills Music, Inc. v. Snyder*, 469 U.S. 153,164 (1985).

The 1969 Agreement between Ms. Lee and Dramatic contains a number of terms. One of the terms of that grant is the term in Paragraph 2(a) providing that the Sergel Play "…is to be the only one the [non-first-class] acting rights of which [Ms. Lee] will permit to be leased and /or licensed." (SOAF ¶1.) At no point do the Rudinplay Affiliates suggest that the foregoing term of the grant is not a term of the grant. Instead, they tell the Court that this particular term of the grant doesn't count and the Court should ignore it. They also tell the Court that it should ignore the plain language of the statute, but offer no legitimate basis for their instruction claiming, instead, that because the statute's exception employs the word "utilized" it renders impotent any enforcement power Dramatic may have under the grant.

Thus, under the Rudinplay Affiliates' interpretation of the term "utilized," Dramatic would be unable to "prevent" others from trampling on any of its rights, including the Lee Estate who,

"under the terms of the grant" is specifically prohibited from doing anything that "…would prevent or hinder [Dramatic] from the full exercise of all rights granted" in the 1969 Agreement.  (Doc. 30-4, ¶ 1(a).) Likewise, under the Rudinplay Affiliates' facile reading of "utilize," it is unclear just how Dramatic could seek indemnification under ¶ 1(b) for any violations by the Lee Estate of its ongoing obligations under the terms of the grant. Indeed, Dramatic's inability to affirmatively enforce its rights under the 1969 Agreement would mean it had no remedy when the Lee Estate and the Rudinplay Affiliates teamed up to falsely and maliciously interfere with Dramatic's rights to license non-first-class theaters both in and outside the United States.

This is why, should the Court accept the Rudinplay Affiliates invitation to stray from the plain, unambiguous language of the statute, Dramatic is entitled to conduct discovery testing the basis of the Rudinplay Affiliates' conceit, including allowing Dramatic the opportunity to depose a representative who can identify and explain every term of the grant they believe should be included and every term of the grant they believe should be excluded post-termination. At a minimum, as an initial matter, Dramatic should be permitted to serve contention interrogatories on the issue.

Of course, the Court can avoid all of this by taking the approach specifically endorsed by the Supreme Court in *Mills Music* and read the term "utilized" as written "…in the 'Exception' and not separate it 'from its context' or 'read [it] in isolation.'" 469 U.S. at 169. The Court could also consider the Supreme Court's express admonitions, ignored by the Rudinplay Affiliates, that the word "utilized" is "confined by 'the terms of the grant," *id.*, and that in applying the statute, a court may not pick and choose terms to enforce, recognizing that "[t]he statute itself, however, refers to '*the* terms of the grant'—not to *some* of the terms of the grant." *Id.* at 167, n.35 (emphasis in original). Taking the Supreme Court at its word, then, means that Dramatic's work "is to be the only one the [non-first-class] acting rights of which [Ms. Lee] will permit to be leased and /or licensed" when it is "utilized the terms of grant."

21

Dramatic acknowledges that the issue of exclusivity was not addressed in *Mills Music*. *Mills Music* also didn't discuss theater. That doesn't mean that the basic principles of statutory construction applied by the Supreme Court or its exhaustive analysis of the Congressional intent behind and meaning of the specific statutory exception here can be ignored. This is especially true given that the Rudinplay Affiliates have failed to point to any authority refusing to apply the exception to a grant of exclusive rights.[16] Moreover, as Dramatic previously discussed at length, Subsection (c) of Section 304 starts out stating that it applies to "exclusive or nonexclusive grant[s]" repeatedly references the term "grant" and never once qualifies the term grant to apply only to nonexclusive grants. The fact that in this particular case the Rudinplay Affiliates may not like the result is of no moment because, as the Supreme Court said:

> The ***Exception*** in § 304(c)(6)(A) was designed, however, to exclude a specific category of grants—***even if they were manifestly unfair to the author***—from that broad objective. The purpose of the ***Exception*** was to "***preserve the right of the owner of a derivative work to exploit it, notwithstanding the reversion.***" Therefore, even if a person acquired the right to exploit ***an already prepared derivative work by means of an unfavorable bargain with an author***, that right was to be excluded from the bundle of rights that would revert to the author when he exercised his termination right.

*Mills Music*, 469 U.S. at 173. (emphasis added).

The Rudinplay Affiliates have given this Court no basis to unread the express terms of the statute. As in any case of statutory construction, the Court's analysis begins with "the language of the statute.… And where the statutory language provides a clear answer, it ends there as well." *Hughes Aircraft Co. v. Jacobson*, 525 U.S. 432, 437 (1999). Their motion should be denied.[17]

---

[16] For multiple reasons set forth in Dramatic's initial motion to dismiss memorandum, the Rudinplay Affiliates selective misquoting of something from the Copyright Office website would not properly constitute proper authority even if it weren't misquoted. (Doc. 20, pp. 22-23.)

[17] The Rudinplay Affiliates misread *Mills Music* when they suggest application of exclusivity turns on the issue of ownership. Under the particular facts of the case, the initial grant included an assignment or rights. The derivative works at issue reflected the second leg of the transaction when hundreds of derivative works were created. The Second Circuit found that when the original assignment reverted back to the author's heirs it

## CONCLUSION

For the reasons set forth above this Court should deny the Rudinplay Affiliates' Motion for Summary Judgment. Alternatively, this Court should stay the motion to permit Dramatic sufficient time to conduct appropriate discovery.

Dated: February 21, 2023

Respectfully submitted,

TottisLaw

By:     /s/ Kevin Tottis

Kevin Tottis
Keith Stolte
Max A. Stein
401 N. Michigan Avenue
Suite 530
Chicago, IL 60611
Tel: (312) 527-1400
ktottis@tottislaw.com
kstolte@tottislaw.com
mstein@tottislaw.com

McLaughlin & Stern, LLP

Steven J. Hyman
David Blasband
Oliver R. Chernin
260 Madison Avenue
New York, New York  10016
Tel: (212) 447-1100
shyman@mclaughlinstern.com
dblasband@mclaughlinstern.com
ochernin@mclaughlinstern.com

*Attorneys for The Dramatic Publishing Company*

---

also transferred the right to them to collect the royalties from the second leg, *i.e.*, the derivative works part of the transaction. The Supreme Court reversed. The quoted language reflects the Supreme Court's description of the Second Circuit's analysis and the misguided view that the reversion of the first leg meant the right to collect royalties from the derivative works went with it. 469 U.S. at 163. In any case, since the transfer arose under the 1909 Copyright Act, their entire false premise crumbles since an exclusive grant of part of a copyright's rights operated "…merely as a license, not an assignment of ownership of a copyright." *First Financial Marketing Services Group, Inc. v. Field Promotions, Inc.*, 286 F.Supp. 295, 298 (1968) *citations omitted. See also Davis v. Blige*, 505 F.3d 90, 100, n.10 (2007) ("individual rights comprising the bundle of copyright property rights could not be separately assigned, and exclusive licenses granted more limited rights… .")