```
-------------------------------------X
                                     :
ATTICUS LIMITED LIABILITY COMPANY,   :      22cv10147 (DLC)
                                     :
                    Plaintiff,       :      OPINION AND ORDER
        and                          :
                                     :
AARON SORKIN,                        :
                                     :
            Involuntary Plaintiff,   :
                                     :
               -v-                   :
                                     :
THE DRAMATIC PUBLISHING COMPANY,     :
                                     :
                    Defendant.       :
                                     :
-------------------------------------X
```

APPEARANCES:

For plaintiff Atticus Limited Liability Company:
Frank David D'Angelo
Wook J Hwang
Jonathan Zavin
Loeb & Loeb LLP
345 Park Avenue
New York, NY 10154

Keane A. Barger
Loeb & Loeb, LLP
35 Music Square East
Suite 310
Nashville, TN 37203

For involuntary plaintiff Aaron Sorkin:
Maura Wogan
Nicole Bergstrom
Frankfurt Kurnit Klein & Selz, P.C.
28 Liberty Street
New York, NY 10005

For defendant The Dramatic Publishing Company:
Kevin Tottis
Keith Stolte
Max A. Stein
TottisLaw

401 N. Michigan Avenue
Suite 530
Chicago, IL 60611

Steven J. Hyman
David Blasband
Oliver R. Chernin
Paul Howard Levinson
McLaughlin & Stern, LLP
260 Madison Avenue
New York, New York 10016

DENISE COTE, District Judge:

In 1960, Harper Lee published the American masterpiece <u>To Kill a Mockingbird</u> (the "Novel").  This lawsuit raises the question of whether the defendant has exclusive rights to perform amateur productions of a play derived from that masterpiece.  The plaintiff, Atticus Limited Liability Company ("Atticus"), which owns the production rights to the play authored by Aaron Sorkin that arrived on Broadway in 2018 to critical acclaim (the "Sorkin Play"), contends that the defendant has only non-exclusive rights.  The defendant -- The Dramatic Publishing Company ("Dramatic") -- disagrees.  Dramatic contends that it has exclusive rights to perform in amateur productions a play derived from the Novel.  Dramatic's play, written by Dramatic's former-President Christopher Sergel (the "Sergel Play"), has been performed pursuant to a license from Lee for nearly 50 years.

For the reasons explained below, this Opinion finds as a matter of law that Dramatic's rights are no longer exclusive.[1] It remains to be determined, however, whether the plaintiff's right to assert as much is limited by an award entered on January 28, 2022, in the arbitration between the Estate of Harper Lee and Dramatic.  Dramatic prevailed in that arbitration and contends that the plaintiff is bound through the doctrine of claim preclusion to abide by that decision.

## Background

The following facts are taken from the evidence submitted in connection with the motion for summary judgment brought by Atticus and a motion to dismiss filed by Dramatic.  The facts are undisputed or are taken in the light most favorable to Dramatic, unless otherwise indicated.

I.   Factual Background

A.   Lee's 1969 Agreement with Dramatic

In 1969, Lee entered into an agreement with Dramatic, granting Dramatic "the complete right throughout the world" to create a dramaztization of the Novel which "is to be the only one the amateur acting rights of which [Lee] will permit to be leased and/or licensed" (the "1969 Agreement").  The phrase

---

[1] This Opinion will not address stock rights, a topic of some importance to the arbitrator's analysis.  Whatever rights Dramatic obtained, they are no longer exclusive.

"amateur acting rights" was defined under the contract to include:

> [A]ll performance rights for little theatres, community theatres and/or drama associations, colleges, universities, high school and other school groups, churches, clubs and other amateur organizations or groups therein or connected therewith, together with all stock, repertoire, lyceum and Chautauqua performances whether any or all of the abovementioned performances are given by paid and/or unpaid actors, but shall not include Broadway production rights nor first-class professional road and/or first class touring production rights.

Lee "reserve[d] all rights not expressly granted to [Dramatic], including but not limited to the professional acting . . . rights."

Lee agreed to "do nothing, either by omission or commission, to prevent or hinder [Dramatic] from the full exercise of all rights granted and/or purported to be granted herein."  For its part, Dramatic agreed that during the run of any "first class" production in New York or a related touring engagement, Dramatic "shall not permit amateur performances [of the Sergel Play], as provided herein, within a distance of twenty-five (25) miles of the city limits of any city which had a 1960 U.S. census population in excess of 150,000."

The 1969 Agreement also contained an arbitration clause. It stated that: "[a]ny controversy arising out of this agreement is to be arbitrated in Chicago by and under the rules of the

4

American Arbitration Association."  Pursuant to the 1969
Agreement, Dramatic's then-President, Christopher Sergel, wrote
a stage adaptation of the Novel, the Sergel Play.

B.    2011 Termination Letter

In April 2011, Dramatic was notified that Lee was
terminating the 1969 Agreement (the "2011 Termination Letter").
The 2011 Termination Letter states, in relevant part,

> Pursuant to Section 304(c) of the Copyright Act of
> 1976 (as amended) (17 U.S.C. § 304(c)) and the
> regulations issued thereunder by the Register of
> Copyrights, 37 CFR § 201.10, Nelle Harper Lee hereby
> terminates the grant of transfer of copyright(s) made
> in that certain Agreement dated June 26, 1969 between
> Nelle Harper Lee on the one hand and The Dramatic
> Publishing Company on the other hand . . . . The
> effective date of termination shall be April 26, 2016.

