UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY,<br><br>               *Plaintiff*,<br><br>   and<br><br>AARON SORKIN,<br><br>              *Involuntary Plaintiff*,<br><br>  -against-<br><br>THE DRAMATIC PUBLISHING COMPANY,<br><br>             *Defendant.* | No. 1:22-cv-10147-DLC |

## **MEMORANDUM OF LAW IN SUPPORT OF DRAMATIC PUBLISHING COMPANY'S MOTION FOR SUMMARY JUDGMENT**

**Table of Contents**

FACTUAL SUMMARY...................................................................................................2

   **A.**  Atticus threatens to sue Dramatic and its licensees. ......................................2

   **B.**  Dramatic files its arbitration demand against the Estate on March 7, 2019, asserting it continued to own exclusive rights...................................................................3

   **C.**  Atticus learns of Dramatic's claim of exclusive rights on the same day. ......................4

PROCEDURAL BACKGROUND ..............................................................................5

   **A.**  Atticus files its declaratory judgment complaint more than three years after learning of Dramatic's claim to exclusivity................................................................5

   **B.**  Dramatic moves to dismiss Atticus' declaratory judgment complaint. ..........................6

   **C.**  Dramatic did not move for summary judgment. .................................................7

   **D.**  Atticus responds to Dramatic's motion to dismiss and cross-moves for summary judgment.....................................................................................................7

   **E.**  Dramatic opposes Atticus' cross-motion and cautions against granting summary judgment prematurely. ...............................................................................8

   **F.**  The Court issues its Opinion and Order.........................................................9

   **G.**  Dramatic files its answer and affirmative defenses..........................................9

LEGAL STANDARD ..................................................................................................10

ARGUMENT ..............................................................................................................10

   **A.**  Atticus' claim is time-barred...........................................................................10

   **B.**  Dramatic did not waive its statute of limitations affirmative defense. ...........................13

CONCLUSION ............................................................................................................17

## Table of Authorities

**Cases**

*Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 83 (2d Cir. 2018) ...................................10

*Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993) ....................................................................17

*Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 16 (2d Cir. 2021) ..........................................................................10

*Frederick v. Capital One Bank (USA), NA*, 2015 WL 5521769 (S.D.N.Y. Sept. 17, 2015) .....................15

*Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 23 F.Supp.3d 173, 189 (S.D.N.Y. 2014) ..........................15

*Hirsch v. Complex Media, Inc.*, 2018 WL 6985227, * 10 (S.D.N.Y. Dec. 10, 2018) ...................................15

*Hirsch v. Complex Media, Inc.*, 2018 WL 6985227, *10 (S.D.N.Y. Dec. 10, 2018) ....................................11

*Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d. Cir. 2021) ....................................................................................10

*Kwan v. Schlein*, 634 F.3d 224, 228-229 (2d Cir. 2011) ................................................................1, 2, 11, 13

*Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1315 (S.D.N.Y. 1997) ...........................11

*Roberts v. BroadwayHD LLC*, 518 F.Supp.3d 719, 731 (S.D.N.Y. 2021) ......................................................1

*Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008) ..........................................................................17

*Saks v. Franklin Covey Co.*, 316 F.3d 337, 349 (2d Cir. 2003) ........................................................................17

*Santos v. District Council of New York City*, 619 F.2d 963, 967 (2d Cir. 1980) ...........................................14

*Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016) .......................................................................... 1, 12

*Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992) ..............................................................................13, 14

*Walker v. Carter*, 210 F.Supp.3d 487, 505 (S.D.N.Y. 2016) ...........................................................................13

*Waters v. Experian Info. Solutions, Inc.*, 2012 WL 1965333, at *4 n.2 (S.D. Cal. May 31, 2012) ..............15

**Statutes**

17 U.S.C. § 304 ............................................................................................................................................ 1, 7, 9

17 U.S.C. § 507 ....................................................................................................................................................1

**Rules**

Fed. R. Civ. P. 12 ......................................................................................................................................9, 13, 15

Fed. R. Civ. P. 56 ......................................................................................................................................8, 10, 14

Fed. R. Civ. P. 8 ...............................................................................................................................................13

The Dramatic Publishing Company ("Dramatic") filed its arbitration demand against the Estate of Harper Lee (the "Lee Estate") on March 7, 2019. In its demand, Dramatic claimed to own exclusive stage rights in its adaptation of *To Kill a Mockingbird* and that the grant to Dramatic of those exclusive rights survived Ms. Lee's purported termination under the Copyright Act. Atticus learned of Dramatic's arbitration demand the day Dramatic filed it. Nevertheless, Atticus waited nearly four years to bring this declaratory judgment action challenging Dramatic's exclusive ownership claim.

