June 16, 2023

Hon. Denise L. Cote
United States District Court
Southern District of New York
500 Pearl Street
New York, New York 10007-1312

**Re:** *Atticus LLC v. The Dramatic Publishing Company*, No. 1:22-cv-10147-DLC (S.D.N.Y.)

Defendant Dramatic Publishing Company ("Dramatic") and Plaintiff Atticus LLC ("Atticus") respectfully submit this joint letter regarding the status of fact discovery on the issue of privity through control, in accordance with the Court's May 25, 2023, Order (ECF No. 75). Counsel conferred on June 12, 2023, and resolved some issues. An email confirmation is attached as Ex. A.

**Dramatic's submission**

Dramatic respectfully requests the Court consider allowing additional, targeted discovery of Atticus' control over the Lee Estate's briefing on the limited issue of exclusive ownership. The word "control" for purposes of issue and claim preclusion does not require absolute dominance over decision-making. "[O]ne who prosecutes or defends a suit in the name of another to establish and protect his own right, or *who assists in the prosecution or defense of an action in aid of some interest of his own* . . . is as much bound . . . as he would be if he had been a party to the record." *Montana v. United States*, 440 U.S. 147, 154 (1979) (emphasis added).[1] Citing *Montana,* the Supreme Court explained in *Taylor,* "[b]ecause such a person has had 'the opportunity to present proofs and argument,' he has already 'had his day in court' even though he was not a formal party to the litigation." *Taylor v. Sturgell*, 553 U.S. 880, 895 (2008); *see also Marine Power & Equip. Co., Inc. v. United States*, 594 F. Supp. 997, 1003 (D.D.C. 1984) (furnishing affidavits, conducting legal research, suggesting argument, consulting on discovery among indicia of "control").

Here, the issue is whether an exclusivity term survives termination under § 304(a) of the Copyright Act. Despite a lengthy evidentiary arbitration hearing, the **exclusivity issue was decided solely on the papers**. Atticus' recent production shows Atticus not only commented on the Estate's post-hearing submission on the issue, but also drafted roughly a third of the final brief's exclusivity section (as confirmed by counsel in Ex. A) and appears to have approved the balance of the Estate's draft. *Compare* Ex. B (email with portion of brief drafted by Atticus), *with* Ex. C (relevant excerpts of final, filed version highlighted to show portions drafted by Atticus).[2] In addition, Atticus' counsel sought intervention in the arbitration from the U.S. Copyright Office. *See* Ex. D (requesting "a short statement/brief . . . explaining to the arbitrators that termination terminates exclusivity in the grant to the original work . . . ."). Shortly after Atticus' counsel's email, the Copyright Office changed its

---

[1] Despite financing the litigation, notably, the Government did not try or argue the underlying case.
[2] Atticus' counsel also prepared a five-page internal legal memorandum for the Estate on post-termination issues. It is unclear the extent to which the memorandum applies directly to the exclusivity issue, but Atticus has agreed to produce it to the Court for *in camera* review. Atticus's production demonstrates it also had a hand in other matters, including the selection of potential arbitrators and experts as reflected in the attached. Ex. F.

website to address derivative works following termination. *See* Ex. E ("Wayback Machine" captures of Feb. 5 and Mar. 4, 2021 Copyright Office webpage). The Estate quoted the changed language in its briefs in the arbitration and the district court confirmation proceedings (Ex. C (excerpts from briefs)) long before Atticus quoted it before this Court three times. *See* ECF No. 1, ¶ 19; ECF No. 36, at 10; ECF No. 63, at 2-3. Atticus has had its "day in court" on the issue of exclusivity.

