UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| ATTICUS LIMITED LIABILITY COMPANY, | No. 1:22-cv-10147-DLC |
| *Plaintiff*, | |
| and | |
| AARON SORKIN, | |
| *Involuntary Plaintiff*, | |
| -against- | |
| THE DRAMATIC PUBLISHING COMPANY, | |
| *Defendant*. | |

**DRAMATIC PUBLISHING COMPANY'S OPPOSITION
TO ATTICUS' MOTION FOR ATTORNEY'S FEES**

## **TABLE OF CONTENTS**

TABLE OF AUTHORITIES ................................................................................................................ ii

INTRODUCTION ............................................................................................................................. 1

LEGAL STANDARD ........................................................................................................................ 4

ARGUMENT ................................................................................................................................... 7

I.    DRAMATIC'S LITIGATION POSITIONS WERE SUPPORTED AND OBJECTIVELY
      REASONABLE ......................................................................................................................... 7

   A.   Dramatic Reasonably Relied on Judge Kennelly's Decision in *Carter*. ........................... 7

   B.   Dramatic Reasonably Relied on Two Decisions in the Arbitration ................................. 10

      1.   The Arbitration Panel's Denial of Partial Summary Judgment Formed a Reasonable Basis
           for Dramatic's Position ............................................................................................... 11

      2.   Professor McGrath's Arbitration Award Formed a Reasonable Basis for Dramatic's
           Position ....................................................................................................................... 12

      3.   Dramatic Reasonably Relied on the Confirmation of the Arbitrator's Award by the
           Northern District of Illinois ....................................................................................... 15

   C.   Atticus' Statements Regarding Dramatic's Fee Award Are Baseless and Irrelevant. ........ 16

II.   DRAMATIC'S LITIGATION CONDUCT WAS SUPPORTED AND OBJECTIVELY
      REASONABLE ....................................................................................................................... 18

III.  A FEE AWARD WOULD ADVANCE ONLY ATTICUS' INTERESTS, NOT THE
      PURPOSES OF THE COPYRIGHT ACT OR PUBLIC INTEREST ..................................... 23

IV.   DRAMATIC REQUESTS DISMISSAL OR DEFERRAL OF THE FEE MOTION ............. 24

CONCLUSION ............................................................................................................................... 24

## <u>TABLE OF AUTHORITIES</u>

**Cases**

*Agolf, LLC v. Village of Arlington Heights*, 946 N.E.2d 1123, 1132-33 (Ill. App. 2011)............................22

*Apex Employee Wellness Servs., Inc., v. APS Healthcare Bethesda, Inc.,* No. 11-CV-9718,
2017 WL 456466, at *12 (S.D.N.Y., February 2, 2017)..........................................................24

*Badgerow v. Walters* 142 S. Ct. 1310, 1314, 1316-17 (2022)......................................................22

*Bourne Co. v. Walt Disney Co.*, No. 91-cv-0344, 1994 WL 263482, *2 (S.D.N.Y. June 10, 1994)............7

*Capitol Records, LLC v. ReDigi Inc.*, No. 1:12-cv-95-RJS, 2022 U.S. Dist. LEXIS 65110, at *25
(S.D.N.Y. Apr. 7, 2022) ..........................................................................................22

*Charles v. Seinfeld* , 410 F.Supp.3d 656, 659 (S.D.N.Y. 2019)......................................................21

*Chicago Title Land Trust Co. v. Potash Corp.*, 664 F.3d 1075, 1079 (7th Cir. 2011).............................22

*City of Chicago v. St. John's United Church of Christ*, 935 N.E.2d 1158, 1168 (Ill. App. 2010) ...............22

*Cottrill v. Spears*, No. 02-cv-3646, 2003 WL 21545105, *2 (E.D. Pa. July 2, 2003) ............................7

*Crown Awards, Inc. v. Disc. Trophy & Co.*, 564 F. Supp. 2d 290, 295 (S.D.N.Y. 2008)...........................22

*Dramatic Publishing Company v. Carter*, 608 F.Supp.3d 618, 624-25 (N.D. Ill. 2022)...............1, 7, 8, 9, 15

*Earth Flag Limited v. Alamo Flag Co.*, 154 F. Supp. 2d 663, 666 (S.D.N.Y. 2001).................................7

*Easter Unlimited, Inc. v. Rozier*, No. 18-cv-6637,
2021 WL 4409729, *7-8 (E.D.N.Y. Sept. 27, 2021) ...........................................................21

*Effie Film, LLC v. Pomerance*, No. 11-CV-7087,
2013 WL 1759560, *2 (S.D.N.Y. April 24, 2013) ..............................................................7

*Fogerty v. Fantasy, Inc.*, 510 U.S. 517, at 527 & 533 (1994)..........................................3, 4, 5, 7

*Jovani Fashion, Ltd. v. Cinderlla Divine, Inc.*, 820 F. Supp. 2d 569, 573 (S.D.N.Y. 2011).........................5

*Kirtsaeng v. John Wiley & Sons, Inc.*, 579 U.S. 197, 202 (2016).........................3, 4, 5, 6, 10, 14

*Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011)...............................................................20

*Lotus Development Corp. v. Borland Int'l, Inc.*, 140 F.3d 70, 74 (1st Cir. 1998) ................................3

*Lutkauskas v. Ricker*, 28 N.E.3d 727, 739 (Ill. App. 2015)........................................................22

*Mahan v. Roc Nation, LLC*, No. 14-cv-5075, 2015 WL 4388885, *2 (S.D.N.Y. July 17 2015) ...............6

*Margo v. Weiss*, 213 F.3d 55, 61-62, 65 (2d Cir. 2000) ..........................................................6

*Matthew Bender & Co. v. West Publ'g Co.*, 240 F.3d 116, 122-23 (2d Cir. 2001)....................................3, 5

*Mills Music v. Snyder,* 489 U.S. 153 (1985)....................................................................3, 13

*Narragansett Elec. Co. v. Am. Home Assur. Co.*, 999 F. Supp. 2d 511, 516 (S.D.N.Y. 2014) ...................20

*Nicholls v. Tufenkian Import/Export Ventures, Inc.*, No. 04-cv-2110,
2005 WL 1949487, *3 (S.D.N.Y. Aug. 11, 2005) .................................................................6

*Overseas Direct Imp. Co. v. Family Dollar Stores Inc.*, No. 10-cv-4919,
2013 WL 5988937, *2 (S.D.N.Y. Nov. 12, 2013) ...............................................................6

*PaySys International, Inc. v. Atos Se*, No. 14-cv-10105, 2019 WL 2051812, *9 (S.D.N.Y. May 9, 2019)...6

People ex rel. *Burris v. Progressive Land Developers, Inc*, 602 N.E.2d 820, 825 (Ill. App. 1992)................22

*Roberts v. BroadwayHD LLC*, 518 F.Supp.3d 719, 731 (S.D.N.Y. 2021) ...................................20

*Santos v. Dist. Council of N.Y.C. & Vic. of Utd. B'hd of Carpenters & Joiners*,
619 F.2d 963, 967 (2d Cir. 1980) .....................................................................................20

*Southland Corp. v. Keating*, 465 U.S. 1, 10 (1984) ........................................................... 4, 15

*Tancredi v. Metropolitan Life Ins. Co.*, 378 F.3d 220, 225-226 (2d Cir. 2004)................................24

*Taylor v. Sturgell*, 553 U.S. 880 (2008) ............................................................................22

*TVT Records, Inc. v. Island Def Jam Music Group*, 446 F.Supp.2d 235, 238-39 (S.D.N.Y. 2006) .......... 3, 7