C.    Atticus and Sorkin's Acquisition of Rights in the
      Novel

On June 29, 2015, Lee entered into an agreement with
Rudinplay, Inc.[2] (the "2015 Agreement").  The 2015 Agreement
designated Rudinplay as Lee's exclusive agent to select a
playwright for a new dramatic adaption of the Novel.  Upon the
written approval by Lee of the selected playwright, Lee granted
Rupinplay:

> [T]he sole and exclusive option (the "Option") to
> acquire, on an exclusive (subject to Paragraph 2(b)
> below), worldwide basis, all live stage rights in and

---

[2] Rudinplay (n/k/a No Ice, Inc.) and Atticus are entities owned,
controlled, or operated by Scott Rudin ("Rudin").

to the Novel and all subsidiary and ancillary rights related to such live stage rights.

That option would "be deemed exercised" upon the "initial commercial first class production" of the play on Broadway or London's West End.  Section 2(b) states:

> [Rudinplay] acknowledges that, notwithstanding [the 2011] termination, the amateur acting rights to the [Sergel Play] can continue to be exploited following such termination under the terms of the [1969] Agreement on a non-exclusive basis in the United States, and on an exclusive basis elsewhere.  The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination.

(emphasis added).

Rudinplay subsequently contracted with Aaron Sorkin to serve as the playwright for the new stage adaptation of the Novel, and Rudinplay assigned to Atticus its production rights to the Sorkin Play.  Sorkin is a well known and successful theater, film, and television writer.  Lee died on February 19, 2016.  The Sorkin Play debuted on Broadway on December 13, 2018.

D.    The Arbitration Proceedings Between Dramatic and the Lee Estate

On March 7, 2019, Dramatic filed an arbitration demand against the Estate of Harper Lee, and later added Harper Lee, LLC as a party (collectively, the "Lee Estate").  In the arbitration proceeding, Dramatic asserted that the Lee Estate had breached the 1969 Agreement by hindering the full exercise

of Dramatic's rights and had tortiously interfered with its related licensing contracts.  Specifically, Dramatic alleged that Rudin and the Lee Estate had interfered with Dramatic's license to Jonathan Church Productions ("Church") for a non-first-class tour of the Sergel Play in the United Kingdom and Ireland.  Dramatic alleged that "Dramatic and Church received a letter from lawyers representing Mr. Rudin and endorsed by the Lee Estate, threatening lawsuits if any presentations of the Sergel version were made[,]" and Church cancelled the tour "as a result of those threats of litigation."  On another occasion, Dramatic had sought permission from the Lee Estate for nine amateur theaters to produce the Sergel Play within 25 miles of certain major cities while the Sorkin Play ran on Broadway.  The Lee Estate initially authorized eight of the nine productions, but revoked that permission months later "as many or most of the Licensed Productions were preparing to open."  Dramatic alleged that "[o]ver the next month, in concert with Mr. Rudin, the Lee Estate proceeded to threaten a number of the productions," and those theaters "shut down their productions because of fears of reprisal."

In its arbitration demand, Dramatic alleged "multiple breaches" of the 1969 Agreement, sought a declaration regarding the scope of "Dramatic's exclusive rights to the Sergel Version

of the play," and requested an injuction against the Lee Estate
"from purporting to own, be authorized to exploit or to exploit
[the amateur] worldwide rights in any stage version of the novel
To Kill a Mockingbird."

The Lee Estate claimed that it had "no advanced approval"
of Atticus' letters regarding the Church tour, and that it "did
not sign those letters and never made any demand on anyone that
the planned tour be cancelled."  The Lee Estate maintained,
however, that "licenses for productions [of the Sergel Play]
involving professional actors are not permitted under the [1969
Agreement]."

The Lee Estate asserted that it had revoked "any purported
waiver" of the 25-mile restriction upon discovering that
"several" of the theaters were "professional theaters."  The Lee
Estate further asserted that Atticus, not the Lee Estate, "sent
letters to the theaters that had been issued licenses by
Dramatic that were not consistent with the geographic
limitiation," and that the Lee Estate "never asked any of these
theaters to cancel their scheduled perfomrances."  Accordingly,
the Lee Estate filed counterclaims against Dramatic, in which it
asserted (1) a claim for breach of contract of "the express
surviving terms of the [1969 Agreement]," (2) a claim of
copyright infringement of the "exclusive live stage rights in

8

and to the Novel," and (3) a claim of copyright infringement of
the Novel.

The arbitrator entered an interim award on October 21,
2021, and a final award on January 28, 2022 (collectively, the
"Arbitration Award").  The Arbitration Award rejected the Lee
Estate's counterclaims and largely found it liable on Dramatic's
claims.

The arbitrator first interpreted the scope of Dramatic's
rights under the 1969 Agreement.  The Arbitration Award
concluded that the 1969 grant to Dramatic consisted of all "non-
first-class rights," including not just amateur productions but
also rights to productions in regional and community theaters
where paid professionals would perform the Sergel Play.