The Copyright Act is clear: a civil action filed more than three years after a claim accrues is time-barred. 17 U.S.C. § 507(b). Under the well-settled law of this Circuit, Atticus' claim accrued on March 7, 2019, the day Atticus learned of Dramatic's assertion of exclusive ownership rights. An ownership claim accrues *only once*, when a plaintiff learns of defendant's "express assertion of sole ownership." *Kwan v. Schlein*, 634 F.3d 224, 228-229 (2d Cir. 2011) (emphasis added). This is true whether the dispute involves ownership or an exclusive license. *Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016) (*per curiam*) (no material difference between "ownership" or "exclusive license" dispute for purposes of statute of limitations). "A copyright infringement is an 'ownership claim' when it 'does not involve the nature, extent or scope of copying,' but instead focuses on competing assertions of ownership or rights in the work at issue." *Roberts v. BroadwayHD LLC*, 518 F.Supp.3d 719, 731 (S.D.N.Y. 2021) (citing *Kwan*, 634 F.3d at 229).

Atticus may wish to characterize its claim as one for "non-infringement," not of ownership, but that is at odds with the factual record, the pleadings, and the law. This case has never been about the "nature, extent or scope" (*Kwan*, 634 F.3d at 229) of the *copying* of Dramatic's adaptation of *To Kill a Mockingbird*. Indeed, Dramatic has not brought an infringement action against or otherwise alleged infringement by Atticus. As this Court held, the "core of this dispute" turns on "whether, under 17 U.S.C. § 304(c), Dramatic retains *exclusive rights* to produce amateur performances of the Novel." ECF No. 65, at 14 (emphasis added). Atticus agrees. As it told this Court: "…Atticus

1

seeks only a declaration that [Dramatic] has no exclusive rights in the Novel as necessary to bring a claim for infringement. That inquiry *turns solely on the scope of [Dramatic's] copyright interest in the Novel*, and not on the scope or even the existence of any such rights held by Atticus or Sorkin." ECF No. 63, at 9 (emphasis added).

Atticus' claim is and always has been about Dramatic's assertion that it owns exclusive rights in its adaptation of *To Kill a Mockingbird*. The undisputed facts demonstrate that Atticus learned of that assertion the day Dramatic sought clarification of its rights in its arbitration demand. Nevertheless, Atticus waited more than three years to sue, choosing instead to let the Lee Estate litigate the issue and allowing the arbitration to run its course. While Atticus would prefer a different result, its claim is now time-barred.

**FACTUAL SUMMARY**

**A.    Atticus threatens to sue Dramatic and its licensees.**

In January 2019, Atticus' counsel sent a cease-and-desist letter to Dramatic over "a planned professional tour of the Dramatic Publishing adaptation [of *To Kill a Mockingbird*] in the U.K. and Ireland." Declaration of Christopher Sergel III ("Sergel Decl."), Ex. 1. In the letter, Atticus claimed it was "the *exclusive licensee* . . . of the Estate of Harper Lee . . . for live stage rights to the novel *To Kill a Mockingbird*, subject only to the limited rights granted by Lee to [Dramatic] in 1969 to create a theatrical adaptation of the Novel for amateur performances." *Id.* (emphasis added).

Even though the 1969 Agreement under which Dramatic obtained the rights it owns defined "amateur" to include "stock" and "repertoire" theater, and even though Harper Lee's lawyer told Atticus' representatives that Dramatic had "everything but first class rights" during negotiations for the Lee/Atticus 2015 Agreement, Declaration of Kevin Tottis ("Tottis Decl."), Ex. 8, Atticus not only took the position in its letter threatening Dramatic that Dramatic was prohibited from licensing any production with professional actors, but also that Harper Lee had granted Atticus *exclusive*

worldwide rights to any theatrical productions that used them, Sergel Decl., Ex. 1. Atticus' Scott Rudin also sent an email to Dramatic's counsel in January 2019 accusing Dramatic of selling rights in To Kill a Mockingbird that it did not own and that belonged exclusively to Atticus, claiming, "Your client sold rights in To Kill a Mockingbird that he does not own or control, rights which belong exclusively to me." He threatened to move against Dramatic "with aggression and alacrity if [Dramatic's president] tries to do it again. I hope the Harper Lee estate and Jonathan Church are smart enough to go after him. What he committed is theft." Tottis Decl., Ex. 1.

Atticus also made these threats in cease-and-desist letters to Jonathan Church, the producer of the professional U.K. tour, and to the 15 theaters on the tour who had licensed rights from Dramatic. Sergel Decl., ¶ 4.[1] Atticus also threatened theaters in the United States and repeated its claims that Harper Lee had given Atticus exclusive rights for all professional productions. *Id.*, Tottis Decl., Ex. 2. As a result of the threats by Atticus and its lawyers in the United Kingdom, Jonathan Church cancelled the U.K. tour and a number of theaters in the United States cancelled their productions. Sergel Decl., ¶ 5.