Atticus' production shows the exclusivity issue was decided in the arbitration on papers submitted in which Atticus took the "laboring oar." Atticus's submission below disputes this, arguing the merits of the control issue, but it does so on the basis of an incomplete record, one that Atticus selectively produced. If the Court believes Dramatic's analysis would benefit from further targeted discovery, Dramatic requests the opportunity to obtain the communications directly related to the exclusivity issue—specifically, (1) unredacted versions of the emails regarding exclusivity as produced by Atticus, and (2) all communications between Atticus and the Estate relating to exclusive ownership during the post-arbitration proceedings before the N.D. Ill. (not produced by Atticus). Dramatic, however, is not interested in prolonging the litigation unnecessarily. If the Court does not view full disclosure of Atticus' role in preparing and advising on the exclusivity briefing sufficient to constitute "control" as a matter of law, Dramatic requests no further discovery.

**Atticus' submission**

Atticus respectfully submits that no further discovery is necessary to establish that Atticus did not "control" the Estate in its arbitration against Dramatic for purposes of the preclusion analysis.

As directed by the Court, Atticus has produced to Dramatic the entire collection of emails sent by Atticus to the Estate's representative Matthew Lembke relating to the arbitration, excluding only a handful of emails pertaining to potential settlement (all of which have been identified on a log). In the **two-and-a-half-year period** from March 7, 2019 through October 19, 2021—respectively, the dates when the arbitration was commenced to when Atticus's counsel learned of the arbitrator's post-hearing award—Atticus's counsel sent the Estate a total of **53 emails**.[3] As Your Honor observed at the May 25 conference, "there's not going to be any control unless they are apparent from" these emails. (May 25, 2023 Conference Tr. at 6:15-16).

In addition to their low number, the contents of these emails eliminate any doubt that Atticus did not "control" the Estate. Indeed, Atticus had no involvement in any of the most fundamental and critical aspects of defending an arbitration, including as follows: (i) Atticus had no input into the Estate's selection of counsel to represent it in the arbitration; (ii) Atticus did not select the arbitrator(s), or the number of arbitrators; (iii) during most of the arbitration, the Estate refused to keep Atticus informed on the grounds that it was a confidential arbitration; (iv) Atticus did not see

---

[3] Atticus has also produced an additional seven emails sent between June 17, 2022 through September 27, 2022, during which period the proceeding had been remanded to the arbitrator for clarification on the scope of Dramatic's stage rights under its purportedly interminable license. An additional 14 emails were located relating to the confirmation proceeding itself. This latter set of emails has not been produced because they reflect the Estate's work product and, in any event, cannot establish control for privity purposes since they do not relate to the underlying arbitration. As we have advised Dramatic, however, Atticus can provide these to the Court for *in camera* review.

the summary judgment briefing that addressed the terminability of exclusive licenses, that is, until after a decision was rendered; (v) Atticus did not have any contact with the lawyer actually conducting the arbitration for the Estate and its sole contact was with a witness, Mr. Lembke; (vi) Atticus had no involvement in the arbitration hearing *at all*. Atticus's near complete lack of involvement—or even knowledge—is reflected in the emails. *See* Exs. 1-7 (emails from 9/25/20 to 6/14/21 in which Atticus's counsel asks, "What is the current status/schedule of the arbitration?"; "What is the status of the arbitration. Have you testified yet, so that you can talk to me about it?"; "How many days has it [the hearing] gone so far?"; "I look forward to you telling me about this when it's over."; "What is the status of the arbitration?"; "Any word on whether you can talk to me. Both my client and I are, to say the least, curious as to what's going on."; "What is the status of the arbitration? Any end in sight?").