*Walsh v. Townsquare Media, Inc.*, No. 19-cv-4958,
2022 WL 1302216, *2 (S.D.N.Y. May 2, 2022) ..................................................................5

*Webber v. Dash*, No. 19-cv-610, 2022 WL 2751874, *7, n.18 (S.D.N.Y. July 14, 2022) ........................5

*Yang v. Mic Network, Inc.*, No. 18-cv-7628, 2020 WL 6562403, * 3 (S.D.N.Y. Nov. 9, 2020) .......... 5, 20

*Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 108 (2d Cir. 2014)...........................................5

**Statutes**

17 U.S.C. § 304 .....................................................................................................1, 3, 10, 11

9 U.S.C. § 13 .......................................................................................................................1

**Rules**

Fed. R. Civ. P. 54(d), Notes of Advisory Committee on Rules – 1993 Amendment...........................24

## <u>INTRODUCTION</u>

Dramatic did not file this action. Dramatic never threatened Atticus or Sorkin with an infringement lawsuit or any other claim, for that matter. Rather, nearly a year after Dramatic posted an announcement on its website describing the successful results of a years-long arbitration with the Estate of Harper Lee, Atticus filed the present action claiming that the portion of the arbitrator's award finding Dramatic had exclusive worldwide rights to non-first-class stage rights in *To Kill a Mockingbird* was wrong. Atticus asked this Court to declare that, contrary to the arbitration award and final judgment in the Northern District of Illinois confirming it, Dramatic did not have exclusive non-first-class rights in the United States.

So Dramatic defended itself, relying on the final judgment confirming the arbitration award entered in the Northern District of Illinois. That judgment, as Congress has dictated, "shall have the same force and effect, in all respects, as, and be subject to all the provisions of law relating to, a judgment in an action. . . ." 9 U.S.C. § 13. Importantly, Dramatic's primary argument was based on the detailed analysis by Judge Matthew F. Kennelly in *Dramatic Publishing Company v. Carter*, 608 F.Supp.3d 618, 624-25 (N.D. Ill. 2022) where he found that Atticus' agreement to subject its rights to Ms. Lee's 1969 Agreement with Dramatic necessarily meant that, following the arbitration award, Atticus did not have the rights it claimed before this Court. Judge Kennelly's contract analysis, which alone amounts to well over a third of Dramatic's arguments in its submissions, is now completely ignored by Atticus.

Similarly, Dramatic's analysis of § 304 of the Copyright Act reflects the same arguments it successfully argued twice in the Arbitration. Despite Congress's and the Supreme Court's express endorsement of arbitration as a favored method of dispute resolution, Atticus belittles Professor William T. McGrath, the arbitrator, and the arbitration process, claiming, without any supporting evidence that Dramatic "was able to mislead the single private practice attorney who served as

arbitrator. . . ." ECF No. 96, at 1. Atticus is less than candid with the Court. The § 304 issue was submitted in the arbitration twice: first as a motion for partial summary judgment by the Estate, which a *unanimous three-arbitrator* panel of experienced practitioners rejected and, second, when Prof. McGrath (the chair of the panel sitting as a single arbitrator) after a full arbitration hearing heard oral argument and again ruled in favor of Dramatic.[1]

Nor does Atticus ever explain just how Dramatic could have duped Prof. McGrath. The objective facts belie this baseless conclusion. In the summary judgment briefing during the Arbitration, the Estate was represented by David Nimmer, whose treatise both Atticus and the Court have cited in these proceedings. *See, e.g.*, ECF Nos. 60-21, 60-22 (the Estate's and Dramatic's summary judgment submissions in the arbitration). Prof. Nimmer failed to persuade the three-arbitrator panel. ECF No. 60-23 (Order on Motion for Partial Summary Judgment). Atticus also fails to acknowledge the evidence already before the Court establishing that its counsel actively advised the Estate and participated in the vetting of the arbitrators on that three-arbitrator panel, where one (Roy Rifkin) was described as "great" and where Atticus' counsel failed to object to any of the potential arbitrators, including the Chair, Prof. McGrath. *See, e.g.*, ECF No. 86-6 at ATTICUS_000008-11. Atticus also ignores the fact that Prof. McGrath—the "single private attorney" it claims was somehow duped by Dramatic—taught copyright law at the John Marshall Law School for over 30 years, ECF No. 60-20 (William T. McGrath biography), or that, in the final argument before Prof. McGrath, the Estate was represented by Robert Clarida, a highly respected New York copyright lawyer, (Robert W. Clarida biography,

---

[1] Prof. McGrath's rulings in the arbitration were made in three orders, the Disposition for Application of Modification of Award to which the Final Award of Arbitrator and Interim Award of Arbitrator (Corrected) are attached and all three are presented together at ECF No. 37-6. To avoid confusion, citations to the contents of the Final Award of Arbitrator are referred to as "Final Award, pp. XX-XX" while citations to the contents of the Interim Award of Arbitrator (Corrected) are referred to as "Interim Award, pp. XX-XX".

https://www.reitlerlaw.com/people/robert-w-clarida/. Other than impugning the competence of

Prof. McGrath, the three-arbitrator panel he initially chaired and imputing wrongful motives to

Dramatic , Atticus does not provide this Court with a shred of evidence to conclude that either Prof.

McGrath or his two "wing" arbitrators were deceived in the process or that either of their decisions

was illegitimate, unreasonable or unreliable.

There is no question that this Court denied the relief Dramatic sought and granted Atticus

summary judgment. That, however, is not the inquiry in the fee context. A district court may not

award attorneys' fees in a copyright case "as a matter of course." *Kirtsaeng v. John Wiley & Sons, Inc.*,

579 U.S. 197, 202 (2016) (*citing Fogerty v. Fantasy, Inc.*, 510 U.S. 517, at 527 & 533 (1994)). As

discussed more fully below, without any explanation, Atticus has labelled Dramatic's position not

only unreasonable, but frivolous. But reasonableness does not hinge on hindsight analysis. *TVT*

*Records, Inc. v. Island Def Jam Music Group*, 446 F.Supp.2d 235, 238-39 (S.D.N.Y. 2006).

Atticus offers this Court no basis to find that Judge Kennelly's contract analysis was

frivolous or unreasonable nor does it explain why it was improper for Dramatic to rely on the

decision of a federal district court judge as the cornerstone of its defense. Atticus also fails to explain

(or even mention) why it was improper for Dramatic to rely on the three-arbitrator's unanimous

decision rejecting Prof. Nimmer's arguments or why it was improper or irresponsible for Dramatic

to adopt Prof. McGrath's detailed analysis of § 304(c), including his reliance on *Mills Music v. Snyder,*

489 U.S. 153 (1985). A litigant's success on its legal position in prior adjudications is compelling

evidence that the legal position is objectively reasonable. *See Matthew Bender & Co. v. West Publ'g Co.*,

240 F.3d 116, 122-23 (2d Cir. 2001); *see also Lotus Development Corp. v. Borland Int'l, Inc.*, 140 F.3d 70,

74 (1st Cir. 1998) (plaintiff's argument objectively reasonable where plaintiff prevailed on a virtually

identical claim in a prior case). Atticus has failed to identify a single opinion even hinting or

suggesting that it was improper for Dramatic to rely on an earlier district court opinion or on two

arbitration decisions, particularly when the second decision has been reduced to final judgment. Atticus also fails to identify any controlling case ignored by Dramatic, or, frankly, any case cited by Atticus that, on its own, carried the day. In short, Atticus' fee demand has no merit.