The arbitrator next analyzed the legal effect of Lee's 2011
Termination Letter.  The arbitrator analyzed §§ 304(c) and
304(c)(6)(A) of the Copyright Act and concluded that Dramatic's
non-first-class rights survived the 2011 Termination Letter and
remained exclusive.  The arbitrator thus determined that
"Dramatic continues to have the right to exclude the Estate from
granting any third party the 'amateur acting rights' for an
adaptation of [To Kill a Mockingbird]."  These findings resolved
the parties' respective breach of contract claims, and Atticus'
copyright infringement claims, in favor of Dramatic.  Lastly,

Case 1:22-cv-10147-DLC   Document 65   Filed 04/27/23   Page 10 of 34

the Arbitration Award found that the Lee Estate had "tortiously interfered with contracts between Dramatic and several of its licensees" because the Lee Estate had worked "in concert with" Rudin "to help him engage in a campaign against Dramatic's licensees."

On November 11, 2021, Dramatic moved to confirm the interim award in the United States District Court for the Northern District of Illinois. The Civil Cover Sheet identified the basis for jurisdiction as "federal question" jurisdiction. The motion to confirm the Arbitration Award asserted that there was federal question jurisdiction in federal court "because the underlying arbitration involved claims under the Copyright Act, 17 U.S.C. § 101, et seq."[3]

On January 14, 2022, the Lee Estate cross-moved to vacate the award. On January 13, 2023, the Northern District of Illinois entered a Final Judgment Order (the "Illinois Judgment") confirming the Arbitration Award. The Lee Estate has appealed the Illinois Judgment. That appeal remains pending. Neither Atticus nor Sorkin were parties to the arbitration or confirmation proceedings in the Northern District of Illinois.

---

[3] The motion added that there was "also" subject matter jurisdiction on the ground of diversity.

10

II.  Procedural History of the Instant Action

Atticus filed this federal lawsuit on November 30, 2022, seeking a declaration that (1) "Atticus and Sorkin have the right, in relation to [Dramatic], to present any and all Second-Class, Stock, Amateur and Ancillary Performances [] of the Sorkin Play in the United States;" and (2) "any such productions of the Sorkin Play have not infringed and could not infringe any purported copyright interest [Dramatic] claims to hold to the Novel."[4]  In the complaint, Atticus named Sorkin as an involuntary party/nominal defendant by virtue of Sorkin's copyright ownership of the Sorkin Play.  By an Order dated January 2, 2023, Sorkin was realigned as an involuntary plaintiff.

Dramatic moved to dismiss the complaint on January 23, 2023.  On February 6, Atticus cross-moved for summary judgment. The motions became fully submitted on March 3.  Discovery has not yet begun.

---

[4] The parties do not dispute that Atticus has the exclusive right to produce the Sorkin Play on Broadway and in other first-class venues.  This dispute centers only on non-first-class rights, which this Opinion refers to as rights for amateur productions. Thus, in this Opinion, the reference to amateur productions includes stock rights.

## Discussion

Although Dramatic has moved to dismiss Atticus' claim
pursuant to Rule 12(b)(6), Fed. R. Civ. P., a court may convert
a motion to dismiss into a motion for summary judgment under
Rule 56, Fed. R. Civ. P., when "matters outside the pleading are
presented to and not excluded by the court."  Fed. R. Civ. P.
12(d).  A district court may not so convert a motion under Rule
12(d), however, unless "[a]ll parties [were] given a reasonable
opportunity to present all the material that is pertinent to the
motion."  Fed. R. Civ. P. 12(d).  "[T]he conversion of a Rule
12(b)(6) motion into one for summary judgment is governed by
principles of substance rather than form."  Palin v. N.Y. Times
Co., 940 F.3d 804, 811 (2d Cir. 2019).  "[T]he essential inquiry
is whether the [nonmovant] should reasonably have recognized the
possibility that the motion might be converted into one for
summary judgment."  Id. at 811-12.

In support of its motion to dismiss, Dramatic presented the
declaration of Kevin Tottis, counsel for defendant, which
included seven exhibits of evidentiary material.  In opposition
to Dramatic's motion, plaintiff cross-moved for summary
judgment, offering its own evidentiary material and a Rule 56.1
statement.  Dramatic submitted additional evidence with its
opposition to Atticus' summary judgment motion and filed a Rule

56.1 counter-statement.  Accordingly, all parties have had a
reasonable opportunity to present supporting material.  In these
circumstances, it is appropriate to convert Dramatic's motion to
dismiss to a motion for summary judgment.

Summary judgment may be granted only when "the movant shows
that there is no genuine dispute as to any material fact and the
movant is entitled to judgment as a matter of law."  Fed. R.
Civ. P. 56(a).  "To present a genuine issue of material fact
sufficient to defeat a motion for summary judgment, the record
must contain contradictory evidence such that a reasonable jury
could return a verdict for the nonmoving party."  Horror Inc. v.
Miller, 15 F.4th 232, 241 (2d Cir. 2021) (citation omitted).
Material facts are those facts that "might affect the outcome of
the suit under the governing law."  Choi v. Tower Rsch. Cap.
LLC, 2 F.4th 10, 16 (2d Cir. 2021) (citation omitted).  In
considering a motion for summary judgment, a court "construe[s]
the facts in the light most favorable to the non-moving party
and must resolve all ambiguities and draw all reasonable
inferences against the movant."  Kee v. City of New York, 12
F.4th 150, 158 (2d Cir. 2021) (citation omitted).