**B.    Dramatic files its arbitration demand against the Estate on March 7, 2019, asserting it continued to own exclusive rights.**

While Atticus was sending threatening letters to Dramatic and its licensees, the Lee Estate sent a letter of its own to Dramatic that made clear the Estate was cooperating with Atticus to threaten theaters in both the United Kingdom and the United States in violation of the 1969 Agreement. Sergel Decl., ¶ 6 and Ex. 2. After receiving threats from Atticus, Mr. Rudin personally and the Lee Estate regarding the scope of its rights under its 1969 Agreement with Ms. Lee,

---

[1] Atticus now acknowledges that Dramatic's rights outside the United States remain exclusive, regardless of the termination notice. ECF No. 74, at 3. Moreover, Atticus no longer disputes that Dramtic's rights—which, by definition, expressly included "stock and repertoire" rights—are not limited to productions with only amateur actors. ECF No. 1, ¶21.  The Lee Estate's about-face on Dramatic's rights and its complicity with Atticus' post-negotiation threats to Dramatic formed the basis for the arbitrator's breach of contract and tortious interference findings. Tottis Decl. Ex. 7.

Dramatic had no choice but to seek to protect its rights and proceed against the party that had granted those rights to all parties, the Lee Estate. Sergel Decl. ¶ 7. On March 7, 2019, Dramatic filed a demand in arbitration with the American Arbitration Association against the Estate as required by the agreement with Ms. Lee. Tottis Decl., Ex. 3. The demand sought, among other relief, a declaration of Dramatic's exclusive rights:

> A declaration that Dramatic's exclusive rights to the Sergel Version of [*To Kill a Mockingbird*] include ***all of the rights granted to Dramatic under paragraph 4(e)*** of [the 1969 Agreement] including but not limited to the ***exclusive right*** to license stock and repertoire theaters to perform any stage version of the novel *To Kill a* Mockingbird, whether or not the actors are paid, ***and that no other person or entity has such rights in any other stage version of the novel*** . . . .

*Id.*, Ex. 3, p. 8(emphasis added). The demand alleged that statements by Atticus in its cease-and-desist letters to the United Kingdom theaters were "materially false." *Id.*, Ex. 3, at p. 5, ¶17 ("The letter claimed that because the tour would be presented in major commercial venues, it would violate both the Original Grant [the 1969 Agreement] and the purported rights under the [2015 Letter] Agreement . . . . Not a single one of the purported restrictions appear in the Original Grant."). The demand also asserted that Atticus' claim to be the "exclusive licensee," subject only to Dramatic's "limited" rights to create an adaptation of the novel for "amateur" purposes only, was false. *Id.*, Ex. 3, p. 7, ¶26.

### C.    Atticus learns of Dramatic's claim of exclusive rights on the same day.

Atticus learned of Dramatic's arbitration demand, and of Dramatic's claim of exclusive rights, on March 7, 2019, or shortly afterwards. *Id.*, Ex. 4 (excerpt from hearing transcript containing stipulation by counsel for Atticus).

On April 24, 2019, Atticus' counsel wrote to the Lee Estate's counsel confirming Atticus understanding that Dramatic claimed to own exclusive rights:

> I also note that in its claim for relief in the Demand for Arbitration, *[Dramatic] seeks a declaration that it has the exclusive worldwide right* for all amateur performances of an adaptation of the *To Kill a Mockingbird*. Obviously the Estate granted the non-exclusive rights in the United States to such performances to Rudinplay, represented and warranted that it had the right to grant such rights, and indemnified Rudinplay with respect to any breach of such representations and warranties. *If for any reason Atticus, through Sorkin, is unable to exploit such amateur rights, the damages for such breach will run to millions of dollars, and Atticus will seek to recover any such damages from the Estate.*
>
> *In light of the above, in the event that Atticus is damaged in any way by [Dramatic's] claims*, or by the actions of the Estate in violation of the agreement between Lee and Rudinplay, Atticus reserves the right to seek appropriate damages from the Estate.

Tottis Decl., Ex. 6, p. 2 (emphasis added).

## PROCEDURAL BACKGROUND

A.   **Atticus files its declaratory judgment complaint more than three years after learning of Dramatic's claim to exclusivity.**

Atticus filed this declaratory judgment action against Dramatic on November 30, 2022, more than three years after learning of Dramatic's claim to exclusive rights. ECF No. 1. In its complaint, Atticus alleged:

> In April 2011, Ms. Lee, through her counsel, served a notice pursuant to the Copyright Act's termination provision (17 U.S.C. § 304(c)), *unequivocally terminating [Dramatic's] exclusive rights* to stage such productions as of April 2016, *subject to [Dramatic's] continuing nonexclusive rights* to stage and license the Sergel Play.