Dramatic thus focuses on the trivial bits of help Atticus did, or tried to, provide over the arbitration's two-year-plus span. The totality of Atticus's "assistance" emphasized by Dramatic is as follows: (i) Atticus requested that the Copyright Office appear as amicus in the arbitration, (ii) Atticus provided a few suggested paragraphs to a single brief; and (iii) Atticus provided an "internal legal memorandum for the Estate on post-termination issues" (*see* fn 1 *supra*). Addressing each of these in turn, the Copyright Office *declined* to appear in the arbitration and, even had it done so—or even if Atticus itself had appeared as amicus—it would not support Dramatic's position. *See Nat'l Fuel Gas Distribution Corp. v. TGX Corp.*, 950 F.2d 829, 839 (2d Cir. 1991 ("TGX's mere participation as an amicus curiae … does not establish that it significantly controlled NFG's conduct of that litigation."). The single brief on which Atticus provided suggestions was a post-hearing brief spanning scores of pages, submitted after the conclusion of the arbitral hearing and more than two years of pre-hearing proceedings, in which Atticus's counsel suggested only a few short paragraphs with additional legal cites and a cover email noting, "**Obviously you will adopt or not adopt this as you will**." *See* Ex. 8 (July 23, 2021 email). This of course is the opposite of control. Finally, the "internal memorandum" on "post-termination issues" that Atticus's counsel provided was an internal email memo on a legal theory that the Estate chose *not* to advance in the arbitration. Indeed, other than the aforementioned status requests, the bulk of the emails Atticus's counsel sent were suggestions on potential options for expert witnesses—given at the Estate's request, and none of whom the Estate chose to retain.

These isolated incidents, none of which relate to any of the core work in litigating the arbitration, do not come close to establishing that Atticus could somehow be bound to an arbitral award issued after a lengthy hearing in which it did not even *participate*, much less control. Recognizing as much, Dramatic once again misstates the standard itself, relying on an out-of-context snippet from *Montana v. United States*, 440 U.S. 147 (1979), to contend that mere "assistance" suffices. It does not. As this Court has already held, "[a] nonparty is not bound by a judgment because it has influenced another's litigation strategy. Privity exists if the nonparty 'assumed control over the litigation in which that judgment was rendered.'" April 27, 2023 Opinion and Order (DE 65) at 31 (quoting *Taylor v. Sturgell*, 553 U.S. 880, 895 (2008)). This Court's conclusion is supported by *Montana*, in which the court did *not* hold that the United States was subject to preclusion due to mere "assistance" but where the government had stipulated to facts establishing that it "directed and financed" the prior litigation, *id.* at 151—facts entirely absent here. Following *Montana* (both before and after the 2008

decision in *Taylor*), courts have repeatedly held that far more is required to establish "control" for purposes of the preclusion analysis than anything that existed here.[4]

Under the actual governing standards, there is no amount of further discovery that could establish that Atticus exercised any semblance of "control" over the Estate in the arbitration. Moreover, and independently, Dramatic does not even attempt to claim that Sorkin—the copyright owner of the Sorkin Play—had any such control, because he also did not. As Dramatic seems to have accepted, Sorkin thus cannot be bound by the arbitral award.

Accordingly, Dramatic's "control" argument is a doomed endeavor under all circumstances, and no further discovery is warranted. Notwithstanding, should the Court direct, Atticus is happy to provide any further materials the Court deems appropriate for *in camera* review.

Respectfully submitted,

/s/ Kevin Tottis                              /s/ Wook Hwang
Kevin Tottis

*Counsel for Dramatic Publishing Company*     *Counsel for Atticus LLC*


cc:    Counsel of record

---

[4] *See, e.g., Stichting Ter Behartiging Van De Belangen Van Oudaandeelhouders in Het Kapitaal Van Saybolt Int'l B.V. v. Phillippe S.E. Schreiber*, 327 F.3d 173, 185 (2d Cir. 2003) ("In those cases where we have applied the doctrine of privity …, we have found that that person nonetheless exercised some degree of *actual control* over the presentation of a party's case at the previous proceeding.") (emphasis added); *Omni Food Sales v. Boan*, 2007 U.S. Dist. LEXIS 62844, at *10 (S.D.N.Y. Aug. 24, 2007) ("Even if this defense agreement existed, however, it would prove only a litigation alliance; it alone would not create privity. There is simply no evidence that Boan either 'controlled or substantially participated in the control' of Cargill's presentation in the arbitration.").