What does have merit, however, is respect for arbitration and the arbitration process. Congress enacted the Federal Arbitration Act nearly a century ago and declared a national policy favoring arbitration. *See, e.g., Southland Corp. v. Keating,* 465 U.S. 1, 10 (1984). Atticus sued Dramatic over part of an arbitration award and Dramatic defended itself in good faith on the basis of that award and the federal court final judgment confirming it. Atticus' motion should be denied.[2]

## **LEGAL STANDARD**

Atticus has moved for attorneys' fees under § 505 of the Copyright Act. "'There is no precise rule or formula for making these determinations,' but instead equitable discretion should be exercised...." *Fogerty,* 510 U.S. at 534 (citations omitted). The Supreme Court has established a pair of important restrictions. "First, a district court may not 'award[ ] attorney's fees as a matter of course'; rather, *a court must make a more particularized, case-by-case assessment. . . .* Second, a court may not treat prevailing plaintiffs and prevailing defendants any differently; defendants should be "encouraged to litigate [meritorious copyright defenses] to the same extent that plaintiffs are encouraged to litigate meritorious claims of infringement." *Kirtsaeng,* 579 U.S. at 202 (citing *Fogerty,* 510 U.S. at 527) (emphasis added).

The Supreme Court also has identified a list of non-exclusive factors to consider when determining whether to award attorneys' fees: (1) the frivolousness of the non-prevailing party's claims or defenses; (2) the party's motivation; (3) whether the claims or defenses were objectively

---

[2] Although Dramatic maintains that any award of fees is improper, Dramatic will not quibble with the specific amounts sought by Atticus. Dramatic notes, however, that time charged in the supplemental request could have been avoided had Atticus' counsel contacted Dramatic's counsel to seek a stipulation on the amount.

unreasonable; and under particular circumstances (4) compensation and deterrence. *Kirtsaeng*, 579 U.S. at 202 (citing *Fogerty*, 510 U.S. at 534 n.19. "Although objective reasonableness or unreasonableness carries significant weight, courts must view all the circumstances of a case on their own terms, in light of the Copyright Act's essential goals." *Kirtsaeng*, 579 U.S. at 209.

Although Atticus tosses around the terms "unreasonable" and "frivolous," it provides the Court with little to inform the "particularized, case-by-case assessment" required by *Kirtsaeng*. Indeed, the cases it cites bear no relationship to the facts before this Court. Certainly none of them involved prior adjudications by district court judges, detailed and multiple analyses by experienced arbitrators, practitioners and teachers or situations where parties relied on existing authority and were not faced with contrary authority.

In fact, objective unreasonableness and frivolousness are often analyzed together, because the test for frivolousness largely duplicates that of objective unreasonableness. *See Walsh v. Townsquare Media, Inc.*, No. 19-cv-4958, 2022 WL 1302216, *2 (S.D.N.Y. May 2, 2022). While frivolousness is distinct from objective unreasonableness, courts generally consider it as a "particularly intense form of objective unreasonableness." *Webber v. Dash*, No. 19-cv-610, 2022 WL 2751874, *7, n.18 (S.D.N.Y. July 14, 2022). "A lawsuit or litigation position is objectively reasonable if it has 'a reasonable basis in law and fact.'" *Yang v. Mic Network, Inc.*, No. 18-cv-7628, 2020 WL 6562403, * 3 (S.D.N.Y. Nov. 9, 2020) (quoting *Zalewski v. Cicero Builder Dev., Inc.*, 754 F.3d 95, 108 (2d Cir. 2014)). As discussed above, a litigant's previous success on a legal position constitutes compelling evidence that the legal position is objectively reasonable. *Matthew Bender*, 240 F.3d at 122-23.

On the other hand, a legal position is objectively unreasonable "if it is 'clearly without merit or otherwise patently devoid of legal or factual basis.'" *Yang*, 2020 WL 6562403 at *3 (quoting *Jovani Fashion, Ltd. v. Cinderlla Divine, Inc.*, 820 F. Supp. 2d 569, 573 (S.D.N.Y. 2011)). Cases found to be

objectively unreasonable include circumstances where the plaintiff filed suit after the statute of limitations had run, *Mahan v. Roc Nation, LLC*, No. 14-cv-5075, 2015 WL 4388885, *2 (S.D.N.Y. July 17 2015); the plaintiff relied on false affidavits in opposition to summary judgment, *Margo v. Weiss*, 213 F.3d 55, 61-62, 65 (2d Cir. 2000); and the plaintiff had no legitimate basis to claim any domestic infringement and then sought to support its foreign copyright claims by untimely expanding the scope of copyright registrations through supplemental registrations, *PaySys International, Inc. v. Atos Se*, No. 14-cv-10105, 2019 WL 2051812, *9 (S.D.N.Y. May 9, 2019).

Importantly, a "lack of success on the merits, without more, does not establish that the non-prevailing party's position was objectively unreasonable." *Overseas Direct Imp. Co. v. Family Dollar Stores Inc.*, No. 10-cv-4919, 2013 WL 5988937, *2 (S.D.N.Y. Nov. 12, 2013). To find as much "would establish a per se entitlement of attorney's fees whenever issues pertaining to judgment are resolved against a copyright plaintiff." This is not "a correct construction of the law." *Nicholls v. Tufenkian Import/Export Ventures, Inc.*, No. 04-cv-2110, 2005 WL 1949487, *3 (S.D.N.Y. Aug. 11, 2005). Indeed, "if some court confuses the issue of liability with that of reasonableness, its fee award should be reversed for abuse of discretion." *Kirtsaeng*, 579 U.S. at 208.

Nor should hindsight enter into the reasonableness analysis. A ruling in favor of a litigant on the merits cannot:

> categorically equate[] to a ruling that the claims of the losing party were frivolous and unreasonable and not worthy of being pursued in the first instance, and on that account subject the loser to pay the adversary's attorneys' fees and costs [because that] would not only penalize litigants for persisting with even colorable claims, but inherently handicap the vast majority of unfortunates not endowed with sufficient prophetic power. Such a holding potentially would also do away with the American rule, the premise of which is that except in very limited circumstances, each side to a lawsuit bears its own litigation expenses.

*TVT Records, Inc.*, 446 F.Supp.2d at 238-39 (S.D.N.Y. 2006); *see also, Cottrill v. Spears*, No. 02-cv-3646, 2003 WL 21545105, *2 (E.D. Pa. July 2, 2003) ("[h]indsight is not the applicable standard in judging the reasonableness of [plaintiffs'] suit.").

Finally, a party's good-faith decision to litigate complex, novel or undecided issues of law is not objectively unreasonable. *Effie Film, LLC v. Pomerance*, No. 11-CV-7087, 2013 WL 1759560, *2 (S.D.N.Y. April 24, 2013). Indeed, "[a]mong other factors that may justify the denial of fees to a prevailing plaintiff is the presence of a complex or novel issue of law that the defendants litigate vigorously and in good faith." *Bourne Co. v. Walt Disney Co.*, No. 91-cv-0344, 1994 WL 263482, *2 (S.D.N.Y. June 10, 1994). "Because copyright law ultimately serves the purposes of enriching the general public through access to creative works, it is peculiarly important that the boundaries of copyright law be demarcated as clearly as possible." *Fogerty*, 510 U.S. at 527. Hence, "a court should not award attorneys' fees where the case is novel or close because such a litigation clarifies the boundaries of copyright law." *Earth Flag Limited v. Alamo Flag Co.*, 154 F. Supp. 2d 663, 666 (S.D.N.Y. 2001).