The Second Circuit has cautioned that "[o]nly in the rarest
of cases may summary judgment be granted against a party who has
not been afforded the opportunity to conduct discovery" because

13

"the nonmoving party must have had the opportunity to discover information that is essential to his opposition to the motion for summary judgment."  Ass'n of Car Wash Owners Inc. v. City of New York, 911 F.3d 74, 83 (2d Cir. 2018) (citation omitted). Still,

> A party resisting summary judgment on the ground that it needs discovery in order to defeat the motion must submit an affidavit [or declaration] showing (1) what facts are sought to resist the motion and how they are to be obtained, (2) how those facts are reasonably expected to create a genuine issue of material fact, (3) what effort affiant has made to obtain them, and (4) why the affiant was unsuccessful in those efforts.

Miller v. Wolpoff & Abramson, L.L.P., 321 F.3d 292, 303 (2d Cir. 2003) (citation omitted); see also Ass'n of Car Wash Owners, 911 F.3d at 83–84; Fed. R. Civ. P. 56(d) (formerly Fed. R. Civ. P. 56(f) (2009)).

I.   Section 304(c) of the Copyright Act

The core of this dispute turns on a straightforward question of statutory interpretation: whether, under 17 U.S.C. § 304(c), Dramatic retains exclusive rights to produce amateur performances of the Novel.  Dramatic in its motion to dismiss and Atticus in its motion for summary judgment each acknowledge that this is a legal issue that can and should be decided on the basis of their respective motions, and that no discovery is needed to resolve it.

Section 304(c) of the Copyright Act confers upon authors and their statutory successors the right to terminate "the <u>exclusive or nonexclusive grant</u> of a transfer or license of the renewal copyright or any right under it, executed before January 1, 1978[.]" 17 U.S.C. § 304(c) (emphasis added). That termination right is subject to certain "limitations." 17 U.S.C. § 304(c)(6). Among those limitations is the "derivative works exception," which provides:

> A derivative work prepared under authority of the grant before its termination <u>may continue to be utilized under the terms of the grant after its termination</u>, but this privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.

<u>Id.</u> § 304(c)(6)(A) (emphasis added) (the "Derivative Works Exception"). The question here is whether an exclusive license to perform a derivative work remains exclusive following a valid termination of a license. This Opinion readily concludes that it does not.

"Statutory interpretation always begins with the plain language of the statute." <u>Grajales v. Comm'r of Internal Revenue</u>, 47 F.4th 58, 62 (2d Cir. 2022) (citation omitted). Plain meaning "draws on the specific context in which that language is used." <u>Williams v. MTA Bus Co.</u>, 44 F.4th 115, 127 (2d Cir. 2022) (citation omitted). When the statute's language

is plain, "the sole function of the courts -- at least where the disposition required by the text is not absurd -- is to enforce it according to its terms."  In re Fogarty, 39 F.4th 62, 73 (2d Cir. 2022) (citation omitted).

The statutory language at issue here is unambiguous. Section 304(c) provides that the "exclusive" grant of copyright "is subject to termination."  As the U.S. Supreme Court noted in Mills Music, Inc. v. Snyder,

> [T]he termination right was expressly intended to relieve authors of the consequences of ill-advised and unremunerative grants that had been made before the author had a fair opportunity to appreciate the true value of his work product.  That general purpose is plainly defined in the legislative history and, indeed, is fairly inferable from the text of § 304 itself.

469 U.S. 153, 172 (1985).  As the Nimmer treatise on copyright law explains, "[i]n general, the termination provisions apply to any 'transfer' of copyright," which includes "exclusive licenses and any other conveyance of copyright or of any exclusive right comprised in a copyright."  Melville B. Nimmer & David Nimmer, 3 Nimmer on Copyright § 11.02[A] (2022).

Thus, nothing in the Derivative Works Exception prevents an author from exercising its termination right.  Rather, the Derivative Works Exception permits a grantee to continue to "utilize" derivative works created during the term of the license without the threat of litigation from the author of the

original work or the author's heirs following such a
termination.  "Without such an exception, authors might use
their reversion rights to extract prohibitive fees from owners
of successful derivative works or to bring infringement actions
against them."  Woods v. Bourne Co., 60 F.3d 978, 986 (2d Cir.
1995).

    The Nimmer treatise furnishes an illustrative example:

> Suppose that publication rights previously granted to
> a book publisher are terminated. . . . [S]uppose the
> publisher, prior to publication, made a number of
> editorial changes in the manuscript and claims to have
> thereby published a "derivative work" for further
> "utilization" purposes.  In most cases, such editorial
> revisions probably would be regarded as too minimal to
> warrant characterizing the result as a derivative
> work.  But if such characterization were found to be
> appropriate, would the publisher merely have the right
> to continue to sell those copies of the book printed
> prior to termination, or would it have the further
> right to print new copies of the book?  As with new
> prints of old movies, new copies probably may be
> printed because this would not constitute "the
> preparation after the termination of other derivative
> works," but only of other copies of the same
> derivative work.

3 Nimmer on Copyright § 11.02[C][1] (2022).  In line with this
example, the publisher of the derivative work retains, at most,
the right to print new copies of that work, but does not retain
the right to prevent the author from licensing others to create
new derivative works.