*Id.* ¶ 2 (emphasis added).

Atticus then alleged that Dramatic, after it prevailed in the arbitration with the Lee Estate, had issued a press release claiming Dramatic "has worldwide exclusive rights to all non-first-class theater or stage rights in *To Kill a Mockingbird*" and asserting that statement as the basis for its claim against Dramatic. *Id.* ¶ 32. Atticus omitted from its complaint the fact that Dramatic had made a virtually identical statement in its arbitration demand, of which Atticus learned in March 2019.

Atticus' sole claimed basis for the declaratory judgment action was Dramatic's claim to "worldwide exclusive rights" in its 2022 statement. *Id.* That statement mirrored Dramatic's statement in its March 7, 2019, demand. Tottis Decl., Ex. 3, p. 8. It also was almost word-for-word identical to Atticus' counsel's characterization of Dramatic's position in his April 24, 2019 letter. ("[Dramatic] seeks a declaration that it has the exclusive worldwide right . . . ."). Tottis Decl., Ex. 6.

In its claim for declaratory judgment, Atticus framed this case as a dispute about whether Dramatic holds exclusive rights:

> 40.    Pursuant to the Sorkin Agreement, Atticus and/or Sorkin hold the ***exclusive right*** to present Second-Class, Stock, Amateur and Ancillary Performances (as those terms are defined in the Sorkin Agreement) of the Sorkin Play derived from the Novel.

> 41.    [Dramatic] claims that it holds the ***"exclusive" rights*** to present all "non-first-class" productions derived from the Novel, pursuant to the arbitral award issued in a proceeding to which neither Atticus nor Sorkin were party.

> 42.    An actual and justiciable controversy has arisen and now exists between Atticus and Sorkin, on the one hand, and [Dramatic], on the other hand, regarding ***whether [Dramatic] owns exclusive rights*** to present "non-first class" productions of any derivative work based on the Novel ***or, as Atticus contends, that Atticus and Sorkin have sufficient rights to present such productions of the Sorkin Play***, for which Atticus has no adequate remedy at law.

ECF No. 1, ¶¶ 40-42 (emphasis added).

Dramatic's position on exclusivity as alleged in Atticus' November 30, 2022 complaint is the same position Dramatic took in its arbitration demand of March 7, 2019, nearly four years earlier. Indeed, all that had changed was that the arbitration vindicated Dramatic's position.

**B.    Dramatic moves to dismiss Atticus' declaratory judgment complaint.**

Dramatic moved to dismiss the complaint on January 23, 2023. ECF Nos. 28 & 29. Dramatic's motion argued that, as a matter of law: (1) any transfer of rights by Harper Lee in the 2015 Agreement that overlapped with Dramatic's were void under 17 U.S.C. § 304(c)(6)(D); (2) the

only rights Harper Lee had to transfer were those rights the arbitrator found she owned in 2015 as

the Illinois district court had concluded; (3) the doctrines of claim and issue preclusion barred the

current action; and (4) Dramatic's exclusive rights survived the purported termination under the

derivative rights exception to 17 U.S.C. § 304(c)(6)(A). In its motion, Dramatic acknowledged that to

the extent the facts set forth in the Complaint were insufficient for the Court to make a *res judicata*

determination, it would seek discovery on the issue. ECF No. 29, at 19 n. 21.

### C.      Dramatic did not move for summary judgment.

Dramatic submitted documents with its motion to dismiss. They included: (1) the complaint

(as required by Rule); (2) the arbitrator's Award repeatedly referenced throughout the complaint and

one exhibit referenced in that Award; (3) the 2015 Agreement between Atticus and Harper Lee

referenced in Atticus' complaint; (4) the 1969 Agreement between Dramatic and Harper Lee

referenced in Atticus' complaint; (5) the Final Judgment from the Northern District of Illinois; and

(6) the Lee Estate's Notice of Termination. In its supporting memorandum, Dramatic expressly

identified the basis for the Court's consideration of the documents, without the need to convert the

motion to one for summary judgment: the documents were integral to the complaint or were

materials of which the Court could take judicial notice. ECF No. 29, at 4-5, nn. 6-7. Although the

Court ultimately converted Dramatic's motion to a motion for summary judgment (ECF No. 65, at

13), Dramatic never requested such conversion as an alternate basis for considering the documents it

submitted, and it did not understand that its motion would be treated as such until the receipt of the

Court's Opinion and Order.