## ARGUMENT

## I.   DRAMATIC'S LITIGATION POSITIONS WERE SUPPORTED AND OBJECTIVELY REASONABLE

### A.   Dramatic Reasonably Relied on Judge Kennelly's Decision in *Carter.*

Dramatic based much of its defense against Atticus' lawsuit on arguments presented to and adopted by Judge Matthew F. Kennelly in *Dramatic Publishing Company v. Carter*. In *Carter*, Judge Kennelly held that Atticus' predecessor Rudinplay (Atticus' predecessor) did not acquire from Harper Lee the right to license its version of the play in non-first-class theaters. *See Dramatic Publ'g Co. v. Carter*, 608 F. Supp. 3d 618, 624-25 (N.D. Ill. 2022). The court reached its decision as a matter of contract law: Lee and Rudinplay contracted to make the grant of rights subject to whatever rights Lee had in relation to Dramatic. *Id.* at 624 ("In short, this clause says that the rights granted to

Rudinplay are subject to those previously granted to Dramatic."). The arbitrator's finding that the Lee Estate did not recover non-first-class rights from Dramatic meant that the Estate never had the rights to transfer to Rudinplay. When Atticus sued, Dramatic made the exact same arguments in its defense. *See* ECF No. 29 at 1-3, 4, 7-8, 13-16; ECF No. 47 at 1, 2-3, 5-6; ECF No. 50, at 5-6, 7-11. Dramatic reasonably relied on Judge Kennelly's decision, and its presentation of the same arguments to this Court was neither frivolous nor unreasonable.

Exploring Judge Kennelly's decision in depth demonstrates why Dramatic relied on it in good faith. In *Carter*, the Lee Estate sought to vacate the portion of the arbitration award holding Dramatic's exclusive rights survived termination. *See Carter*, 608 F. Supp. 3d at 623-24. The Estate argued that the arbitrator's award should be vacated because it would require the Estate to violate the rights of third parties Atticus and Sorkin, by requiring the Estate to refrain from helping them license the Sorkin version of *To Kill a Mockingbird* for any non-first-class production. *See id.* Judge Kennelly rejected the argument, ruling that as a matter of law Atticus and Sorkin had no rights to which exclusivity would apply.

Judge Kennelly found that under the terms of Rudinplay's agreement with Lee, Rudinplay never obtained the "legal right to license the play for non-first-class productions from Lee." *Id.* at 624. This was because of the language of Rudinplay's agreement with Lee: "The rights granted hereunder shall be subject to the rights granted under the Prior Agreement, as limited by such termination." *Id.* (quoting Rudinplay Agreement ¶ 2(b)). Judge Kennelly held the agreement meant that if the arbitrator found Dramatic retained exclusive rights under the 1969 Agreement, Lee never had those rights to transfer to Atticus' predecessor in the first place:

> In short, this clause says that the rights granted to Rudinplay are subject to those previously granted to Dramatic. This limitation means that ***if Dramatic is properly found to have retained the right*** to produce the play in non-first-class theatres, then Rudinplay ***did not acquire*** that right.

*Id.* (emphasis added). Judge Kennelly found that is precisely what occurred:

> ***This is exactly what transpired****. The arbitrator determined that following Lee's termination of the license, under the Derivative Works Exception, Dramatic continues to exclusively hold all non-first-class rights.* ***Thus by the terms of the Rudinplay Agreement, Rudinplay does not own the non-first-class rights—as they never returned to the Estate following its termination of Dramatic's license****. The arbitrator put it this way: "Because Rudin's rights are subject to Dramatic's rights under the terms of 1969 Agreement, and because Dramatic's exclusive rights are preserved by the Derivative Works Exception, it follows that Rudin has no stock and amateur rights for live theatrical productions of [the novel]." Interim Arbitration Award at 71-72 (dkt. No. 21).

*Id.* (emphasis added). In short, Judge Kennelly concluded, "Rudinplay did not acquire the right to license its version of the play in non-first-class theaters," and the arbitration award did not direct the Estate to violate the rights of Atticus and Sorkin, "as they do not have a legal right to license the play in non-first-class theaters either." *Id.* at 625.

As noted above, Dramatic presented these very same arguments to this Court in seeking dismissal of Atticus' declaratory judgment complaint and denial of Atticus' summary judgment motion. Dramatic made these arguments the cornerstone of its defense, leading off its motion to dismiss and reply with Judge Kennelly's contract analysis, amounting to roughly a third of Dramatic's arguments in its submissions on the subject.

In its current motion, Atticus calls each position Dramatic took in the litigation "objectively unreasonable and frivolous" ECF. No. 96, at 9, but it pays scant attention to the implications of the arbitral award, and it says nothing about Judge Kennelly's analysis and decision which Dramatic briefed extensively and formed the core of Dramatic's defense. ECF No. 96, at 10 (arguing without explanation that Dramatic seeks to "bootstrap off the arbitral award to claim that its position was reasonable," having supposedly "misled the arbitrator"). Even though Judge Kennelly's contract analysis amounted to over a third of Dramatic's argument, Atticus tries to sidestep it, suggesting that Dramatic's argument that Atticus was contractually bound to the arbitrator's finding was solely

derived from *res judicata* preclusion theories. *See id.* (arguing that "the Court rejected each of Dramatic's preclusion arguments"). This simply is not true. In its briefing to this Court, Dramatic emphasized that its contract argument was ***not*** based on *res judicata* or any other preclusion theory. (*See, e.g.,* ECF No. 47, at 1 ("Importantly, none of this analysis turns on application of res judicata, although that doctrine provides an independent basis for dismissal"); ECF No. 50 at 9 ("As Dramatic has made clear, this is an issue of contract law.").) Atticus provided no basis to conclude that Dramatic improperly relied on Judge Kennelly's ruling, much less Atticus' sweeping declaration that "each of Dramatic's positions in the litigation were objectively unreasonable and frivolous." ECF No. 96 at 9.

Atticus vehemently disagrees with Dramatic's positions in this case, and this Court reached a different conclusion than what Dramatic argued. But that does not render Dramatic's positions frivolous, or its reliance on another district judge's opinion unreasonable. *See Kirtsaeng*, 579 U.S. at 208 (in assessing a fee award a court should not confuse "the issue of liability with that of reasonableness"). Dramatic had strong reasons to assert arguments forming the basis for the earlier opinion of the district court that ruled in its favor.

### B.   Dramatic Reasonably Relied on Two Decisions in the Arbitration.

Atticus argues that Dramatic somehow "misled" the arbitrator, Prof. McGrath, on whether the grant in the 1969 Agreement to Dramatic of non-first-class rights survived termination under the derivative works exception to § 304 of the Copyright Act.[3] ECF No. 96, at 10. But Atticus never explains just how Dramatic could have "misled" the arbitrator—or, more accurately here, the

---

[3] Atticus' misstatements to the contrary, Dramatic never—not once—claimed that the termination provision can never apply to an exclusive license (or, as Atticus puts it, "that the Copyright Act's derivative works exception renders exclusive licenses interminable"). ECF No. 96, at 10. Rather, Dramatic argued that application in this instance of the derivative works exception of § 304 to Dramatic's the specific terms of Dramatic's grant from Ms. Lee resulted in Dramatic retaining exclusive non-first-class rights after the valid termination of its exclusive license.

arbitrators—who previously considered the issue. As discussed above, a full panel of arbitrators first addressed the legal issue in response to Prof. Nimmer's summary judgment motion and rejected it. ECF No. 60-23 (Order on Motion for Partial Summary Judgment). After giving the Estate the opportunity to develop any further facts in a full hearing, Prof. McGrath-now sitting as the sole arbitrator—entertained the same legal issue a second time. ECF No. 37-6, Interim Award, p. 3, n.2 and 60-72. The arbitrators' decisions, including the final award which was confirmed by a sitting federal district judge in the Northern District of Illinois, provided a reasonable basis for the arguments that Dramatic made in seeking to dismiss Atticus' claims in this case.