    This same reasoning applies with equal force if the
underlying work enters the public domain.  The playright who

17

created the derivative work continues to have rights in her creation, but cannot bar others from creating derivative works from an original work that has entered the public domain. Again, as the Nimmer treatise explains,

> [T]he effect [on the derivative work from the underlying work entering the public domain] is adverse.  Thus, suppose an author of a novel grants to a playwright the exclusive dramatic rights in the novel, and the playwright accordingly writes and copyrights a play based upon the novel.  While the novel remains in copyright, no one may write a second play based either upon the first play or upon the novel.  However, once the novel enters the public domain, then although the first play remains protected by copyright, anyone may write a new play based upon the same novel, as long as they do not copy the original material that appeared in the first play, but not in the novel.

3 Nimmer on Copyright § 3.07 (2022)(emphasis added).

Dramatic argues that because § 304(c)(6)(A) allows a derivative work to "continue to be utilized under the terms of the grant after its termination" (emphasis added), an exclusive license remains exclusive even following its termination.  This interpretation fails.  Such a reading would thwart the plain language of the Copyright Act, rendering any exclusive license interminable.  The Derivative Works Exception does not, and cannot, eviscerate the statutory termination right of § 304(c).

Dramatic's argument relies primarily on Mills Music, 469 U.S. 153 (1985).  Mills Music addressed the question of "whether an author's termination of a publisher's interest in a copyright

also terminates the publisher's contractual right to share in the royalties on such derivative works." Id. at 156.  The Court held that the "contractual obligation to pay royalties survives the termination." Id. at 169.  Music Mills did not address the question of whether an exclusive license remains exclusive following a valid termination, and, accordingly, does not help Dramatic.

II.  Claim Preclusion

Dramatic contends that, even if it does not retain exclusive rights over amateur productions of plays derived from the Novel, Atticus is nonetheless bound by the arbitrator's decision to the contrary under the doctrine of claim preclusion. Dramatic asserts that Atticus, although not a party to the arbitration, is bound because it was in privity with the Lee Estate during the arbitration.

It is necessary, as a first step, to select the jurisdiction whose law will provide the claim preclusion principles that will be applied to this dispute.  The instant action is brought for a declaration of rights under U.S. copyright law, and is therefore premised on federal question jurisdiction.

In federal question cases, a court looks to federal choice of law principles.  Wells Fargo Asia Ltd. v. Citibank, N.A., 936

F.2d 723, 726 (2d Cir. 1991).  The preclusive effect of a federal court judgment depends on the basis for jurisdiction in the action.  For federal judgments in federal question cases, courts apply "uniform federal rules of res judicata."  Taylor v. Sturgell, 553 U.S. 880, 891 (2008) (citation omitted).  For federal judgments in diversity cases, "federal law incorporates the rules of preclusion applied by the State in which the rendering court sits."  Id. at 891 n.4.

The Illinois Judgment does not state the basis of its jurisdiction.  To confirm or vacate arbitral awards under the Federal Arbitration Act's §§ 9 and 10, however, a federal court must have an independent jurisdictional basis -- as determined from the "face of the application" submitted to the court. Badgerow v. Walters, 142 S. Ct. 1310, 1316 (2022).

Dramatic's Civil Cover Sheet, which it completed when it filed its action in the Northern District of Illinois to confirm the Arbitration Award, identified the basis for jurisdiction as federal question jurisdiction.  Dramatic's motion to confirm the Arbitration Award asserted that there was federal question jurisdiction "because the underlying arbitration involved claims under the Copyright Act, 17 U.S.C. § 101, et seq."  Accordingly, this Court concludes that the Illinois Judgment was premised on federal question jurisdiction, and it is appropriate to apply

federal common law in assessing the preclusive effect of the
Illinois Judgment.

"The term res judicata . . . encompasses two significantly
different doctrines: claim preclusion and issue preclusion."
Marcel Fashions Grp., Inc. v. Lucky Brand Dungarees, Inc., 779
F.3d 102, 107 (2d Cir. 2015).  Dramatic asserts only claim
preclusion.  Under the doctrine of claim preclusion, "a final
judgment on the merits of an action precludes the parties or
their privies from relitigating issues that were or could have
been raised in that action."  In re Motors Liquidation Co., 943
F.3d 125, 130 (2d Cir. 2019) (citation omitted).  Under federal
law, "a judgment's preclusive effect is generally immediate,
notwithstanding any appeal."  Coleman v. Tollefson, 575 U.S.
532, 539 (2015).  To establish claim preclusion, a party must
show that:

> (1) the previous action involved an adjudication on
> the merits; (2) the previous action involved the
> plaintiffs or those in privity with them; [and] (3)
> the claims asserted in the subsequent action were, or
> could have been, raised in the prior action.

Soules v. Connecticut, Dep't of Emergency Servs. & Pub. Prot.,
882 F.3d 52, 55 (2d Cir. 2018).

It is undisputed that, under federal common law, the
arbitration involved a final adjudication on the merits.[5]  It

---

[5] The parties do not dispute that the judgment is final for
purposes of applying the federal law of claim preclusion.  The

addressed and resolved the issues of (1) what theatrical rights Dramatic owned under its 1969 Agreement with Lee, and (2) what legal effect Lee's 2011 Termination Letter had on those rights. It is also undisputed that the claim in this action -- whether Dramatic retains the exclusive right to produce amateur theatrical performances of the Novel in the U.S. -- was asserted in the prior action.  Accordingly, the issue in dispute is whether Atticus was in 'privity' with the Lee Estate such that Atticus is bound by the Illinois Judgment.