### D.      Atticus responds to Dramatic's motion to dismiss and cross-moves for
####        summary judgment.

On February 7, 2023, Atticus filed its opposition to Dramatic's motion to dismiss and

brought its own cross-motion for summary judgment. ECF No. 34. In opposing Dramatic's motion,

Atticus did not argue that consideration of the documents attached to Dramatic's motion required

conversion of the motion to one for summary judgment; instead, it argued that the motion should

be denied. ECF No. 36, 3-4, 8 n.3. Atticus' summary judgment motion did not raise any issues

beyond those set forth in Dramatic's motion to dismiss. Neither the parties nor the Court suggested

that both motions be treated as cross-motions for summary judgment. In fact, in a stipulation filed

by the parties on February 14, 2023, the parties agreed that Dramatic would file a reply in further

support of its motion to dismiss on February 15, 2023 and that Atticus could file its reply in further

support of its summary judgment motion on March 3, 2023. ECF No. 44. The Court so-ordered the

stipulation on February 15, 2023. ECF No. 45. Dramatic did not request additional time to file its

separate response to the motion for summary judgment, which it filed on February 22, 2023. ECF

No. 50.

### E. Dramatic opposes Atticus' cross-motion and cautions against granting summary judgment prematurely.

Because Dramatic had not filed its answer and affirmative defenses to the complaint,

Dramatic did ***not*** cross-move for summary judgment. Rather, Dramatic's opposition to the cross-

motion responded to the issues raised by Atticus to the extent it could without additional discovery.

Where it could not "present facts essential to justify its opposition" pursuant to Federal Rule 56(d),

it provided reasons in a declaration.[2]

In its opposition, Dramatic raised concerns about entry of summary judgment before having

the opportunity to answer the complaint. ECF No. 50, at 2 ("These numerous issues require

discovery and certainly ***make entertaining summary judgment inappropriate*** until that discovery

---

[2] Rule 56 no longer addresses the timing of an answer. Before 2010, filing an answer after a summary
judgment motion would not be an issue because Rule 56 specifically addressed timing. As the Advisory
Committee Notes acknowledge, "Although the rule allows a motion for summary judgment to be filed at the
commencement of an action, ***in many cases the motion will be premature until the nonmovant has had
time to file a responsive pleading or other pretrial proceedings have been had***. Scheduling orders or
other pretrial orders can regulate timing to fit the needs of the case." Fed. R. Civ. P 56 (emphasis added). No
scheduling order was entered before issuance of the Court's Opinion and Order.

can be completed, *let alone before Dramatic has even answered*.")(emphasis added). Dramatic cautioned that summary judgment was premature because Dramatic had not yet had an opportunity to raise affirmative defense or counterclaims:

> Not only has there been no opportunity for discovery, *Dramatic has not had an opportunity to raise affirmative defenses or assert any counterclaims*, be they voluntary or compulsory counterclaims. This last point could mean that entry of summary judgment at this early juncture would give the Rudinplay Affiliates the opportunity to claim Dramatic is bound by a judgment far beyond the limited issue before this Court regarding exclusivity.

*Id.* at 2 n. 1. The Declaration of Kevin Tottis, ECF No. 52, raised a similar concern: "At this point in the litigation, Dramatic has not answered the Complaint, nor has it had the opportunity to raise any affirmative defenses or bring any counterclaims or third-party claims it may have." *Id.* at ¶ 12.

## F.   The Court issues its Opinion and Order.

On April 27, 2023, the Court entered an Opinion and Order and converted Dramatic's motion to dismiss to a motion for summary judgment. ECF No. 65 at 13. The Court then denied Dramatic's motion, finding that under § 304(a) of the Copyright Act, Dramatic does not currently possess exclusive rights, and granted Atticus' summary judgment motion "in part for the same reason." *Id.* at 34. The Court set a conference to discuss "whether Dramatic is entitled to discovery on the issue of whether Atticus controlled the Lee Estate in its arbitration with Dramatic." *Id.* The Court did not enter final judgment.

## G.   Dramatic files its answer and affirmative defenses.

Pursuant to Rule 12(a)(4), Dramatic timely filed its answer fourteen days after denial of the motion to dismiss, on May 11, 2023. ECF No. 72. The answer set forth Dramatic's affirmative defenses, including an affirmative defense that Atticus' claims are time-barred by the Copyright Act's statute of limitations. *Id.* at 16-17.

Dramatic did not counterclaim against Atticus for copyright infringement. ECF No. 72.

**LEGAL STANDARD**

Summary judgment is appropriate when "the movant shows that there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A genuine issue of material fact results where the record contains contradictory evidence such that a reasonable jury could return a verdict for the nonmoving party. *Horror Inc. v. Miller*, 15 F.4th 232, 241 (2d. Cir. 2021). A material fact is one that might affect the outcome of the case under the applicable law. *Choi v. Tower Rsch. Cap. LLC*, 2 F.4th 10, 16 (2d Cir. 2021).