### 1.   The Arbitration Panel's Denial of Partial Summary Judgment Formed a Reasonable Basis for Dramatic's Position

In the arbitration, the Lee Estate moved for partial summary judgment before a panel of three arbitrators on the exclusivity issue. ECF No. 60-21. Dramatic opposed the motion, and the panel ultimately ruled in Dramatic's favor, denying partial summary judgment. ECF Nos. 60-22 and 60-23.

The Estate was ably represented in its motion before the panel by Prof. Nimmer who explained, the three-arbitrator tribunal would decide a legal issue:

> Because [Dramatic's] requested declaration that it retains exclusionary rights post-termination contravenes United States copyright law, it should be summarily denied and partial summary judgment should be granted in favor of the Estate on this issue. The parties agree that the issue presented by the motion is purely a question of law and that there are no disputed facts that would prevent summary disposition with respect to the issue.

ECF No. 60-21, at 2.

On February 13, 2020, the Panel denied the Estate's motion, finding that "[w]e do not find that as a matter of law § 304(c)(6)(A) eliminates any and all affirmative exclusionary rights that were transferred in the original grant." ECF No. 60-23, at 2. There is no reason to believe that the arbitrators were "misled" or somehow incapable of discerning meritorious arguments from frivolous

ones. Indeed, as discussed above, Atticus played a direct role in choosing the same arbitrators who would later deny the Estate's summary judgment motion.

Each of the three arbitrators on the panel had significant litigation and copyright experience. Atticus has provided no reason to believe these experienced arbitrators did not approach their duties with diligence and integrity. Each arbitrator executed an oath in which he agreed to "effectively manage all phases of this case with commitment to speed, economy and just resolution . . . ." ECF No. 60-19 (General Arbitrator Oath Forms). The oath binds the arbitrators to the AAA Code of Ethics for commercial arbitrators, which requires arbitrators to conduct proceeding fairly, diligently and in a "just, independent and deliberate manner." Ex. 1, Tottis Decl., Ex. B (The Code of Ethics for Arbitrators in Commercial Disputes), at 6. Atticus has not suggested they violated their oaths or ethical duties.

### 2. Professor McGrath's Arbitration Award Formed a Reasonable Basis for Dramatic's Position

For the hearing, the parties agreed to proceed with a single arbitrator, Prof. McGrath. ECF No. 37-6, Interim Award, p. 2.) Over Dramatic's objection, Prof. McGrath permitted the Estate to reargue the exclusivity issue. (*Id.* at 3, n.2.) Prof. McGrath presided over a five-week arbitration, hearing the testimony of 13 witnesses and receiving over 1000 exhibits. (*Id.* at 4; *see also* Ex. 1, Tottis Decl., ¶ 5.) On October 18, 2021, the arbitrator issued an Interim Award, ruling in favor Dramatic on nearly all points. (ECF No. 37-6, Interim Award.)

Roughly 11 pages of the arbitrator's 88-page Interim Award address the exclusive rights issue. ECF No. 37-6, Interim Award, pp. 60-71. In his analysis, Prof. McGrath found "[a]n author's right to terminate a transfer is subject to certain conditions. One of those conditions is the Derivative Works Exception." (*Id.* at 62.) Prof. McGrath proceeded to discuss the effect of the language of the exception, relying on both the language of the Copyright Act (*id.* at 62-64) and the U.S. Supreme Court's application of the derivative works exception in *Mills Music, Inc. v. Snyder,* 489

U.S. 153 (1985) (*id.* at 64-66). The arbitrator acknowledged that while *Mills Music* addressed a "somewhat different" issue than the one before him:

> much of the Court's language and reasoning provides guidance to the proper interpretation of the Exception. The Court reinforces that the Exception means what it clearly says: "we believe the consequences of a termination that §304 authorizes simply do not apply to derivative works that are protected by the Exception defined in §304(c)(6)(A)."

(*Id.* at 65.) Prof. McGrath then explained, quoting *Mills,* that although termination may permit a copyright to revert to an author, "nothing in the statute gives them any right to acquire any contractual rights that the Exception preserves." (*Id.* at 66 (quotations and citations omitted).)

Prof. McGrath then explained the two "key facts" in *Mills Music* that determine whether a derivative author is protected by the exception: the scope of "the duly authorized grant" and when the derivative work was prepared. *Id.* Prof. McGrath then found Dramatic met both tests: it was granted an exclusive license and its derivative work was created before the termination. *Id.* He recognized that the general purpose of the Copyright Act is to award original authors with an extended term by reverting rights back to them, but also noted that this was not absolute, finding that Congress, "with guidance from the Copyright Office and interested industries," created a "carefully balanced compromise that provided with [*sic*] some benefits to original authors and some benefits to derivative authors." *Id.* at 67. Quoting *Mills Music,* he also explained that "the Exception 'is as much a part of the statute as the right of reversion.'" *Id.* at 68 (citations omitted). At no point did Prof. McGrath suggest that an author never could terminate of exclusive rights; indeed he emphasized that, consistent with the statutory language of the derivative works exception, the Estate was free to authorize the creation of **new** derivative works following termination. *Id.*; *see also* 17 U.S.C. § 304(c)(6)(A) ("A derivative work prepared under authority of the grant before its termination may continue to be utilized under the terms of the grant after its termination, *but this*

*privilege does not extend to the preparation after the termination of other derivative works based upon the copyrighted work covered by the terminated grant.*") (emphasis added).

To be sure, this Court rejected the arbitrator's analysis and decision. But for purposes of Atticus' demand for fees, the question is whether Dramatic had a serious basis to make such an argument in this case. *See Kirtsaeng*, 579 U.S. at 208. Dramatic did and, in good faith, relied on the arbitrator's analysis of the statute and the case law interpreting it, and the arbitrator's ultimate award.

Atticus has not cited any authority for awarding attorney's fees against a litigant who made arguments that were based on a prior arbitral award. Atticus' only response to the award is that Dramatic somehow "misled" the arbitrator. ECF No. 96, at 10. There is no support for this accusation. During summation, the Estate was represented by, among others, Robert Clarida, a respected and accomplished New York copyright practitioner who argued the exclusivity issue on behalf of the Estate. Notably, Atticus' counsel in this case—the same counsel who persuaded this Court to rule against Dramatic and now is seeking attorney's fees—wrote at least a third of the Estate's brief filed with the arbitrator, including the arguments on termination and reversion. ECF No. 86-2 (July 23, 2021 email from Mr. Zavin providing "comments on excerpt of the brief regarding the exclusivity argument"). Having considered the arguments made by Mr. Clarida, the Estate's other lawyers, and Atticus' current counsel (as well as the earlier briefing and argument from Prof. Nimmer), the arbitrator nevertheless ruled against the Estate and issued an award on which Dramatic relies for its position that it owns non-first-class rights. Dramatic had a strong basis to continue taking the same the position here as it took, and prevailed on, in the arbitration.