The "rule against nonparty preclusion" recognizes that "[a] person who was not a party to a suit generally has not had a full and fair opportunity to litigate the claims and issues settled in that suit." Taylor, 553 U.S. at 892 (citation omitted).  Therefore, a person cannot typically be bound by a judgment "in a litigation in which he is not designated as a party or to which he has not been made a party by service of process." Id. at 893 (citation omitted).

The Supreme Court has, however, enumerated six exceptions to the rule against nonparty preclusion.  Id.  "When any of these circumstances is present, the parties are said to be in

parties contend that if Illinois law were to be applied, however, then the judgment may not be final until the Seventh Circuit decides the pending appeal from the decision by the District Court for the Northern District of Illinois confirming the Arbitration Award.

22

privity" for purposes of claim preclusion.  Sacerdote v. Cammack
Larhette Advisors, LLC, 939 F.3d 498, 506 (2d Cir. 2019).

Dramatic asserts that any of four of the six Taylor
exceptions should apply: (1) Atticus agreed to be bound; (2)
Atticus was in a qualified pre-existing substantive legal
relationship with the Lee Estate; (3) the interests of Atticus
were adequately represented by a party with the same interests;
or (4) Atticus assumed control over the litigation.[6]  553 U.S. at
893-95.  Each exclusion will be discussed in turn.

A.   Agreement to be Bound

Dramatic argues that the 2015 Agreement between Rudinplay
and Lee, which recognized the existence of the 1969 Agreement,
incorporated the arbitration provision from the 1969 Agreement,
and thereby contractually binds Atticus to the terms of the
Arbitration Award.  This argument fails.

In general, any agreement to be bound by an arbitration
should be explicit.  "A person who agrees to be bound by the
determination of issues in an action between others is bound in
accordance with the terms of his agreement."  Taylor, 553 U.S.
at 893 (quoting Restatement (Second)of Judgments § 40 (1980)

---

[6] The other two Taylor exceptions are: (5) a nonparty is acting
as a proxy, agent, or designated representative of a party bound
by a judgment; and (6) a statutory scheme expressly forecloses
successive litigation by nonlitigants, so long as the scheme
comports with due process.  553 U.S. at 895.

("Restatement")).  As the Supreme Court noted in Taylor, this
exception applies where, for example, "separate actions
involving the same transaction are brought by different
plaintiffs against the same defendant, [and] all the parties to
all the actions [] agree that the question of the defendant's
liability will be definitely determined, one way or the other,
in a 'test case.'"  Id. (citation omitted).

Dramatic has not identified any express agreement by
Atticus or its affiliates to be bound by the arbitration between
Dramatic and the Lee Estate or the Arbitration Award.  Instead,
it argues that § 2(b) of the 2015 Agreement should be read as
expressing the intention to be bound by any arbitration
proceedings between Dramatic and the Lee Estate.[7]

Section 2(b) of the 2015 Agreement refers to Lee's
termination of the 1969 Agreement with Dramatic, but adds the
acknowledgment that "[t]he rights granted hereunder shall be
subject to the rights granted under the [1969] Agreement, as
limited by such termination."  Section 2(b) cannot be read as an
agreement by Rudinplay to become a party to the terminated 1969

---

[7] Dramatic argues as well, however, that the 2015 Agreement was
without force and effect since it preceded the effective date of
the termination of Dramatic's exclusive license.  Nonetheless,
for purposes of its claim preclusion argument Dramatic
recognizes the validity of the 2015 Agreement.

Agreement and thereby to be bound by the arbitration provision
in that agreement, or to otherwise adopt the arbitration
provision in that earlier agreement.[8]  Section 2(b) simply
acknowledges that Lee had previously given Dramatic a license to
create a derivative work, and that the license given to
Rudinplay to create another derivative work from the Novel would
not preclude Dramatic from performing the Sergel Play.  That is,
Rudinplay's rights were "subject to" the rights Lee had granted
to another in the 1969 Agreement.

Dramatic also argues that Atticus impliedly agreed to be
bound, by virtue of its actions, to respect the Arbitration
Award.  Dramatic argues that an agreement should be implied here
because

> [T]he Rudinplay Affiliates worked "in concert" with
> the Lee Estate and directly collaborated.  They don't
> deny they could have intervened in the arbitration.
> Had the Arbitrator ruled against Dramatic, can anyone
> seriously dispute that the Rudinplay Affiliates
> wouldn't have used the ruling to their own benefit?
> Finally, the Lee Estate claimed that the Rudinplay
> Affiliates were necessary parties to the Arbitration.

None of the actions to which Dramatic refers implies an
agreement by Rudinplay or its affiliates to be bound by the
arbitration provision in the 1969 Agreement.  As discussed

---

[8] Dramatic does not explain how Rudinplay could have joined the
1969 Agreement without its consent and a more formal
acknowledgment by all parties.  Nor does it explain how
Rudinplay could be bound by a provision in a terminated
contract.

further below, the situations in which Atticus allegedly worked
in concert with the Lee Estate do not include the arbitration
itself.  And, as Dramatic acknowledges, Atticus was not a party
to the arbitration.