Although courts often hold that summary judgment is inappropriate where there has not been discovery and should be granted in "[o]nly the rarest of cases," *Ass'n of Car Wash Owners Inc. v. City of New York*, 911 F.3d 74, 83 (2d Cir. 2018); *see also Hirsch v. Complex Media, Inc.*, 2018 WL 6985227, *10 (S.D.N.Y. Dec. 10, 2018), Dramatic is bringing this motion regarding its statute of limitations defense now per the Court's order. ECF No. 75. To the extent Atticus raises issues that require discovery, Dramatic will address those issues and any need for discovery in its Reply.

**ARGUMENT**

**A.      Atticus' claim is time-barred.**

This Court found the "core" issue in this case is whether Dramatic retained exclusive stage rights in *To Kill a Mockingbird*. ECF No. 65, at 14. This is not a dispute about copying. This is not a dispute about substantial similarity or infringement. This case is about competing claims of exclusive rights in *To Kill a Mockingbird*. Dramatic says its rights are exclusive. Atticus says they are not.

Second Circuit law holds that for the purposes of the statute of limitations, where the "core" issue is ownership and not infringement, the statute of limitations begins to run when the plaintiff first knew defendant disputed ownership. *See Kwan,* 634 F.3d at 228 ("any number of events can trigger the accrual of an ownership claim, including '[a]n express assertion of sole authorship or ownership") (quoting *Netzer v. Continuity Graphic Assocs., Inc.*, 963 F. Supp. 1308, 1315 (S.D.N.Y.

1997). In *Kwan,* the publisher of a book about searching on the internet hired plaintiff Kwan in 1998 (at defendant author Schlein's request) to perform 100 hours of editing. *Id.* at 227. At defendant Schlein's request, Kwan provided further editorial assistance beyond the 100 hours. Later that year, claiming she had "ghostwritten" the book, Kwan demanded co-authorship credit from the publisher and her lawyer sent the publisher a letter demanding she be given credit as co-author. *Id.*  In 2005 Kwan sued Schlein for copyright infringement. *Id.* Finding that the "core" issue was ownership and not infringement and that the plaintiff's claim accrued when she learned of the dispute regarding her rights, the district court granted summary judgment on statute of limitations grounds. *Id.* at 228. The Second Circuit affirmed.

The Court of Appeals explained that to maintain an action for copyright infringement, a plaintiff must show: (1) ownership of a valid copyright and (2) "copying of constituent elements of the work that are original." *Id.* at 229 (citations omitted). Although in many cases ownership is not in dispute, where the dispute "does not involve the nature, extent or scope of copying, and therefore, ownership forms the backbone of the infringement claim," for the purposes of the statute of limitations, a claim is time-barred three years after the plaintiff becomes aware of the dispute. Indeed, even when "ownership is the dispositive issue, any attendant infringement claims must fail." *Id.* Copying of any part of anyone's work is not at issue in this case. The issue is whether Dramatic retained exclusive ownership rights in the rights granted to it by Ms. Lee under § 4(e) of the 1969 Agreement. Atticus has stipulated was of Dramatic's position in March 2019 when it received Dramatic's arbitration demand from the Lee Estate. Atticus made the conscious decision not to take action against Dramatic at the time, and it waited more than three years to file its lawsuit. Atticus' claim is now time-barred.

The fact that Dramatic claimed "exclusive rights" as opposed to "ownership" does not change the analysis. In a *per curiam* opinion, the Second Circuit made short work of that argument in

11

*Simmons v. Stanberry*, 810 F.3d 114, 116 (2d Cir. 2016). There, the plaintiff tried to distinguish his case from *Kwan*, because the dispute was over an exclusive license rather than ownership. The Court of Appeals was clear: "*Kwan* controls this case." *Id.*

Likewise, *Kwan* controls this case. Atticus' knowledge of the demand is not in dispute. Tottis Decl., Ex. 4. Atticus' full knowledge and understanding of Dramatic's position is also reflected in its counsel's April 24, 2019, letter to the Lee Estate's counsel in which Atticus' counsel wrote, "I also note that in its claim for relief in the Demand for Arbitration, [Dramatic] seeks a declaration it has the 'exclusive' worldwide right for all amateur performances of an adaption of the novel, *To Kill a Mockingbird."* Tottis Decl., Ex. 6. Atticus' counsel then wrote that if "Atticus, through Sorkin" is prohibited from asserting such rights, damages "for such breach will run to millions of dollars, and Atticus will seek to recover any such damages from the Estate." *Id.* As Atticus' counsel made clear, Atticus viewed Dramatic's position as creating the risk of serious injury to Atticus. *Id.*

The facts here are straightforward. Atticus knew no later than March 7, 2019 that Dramatic was asserting exclusive rights over everything Ms. Lee granted Dramatic in 1969. At that point, the only question is whether "'a reasonably diligent plaintiff would have been put on inquiry as to the existence of a right.'" *Kwan,* 634 F.3d at 228 (citing *Stone v. Williams,* 970 F.2d 1043, 1048 (2d Cir.1992)). Atticus would be hard-pressed to argue that receipt of an arbitration demand that followed Atticus' own threatening communications and that Atticus' own counsel admitted at the time "will" cause millions of dollars to Atticus failed to put it on inquiry notice. To the extent there is any question, *Kwan* resolves it, instructing: "any number of events can trigger the accrual of an ownership claim, including '[a]n express assertion of sole authorship or ownership.'" *Id.* (citations omitted).