Finally, the reasonableness of Dramatic's reliance on the Interim Award is confirmed by Judge Kennelly's decision in *Carter*. In his opinion, Judge Kennelly did not expressly rule on the applicability of the derivative works exception to termination under the Copyright Act. The Estate argued that point, but Judge Kennelly found he did not need to decide it, given the agreement

between Lee and Rudinplay which, as a matter of contract law, made the grant of rights to

Rudinplay subject to an arbitrator's determination of the rights retained by Dramatic. *See Carter*, 608

F. Supp. 3d, at 624 ("Much of the briefing focuses on the first premise—determining what rights a

grantee retains, and the exclusivity of those rights, following termination under the Copyright Act.

But the Court need not address whether the arbitrator erred on that issue, because the Estate's

argument falls short on the second premise regardless."). It is notable, though, how Judge Kennelly

characterized the arbitrator's decision: "if Dramatic is ***properly found*** to have retained the right to

produce the play in non-first-class theatres, then Rudinplay did not acquire that right. ***This is***

***exactly what transpired.***" *Id.*

### 3. Dramatic Reasonably Relied on the Confirmation of the Arbitrator's Award by the Northern District of Illinois

Judge Kennelly confirmed the arbitrator's final award. ECF 30-5 (Final Judgment Order

entered in NDIL). An arbitration award, once confirmed and reduced to judgment, must be treated

like any other judgment by any other federal district court. "The judgment so entered shall have the

same force and effect, in all respects, as, and **be subject to all the provisions of law relating to, a**

**judgment in an action**; and it may be enforced as if it had been rendered in an action in the court

in which it is entered. 9 U.S.C. § 13. (emphasis added).[4] There is a strong public policy favoring the

enforceability of arbitral awards. *See, e.g., Southland Corp.,* 465 U.S. at 10. As such, Dramatic had a

well-founded basis to rely on the award in this case.

---

[4] As Judge Kennelly noted in *Carter*, the exclusivity issue was fully briefed before him: "[m]uch of the briefing focuses on the first premise—determining what rights a grantee retains, and the exclusivity of those rights, following termination under the Copyright Act." *Carter*, 608 F. Supp. 3d at 624. If Dramatic's position as adopted by the Arbitrator were such "a grossly distorted interpretation of the Copyright Act's termination provisions" as Atticus argues, ECF No. 96, at 10, it would not be out of the realm of possibility for Judge Kennelly to say so.

**C.**     **Atticus' Statements Regarding Dramatic's Fee Award Are Baseless and Irrelevant.**

After falsely claiming Dramatic somehow "misled" Prof. McGrath in ruling that Dramatic's exclusive non-first-class rights survived termination, Atticus—without a shred of evidence—tells this Court that Dramatic "incurred over $2.5 *million* in attorney's fees to obtain this distorted result . . ."[5] ECF No. 96, at 1. That is nonsense. The exclusivity issue in the arbitration was a small part of Dramatic's larger dispute with the Estate, as even a cursory review of the Interim and Final Arbitration Awards shows. ECF No. 37-6. The majority of the 88-page Interim Award addresses the Estate's repeated violations of its 1969 Agreement with Dramatic, its tortious interference with Dramatic's licensees, and the Estate's unsuccessful copyright infringement claim against Dramatic. Only about 11 pages of the 88-page Interim Award address the exclusivity issue. ECF No. 37-6, at 60-72. The Estate's two losses on the issue certainly did not form the basis for the fee award.

The Final Award, which set forth the basis for the arbitrator's fee award to Dramatic, does not even mention the exclusivity issue. ECF No. 37-6. It gave three bases for awarding attorney's fees—the Copyright Act, the contract, and the AAA rules. ECF No. 37-6, Final Award, p. 5. After stating he did not find the Estate's copyright claims objectively unreasonable—the "copyright claims" raised by the Estate involving infringement, not exclusivity—Prof. McGrath concluded that factors of "encouraging meritorious defenses, motivation and the need for compensation and deterrence to be compelling in this case." *Id.* Next, he explained that Dramatic prevailed by showing it "did not violate the 1969 Agreement and that the Estate did." *Id.* The primary event triggering the

---

[5] Atticus also continues to perpetuate the falsity that "Dramatic advanced the nonsensical position that exclusive licenses are *interminable.*" ECF No. 96, at 1. That is a gross mischaracterization of Dramatic's position. Rather, as Prof. McGrath found Dramatic argued that its pre-termination derivative work was to be utilized "under the terms of the original grant" consistent with the language of the statute. ECF No. 37-6, Interim Award, pp. 66-69. Nothing Dramatic argued or that Prof. McGrath found would prohibit creation of subsequent derivative works, including the Sorkin work.

arbitration in the first place was the Estate's unlawful position (encouraged by the "Rudin interests")
that Dramatic was not authorized to grant "stock licenses to regional theaters that use one or more
professional actors." *Id.* The arbitrator found this a "crucial issue" and was clearly troubled by the
Estate's failure to heed the advice of its lawyer, Tim O'Donnell and to bow to outside pressure:

> Evidence of Mr. O'Donnell's statement and communications
> provided **substantial evidence** that the practice did not exceed the
> scope of the grant, **and that the Estate were aware of this.** This
> was reinforced by decades of acquiescence. Nevertheless,
> Respondents yielded to pressure from the Rudin interests to the
> detriment of Dramatic. The Respondents' motivations in this
> litigation were, **as shown in substantial evidence**, influenced by
> these outside interests rather **than by the respective rights of the
> parties under the 1969 Agreement.**

*Id.* (emphasis added).

Atticus' repeated references to the $2.5 million fee award suggest, falsely, that all the money
spent by (and repaid to) Dramatic somehow enabled it to "mislead" Prof. McGrath into ruling that
the exclusivity term of the original grant survived termination. They also suggest, falsely, that an
attorney's fee award by the Court in this case would inflict no harm on Dramatic—and that
Dramatic should disgorge ill-gotten-gains. But Dramatic was forced to incur those significant fees in
the arbitration to vindicate its rights in relation to the Estate across a range of issues. The fees
Dramatic incurred in doing so were reasonable. As the arbitrator found, the Estate's law firm billed
55% more hours than Dramatic's (*id.* at 10) at higher rates (*id.* at 6) in the arbitration.

In truth, Dramatic was billed less than $200,000 in connection with the exclusive rights issue.
Ex. 1, Tottis Decl., ¶ 4. Beyond preliminary research and drafting and arguing the summary
judgment motion, the only other time spent addressing the exclusivity issue in any meaningful was in
the parties' summation hearing and in final briefing. Ex. 1, Tottis Decl., ¶ 4. During the nearly 25
days of testimony, not a single witness testified to any fact or issue relating to exclusivity. Ex. 1,
Tottis Decl., ¶ 5. Indeed, neither party's post-hearing briefing regarding exclusivity includes any

record citations beyond the terms of the 1969 Agreement. ECF No. 86-3 (the Estate's Post-Hearing Brief) and Ex. A (except from DPC's Post-Hearing Brief). Dramatic's total post-hearing briefing on exclusivity totaled 5 pages (pages 39-43) out of 52, Ex. 1, Tottis Decl., Ex. A; according to hearing transcripts, 8 pages out of 106-page transcript from the closing arguments and of the 5,065 total transcript pages were devoted to the issue. Ex. 1, Tottis Decl., ¶ 6.

Atticus has no legitimate basis to claim Dramatic incurred $2.5 million in fees to obtain the exclusivity ruling in the arbitration. The Court should disregard this inflammatory claim.