        In making its argument, Dramatic refers as well to
comment (b) to § 40 of the Restatement.  That comment does not
support Dramatic's argument.  The comment provides that an
agreement to be bound may be implied in the following
circumstances:

> In ascertaining whether such an agreement is to be
> inferred, however, it is relevant to consider the
> closeness of the interests of the persons involved,
> whether they were represented by the same or
> collaborating counsel, whether opportunity existed for
> the person to participate as a party in the first
> action, whether the person asserted to have made the
> agreement could invoke benefits of the judgment in the
> other action should its outcome favor his position,
> and what representations were made to the court
> concerning the relation between the actions.

Restatement § 40 cmt. b.  The Restatement warns that no such
agreement "should be inferred except upon the plainest
circumstances."  Restatement § 40 cmt. b; Becherer v. Merrill
Lynch, Pierce, Fenner & Smith, Inc., 193 F.3d 415, 423 (6th Cir.
1999) (same).  The example cited in comment (b) is illustrative:

> A brings an action to restrain B, a common carrier,
> from putting a rate increase into effect.  C, who
> appeared with A in a prior administrative hearing
> challenging the rate, brings a similar action,
> employing the same attorney, and asserting
> substantially identical claims.  C requests deferral

> of his suit until the trial of A against B, stating
> that the two actions involve identical issues and that
> the deferral will prevent duplication of trial
> proceedings.  It may be inferred that C consented to
> be bound by the determinations made in the action
> between A and B.

<u>Id.</u>  No such plain circumstances are present here.

    B.    Pre-Existing Legal Relationship

Dramatic next argues that Atticus is in privity with the Lee Estate for purposes of claim preclusion because the 2015 Agreement created a successor in interest relationship between them.  This argument misconstrues the law of privity.[9]

It is true that certain legal relationships between two entities may create privity for purposes of claim preclusion, but not a license agreement executed before the inauguration of the arbitration.  Nonparty preclusion may be justified based on "a variety of pre-existing substantive legal relationships between the person to be bound and a party to the judgment," including succeeding owners of property.  <u>Taylor</u>, 553 U.S. at 894 (citation omitted).  The successor in interest exception, however, "has no application to a successor who acquires his interest before the action was commenced concerning the property."  Restatement § 44 cmt. f.

---

[9] Again, Dramatic contends that the 2015 Agreement was invalid, but relies on it to support its claim that Atticus is in privity with the Lee Estate.

Atticus was granted rights to the Novel pursuant to the 2015 Agreement.  This occurred before the commencement of the arbitration action on March 7, 2019.  Accordingly, the successor in interest exception does not apply.

Dramatic argues that the Second Circuit's decision in Matter of Emergency Beacon Corp., 665 F.2d 36 (2d Cir. 1981), supports its reliance on this arm of the privity doctrine. Dramatic is incorrect.  In Emergency Beacon, the Court of Appeals held that, where a corporation had sold two vehicles to its former president, the corporation had no further rights in the vehicles and could not later convey a security interest in the vehicles to a third-party.  Id. at 40.  There is no principle established by Emergency Beacon that assists Dramatic.

C.   Adequate Representation

Dramatic next contends that the Lee Estate sufficiently represented Atticus' interests during the arbitration such that Atticus should be considered as being in privity with the Lee Estate.  Privity requires a far closer relationship than Dramatic argues existed here.  Therefore, this attempt at establishing privity fails as well.

Privity based on adequate representation exists in "certain limited circumstances" when the nonparty was "adequately represented by someone with the same interests who was a party

to the [prior] suit," such as in class actions and in suits brought by trustees, guardians, and other fiduciaries.  Taylor, 553 U.S. at 894–95.  A party's representation of a nonparty is considered "adequate" for preclusion purposes "only if, at a minimum: (1) the interests of the nonparty and her representative are aligned; and (2) either the party in the first suit understood herself to be acting in a representative capacity of the nonparty or the original court took care to protect the interests of the nonparty."  Sacerdote, 939 F.3d at 510 (citation omitted).  Adequate representation often also requires "notice of the original suit to the persons alleged to have been represented."  Id. (citation omitted).

Atticus was not "adequately represented" by the Lee Estate in the arbitration proceeding.  This exception applies only in "limited circumstances" where more formally defined legal relationships are present than existed here between Atticus and the Lee Estate.  Taylor, 553 U.S. at 894.

In making its "adequate representation" argument, Dramatic relies on a theory of virtual representation.  Virtual representation has been recognized by Illinois courts as creating privity under Illinois law.  See, e.g., City of Chicago v. St. John's United Church of Christ, 404 Ill. App. 3d 505, 513 (2010); City of Rockford v. Unit Six of Policemen's Benevolent &

Protective Ass'n of Illinois, 362 Ill. App. 3d 556, 563 (2005).
"The contours of a proposed virtual representation category have
differed from circuit to circuit."  Sacerdote, 939 F.3d at 509.
Under one formulation considered by the Court in Taylor, virtual
representation requires that the nonparty: had the same
interests as the party, was adequately represented by the party,
and that at least one of the following conditions was present:
(a) a close relationship between the nonparty and party; (b)
substantial participation by the nonparty in the other action;
or (c) tactical maneuvering by the nonparty to avoid preclusion.
Id.