Atticus' attempt to frame the issue as one for "non-infringement" is unavailing. This is a case about the extent of Dramatic's ownership rights. The substance of a claim governs, not how a

plaintiff packages a cause of action. *Walker v. Carter*, 210 F.Supp.3d 487, 505 (S.D.N.Y. 2016) (collecting cases). Indeed, where, as here, a plaintiff has made ownership the subject of a summary judgment motion, the issue is resolved or "Plaintiff is hoisted by his own petard: he cannot plausibly maintain that this is a pure infringement action while simultaneously asking this Court to rule on the question of copyright ownership." *Id.* at 506

Finally, any claim by Atticus that it could await an arbitration decision baseless. The Second Circuit made clear decades ago that "[T]the legal rights that stem from certain facts or circumstances need not be known, only the facts or circumstances themselves." *Stone,* 970 F.2d 1049.

### B.    Dramatic did not waive its statute of limitations affirmative defense.

The Federal Rules allow a party to raise, in any pleading, a defense of failure to state a claim upon which relief can be granted. *See* Fed. R. Civ. P. 12(h)(2)(A). Fed. R. Civ. P. 8 also provides the right to file and answer and affirmative defenses. The statute of limitations is precisely such an affirmative defense. Dramatic timely raised the statute of limitations defense in its answer. ECF No. 72, at 16-17. Dramatic did not waive it.

Atticus filed a summary judgment motion before Dramatic had an opportunity to answer or assert affirmative defenses or counterclaims. Although the 2010 amendments to Rule 56 permit parties to move for summary judgment in a case's nascent stages, nothing in the rule suggests that such a filing divests a defendant of its right to assert affirmative defenses or defenses of failure to state a claim.  The authority is clear: a party does not waive a statute of limitations of defense by failing to raise it in pre-answer motion papers. *See Santos v. District Council of New York City*, 619 F.2d 963, 967 (2d Cir. 1980) ("assertion of the limitations defense in the defendant union's answer, rather than in its prior motion for dismissal and summary judgment, was both timely and sufficient as a matter of pleading").

This is not surprising. Courts in this district have noted that motions for summary judgment made before the filing of an answer often are premature. *See, e.g., Helios Int'l S.A.R.L. v. Cantamessa USA, Inc.*, 23 F.Supp.3d 173, 189 (S.D.N.Y. 2014) (quoting *Waters v. Experian Info. Solutions, Inc.*, 2012 WL 1965333, at \*4 n.2 (S.D. Cal. May 31, 2012) ("This court typically finds pre-answer summary judgments premature and unhelpful" and collecting cases denying motions for summary judgment filed before a defendant has answered). This is especially true where the answer is likely to include affirmative defenses, since "[w]ithout those defenses before it, the Court cannot possibly entertain whether they could be meritorious," meaning that where "there has been no discovery and the non-movant has not yet filed a responsive pleading, summary judgment is inappropriate." *Hirsch v. Complex Media, Inc.*, 2018 WL 6985227, \* 10 (S.D.N.Y. Dec. 10, 2018) (denying plaintiff's cross-motion for partial summary judgment in copyright infringement litigation); *see also Frederick v. Capital One Bank (USA), NA*, 2015 WL 5521769 (S.D.N.Y. Sept. 17, 2015) (denying plaintiff's pre-answer cross-motion for summary judgment as premature). There is no authority suggesting a plaintiff's early summary judgment filing precludes a defendant from asserting a failure to state a claim defense or somehow requires a defendant to argue and prove all its defenses in opposition to such a summary judgment motion.