## II.     DRAMATIC'S LITIGATION CONDUCT WAS SUPPORTED AND OBJECTIVELY REASONABLE

Dramatic's conduct in the litigation was not objectively unreasonable as Atticus claims. ECF No. 96, at 12. As an initial matter, Dramatic's conduct in this case was driven not by any sort of improper motivation or bad faith, as Atticus suggests. Dramatic did not file this lawsuit. It never threatened Atticus with an infringement suit or a declaratory judgment action. ECF No. 79, at ¶¶ 9-11. Dramatic had not even obtained final judgment on Judge Kennelley's confirmation of the arbitration award before Atticus filed its declaratory judgment complaint. After being sued, Dramatic defended the arbitration award and final judgment, making many of the same arguments on which it prevailed in the arbitration and the Northern District of Illinois. Dramatic defended itself against Atticus' claim. None of this demonstrates improper motivation or bad faith.

The three arguments Atticus offers as to Dramatic's purported litigation conduct are without merit. First, Atticus' complaint about "voluminous" filings in response to Atticus' cross-motion for summary judgment, ECF No. 96, at 12, is unwarranted. Atticus moved for case-terminating summary judgment before Dramatic had an opportunity to file an answer or obtain any discovery. With no answer on file, Dramatic's statements of additional facts, Rule 56(d) declaration, and exhibits were justified and provided the various grounds on which Dramatic relied in its defense.

Dramatic's filings opposing summary judgment did not impose an undue burden on Atticus. According to Atticus' time records, Atticus' counsel spent no more than 6 hours responding to the statements of additional facts. ECF No.95-8, at 13-15. And Atticus' complaint that Dramatic served "forty exhibits totaling over 500 pages," ECF No. 96, at 12, rings hollow, where Atticus itself served exhibits in support of its cross-motion for summary judgment totaling 386 pages. ECF Nos. 37-1 - 37-9.

Second, Atticus' complaint about Dramatic initiating "an expensive and time-consuming e-discovery process" is equally without merit. In its April 27, 2023 Opinion and Order, the Court ordered a conference "to determine whether Dramatic is entitled to discovery on the issue of whether Atticus controlled the Lee Estate in its arbitration with Dramatic." ECF. No. 65, at 34. At the May 25, 2023 conference, counsel for Atticus *volunteered* to produce select correspondence between itself and counsel for the Lee Estate regarding the arbitration. ECF No. 84, at 3-4. The Court ordered the parties to submit a letter by June 16 regarding the status of fact discovery on the issue of privity through control. ECF No. 75, at 2. In the letter, Dramatic said it sought further targeted discovery in light of its review of the correspondence Atticus produced. ECF No. 86, at 2. But Dramatic also noted that "it is not interested in prolonging the litigation unnecessarily. If the Court does not view full disclosure of Atticus' role in preparing and advising on the exclusivity briefing sufficient to constitute 'control' as a matter of law, Dramatic requests no further discovery." *Id.* Dramatic did not serve any document requests or interrogatories, and it did not move to compel discovery. If anything, Dramatic exercised restraint in inquiring as to the facts of Atticus' control over the litigation.

It also is not true that the limited, redacted correspondence Atticus voluntarily produced "accomplished nothing." ECF No. 96, at 12. To the contrary, the correspondence revealed, among other things, that Atticus' counsel had drafted substantial portions of the Lee Estate's briefs on

exclusivity, indicating the extent of Atticus' involvement in the underlying arbitration. ECF No. 86-2. While the Court ultimately ruled against Dramatic on the merits, that does not render the efforts to seek discovery of Atticus frivolous or objectively unreasonable.

Third, Dramatic's motion for summary judgment was neither frivolous nor objectively unreasonable. Not only did Dramatic seek this Court's permission to file the motion after outlining the basis for it at the May 25 conference, Dramatic's request was not "devoid of a legal or factual basis." *Yang*, 2020 WL 6562403, *3. With respect to the timing of the motion, Dramatic relied on Second Circuit law stating that, even after pre-answer motion practice, a defendant does not waive its right to assert the statute of limitations affirmative defense in its answer. *See Santos v. Dist. Council of N.Y.C. & Vic. of Utd. B'hd of Carpenters & Joiners*, 619 F.2d 963, 967 (2d Cir. 1980) (cited in ECF No. 77, at 13; ECF No. 83, at 7-8). Dramatic also cited a case in this district directly on point where the court refused to bar a statute of limitations defense not raised in response to a pre-answer summary judgment motion. *See Narragansett Elec. Co. v. Am. Home Assur. Co.*, 999 F. Supp. 2d 511, 516 (S.D.N.Y. 2014) (cited in ECF No. 83, at 13). There, Judge Schofield rejected the notion that the defendant waived its statute of limitations defense and said "[j]ustice requires consideration of Defendant's statute of limitations defense." Dramatic's reliance on the decision was neither frivolous nor unreasonable.

Likewise, with respect to the merits of Dramatic's statute of limitations defense, Dramatic explained in detail why it viewed Atticus' declaratory judgment claim as one involving competing claims of ownership and not copying, thus triggering the single-accrual rule. *See Roberts v. BroadwayHD LLC*, 518 F.Supp.3d 719, 731 (S.D.N.Y. 2021) (a claim for copyright infringement is an "ownership claim, when it 'does not involve the nature, extent or scope of copying,' but instead focuses on competing assertions of . . . rights in the work at issue." (citing *Kwan v. Schlein*, 634 F.3d 224, 229 (2d Cir. 2011)) (cited in ECF No. 77 at 1; ECF No. 83 at 3-4). Dramatic pointed out that

the very basis for Atticus' claim for standing in this case was that "[a]n actual and justiciable controversy has arisen . . . regarding *whether [Dramatic] owns exclusive rights* to present 'non-first class' productions . . . *or, as Atticus contends, that Atticus and Sorkin have sufficient rights* to present such productions of the Sorkin Play. ECF No. 77, at 6 (quoting Atticus' Complaint, ECF No. 1, ¶ 42).

Based on the language from Atticus' complaint, Dramatic argued the case was about competing assertions of rights in a work. Dramatic cited case authority where a party's own ownership was not at interest, but still, the court held the statute of limitations began to run on the dispute. *See Charles v. Seinfeld*, 410 F.Supp.3d 656, 659 (S.D.N.Y. 2019); *Easter Unlimited, Inc. v. Rozier*, No. 18-cv-6637, 2021 WL 4409729, *7-8 (E.D.N.Y. Sept. 27, 2021) (cited in ECF No. 83, at 4). Again, the Court did not accept the holdings of these cases, but it was not unreasonable for Dramatic to rely on them.

Atticus suggests it was unreasonable for Dramatic to argue Atticus had notice of the conflicting claims of ownership rights because "Dramatic merely took the position in a private arbitration, against a non-party to this action (the Lee Estate), that its exclusivity was interminable." ECF No. 96, at 6 (emphasis omitted). But Atticus knew Dramatic's position and, in fact, stipulated that it received the arbitration demand when it was filed. The demand was clear that Dramatic sought a declaration that it held exclusive rights in non-first-class stage rights and expressly sought "[a] declaration *. . . that no other person or entity has such rights in any other stage version of the novel."* ECF No. 60-18, at 8 (emphasis added).

The two cases Atticus cites are not remotely relevant. In *Capitol Records*, the court awarded fees primarily on the grounds that the defendants sought to repudiate a series of prior judicial admissions on summary judgement and asserted dozens of affirmative defenses, including several premised on arguments previously rejected by the court. *See Capitol Records, LLC v. ReDigi Inc.*, No.