It is highly unlikely that Dramatic could establish privity
under any theory of virtual representation, but it is
unnecessary to explore that issue.  The theory of virtual
representation was squarely rejected by the Supreme Court in
Taylor, 553 U.S. at 898, and cannot be relied upon here.  See
also, Sacerdote, 939 F.3d at 509.  Federal common law, not
Illinois law, applies here.

D.   Assumed Control

Finally, Dramatic argues that Atticus and the Lee Estate
were in privity because Atticus was "kept fully up to speed on
the arbitration" and "prior to the Arbitration the Lee Estate
and its agents were doing [Atticus'] bidding to hinder

30

Dramatic's licensing rights."  Dramatic argues as well that it
is entitled to discovery to establish the existence and extent
of Atticus's "influence" during the arbitration.  Dramatic has
not accurately described its burden of establishing privity
under this last pathway.

A nonparty is not bound by a judgment because it has
influenced another's litigation strategy.  Privity exists if the
nonparty "assumed control over the litigation in which that
judgment was rendered." Taylor, 553 U.S. at 895 (citation
omitted).  As the Court explained, it is just to bind the
controlling party to the judgment in these circumstances.
"Because such a person has had the opportunity to present proofs
and argument, he has already had his day in court even though he
was not a formal party to the litigation." Id. (citation
omitted); see also Restatement § 39 cmt. a.  A finding of
assumed control "requires that a person have effective choice as
to the legal theories and proofs to be advanced in [sic] behalf
of the party to the action and have control over the opportunity
to obtain review." Students for Fair Admissions, Inc. v. Univ.
of Texas at Austin, 37 F.4th 1078, 1087 (5th Cir. 2022)
(citation omitted).  See Restatement § 39 cmt. c.

In opposition to the motion for summary judgment, Dramatic
contends that it is premature to grant summary judgment on the

31

issue of claim preclusion since it has had no opportunity to
take discovery of Atticus.  Most of the topics for discovery
that Dramatic identifies in its Rule 56(d) declaration, however,
are irrelevant to the issues to be decided in this litigation.
Many of them seek to explore and undermine any grant of rights
that Atticus obtained from the Lee Estate.  But, while both
Dramatic and Atticus agree that it is essential to this
litigation to determine whether Dramatic retains the exclusive
right to perform in amateur theatrical settings a work derived
from the Novel, it is unnecessary to resolve through this
lawsuit the extent to which the Lee Estate granted Atticus
rights through the 2015 Agreement to perform a derivative work.
That latter issue is irrelevant to Dramatic: if Dramatic has
exclusive rights, then Atticus cannot produce the Sorkin Play in
amateur settings; if Dramatic's rights are not exclusive, then
it has no power to bar anyone from performing derivative works
based on the Novel, other than of course the Sergel Play.

      Dramatic does attempt to identify one issue, however, that
may be relevant to the question of privity and to this
declaratory judgment action.  Dramatic seeks evidence of
communications between the Lee Estate and Atticus, as well as
those associated with Sorkin, in order to ascertain "the ability
of the Rudinplay Affiliates to influence the Lee Estate's

32

actions in the arbitration." But again, the test for privity is not one of influence but of control.

To support its request for discovery, Dramatic points to the arbitrator's rejection, as "unconvincing," of the Lee Estate's denial that it had worked in concert with Rudinplay to stop productions of the Sergel Play that used professional actors.[10] That comment by the arbitrator, however, does not reflect a conclusion that Atticus controlled the Lee Estate's conduct of the arbitration. The arbitrator's comment related to historical events and his finding that the Lee Estate had violated the "prevent-hinder provision" of the 1969 Agreement and had tortiously intereferred with Dramatic's licensing agreements. Regardless, as already noted, Dramatic has not invoked the correct standard for establishing privity under the control test. Establishing privity between the Lee Estate and Atticus will require more than a showing of "influence."

For its part, Atticus asserts that it had "no control over the Estate" in the arbitration proceedings. It points out that Atticus's predecessor, Rudinplay, and the Lee Estate were

---

[10] The arbitrator concluded that Lee had granted Dramatic not only rights to perform amateur productions of the Sergel Play but also "stock" productions employing professional actors. As noted supra note 1, this Opinion does not address stock rights.

litigating against each other as recently as 2018.   Dramatic
began the arbitration in early 2019.

The parties will have an opportunity to address these
issues in a conference with the Court.   In that conference, it
will be determined whether Dramatic is entitled to discovery and
the scope of any such discovery.

## Conclusion

Dramatic's January 23 motion to dismiss is denied.   As a
matter of copyright law, specifically § 304(c) of the Copyright
Act of 1976, Dramatic does not currently possess exclusive
rights to perform amateur theatrical productions of Harper Lee's
novel To Kill a Mockingbird.   Atticus' February 6 motion for
summary judgment is granted in part for that same reason.

A conference with the parties will be held to determine
whether Dramatic is entitled to discovery on the issue of
whether Atticus controlled the Lee Estate in its arbitration
with Dramatic.   A finding of privity may bind Atticus to the
Arbitration Award issued against the Lee Estate.

Dated:     New York, New York
           April 27, 2023

                                    DENISE COTE
                         United States District Judge

34