While Dramatic did respond separately to Atticus' premature summary judgment motion, it limited its response to the facts and arguments raised in that motion. Dramatic did not file a cross-motion for summary judgment. In addition to noting the need to raise affirmative defenses, Dramatic also filed a declaration pursuant to Rule 56(d) and identified facts it needed to discover to

respond to Atticus' motion. In its Opinion and Order, the Court permitted limited discovery of those facts.[3]

Moreover, nothing in Dramatic's motion to dismiss suggested it was seeking to convert its motion to summary judgment or was raising all affirmative relief it would seek in the action before this Court. Nor did Atticus argue that such a conversion was necessary. As a result, the parties fully briefed Dramatic's motion applying the standards for Rule 12 (b)(6) motions and using only the facts alleged in Atticus's complaint and the documents it relied upon in framing those allegations. *See, e.g.*, ECF No. 29, at 4 & n.6 (discussing standards for Rule 12(b)(6) motions and noting that documents of which the plaintiff has actual notice and relied upon in framing the complaint can be considered); ECF No. 36, at 3-4, 8 n.3, 24 (Atticus' requests that the court deny Dramatic's motion to dismiss). Dramatic was unaware the Court would treat the motion as a summary judgment motion. The first notice either party had that Dramatic's motion would be converted to a motion for summary judgment (resulting in the application of wholly different standards and allowing for the consideration of different material) was when the Court issued its ruling. As a result, Dramatic (and Atticus) did not have "a reasonable opportunity to present all the material that is pertinent to the motion." Fed. R. Civ. P. 12(d); *see Sahu v. Union Carbide Corp.*, 548 F.3d 59, 67 (2d Cir. 2008) (reversing district court's conversion of motion to dismiss pursuant to Rule 12(d) where no notice was provided to the parties). Although the *Sahu* case involved notice to a non-movant, Rule 12(d) requires notice to "all parties" and that they be given an "opportunity to present all material that is pertinent to the motion."

---

[3] Atticus has indicated it will produce documents relevant to *res judicata* discovery on June 2, 2023. This motion was prepared without the benefit of such discovery, and to the extent Atticus produces documents relevant to the statute of limitations, Dramatic may include such documents in its reply.

Even had Dramatic been given such notice, the material "pertinent" to the motion would not necessarily have included material relevant to the statute of limitations. That is because, by definition, an affirmative defense is a "defendant's assertion raising new facts and arguments that, if true, will defeat the plaintiff's or prosecution's claim, even if all allegations in the complaint are true." *Saks v. Franklin Covey Co.*, 316 F.3d 337, 349 (2d Cir. 2003) (citations omitted). Dramatic took no action to suggest it would not seek to raise all its defenses in a subsequent pleading; indeed, Dramatic expressly indicated it would.

In accordance with the Federal Rules, after the Court denied Dramatic's motion to dismiss, Dramatic timely filed its answer and affirmative defenses. It is unclear how Dramatic's strict compliance with the rules could constitute waiver of the right to file an answer and affirmative defenses. Even if the defenses were somehow construed to have been waived, the Second Circuit has long recognized that a party should be permitted to amend its pleadings "in the absence of a showing of prejudice or bad faith." *Block v. First Blood Associates*, 988 F.2d 344, 350 (2d Cir. 1993). In *Block*, the Court of Appeals affirmed the district court's decision to permit the defendants to raise a statute of limitations defense *four years* after the case was filed. As the court explained, mere delay does not constitute prejudice. To show prejudice, the court considered whether assertion of the new claim would (1) require the opponent to expend significant additional resources to conduct discovery and prepare for trial; (2) significantly delay the resolution of the dispute; or (3) prevent the plaintiff from bringing a timely action in another jurisdiction. *Id.* Those circumstances are entirely absent here. Finally, as the *Block* court noted the plaintiffs' claim was untimely the day that case was filed. The same is true here. Nothing has happened since November 30, 2022 that would change resolution of any of the statute of limitations issues.

16

Dramatic did not waive its statute of limitations affirmative defense. Dramatic identified the need to file affirmative defenses in opposition to Atticus' summary judgment motion, and Dramatic timely asserted its affirmative defenses in its answer in accordance with the Federal Rules.

## **CONCLUSION**

Dramatic requests that the Court issue an order (1) finding Atticus' claim time-barred under the Copyright Act's statute of limitations; (2) granting summary judgment to Dramatic; (3) dismissing the complaint with prejudice; and (4) awarding to Dramatic its costs, attorney's fees, and all other relief the Court deems appropriate.

Respectfully submitted,

Dated:  June 2, 2023                    TOTTISLAW

By: /s/ Kevin Tottis
　　　Kevin Tottis (*pro hac vice*)
　　　Keith Stolte (*pro hac vice*)
　　　Max A Stein (*pro hac vice*)
401 North Michigan Avenue, Suite 530
Chicago, Illinois 60611
Tel. + 1 312 527 1400
ktottis@tottislaw.com
kstolte@tottislaw.com
mstein@tottislaw.com

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. + 1 212 813 8800
smentzer@goodwinlaw.com

David Blasband
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
Tel. + 1 212 447 1100
dblasband@mclaughlinstern.com

17

*Attorneys for Defendant*
*The Dramatic Publishing Company*