1:12-cv-95-RJS, 2022 U.S. Dist. LEXIS 65110, at *25 (S.D.N.Y. Apr. 7, 2022). In *Crown Awards*, the court on several occasions admonished the defendant and its counsel for misconduct during the trial and found that a witness's testimony contained statements that the witness admitted at his deposition were false. *Crown Awards, Inc. v. Disc. Trophy & Co.*, 564 F. Supp. 2d 290, 295 (S.D.N.Y. 2008). Nothing remotely approaching such egregious misconduct occurred here.

Elsewhere in its brief, Atticus takes Dramatic to task for arguing that the Lee Estate adequately represented Atticus' interests in the arbitration because the Supreme Court rejected the concept of "virtual representation" in *Taylor v. Sturgell*, 553 U.S. 880 (2008). ECF No. 96, at 10. Atticus ignores the fact that Dramatic relied on Illinois rather than federal authority, including specific Illinois authority finding that Illinois courts are not bound by *Taylor*. *City of Chicago v. St. John's United Church of Christ*, 935 N.E.2d 1158, 1168 (Ill. App. 2010). ECF No. 50, at 16. Worse yet, Atticus conveniently forgets that it expressly argued that Illinois law may govern the *res judicata* issues, based on the Supreme Court's recent decision in *Badgerow v. Walters* 142 S. Ct. 1310, 1314, 1316-17 (2022) that district courts must have an independent federal basis for jurisdiction beyond the Federal Arbitration Act. *See e.g.*, ECF No. 36, at 14, n.5. Thus, Dramatic supported its "adequate representation" arguments with significant of Illinois authority.[6] In the end, the Court disagreed with Dramatic's and Atticus' mutual assumption that Illinois law applied, and applied federal common law instead, including *Taylor*. That Atticus itself assumed that Illinois law applied to the *res judicata* defense aptly demonstrates that Dramatic's assumption that Illinois law, and not federal law, applied was neither frivolous nor unreasonable.

---

[6] See ECF No. 47, at 7-8, citing *City of Chicago v. St. John's United Church of Christ*, 935 N.E.2d 1158, 1168 (Ill. App. 2010); *Chicago Title Land Trust Co. v. Potash Corp.*, 664 F.3d 1075, 1079 (7th Cir. 2011) and ECF No. 50 at 15-17, citing *Lutkauskas v. Ricker*, 28 N.E.3d 727, 739 (Ill. App. 2015), quoting People ex rel. *Burris v. Progressive Land Developers, Inc*, 602 N.E.2d 820, 825 (Ill. App. 1992); *Agolf, LLC v. Village of Arlington Heights*, 946 N.E.2d 1123, 1132-33 (Ill. App. 2011).

III.   **A FEE AWARD WOULD ADVANCE ONLY ATTICUS' INTERESTS, NOT THE PURPOSES OF THE COPYRIGHT ACT OR PUBLIC INTEREST**

It is ironic that Atticus claims to have "vindicated" the public's interest. ECF No. 96, at 13. The dispute among Dramatic, the Lee Estate, and Atticus originated when *Atticus*, in pursuit of its own interest, threatened legal action against Dramatic and its licensee, causing the shutdown or cancellation of multiple productions and an UK tour of *To Kill a Mockingbird*, depriving audiences of their ability to see the play. *See, e.g.*, ECF No. 37-6, Interim Award, pp. 72-80; ECF No. 78 at ¶ 4 and ECF No. 79 at ¶¶ 3-6 (Declarations of Kevin Tottis and Christopher Sergel III regarding threats received from Atticus). As Prof. McGrath explained in detail in his arbitral award, the arbitration largely arose because the Estate improperly "yielded to pressure from the Rudin interests to the detriment of Dramatic" and allowed Atticus to wrongfully threaten Dramatic's licensees with lawsuits based on the frivolous claim that "stock" theater rights did not include performances with professional actors.[7] ECF No. 37-6, Final Award, p. 5. Separate from the issue of exclusivity and termination, Dramatic was forced to spend three years litigating to protect the right to license professional non-first-class theater it had enjoyed for 40 years under its agreement with Harper Lee. And after Dramatic prevailed in the arbitration, ***not once*** did Dramatic threaten to shut down any potential Sorkin production. ECF No. 79, at ¶¶ 9-11. Atticus nevertheless decided to initiate this litigation, suing Dramatic, and now demanding that Dramatic pay its fees—all in a dispute that, ultimately, boils down to the scope of rights each party owns.

Atticus claims to be an advocate of authors for the benefit of the general public, but it is not the only author with an interest in this case. Dramatic's late president Christopher Sergel, Sr., was

---

[7] Dramatic is in the business of licensing "stock and amateur" rights and, presumably, has an understanding of the meaning of "stock." Moreover, as reflected in Prof. McGrath's lengthy discussion, during the five-week hearing not a single witness testified that "stock" excludes professional theater. ECF No. 37-6, Interim Award, pp. 9-43, 72-85.

the creator and author of the beloved theatrical version of *To Kill a Mockingbird* presented for decades in regional theaters, schools and other settings in the United States and throughout the world. Punishing one author's interest for the benefit of another in a dispute over the ownership of rights does not advance the purposes of the Copyright Act or the public at large.

## IV.    DRAMATIC REQUESTS DISMISSAL OR DEFERRAL OF THE FEE MOTION

Dramatic has filed a notice of appeal of the judgment in this case. ECF No. 102. The Second Circuit has approved three options for a district court considering a fees motion during the pendency of an appeal of the underlying merits: "If an appeal on the merits of the case is taken, the [district] court may rule on the claim for fees, may defer its ruling on the motion, or may deny the motion without prejudice, directing under subdivision (d)(2)(B) a new period for filing after the appeal has been resolved." Fed. R. Civ. P. 54(d), Notes of Advisory Committee on Rules – 1993 Amendment (cited by *Tancredi v. Metropolitan Life Ins. Co.,* 378 F.3d 220, 225-226 (2d Cir. 2004)). District courts in this circuit regularly defer ruling on fee motions while an appeal of the merits is pending. *See Apex Employee Wellness Servs., Inc., v. APS Healthcare Bethesda, Inc.,* No. 11-CV-9718, 2017 WL 456466, at *12 (S.D.N.Y., February 2, 2017). Dramatic respectfully requests that the Court deny with prejudice Atticus' motion for attorney's fees for the reasons set forth in its opposition. Alternatively, the Court should defer its ruling, or deny Atticus' motion without prejudice, during the pendency of Dramatic's appeal of the underlying merits issues.

## CONCLUSION

For the reasons set forth above, Dramatic requests that the Court deny, with prejudice, Atticus' motion for attorney's fees or, alternatively, defer ruling or deny the motion without prejudice pending resolution of the pending appeal.

Respectfully submitted,

Dated: September 8, 2023          TOTTISLAW

By: /s/ Kevin Tottis
    Kevin Tottis (*pro hac vice*)
    Keith Stolte (*pro hac vice*)
    Max A Stein (*pro hac vice*)
401 North Michigan Avenue, Suite 530
Chicago, Illinois 60611
Tel. + 1 312 527 1400
ktottis@tottislaw.com
kstolte@tottislaw.com
mstein@tottislaw.com

Stefan Mentzer
GOODWIN PROCTER LLP
The New York Times Building
620 Eighth Avenue
New York, New York 10018
Tel. + 1 212 813 8800
smentzer@goodwinlaw.com

David Blasband
MCLAUGHLIN & STERN, LLP
260 Madison Avenue
New York, New York 10016
Tel. + 1 212 447 1100
dblasband@mclaughlinstern.com

*Attorneys for Defendant*
*The Dramatic Publishing Company*